# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CANAL INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV NO.: 1:07-cv-410-MHT** |
| | ) | |
| **FRANK LADON COOK; et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## EVIDENTIARY SUBMISSIONS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**COMES NOW** the Defendant, and hereby files, contemporaneously herewith his Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment, this Evidentiary Submission in support of the same.

Exhibit "A" - Basic Automobile Liability Policy No. 470433

Exhibit "B" – Bill of Sale

Exhibit "C" – Deposition of Colbert Bryan McGriff, September 14, 2007

Exhibit "D" – Affidavit of Ray G. Helmer

Exhibit "E" – Deposition of Randy Lee Cook, November 8, 2006

Exhibit "F" – Deposition of David Brasher, November 8, 2006

Exhibit "G" – Deposition of Colbert Bryan McGriff, November 8, 2006

Respectfully submitted,

/s/ L. Andrew Hollis, Jr.
L. ANDREW HOLLIS, JR. (HOL-043)

**OF COUNSEL:**
**HOLLIS & WRIGHT, P.C.**
1500 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 324-3600
(205) 324-3636 Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the above and foregoing via the CM/ECF system, this the 23rd day of October, 2007, which will provide notice to the following:

K. Donald Simms
David R. Wells
Miller, Hamilton, Snider & Odom, L.L.C.
500 Financial Center
505 20th Street North
Birmingham, Alabama 35203

Samuel L. Adams, Esq.
Merrill, Harrison & Adams, LLC
Post Office Box 1690
Dothan, Alabama 36302

Rufus R. Smith, Esq.
Post Office Drawer 6629
Dothan, Alabama 36302-0000

/s/ L. Andrew Hollis, Jr.
OF COUNSEL

**BASIC AUTOMOBILE LIABILITY** ~~General Insurance Company~~ *Copy of Image*
BOX 7 - GREENVILLE, SOUTH CAROLINA 2~~~

**470433**

Duplicate policy certified by: _[signature]_ Chase C.P. Levy
Date: 7.22.07

| | | |
|---|---|---|
| Surcharge _____ | Class __Mobile Home T/T__ | Radius __300__ |

Consecutive Year
NEW

☒ SEE LIST FILING RECORD

Underwriter
STATE: 01
TERR.:

Insureds Phone: 3348862651
Insureds ID: 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

**ALPHA, PMT CARD, CHARGED**
**Nov 8, 2005  RDB**

4
7
0
4
3
3

Items
1. Named Insured and Address
COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS
1565 CO. RD. 73
SLOCOMB, AL 36375 [GENEVA county]

ALABAMA PUBLIC AUTO INS AGCY LIC#A043008
PO BOX 321215
BIRMINGHAM, AL 35232   (205) 324-0406

Agent Code   01008    Comm.
Follow-Up Record  Und Rept

2. Policy Period:
From  11/2/2005 UNTIL CANCELLED
12:01 A.M.,standard time at the address of the named insured as stated herein.

Business of the **named insured** is:  **MOBILE HOME PULLERS - MOBILE HOMES**
Radius:  **within 300 miles of the garage location.**

3. Schedule as of Effective Date of this Insurance - As To:  (a) Owned Automobiles;
Description:                    Purposes of Use (P&B=Pleasure and Business; C=Commercial)

| AUTO No. | Year of Model | Trade Name | Body Type and Model; Truck Size; Truck Load; Tank Gallonage Capacity; or Bus Seating Capacity | Identification (I) No.; Serial (S) No.; Motor (M) No. | Cylinders (No.) | Principally Garaged in (Town or City, State) | Purposes of Use | Classi-fication |
|---|---|---|---|---|---|---|---|---|
| 1 | 1988 IH TRACTOR | | | 1HSZDGEN7JH571292 | | SLOCOMB, AL | C | |
| 2 | ANY MOBILE HOME WHILE SINGULARLY ATTACHED TO A SCHEDULED TRACTOR | | | | | | | |

(b) Automobile Medical Payments Coverage:  Designated Person Insured

(c) Uninsured Motorists Coverage:  Designated Person Insured

**Designation of Automobiles - Division 1**
AUTO No. _____
**Insured Highway Vehicles**
AUTO No. _____

4.  The insurance afforded is only with respect to such and so many of the following coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage shall be as stated herein, subject to all the terms of this insurance having reference thereto.

| PREMIUMS | | | | | LIMIT OF LIABILITY | | COVERAGES | SEC-TION |
|---|---|---|---|---|---|---|---|---|
| Total | Auto No. 1 | Auto No. 2 | Auto No. 3 | Auto No. 4 | | | | |
| SEE E69L | | | | | | each occurrence $1,000,000 | Combined Single Limit | A |
| | | | | | each person | each occurrence | A.  Bodily Injury Liability | A |
| | | | | | | | B.  Property Damage Liability | |
| | | | | | | | Automobile Medical Payments | B |
| | | | | | each person $20,000 BI | each accident $40,000 BI | D.  Uninsured Motorists | C |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | Premium for Endorsements: | | | |
| | | | | | TOTAL PREMIUM | $3,931.00 | | |

Form numbers of endorsements attached to policy at issue:
TRN-1 (11-02) E-1  (12-91) E-69L (12-91) E-96 (7-91) E-4 (12-91) E-5 (12-91) E-18 (1-94) E-45 (12-91) E-70 AL (4-03) E-102 (11-93) E-125 (4-99)
Form F (6-71) A101, Info Notice: D-101 CL (1-03) ID-1 (9-03)

5.  Except with respect to bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance, the **named insured** is the sole owner of every vehicle described in Item 3 above, unless otherwise stated herein:

Countersigned:    PO BOX 321215
BIRMINGHAM, AL 35232  11/7/2005

By _Estelle E. Smith_
Authorized Representative
**ALABAMA PUBLIC AUTO INS AGCY LIC#A043008**

EXHIBIT 2

Home Office Copy

*Copy of Image*

0100615114

# BASIC AUTOMOBILE LIABILITY POLICY

STOCK COMPANY



*Canal Insurance Company*

P.O. Box 7 - Greenville, South Carolina - 29602-0007

## CANAL INSURANCE COMPANY
### GREENVILLE, SOUTH CAROLINA
(A stock insurance company, herein called the company)

In consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, agrees with the **named insured** as follows:

## SECTION A - BASIC AUTOMOBILE LIABILITY INSURANCE

### I.  COVERAGE A - BODILY INJURY LIABILITY -- COVERAGE B - PROPERTY DAMAGE LIABILITY:

The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

**bodily injury or property damage**

to which this insurance applies, caused by an **occurrence** and arising out of the ownership, maintenance or use, including loading and unloading, for the purposes stated as applicable thereto in the declarations, of an **owned automobile** or of a **temporary substitute automobile**, and the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

**Exclusions:**  This insurance does not apply:

(a) to liability assumed by the **insured** under any contract or agreement;

(b) to any obligation for which the **insured** or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(c) to **bodily injury** to any employee of the **insured** arising out of and in the course of his employment by the **insured** or to any obligation of the **insured** to indemnify another because of damages arising out of such injury; but this exclusion does not apply to any such injury arising out of and in the course of domestic employment by the **insured** unless benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law;

(d) to **property damage** to
  (1) property owned or being transported by the **insured**, or
  (2) property rented to or in the care, custody or control of the **insured**, or as to which the **insured** is for any purpose exercising physical control, other than **property damage** to a residence or private garage by a **private passenger automobile** covered by this insurance;

(e) to **bodily injury** or **property damage** due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to expenses for first aid under the Supplementary Payments provision;

(f) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of any **owned automobile** or **temporary substitute automobile** while such **automobile** is being used as a public or livery conveyance, unless such use is specifically declared and described in the declarations;

(g) to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

### II.  SUPPLEMENTARY PAYMENTS:  The company will pay, in addition to the applicable limit of liability:

(a) all expenses incurred by the company,  all costs taxed against the **insured** in any suit defended by the company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon;

(b) premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the **insured** because of accident or traffic law violation arising out of the use of any vehicle to which this policy applies, not to exceed $250 per bail bond, but the company shall have no obligation to apply for or to furnish any such bonds;

(c) expenses incurred by the **insured** for first aid to others at the time of an accident, for **bodily injury** to which this policy applies;

(d) reasonable expenses incurred by the **insured** at the company's request in assisting the company in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $25 per day.

**III. PERSONS INSURED:** Each of the following is an **insured** under this insurance to the extent set forth below:

(a) the **named insured**;

(b) any partner or executive officer thereof, but with respect to a **temporary substitute automobile** only while such **automobile** is being used in the business of the **named insured**;

(c) any other person while using an **owned automobile** or a **temporary substitute automobile** with the permission of the **named insured**, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, but with respect to **bodily injury** or **property damage** arising out of the loading or unloading thereof, such other person shall be an **insured** only if he is:

    (1) a lessee or borrower of the **automobile**, or

    (2) an employee of the **named insured** or of such lessee or borrower;

(d) any other person or organization but only with respect to his or its liability because of acts or omissions of an **insured** under (a), (b) or (c) above.

None of the following is an **insured**:

(i) any person while engaged in the business of his employer with respect to **bodily injury** to any fellow employee of such person injured in the course of his employment;

(ii) except as stated under (b) above, the owner of a **temporary substitute automobile**, or any agent or employee of such owner;

(iii) any person or organization, other than the **named insured**, with respect to:

    (1) a motor vehicle while used with any **trailer** owned or hired by such person or organization and not covered by like insurance in the company (except a **trailer** designed for use with a four wheel **private passenger automobile** and not being used for business purposes with another type motor vehicle), or

    (2) a **trailer** while used with any motor vehicle owned or hired by such person or organization and not covered by like insurance in the company;

(iv) any person while employed in or otherwise engaged in duties in connection with an **automobile business**, other than an **automobile business** operated by the **named insured**.

**IV. LIMITS OF LIABILITY:** Regardless of the number of (1) **insureds** under this policy, (2) persons or organizations who sustain **bodily injury** or **property damage**, (3) claims made or suits brought on account of **bodily injury** or **property damage** or (4) **automobiles** to which this policy applies, the company's liability is limited as follows:

**Coverage A -** The limit of **bodily injury** liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages, including damages for care and loss of services, because of **bodily injury** sustained by one person as the result of any one **occurrence**; but subject to the above provision respecting "each person", the total liability of the company for all damages, including damages for care and loss of services, because of **bodily injury** sustained by two or more persons as the result of any one **occurrence** shall not exceed the limit of **bodily injury** liability stated in the declarations as applicable to "each **occurrence**".

**Coverage B -** The total liability of the company for all damages because of all **property damage** sustained by one or more persons or organizations as the result of any one **occurrence** shall not exceed the limit of **property damage** liability stated in the declarations as applicable to "each **occurrence**".

**Coverages A and B -** For the purpose of determining the limit of the company's liability, all **bodily injury** and **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **occurrence**.

**V. POLICY TERRITORY:** This insurance applies only to **bodily injury** or **property damage** which occurs within the **policy territory**.

**VI. DEFINITIONS:** When used in this policy (including endorsements forming a part hereof):

**"automobile"** means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include **mobile equipment**;

**"bodily injury"** means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

**"insured"** means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each **insured** against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

**"mobile equipment"** means a land vehicle (including any machinery or apparatus attached thereto,) whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the **named insured**, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment;

**"named insured"** means the person or organization named in Item 1 of the declarations of this policy;

**"occurrence"** means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**;

**"policy territory"** means:
(1) the United States of America, its territories or possessions, or Canada, or
(2) international waters or air space, provided the **bodily injury** or **property damage** does not occur in the course of travel or transportation to or from any other country, state or nation;

**"property damage"** means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

**VII. ADDITIONAL DEFINITIONS (Automobile Liability Insurance):** When used in reference to this insurance (including endorsements forming a part of the policy):

**"automobile business"** means the business or occupation of selling, repairing, servicing, storing or parking **automobiles**;

**"owned automobile"** means either
(a) an **automobile** which is owned by the **named insured** and described in the declarations; or
(b) an **automobile** ownership of which is newly acquired by the **named insured** during the policy period, provided
  (i) it replaces an **owned automobile** as defined in (a) above, or
  (ii) the company insures all **automobiles** owned by the **named insured** on the date of such acquisition and the **named insured** notifies the company within 30 days thereafter of his election to make this and no other policy issued by the company applicable to such **automobile** and pays any additional premium required therefor;
and **"owned automobile"** includes a **trailer** not described in this policy, if designed for use with a four wheel **private passenger automobile** and if not being used for business purposes with another type **automobile**;

**"private passenger automobile"** means a private passenger or station wagon type **automobile** and any **automobile** the **purpose of use** of which is stated in the declarations as **pleasure and business**;

**"temporary substitute automobile"** means an **automobile** not owned by the **named insured** or any resident of the same household, while temporarily used with the permission of the owner as a substitute for an **owned automobile** when withdrawn from normal use for servicing or repair or because of its breakdown, loss or destruction;

**"trailer"** includes semi-trailer but does not include **mobile equipment**;

and as to **"purpose(s) of use"**:

**"commercial"** means use principally in the business occupation of the **named insured** as stated in the declarations including occasional use for personal, pleasure, family and other business purposes;

**"pleasure and business"** means personal, pleasure, family and business use.

**VIII. ADDITIONAL CONDITIONS:**

**A.    Other Insurance-Temporary Substitute and Newly Acquired Automobiles:** With respect to a **temporary substitute automobile**, this insurance shall be excess insurance over any other valid and collectible insurance available to the **insured**.
With respect to an **owned automobile** ownership of which is newly acquired by the **named insured** during the policy period and not described in the declarations, this insurance shall not apply if any other valid and collectible insurance is available to the **named insured**.

**B.    Out of State Insurance:** If, under the provisions of the motor vehicle financial responsibility law or the motor vehicle compulsory insurance law or any similar law of any state or province, a non-resident is required to maintain insurance with respect to the operation or use of a motor vehicle in such state or province and such insurance requirements are greater than the insurance provided by the policy, the limits of the company's liability and kinds of coverage afforded by the policy shall be as set forth in such law, in lieu of the insurance otherwise provided by the policy, but only to the extent required by such law and only with respect to the operation or use of a motor vehicle in such state or province; provided that the insurance under this provision shall be reduced to the extent that there is other valid and collectible insurance under this or any other motor vehicle insurance policy. In no event shall any person be entitled to receive duplicate payments for the same elements of loss.

## SECTION B - AUTOMOBILE MEDICAL PAYMENT INSURANCE

**I.  COVERAGE C - AUTOMOBILE MEDICAL PAY-MENTS:** The company will pay all reasonable **medical expense** incurred within one year from the date of the accident:

**Division 1.** to or for each person who sustains **bodily injury**, caused by accident, while **occupying** a **designated automobile** which is being used by a person for whom **bodily injury** liability insurance is afforded under this policy with respect to such use;

**Division 2.** to or for each **insured** who sustains **bodily injury**, caused by accident, while **occupying** or, while a pedestrian, through being struck by a **highway vehicle**.

**Exclusions:** This insurance does not apply:

(a) to **bodily injury** to any person or **insured** while employed or otherwise engaged in duties in connection with an **automobile business**, if benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law;

(b) to **bodily injury** due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing;

(c) under Division 1, to **bodily injury** to any employee of the **named insured** arising out of and in the course of employment by the **named insured**, but this exclusion does not apply to any such **bodily injury** arising out of and in the course of domestic employment by the **named insured** unless benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law;

(d) under Division 2, to **bodily injury** sustained while **occupying** a **highway vehicle** owned by any **insured**, or furnished for the regular use of any **insured** by any person or organization other than the **named insured**.

**II.  PERSONS INSURED - DIVISION 2:** Each of the following is an **insured** under this insurance to the extent set forth below:

(a) any person designated as **insured** in the schedule;

(b) while residents of the same household as such designated person, his spouse and the relatives of either;

and if such designated person shall die, any person who was an **insured** at the time of such death shall continue to be an **insured**.

**III.  LIMIT OF LIABILITY:** Regardless of the number of (1) persons or organizations who are **insureds** under this policy, (2) persons who sustain **bodily injury**, (3) claims made or suits brought on account of **bodily injury**, or (4) **designated automobiles** to which this policy applies, the limit of liability for medical payments stated in the declarations as applicable to "each person" is the limit of the company's liability for all expenses

incurred by or on behalf of each person who sustains **bodily injury** as the result of any one accident.

When more than one medical payments coverage afforded by this policy applies to the loss, the company shall not be liable for more than the amount of the highest applicable limit of liability.

**IV.  ADDITIONAL DEFINITIONS:** The additional definitions applicable to **automobile bodily injury** liability insurance also apply to this insurance; and when used in reference to this insurance (including endorsements forming a part of the policy):

**"designated automobile"** means an **automobile** designated in the schedule and includes:

(a) an **automobile** not owned by the **named insured** while temporarily used as a substitute for an **owned automobile** designated in the schedule when withdrawn from normal use for servicing or repair or because of its breakdown, loss or destruction; and

(b) a trailer designed for use with a **private passenger automobile**, if not being used for business purposes with another type **automobile** and if not a home, office, store, display or passenger trailer;

**"highway vehicle"** means a land motor vehicle or trailer other than

(a) a farm type tractor or other equipment designated for use principally off public roads, while not upon public roads;

(b) a vehicle operated on rails or crawler-treads, or

(c) a vehicle while located for use as a residence or premises;

**"medical expense"** means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services;

**"occupying"** means in or upon or entering into or alighting from.

**V.  POLICY PERIOD; TERRITORY:** This insurance applies only to accidents which occur during the policy period within the policy territory.

**VI.  ADDITIONAL CONDITIONS:**

**A.  Medical Reports; Proof and Payment of Claim:** As soon as practicable the injured person or someone on his behalf shall give to the company written proof of claim, under oath if required, and shall, after each request from the company, execute authorization to enable the company to obtain medical reports and copies of records. The injured person shall submit to physical examination by physicians selected by the company when and as often as the company may reasonably require. The company may pay the injured person or any person or organization rendering the services and such payment shall reduce the amount payable hereunder for such injury. Payment hereunder

shall not constitute an admission of liability of any person or, except hereunder, of the company.

**B. Excess Insurance**:  Except with respect to an **owned automobile**, the insurance under Division 1 shall be excess insurance over any other valid and collectible automobile medical payments or automobile **medical expense** insurance.

The insurance under Division 2 shall be excess insurance over any other valid and collectible automobile medical payments or automobile **medical expense** insurance available to the **insured** under any other policy.

**C. Non-Applicability of Subrogation Condition:** The Subrogation Condition does not apply to the Automobile Medical Payments Coverage.

## SECTION C - UNINSURED MOTORISTS INSURANCE

**I.  COVERAGE D - UNINSURED MOTORIST (Damages for Bodily Injury):** The company will pay all sums which the **insured** or his legal representative shall be legally entitled to recover as damages from the owner or operator of an **uninsured highway vehicle** because of **bodily injury** sustained by the **insured**, caused by accident and arising out of the ownership, maintenance or use of such **uninsured highway vehicle**; provided, for the purposes of this coverage, determination as to whether the **insured** or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the **insured** or such representative and the company or, if they fail to agree, by arbitration.

No judgment against any person or organization alleged to be legally responsible for the **bodily injury** shall be conclusive, as between the **insured** and the company, of the issues of liability of such person or organization or of the amount of damages to which the **insured** is legally entitled unless such judgment is entered pursuant to an action prosecuted by the **insured** with the written consent of the company.

**Exclusions:**  This insurance does not apply:

(a)  to **bodily injury** to an **insured** with respect to which such **insured**, his legal representative or any person entitled to payment under this insurance shall, without written consent of the company, make any settlement with any person or organization who may be legally liable therefor;

(b)  to **bodily injury** to an **insured** while **occupying** a **highway vehicle** (other than an **insured highway vehicle**) owned by the **named insured**, any **designated insured** or any relative resident in the same household as the **named** or **designated insured**, or through being struck by such a vehicle, but this exclusion does not apply to the **named insured** or his relatives while **occupying** or if struck by a **highway vehicle** owned by a **designated insured** or his relatives;

(c)  so as to inure directly or indirectly to the benefit of any workmen's compensation or disability benefits carrier or any person or organization qualifying as a self-insurer under any workmen's compensation or disability benefits law or any similar law.

**II.  PERSONS INSURED:** Each of the following is an **insured** under this insurance to the extent set forth below:

(a)  the **named insured** and any **designated insured** and, while residents of the same household, the spouse and relatives of either;

(b)  any other person while **occupying** an **insured highway vehicle**; and

(c)  any person, with respect to damages he is entitled to recover because of **bodily injury** to which this insurance applies sustained by an **insured** under (a) or (b) above.

The insurance applies separately with respect to each **insured**, except with respect to the limits of the company's liability.

**III.  LIMITS OF LIABILITY :**  Regardless of the number of (1) persons or organizations who are **insureds** under this policy, (2) persons who sustain **bodily injury**, (3) claims made or suits brought on account of **bodily injury**, or (4) **highway vehicles** to which this policy applies,

(a)  The limit of liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages because of **bodily injury** sustained by one person as the result of any one accident and, subject to the above provision respecting "each person" the limit of liability stated in the declarations as applicable to "each accident" is the total limit of the company's liability for all damages because of **bodily injury** sustained by two or more persons as the result of any one accident.

(b)  Any amount payable under the terms of this insurance because of **bodily injury** sustained in an accident by a person who is an **insured** under this coverage shall be reduced by

(1) all sums paid on account of such **bodily injury** by or on behalf of

(i)  the owner or operator of the **uninsured highway vehicle** and

(ii)  any other person or organization jointly or severally liable together with such owner or operator for such **bodily injury**,

including all sums paid under the **bodily injury** liability coverage of the policy, and

(2) the amount paid and the present value of all amounts payable on account of such **bodily**

**injury** under any workmen's compensation law, disability benefits law or any similar law.

(c) Any payment made under this insurance to or for any **insured** shall be applied in reduction of the amount of damages which he may be entitled to recover from any person or organization who is an **insured** under the **bodily injury** liability coverage of the policy.

(d) The company shall not be obligated to pay under this insurance that part of the damages which the **insured** may be entitled to recover from the owner or operator of an **uninsured highway vehicle** which represents expenses for medical services paid or payable under the medical payments coverage of the policy.

**IV. POLICY PERIOD; TERRITORY**: This insurance applies only to accidents which occur during the policy period and within the United States of America, its territories or possessions, or Canada.

**V. ADDITIONAL DEFINITIONS**: When used in reference to this insurance (including endorsements forming a part of the policy):

"**designated insured**" means an individual named in the schedule under **Designated Insured**;

"**highway vehicle**" means a land motor vehicle or trailer other than

(a) a farm type tractor or other equipment designed for use principally off public roads, while not upon public roads,

(b) a vehicle operated on rails or crawler-treads, or

(c) a vehicle while located for use as a residence or premises;

"**hit-and-run vehicle**" means a **highway vehicle** which causes **bodily injury** to an **insured** arising out of physical contact of such vehicle with the **insured** or with a vehicle which the **insured** is **occupying** at the time of the accident, provided:

(a) there cannot be ascertained the identity of either the operator or owner of such **highway vehicle**;

(b) the **insured** or someone on his behalf shall have reported the accident within 24 hours to a police, peace or judicial officer or to the Commissioner of Motor Vehicles, and shall have filed with the company within 30 days thereafter a statement under oath that the **insured** or his legal representative has a cause or causes of action arising out of such accident for damages against a person or persons whose identity is unascertainable, and setting forth the facts in support thereof; and

(c) at the company's request, the **insured** or his legal representative makes available for inspection the vehicle which the **insured** was **occupying** at the time of the accident;

"**insured highway vehicle**" means a **highway vehicle**:

(a) described in the schedule as an **insured highway vehicle** to which the **bodily injury** liability coverage of the policy applies;

(b) while temporarily used as a substitute for an **insured highway vehicle** as described in subparagraph (a) above, when withdrawn from

normal use because of its breakdown, repair, servicing, loss or destruction;

(c) while being operated by the **named** or **designated insured** or by the spouse of either if a resident of the same household;

but the term "**insured highway vehicle**" shall not include:

(i) a vehicle while used as a public or livery conveyance, unless such use is specifically declared and described in this policy;

(ii) a vehicle while being used without the permission of the owner;

(iii) under subparagraphs (b) and (c) above, a vehicle owned by the **named insured**, any **designated insured** or any resident of the same household as the **named** or **designated insured**; or

(iv) under subparagraphs (b) and (c) above, a vehicle furnished for the regular use of the **named insured** or any resident of the same household;

"**occupying**" means in or upon or entering into or alighting from;

"**state**" includes the District of Columbia, a territory or possession of the United States, and a province of Canada;

"**uninsured highway vehicle**" means:

(a) a **highway vehicle** with respect to the ownership, maintenance or use of which there is, in at least the amounts specified by the financial responsibility law of the **state** in which the **insured highway vehicle** is principally garaged, no **bodily injury** liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such vehicle, or with respect to which there is a **bodily injury** liability bond or insurance policy applicable at the time of the accident but the company writing the same denies coverage thereunder or is or becomes insolvent; or

(b) a **hit-and-run vehicle**;

but the term "**uninsured highway vehicle**" shall not include:

(i) an **insured highway vehicle**,

(ii) a **highway vehicle** which is owned or operated by a self-insurer within the meaning of any motor vehicle financial responsibility law, motor carrier law or any similar law,

(iii) a **highway vehicle** which is owned by the United States of America, Canada, a **state**, a political subdivision of any such government or an agency of any of the foregoing.

**VI. ADDITIONAL CONDITIONS:**

**A. Premium**: If during the policy period the number of **insured highway vehicles** owned by the **named insured** or spouse or the number of dealer's license plates issued to the **named insured** changes, the **named insured** shall notify the company during the policy period of any change and the premium shall be adjusted in accordance with the manuals in use by the company. If the earned premium thus computed exceeds the advance premium paid, the **named insured** shall pay the excess to the company; if less, the company shall return to the **named insured** the unearned portion paid by such **insured**.

**B. Proof of Claim; Medical Reports:** As soon as practicable, the **insured** or other person making claim shall give to the company written proof of claim, under oath if required, including full particulars of the nature and extent of the injuries, treatment, and other details entering into the determination of the amount payable hereunder. The **insured** and every other person making claim hereunder shall submit to examinations under oath by any person named by the company and subscribe the same, as often as may reasonably be required. Proof of claim shall be made upon forms furnished by the company unless the company shall have failed to furnish such forms within 15 days after receiving notice of claim.

The injured person shall submit to physical examinations by physicians selected by the company when and as often as the company may reasonably require and he, or in the event of his incapacity his legal representative, or in the event of his death his legal representative or the person or persons entitled to sue therefor, shall upon each request from the company execute authorization to enable the company to obtain medical reports and copies of records.

**C. Assistance and Cooperation of the Insured:** After notice of claim under this insurance, the company may require the **insured** to take such action as may be necessary or appropriate to preserve his right to recover damages from any person or organization alleged to be legally responsible for the **bodily injury**; and in any action against the company, the company may require the **insured** to join such person or organization as a party defendant.

**D. Notice of Legal Action:** If, before the company makes payment of loss hereunder, the **insured** or his legal representative shall institute any legal action for **bodily injury** against any person or organization legally responsible for the use of a **highway vehicle** involved in the accident, a copy of the summons and complaint or other process served in connection with such legal action shall be forwarded immediately to the company by the **insured** or his legal representative.

**E. Other Insurance:** With respect to **bodily injury** to an **insured** while **occupying** a **highway vehicle** not owned by the **named insured**, this insurance shall apply only as excess insurance over any other similar insurance available to such **insured** and applicable to such vehicle as primary insurance, and this insurance shall then apply only in the amount by which the limit of liability of this coverage exceeds the applicable limit of liability of such other insurance.

Except as provided in the foregoing paragraph, if the **insured** has other similar insurance available to him and applicable to the accident, the damages shall be deemed not to exceed the higher of the applicable limits of liability of this insurance and such other insurance, and the company shall not be liable for a greater proportion of any loss to which this coverage applies than the limit of liability hereunder bears to the sum of the applicable limits of liability of this insurance and such other insurance.

**F. Arbitration:** If any person making claim hereunder and the company do not agree that such person is legally entitled to recover damages from the owner or operator of an **uninsured highway vehicle** because of **bodily injury** to the **insured**, or do not agree as to the amount of payment which may be owing under this insurance, then, upon written demand of either, the matter or matters upon which such person and the company do not agree shall be settled by arbitration, which shall be conducted in accordance with the rules of the American Arbitration Association unless other means of conducting the arbitration are agreed to between the **insured** and the company, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Such person and the company each agree to consider itself bound and to be bound by any award made by the arbitrators pursuant to this insurance.

**G. Trust Agreement:** In the event of payment to any person under this insurance:

(a) the company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against any person or organization legally responsible for the **bodily injury** because of which such payment is made;

(b) such person shall hold in trust for the benefit of the company all rights of recovery which he shall have against such other person or organization because of the damages which are the subject of claim made under this insurance;

(c) such person shall do whatever is proper to secure and shall do nothing after loss to prejudice such rights;

(d) if requested in writing by the company, such person shall take, through any representative designated by the company, such action as may be necessary or appropriate to recover such payment as damages from such other person or organization, such action to be taken in the name of such person; in the event of a recovery, the company shall be reimbursed out of such recovery for expenses, costs and attorneys' fees incurred by it in connection therewith;

(e) such person shall execute and deliver to the company such instruments and papers as may be appropriate to secure the rights and obligations of such person and the company established by this provision.

**H. Payment of Loss by the Company:** Any amount due hereunder is payable:

(a) to the **insured**, or

(b) if the **insured** be a minor to his parent or guardian, or

(c) if the **insured** be deceased to his surviving spouse, otherwise

(d) to a person authorized by law to receive such payment or to a person legally entitled to recover the damages which the payment represents;

provided, the company may at its option pay any amount due hereunder in accordance with division (d) hereof.

## CONDITIONS

**1. Premium:** All premiums for this policy shall be computed in accordance with the company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

Premium designated in this policy as "advance premium" is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. At the close of each period (or part thereof terminating with the end of the policy period) designated in the declarations as the audit period the earned premium shall be computed for such period and, upon notice thereof to the **named insured**, shall become due and payable. If the total earned premium for the policy period is less than the premium previously paid, the company shall return to the **named insured** the unearned portion paid by the **named insured**.

The **named insured** shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to the company at the end of the policy period and at such times during the policy period as the company may direct.

**2. Inspection and Audit:** The company shall be permitted but not obligated to inspect the **named insured's** property and operations at any time. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the **named insured** or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

The company may examine and audit the **named insured's** books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

**3. Financial Responsibility Laws:** When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for **bodily injury** liability or for **property damage** liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The **insured** agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**4. Insured's Duties in the Event of Occurrence, Claim or Suit:**

(a) In the event of an **occurrence**, written notice containing particulars sufficient to identify the **insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the **insured** to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the **insured**, the **insured** shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The **insured** shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **insured** because of injury or damage with respect to which insurance is afforded under this policy; and the **insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **insured** shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

**5. Action Against Company:** No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **insured's** obligation to pay shall have been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured**, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the company as a party to any action against the **insured** or determine the **insured's** liability, nor shall the company be impleaded by the **insured** or his legal representative. Bankruptcy or insolvency of the **insured** or of the **insured's** estate shall not relieve the company of any of its obligations hereunder.

**6. Other Insurance:** The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the **insured** has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable

under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) **Contribution by Equal Shares.** If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) **Contribution by Limits**. If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

**7. Subrogation:** In the event of any payment under this policy, the company shall be subrogated to all the **insured's** rights of recovery therefor against any person or organization and the **insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **insured** shall do nothing after loss to prejudice such rights.

**8. Changes:** Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

**9. Assignment:** Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon; if, however, the **named insured** shall die, such insurance as is afforded by this policy shall apply (1) to the **named insured's** legal representative, as the **named insured**, but only while acting within the scope of his duties as such, and (2) with respect to the property of the **named insured**, to the person having proper temporary custody thereof, as **insured**, but only until the appointment and qualification of the legal representative.

**10. Cancellation:** This policy may be cancelled by the **named insured** by surrender thereof to the company or any of its authorized agents or by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the company by mailing to the **named insured** at the address shown in this policy, written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the **named insured** or by the company shall be equivalent to mailing.

If the **named insured** cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

**11. Declarations:** By acceptance of this policy, the **named insured** agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

**In Witness Whereof,** the company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the company.

*Secretary*

*President*

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM)

This endorsement modifies the provisions of this policy relating to **ALL AUTOMOBILE LIABILITY AND MEDICAL PAYMENTS INSURANCE.**

It is agreed that:

I.   This policy does not apply:

A.  Under any Liability Coverage, to **bodily injury** or **property damage**

(1) with respect to which an **insured** under this policy is also an **insured** under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an **insured** under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the **hazardous properties** of **nuclear material** and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B.  Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to **bodily injury** resulting from the **hazardous properties** of **nuclear material** and arising out of the operation of a **nuclear facility** by any person or organization.

C.  Under any Liability Coverage, to **bodily injury** or **property damage** resulting from the **hazardous properties** of **nuclear material**, if

(1) the **nuclear material** (a) is at any **nuclear facility** owned by, or operated by or on behalf of, an **insured** or (b) has been discharged or dispersed therefrom;

(2) the **nuclear material** is contained in **spent fuel** or **waste** at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **insured;** or

(3) the **bodily injury** or **property damage** arises out of the furnishing by an **insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility,** but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to **property damage** to such **nuclear facility** and any property thereat.

II.  As used in this endorsement:

**"hazardous properties"** include radioactive, toxic or explosive properties;

**"nuclear material"** means **source material, special nuclear material** or **byproduct material;**

**"source material," "special nuclear material"**, and **"byproduct material"** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**"spent fuel"** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **nuclear reactor;**

**"waste"** means any waste material (1) containing **byproduct material** and (2) resulting from the operation by any person or organization of any **nuclear facility** included within the definition of **nuclear facility** under paragraph (a) or (b) thereof;

**"nuclear facility"** means

(a) any **nuclear reactor,**

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing **spent fuel,** or (3) handling, processing or packaging **waste,**

(c) any equipment or device used for the processing, fabricating or alloying of **special nuclear material** if at any time the total amount of such material in the custody of the **insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of **waste,**

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**"nuclear reactor"** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**"property damage"** includes all forms of radioactive contamination of property.

**NEW YORK EXCEPTION:** The "Nuclear Energy Liability Exclusion Endorsement (Broad Form)" does not apply to Automobile Liability Insurance in New York.

# BASIC AUTOMOBILE LIABILITY POLICY

STOCK COMPANY



*Canal Insurance Company*

P.O. Box 7 - Greenville, South Carolina - 29602-0007

## SHORT RATE CANCELLATION TABLE FOR ONE YEAR POLICIES

| Days Policy in Force | Per Cent of One Year Premium | Days Policy in Force | Per Cent of One Year Premium | Days Policy in Force | Per Cent of One Year Premium | Days Policy in Force | Per Cent of One Year Premium | Days Policy in Force | Per Cent of One Year Premium | Days Policy in Force | Per Cent of One Year Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5 | 37-40 | 21 | 95-98 | 37 | 154-156 | 53 | 219-223 | 69 | 292-296 | 85 |
| 2 | 6 | 41-43 | 22 | 99-102 | 38 | 157-160 | 54 | 224-228 | 70 | 297-301 | 86 |
| 3-4 | 7 | 44-47 | 23 | 103-105 | 39 | 161-164 | 55 | 229-232 | 71 | 302-305 (10 mos.) | 87 |
| 5-6 | 8 | 48-51 | 24 | 106-109 | 40 | 165-167 | 56 | 233-237 | 72 | 306-310 | 88 |
| 7-8 | 9 | 52-54 | 25 | 110-113 | 41 | 168-171 | 57 | 238-241 | 73 | 311-314 | 89 |
| 9-10 | 10 | 55-58 | 26 | 114-116 | 42 | 172-175 | 58 | 242-246 (8 mos.) | 74 | 315-319 | 90 |
| 11-12 | 11 | 59-62 (2 mos.) | 27 | 117-120 | 43 | 176-178 | 59 | 247-250 | 75 | 320-323 | 91 |
| 13-14 | 12 | 63-65 | 28 | 121-124 (4 mos.) | 44 | 179-182 (6 mos.) | 60 | 251-255 | 76 | 324-328 | 92 |
| 15-16 | 13 | 66-69 | 29 | 125-127 | 45 | 183-187 | 61 | 256-260 | 77 | 329-332 | 93 |
| 17-18 | 14 | 70-73 | 30 | 128-131 | 46 | 188-191 | 62 | 261-264 | 78 | 333-337 (11 mos.) | 94 |
| 19-20 | 15 | 74-76 | 31 | 132-135 | 47 | 192-196 | 63 | 265-269 | 79 | 338-342 | 95 |
| 21-22 | 16 | 77-80 | 32 | 136-138 | 48 | 197-200 | 64 | 270-273 (9mos.) | 80 | 343-346 | 96 |
| 23-25 | 17 | 81-83 | 33 | 139-142 | 49 | 201-205 | 65 | 274-278 | 81 | 347-351 | 97 |
| 26-29 | 18 | 84-87 | 34 | 143-146 | 50 | 206-209 | 66 | 279-282 | 82 | 352-355 | 98 |
| 30-32 (1 mo.) | 19 | 88-91 (3 mos.) | 35 | 147-149 | 51 | 210-214 (7 mos.) | 67 | 283-287 | 83 | 356-360 | 99 |
| 33-36 | 20 | 92-94 | 36 | 150-153 (5 mos.) | 52 | 215-218 | 68 | 288-291 | 84 | 361-365 (12 mos.) | 100 |

Copy of Image

**CANAL**
G R O U P

### POLICYHOLDER DISCLOSURE
### NOTICE OF TERRORISM
### INSURANCE COVERAGE

Coverage for acts of terrorism is included in your policy. Effective November 26, 2002, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States--to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is:  **$ waived** .

Form TRN-1

Copy of Image

(Rev. 11-2002)

0100815114

Copy of Image

# ENDORSEMENT

## GENERAL CHANGE

IT IS UNDERSTOOD AND AGREED THAT THE FORM UM-101 AL REV. 10-2004 IS ADDED AS PART OF THIS POLICY.

Policy Number __470433__ Endorsement Effective Time 12:01 AM _____ Endorsement Effective Date __11/02/2005__

Insured __COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS__ Expiration Date __Until Cancelled__

Issue Date __11/07/2005__ Authorized Signature __ALABAMA PUBLIC AUTO INS AGCY LIC#A043008__

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
## Canal Insurance Company
Greenville, South Carolina

Form E-1                                                                                (Rev. 12-1991)

Copy of Image

0100815114

## Schedule of Equipment                    Liability

| Vehicle # | Year/Trade Name/Model/Body Type | Radius (miles) | Garage Location | Premium |
|---|---|---|---|---|
|  | Motor Vehicle Identification #(VIN) |  |  | Monthly Prem. |
| 1 | 1988 IH TRACTOR<br>1HSZDGEN7JH571292 | 300 | SLOCOMB, AL | $3,931.00<br>$328.00 |
| 2 | ANY MOBILE HOME WHILE SINGULARLY ATTACHED TO A SCHEDULED TRACTOR |  |  | INCLUDED |

Policy Number ___470433___ Endorsement Effective Time 12:01 AM _____ Endorsement Effective Date _11/02/2005_

Insured _COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS_ Expiration Date _Until Cancelled_

Issue Date __11/07/2005_ Authorized Signature _____ALABAMA PUBLIC AUTO INS AGCY LIC#A043008____

### ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
## Canal Insurance Company
Greenville, South Carolina

Form E-69L                                          (Rev. 12-1991)

0100815114

Copy of Image

# ENDORSEMENT

## GENERAL CHANGE

IT IS UNDERSTOOD AND AGREED THAT, FOR THE VEHICLE SHOWN ON THE ATTACHED E-69 SCHEDULE OF EQUIPMENT:

*THE VIN IS AMENDED FOR VEHICLE 1, AS PER E-69L, COPY ATTACHED.

Policy Number __470433__ Endorsement Effective Time 12:01 AM _____ Endorsement Effective Date __11/14/2005__

Insured __COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS__ Expiration Date __Until Cancelled__

Issue Date __11/16/2005__ Authorized Signature _____
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED**

## Canal Insurance Company

Greenville, South Carolina

Form E-1

Copy of Image

(Rev. 12-1991)

0100815207

# Schedule of Equipment          Liability

| Vehicle # | Year/Trade Name/Model/Body Type | Radius (miles) | Garage Location | Premium |
|---|---|---|---|---|
|  | Motor Vehicle Identification #(VIN) |  |  | Monthly Prem. |
| 1 | 1988 IH TRACTOR<br>1HSZDGFN7JH571292 | 300 | SLOCOMB, AL | $3,931.00<br>$328.00 |

Policy Number __470433__  Endorsement Effective Time 12:01 AM _____  Endorsement Effective Date __11/14/2005__

Insured __COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS_____  Expiration Date __Until Cancelled__

Issue Date __11/16/2005__ Authorized Signature _____
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

# Canal Insurance Company

Greenville, South Carolina

Form E-69L                                                                 (Rev. 12-1991)



0100815207

Copy of Image

# ENDORSEMENT

## MONTHLY PREMIUM ENDORSEMENT

It is agreed that this insurance shall take effect as of the date and time shown in Item 2 of the Declarations and continue in full force and effect as long as the monthly premium shown below is paid on or before each monthly due date.

$ __3,931.00__ - Annual Premium Rate

$ __328.00__ - Monthly Premium

__12/1/2005__ - Due date of first monthly premium; subsequent payments due on the

__1st__ of each month.

$ __656.00__ - Deposit

$ __317.00__ - Partial Month Premium from inception to first installment

To guarantee the payment of earned premium under this policy, the named Insured hereby agrees to deposit with the Company the above deposit amount, which the Company agrees to hold in a special escrow account until this policy is terminated as provided herein or in the policy conditions. Upon termination of this policy, the Company will refund to the named Insured the entire amount of such escrow deposit, less only such part thereof as may be necessary to complete the payment of any previously unpaid earned premium under the policy. No part of this escrow deposit shall be considered as policy premium except such part as may actually be applied by the Company to the payment of earned premium as herein before specified and provided.

In event this policy is cancelled short rate as provided in the Cancellation condition of the policy, the basis used for the calculation of the short rate earned premium shall be the full annual premium from which the monthly premium for this policy has been determined.

And it is further agreed that the conditions of this policy are hereby amended to provide that failure on the part of the assured to make any monthly payment on or before due dates above set forth will constitute request on his part for cancellation and cancellation will be effected on the customary short rate basis by the mailing of cancellation notice. In the event cancellation notice is mailed for non-payment of premium, such notice, at the option of the Company, may be rescinded if past due premium plus $3.00 rescinder fee is received at Home Office of Company on or before effective date of cancellation.

Policy Number __470433__ Endorsement Effective Time 12:01 AM _____ Endorsement Effective Date __11/02/2005__

Insured __COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS__ Expiration Date __Until Cancelled__

Issue Date __11/07/2005__ Authorized Signature __ALABAMA PUBLIC AUTO INS AGCY LIC#A043008__

### ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
# Canal Insurance Company

Greenville, South Carolina

Form E-96    (Rev. 7-1991)

0100615114

Copy of Image

# ENDORSEMENT

## OCCUPANT HAZARD EXCLUDED

It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability does not apply to Bodily Injury including death at any time resulting therefrom, sustained by any person while in or upon, entering or alighting from the automobile.

It is further agreed that, in the event the company shall, because of provision of the Federal or State statutes become obligated to pay any sum or sums of money because of such bodily injury or death resulting therefrom, the insured agrees to reimburse the company for any and all loss, costs and expenses paid or incurred by the company.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED** - This endorsement is effective the same date and hour as shown in Item 2 of the Policy Declarations and forms a part of the policy to which it is attached.

## Canal Insurance Company

Greenville, South Carolina

Copy of Image

Form E-4

(Rev. 12-1991)

0100815114

Copy of Image
# ENDORSEMENT

## LIMITATION OF USE

In consideration of the premium charged for policy to which this endorsement is attached, it is understood and agreed that insurance applies only while the respective vehicles are operated within the radius indicated for each vehicle.

| Vehicle Number | Garage Location | Radius in Miles |
|---|---|---|
| 1 - IH TRACTOR | SLOCOMB, AL | 300 |
| 2 - ANY MOBILE HOME WHILE SINGULARLY ATTACHED TO A SCHEDULED TRACTOR | | |

It is further agreed that the radius is measured from the garage location indicated on this endorsement for each vehicle and that no vehicle is covered if operated beyond its radius, whether as a substitute vehicle for another vehicle described in this policy or otherwise. It is expressly understood and agreed that occasional trips beyond the radius specified are not permitted.

Policy Number __470433__ Endorsement Effective Time 12:01 AM _____ Endorsement Effective Date __11/02/2005__

Insured __COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS_____ Expiration Date __Until Cancelled__

Issue Date __11/07/2005__ Authorized Signature _____ __ALABAMA PUBLIC AUTO INS AGCY LIC#A043008_____

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
# Canal Insurance Company
Greenville, South Carolina

Copy of Image

Form E-5

(Rev. 12-1991)

010081511

Copy of Image

# ENDORSEMENT

## ERRONEOUS DELIVERY OF LIQUID PRODUCTS

It is agreed that the insurance with respect to any **automobile** does not apply to **bodily injury** or **property damage** arising out of the delivery of any liquid product into a wrong receptacle or to a wrong address or the erroneous delivery of one liquid product for another, if the **bodily injury** or **property damage** occurs after such operations have been completed or abandoned at the site of such delivery. Operations which may require further service or maintenance work, or correction, repair or replacement because of performance at the wrong address or because of any error, defect or deficiency, but which are otherwise complete, shall be deemed completed.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED** - This endorsement is effective the same date and hour as shown in Item 2 of the Policy Declarations and forms a part of the policy to which it is attached.

# Canal Insurance Company

Greenville, South Carolina

Form E-18

Copy of Image

(Rev. 1-1994)

0100815114

Copy of Image

# ENDORSEMENT

## TRUCKMAN'S ENDORSEMENT

In consideration of the premium charged for the policy to which this endorsement is attached, it is understood and agreed that no coverage is extended to any person, firm or organization using the described automobile pursuant to any lease, contract of hire, bailment, rental agreement, or any similar contract or agreement either written or oral, expressed or implied, the terms and provisions of the Insuring Agreement III of Section A, entitled "Persons Insured" notwithstanding.

In the event the automobile described in this policy is being used or maintained pursuant to any lease, contract of hire, bailment, rental agreement or any similar contract or agreement, either written or oral, expressed or implied, the insurance afforded the named insured shall be excess insurance over any other insurance.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED** - This endorsement is effective the same date and hour as shown in Item 2 of the Policy Declarations and forms a part of the policy to which it is attached.

## Canal Insurance Company

Greenville, South Carolina

Form E-45

Copy of Image

(Rev. 12-1991)

0100815114

Copy of Image

**CANAL**
INSURANCE COMPANY

# AMENDATORY ENDORSEMENT - ALABAMA

SECTION C - UNINSURED MOTORISTS INSURANCE in the Basic Automobile Liability Policy is replaced with the following:

## SECTION C - UNINSURED MOTORISTS INSURANCE

I.  **COVERAGE D - UNINSURED MOTORISTS (Damages for Bodily Injury):** The company will pay all sums which the insured or the insured's legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured highway vehicle because of bodily injury sustained by the insured, caused by accident arising out of the ownership, maintenance, or use of such uninsured highway vehicle; provided, for the purposes of this coverage, determination as to whether the insured or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured or such representative and the company or, if they fail to agree, by arbitration if mutually agreed upon by both parties.

No judgment against any person or organization alleged to be legally responsible for the bodily injury shall be conclusive, as between the insured and the company, of the issues of liability of such person or organization or of the amount of damages to which the insured is legally entitled unless such judgement is entered pursuant to an action prosecuted by the insured with the written consent of the company and the company has:
(a) Received reasonable notice of the pendency of the suit resulting in the judgment; and
(b) Had a reasonable opportunity to protect our interest in the suit.
However, if reasonable notice has not been given to the company, the company has the option to accept the judgment in the suit as binding on the company.

Exclusions: This insurance does not apply:
(a) To bodily injury to an insured with respect to which such insured, his legal representative or any person entitled to payment under this insurance shall, without written consent of the company, make any settlement with any person or organization who may be legally liable therefor; however, this Exclusion does not apply to an underinsured highway vehicle;
(b) So as to inure directly or indirectly to the benefit of any workers' compensation or disability benefits carrier or any person or organization qualifying as a self-insurer under any workers' compensation or disability benefits law or any similar law.
(c) To any insured using a vehicle without a reasonable belief that person is entitled to do so.

II. **PERSONS INSURED:** If the named insured is designated in the Declarations as:
(a) An individual, then the following are insureds:
(i) The named insured and any family members.
(ii) Anyone else occupying an insured highway vehicle or a temporary substitute for an insured highway vehicle. The insured highway vehicle must be out of service because of its breakdown, repair, servicing, loss or destruction.
(iii) Anyone for damages he or she is entitled to recover because of bodily injury sustained by another insured.

(b) A partnership, limited liability company, corporation, an insured doing business as a commercial enterprise, or any other form of organization, then the following are insureds:
(i) Anyone occupying an insured highway vehicle or temporary substitute for an insured highway vehicle. The insured highway vehicle must be out of service because of its breakdown, repair, servicing, loss or destruction.
(ii) Anyone for damages he or she is entitled to recover because of bodily injury sustained by another insured.
The insurance applies separately with respect to each insured, except with respect to the limits of the company's liability.

III. **LIMITS OF LIABILITY:** Regardless of the number of insured highway vehicles, insureds, premiums paid, claims made or vehicles involved in the accident, the limit of insurance is as follows:
(a) The most the company will pay for all damages resulting from bodily injury to any one person caused by any one accident, including all damages claimed by any person or organization for care, loss of services or death resulting from the bodily injury, is the limit of uninsured motorists (BI) shown in the Declarations for each person. If there is more than one insured highway vehicle, the Company's limit of insurance for any one accident is the sum of the limits applicable to each insured highway vehicle, subject to a maximum of three insured highway vehicles.
(b) Subject to the limit for each person, the most the company will pay for all damages resulting from bodily injury caused by any one accident, is the limit of uninsured motorists (BI) shown in the Declarations for each accident.
(c) If coverage for bodily injury is provided on a combined single limit basis, the most the company will pay for all damages resulting from any one accident is the uninsured motorists (CSL) shown on the Declarations subject to affording split limits as required by law.
(d) No one will be entitled to receive duplicate payments for the same elements of loss under this endorsement, any Liability Coverage policy, or any Medical Payments Coverage endorsement.
(e) The company will not make a duplicate payment for any element of loss for which payment has been made by or for anyone who is legally responsible.
(f) The company will not pay for any element of loss if a person is entitled to receive payment for the same element of loss under any workers' compensation law, disability benefits, or similar law.
(g) We will reduce the insured's total damages by any amount available to that insured, under any bodily injury liability bonds or policies applicable to an underinsured motor vehicle, that such insured did not recover as a result of a settlement between that insured and the insurer of such vehicle. However, any reduction of the insured's total damages will not reduce the limit of liability for this coverage. This paragraph shall not apply if the company advances payment to the insured in an amount equal to the tentative settlement with the insurer of the underinsured vehicle.

Copy of Image

0100815114

IV.  POLICY PERIOD; TERRITORY: This issuance applies only to accidents which occur during the policy period and within the United States of America, its territories or possessions, or Canada.

V.  ADDITIONAL DEFINITIONS: When used in reference to this insurance (including endorsements forming a part of the policy):

"designated insured" means an individual named in the Schedule under Designated Person Insured.

"family member" means a person related to an individual named insured by blood, marriage or adoption who is a resident of such named insured's household, including a ward or foster child.

"highway vehicle" means a land motor vehicle or trailer other than a:
(a)  Farm type tractor or other equipment designed for use principally off public roads, while not upon public roads,
(b)  Vehicle operated on rails or crawler-treads, or
(c)  Vehicle while located for use as a residence or premises.

"hit-and-run vehicle" means a highway vehicle which causes bodily injury to an insured arising out of physical contact of such vehicle with the insured or with a vehicle which the insured is occupying at the time of the accident, provided:
(a)  There cannot be ascertained the identity of either the operator or owner of such highway vehicle;
(b)  The insured or someone on the insured's behalf shall have reported the accident within 24 hours to a police, peace or judicial officer or to the Commissioner of Motor Vehicles and shall have filed with the company within 30 days thereafter a statement under oath that the insured or the insured's legal representative has a cause or causes of action arising out of such accident for damages against a person or persons whose identity is unascertainable, and setting forth the facts in support thereof;
(c)  At the company's request, the insured or the insured's legal representative makes available for inspection the vehicle which the insured was occupying at the time of the accident; and
(d)  If there is no physical contact with the hit-and-run vehicle, the insured must submit substantial evidence to establish a right a recovery.

"insured highway vehicle" means a highway vehicle:
(a)  Described in the Schedule as an owned automobile to which the Bodily Injury Liability Coverage of the policy applies;
(b)  While temporarily used as a substitute for an insured highway vehicle as described in subparagraph (a) above, when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;
(c)  While being operated by the named or designated insured or by the spouse of either if a resident of the same household;
but the term "insured highway vehicle" shall not include:
(i)  A vehicle while used as a public or livery conveyance, unless such use is specifically declared and described in this policy;
(ii)  A vehicle while being used without the permission of the owner;
(iii)  Under subparagraphs (b) and (c) above, a vehicle

owned by the named insured, any designated insured or any resident of the same household as the named or designated insured; or
(iv)  Under subparagraphs (b) and (c) above, a vehicle furnished for the regular use of the named insured or any resident of the same household.

"occupying" means in or upon or entering into or alighting from.

"state" includes the District of Columbia, a territory or possession of the United States, and a province of Canada.

"uninsured highway vehicle" means:
(a)  A highway vehicle for which no liability bond or policy at the time of the accident provides at least the amounts specified by the financial responsibility law of Alabama as follows:
(i)  $20,000 for bodily injury to any one person caused by any one accident; and
(ii)  $40,000 for bodily injury to two or more persons caused by any one accident.
(b)  A hit-and-run vehicle;
(c)  An underinsured highway vehicle; or
(d)  A highway vehicle for which the insuring or bonding company denies coverage or is or becomes insolvent.
but the term "uninsured highway vehicle" shall not include:
(i)  An insured highway vehicle;
(ii)  A highway vehicle which is owned or operated by a self-insurer within the meaning of any motor vehicle financial responsibility law, motor carrier law or any similar law;
(iii)  A highway vehicle which is owned by the United States of America, Canada, a state, a political subdivision of any such government or an agency of any of the foregoing;
(iv)  A highway vehicle designed for use mainly off public roads while not on public roads.

"underinsured highway vehicle" means a highway vehicle for which the sum of all liability bonds or policies at the time of the accident provides a limit that is less than the amount an insured is legally entitled to recover as damages caused by the accident.

VI.  ADDITIONAL CONDITIONS

A.  Premium: If during the policy period the number of insured highway vehicles owned by the named insured or spouse or the number of dealer's license plates issued to the named insured changes, the named insured shall notify the company during the policy period of any change and the premium shall be adjusted in accordance with the manuals in use by the company.  If the earned premium thus computed exceeds the advance premium paid, the named insured shall pay the excess to the company; if less, the company shall return to the named insured the unearned portion paid by such insured.

B.  Proof of Claim; Medical Reports: As soon as practicable, the insured or other person making claim shall give the company written proof of claim, under oath if required, including full particulars of the nature and extent of the injuries, treatment, and other details entering into the determination of the amount payable hereunder. The insured and every other person making claim hereunder shall submit to examination under oath by any person named by

the company and subscribe the same, as often as may reasonably be required. Proof of claim shall be made upon forms furnished by the company unless the company shall have failed to furnish such forms within 15 days after receiving notice of claim.

The injured person shall submit to physical examinations by physicians selected by the company when and as often as the company may reasonably require and the insured, or in the event of the insured's incapacity, the insured's legal representative, or in the event of the insured's death, the insured's legal representative or the person or persons entitled to sue therefor, shall upon each request from the company execute authorization to enable the company to obtain medical reports and copies of records.

C. Assistance and Cooperation of the Insured: After notice of claim under this insurance, the company may require the insured to take such action as may be necessary or appropriate to preserve the insured's right to recover damages from any person or organization alleged to be legally responsible for the bodily injury; and in any action against the company, the company may require the insured to join such person or organization as a party defendant.

D. Notice of Legal Action:  If, before the company makes payment of loss hereunder, the insured or the insured's legal representative shall institute any legal action for bodily injury against any person or organization legally responsible for the use of a highway vehicle involved in the accident, a copy of the summons and complaint and other process served in connection with such legal action shall be forwarded immediately to the company by the insured or the insured's legal representative.

E. Other Insurance:  For any insured highway vehicle the named insured owns, this Uninsured Motorists Coverage provides primary insurance.  For any insured highway vehicle the named insured does not own, the insurance provided by this Uninsured Motorists Coverage is excess over any other collectible primary uninsured motorists coverage but only to the extent that the limit of insurance under this Uninsured Motorists Coverage exceeds the limit of such other collectible primary uninsured motorists insurance.

If this Uninsured Motorists Coverage and any other coverage form or policy providing similar insurance apply to the same accident, the maximum limit of insurance under all coverage forms or policies shall be the highest applicable limit of insurance under any one coverage form or policy.

When this Uninsured Motorists Coverage and any other coverage form or policy covers on the same basis, either excess or primary, the company will pay only its share. The company's share is the proportion that the Limit of Insurance of its coverage form bears to the total of the limits of all the coverage forms and policies covering on the same basis.

F. Arbitration:

(a) IF WE AND AN INSURED DISAGREE WHETHER THE INSURED IS LEGALLY ENTITLED TO RECOVER DAMAGES FROM THE OWNER OR DRIVER OF AN UNINSURED MOTOR VEHICLE OR DO NOT AGREE AS TO THE AMOUNT OF DAMAGES THAT ARE RECOVERABLE BY THAT INSURED, THEN THE MATTER MAY BE ARBITRATED. HOWEVER, DISPUTES CONCERNING COVERAGE UNDER THIS ENDORSEMENT MAY NOT BE ARBITRATED.  BOTH PARTIES MUST AGREE TO ARBITRATION.  IF SO AGREED, EACH PARTY WILL SELECT AN ARBITRATOR. THE TWO ARBITRATORS WILL SELECT A THIRD.  IF THEY CANNOT AGREE WITHIN 30 DAYS, EITHER MAY REQUEST THAT SELECTION BE MADE BY A JUDGE OF A COURT HAVING JURISDICTION. THE ARBITRATION PROCEEDINGS SHALL COMMENCE WITHIN ONE YEAR AFTER THE DATE BOTH PARTIES AGREE TO SETTLE A DISPUTE BY ARBITRATION. ARBITRATION EXPENSES WILL BE DETERMINED BY THE ARBITRATOR ACCORDING TO ALABAMA LAW.

(b) UNLESS BOTH PARTIES AGREE OTHERWISE, ARBITRATION WILL TAKE PLACE IN THE COUNTY IN WHICH THE INSURED LIVES.  LOCAL RULES OF LAW AS TO ARBITRATION PROCEDURE AND EVIDENCE WILL APPLY.  A DECISION AGREED TO BY TWO OF THE ARBITRATORS WILL BE BINDING.

(c) THIS ARBITRATION PROVISION WILL NOT APPLY IF LEGAL ACTION HAS BEEN COMMENCED BY THE INSURED AGAINST THE OWNER OR OPERATOR OF AN UNINSURED HIGHWAY VEHICLE.

G. Trust Agreement:  In the event of payment to any person under this insurance:

(a) The company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury because of which such payment is made;

(b) Such person shall hold in trust for the benefit of the company all rights of recovery which he shall have against such other person or organization because of

the damages which are the subject of claim made under this insurance;

(c) Such person shall do whatever is proper to secure and shall do nothing after loss to prejudice such rights;

(d) If requested in writing by the company, such person shall take, through any representative designated by the company, such action as may be necessary or appropriate to recover such payment as damages from such other person or organization, such action to be taken in the name of such person; in the event of a recovery, the company shall be reimbursed out of such recovery for expenses, costs and attorneys' fees incurred by it in connection therewith;

(e) Such person shall execute and deliver to the company such instruments and papers as may be appropriate to secure the rights and obligations of such person and the company established by this provision;

(f) (a) - (e) of this provision do not apply with respect to an accident with an underinsured highway vehicle if the company:

    (1) Has been given prompt written notice of a tentative settlement between the insured and the insurer of an underinsured motor vehicle; and

    (2) Fails to advance payment to the insured in an amount equal to the tentative settlement within 30 days after receipt of notification.

If the company advances payment to the insured in an amount equal to the tentative settlement offer within 30 days after receipt of notification:

    (1) That payment will be separate from any amount the insured is entitled to recover under the provisions of this Uninsured Motorists Coverage; and

    (2) The company has the right to recover the advanced payment.

If the company makes any payment the and insured recovers from another party, the insured shall hold the proceeds in trust for the company and pay the company back the amount the company has paid.

H. Payment of Loss by the Company: Any amount due hereunder is payable:

(a) To the insured, or

(b) If the insured is a minor, to the insured's parent or guardian, or

(c) If the insured is deceased, to the insured's surviving spouse, otherwise

(d) To a person authorized by law to receive such payment or to a person legally entitled to recover the damages which the payment represents;

provided, the company may at its option pay any amount due hereunder in accordance with division (d) hereof.

I. Duties in the Event of Accident, Claim, Suit or Loss:
A person seeking Uninsured Motorists Coverage must promptly notify the company in writing of a tentative settlement between the insured and the insurer of an underinsured highway vehicle and allow the company 30 days to advance payment to that insured in an amount equal to the tentative settlement to preserve the company's rights against the insurer, owner or operator of such underinsured highway vehicle.

**ENDORSEMENT**

---

# SINGLE LIMIT OF LIABILITY

| COVERAGES |
| --- |
| Bodily Injury Liability and Property Damage Liability<br>Uninsured and Underinsured Motorist Coverage |

It is agreed that the provisions of the policy captioned "LIMITS OF LIABILITY" relating to **Bodily Injury** Liability and **Property Damage** Liability are amended to read as follows:

**LIMITS OF LIABILITY**

Regardless of the number of (1) **insureds** under this policy, (2) persons or organizations who sustain **bodily injury** or **property damage**, (3) claims made or suits brought on account of **bodily injury** or **property damage** or (4) **automobiles** to which this policy applies, the company's liability is limited as follows:

**Bodily Injury Liability and Property Damage Liability:**

The limit of liability stated in the schedule of the policy as applicable to "each **occurrence**" is the total limit of the company's liability for all damages because of **bodily injury**, including damages for care and loss of services, or **property damage** as a result of any one **occurrence**, provided that with respect to any one **occurrence** for which notice of this policy is given in lieu of security or when this policy is certified as proof of financial responsibility under the provisions of the Motor Vehicle Financial Responsibility Law of any state or province such limit of liability shall be applied to provide the separate limits required by such law for **bodily injury** liability and for **property damage** liability to the extent of the coverage required by such law, but the separate application of such limit shall not increase the total limit of the company's liability.

**Uninsured and Underinsured Motorist Coverage:**

Whenever Uninsured and/or Underinsured Motorist Coverage has been purchased, Combined Single Limits will be amended to afford Split Limits as required by law.

---

EXCESS POLICY

IT IS FURTHER UNDERSTOOD AND AGREED THAT WHEN THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED IS AN EXCESS POLICY, THE COMPANY'S LIMIT OF LIABILITY SHALL NOT EXCEED 100% OF THE DIFFERENCE BETWEEN THE PRIMARY OR UNDERLYING LIMITS OF LIABILITY AS STATED IN THE POLICY AND TOTAL LIMITS OF PRIMARY AND EXCESS.

---

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED** - This endorsement is effective the same date and hour as shown in Item 2 of the Policy Declarations and forms a part of the policy to which it is attached.

# Canal Insurance Company

Greenville, South Carolina

Form E-102



(Rev 11-1993)

010081511

Copy of Image

ENDORSEMENT

# AMENDATORY ENDORSEMENT

## SECTION A - BASIC AUTOMOBILE LIABILITY INSURANCE

PART I    COVERAGE A - BODILY INJURY LIABILITY - - COVERAGE B - PROPERTY DAMAGE LIABILITY

EXCLUSIONS:  The following are added:

(h)  to bodily injury or property damage resulting from the movement of property by mechanical device (other than a hand truck) unless the device is attached to an owned automobile or temporary substitute automobile;

(i)  to bodily injury or property damage arising out of the named insured's work after that work has been completed or abandoned.  In this exclusion, the named insured's work means:

(1)  work or operations performed by the named insured or on behalf of the named insured; and
(2)  materials, parts or equipment furnished in connection with such work or operations.

The named insured's work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in paragraphs 1. or 2. above.

The named insured's work will be deemed completed at the earliest of the following times:

(1)  when all of the work called for in the named insured's contract has been completed.
(2)  when all of the work to be done at the site has been completed if the named insured's contract calls for work at more than one site.
(3)  when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed;

(j)  to bodily injury or property damage arising out of the operation of the following:

(1)  cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and
(2)  air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED - This endorsement is effective the same date and hour as shown in Item 2 of the Policy Declarations and forms a part of the policy to which it is attached.

# Canal Insurance Company

Greenville, South Carolina

Form E-125

Copy of Image

(Rev. 4-1999)

0100815114

Copy of Image

**FORM F**

# UNIFORM MOTOR CARRIER BODILY INJURY AND PROPERTY DAMAGE LIABILITY INSURANCE ENDORSEMENT

It is agreed that:

1.  The certification of the policy, as proof of financial responsibility under the provisions of any State motor carrier law or regulations promulgated by any State Commission having jurisdiction with respect thereto, amends the policy to provide insurance for automobile bodily injury and property damage liability in accordance with the provisions of such law or regulations to the extent of the coverage and limits of liability required thereby; provided only that the insured agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except by reason of the obligation assumed in making such certification.

2.  The Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificate of Insurance has been filed with the State Commissions indicated below hereof.

3.  This endorsement may not be canceled without cancellation of the policy to which it is attached.  Such cancellation may be effected by the company or the insured giving thirty (30) days' notice in writing to the State Commission with which such certificate has been filed, such thirty (30) days' notice to commence to run from the date the notice is actually received in the office of such Commission.

Attached to and forming part of Policy No. ___470433___

issued by ___Canal Insurance Company___ , herein called

Company, of ___Greenville, South Carolina___

to ___COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS___

of ___1565 CO. RD. 73 SLOCOMB, AL 36375___

Dated at ___BIRMINGHAM, AL 35232___    this  7th  day of  November    20 05

Countersigned by ___ALABAMA PUBLIC AUTO INS AGCY LIC#A043008___

Authorized Representative

| X - - INDICATES STATE COMMISSIONS WITH WHOM UNIFORM MOTOR CARRIER BODILY INJURY AND PROPERTY DAMAGE LIABILITY CERTIFICATE OF INSURANCE HAS BEEN FILED. | | | | | | | |
|---|---|---|---|---|---|---|---|
| ALABAMA | X | HAWAII | | MICHIGAN | | NORTH CAROLINA | UTAH |
| ALASKA | | IDAHO | | MINNESOTA | | NORTH DAKOTA | VERMONT |
| ARIZONA | | ILLINOIS | | MISSISSIPPI | | OHIO | VIRGINIA |
| ARKANSAS | | INDIANA | | MISSOURI | | OKLAHOMA | WASHINGTON |
| CALIFORNIA | | IOWA | | MONTANA | | OREGON | WEST VIRGINIA |
| COLORADO | | KANSAS | | NEBRASKA | | PENNSYLVANIA | WISCONSIN |
| CONNECTICUT | | KENTUCKY | | NEVADA | | RHODE ISLAND | WYOMING |
| DELAWARE | | LOUISIANA | | NEW HAMPSHIRE | | SOUTH CAROLINA | |
| DISTRICT OF COLUMBIA | | MAINE | | NEW JERSEY | | SOUTH DAKOTA | |
| FLORIDA | X | MARYLAND | | NEW MEXICO | | TENNESSEE | |
| GEORGIA | X | MASSACHUSETTS | | NEW YORK | | TEXAS | |

MC1632 (Ed 6-71)

Copy of Image

IRB 3538 A

0100815114

*L790933*

# CANAL

☑ **INSURANCE COMPANY**
☐ **INDEMNITY COMPANY**

## APPLICATION FOR COMMERCIAL MOTOR VEHICLE INSURANCE
## LIABILITY and PHYSICAL DAMAGE

**ALL STATES**

| 1. This Application is for ☑Liability ☐Physical Damage | 2. Desired Effective Date: _____ 11-02-2005 mm/dd/yyyy | Hour: 12:01 ☑a.m. ☐p.m. | 3. US DOT# |

**4. Applicant Name** ColBERT BRyan McGuiff

**5. DBA, if any** BEAR Creek MOvERS

**6. Legal Owner or Officer of Business** ColBERT BRyan McGuiff

**7. Area Code / Phone Number** 334 886 2851

**8. Mobile Phone Number**

**9. Location Address** Street 1565 Co Rd 73   City S/oCom6   County GENEVA   State AL   Zip Code 36375

**10. Mailing Address** Street SAmE   City   County   State   Zip Code

**11. Applicant is** ☑Individual ☐Partnership ☐Corporation ☐LLC

**12. Location** ☐Inside City Limits ☐Outside City Limits

**13. Tax ID and/or Social Security Number** 420 82 6163

**14. Business is** ☑Trucking for Hire (☐Contract Carrier ☐Common Carrier) ☐Trucking Private ☐Non-Trucking ☐Public Auto

**15. Class is** ☐Driveaway ☐Dump ☐Hazardous ☐Mobile Home Toters ☐Other

**16. If Trucking Business, describe type of cargo hauled and list farthest destination:**
Type of Cargo Hauled: Mobile Homes    Farthest Destination:

**17. Is vehicle used to haul explosives?** ☐Yes ☑No

**18. Is vehicle used to transport employees?** ☐Yes ☑No

**19. Past 12 months Gross Receipts** 25000

**20.a. Do you haul any double trailers?** ☐Yes ☑No

**20.b. Do you haul any triple trailers?** ☐Yes ☑No

**20.c. Do you haul any flatbed trailers?** ☐Yes ☑No

**21. Are any vehicles under a long-term leased owner/operator arrangement? If yes, who is responsible for the maintenance of those vehicles?** ☐Yes ☑No

**22. Do you own, lease or rent vehicles not listed on application? If yes, explain.** ☐Yes ☑No

**23. Do you lend, lease or rent equipment to others without drivers?** ☐Yes ☑No
Do you hire owner operators on a trip lease basis? ☐Yes ☐No
Explain any yes answers:

**24. If non-trucking, list name & terminal of lessee to whom you are permanently leased.**    MC# of Lessee:

**25. Does Applicant have other Commercial Auto Liability Insurance in force?** ☐Yes ☑No
If yes, give Insurance Company name, number of units covered, limits and details.

NOV 14 2005

| 26.a. Liability Coverage Limits Desired | Combined Single Units 1,000,000 Each Occurrence | 26.b. Split Limits for Public Autos only | A. Bodily Injury ,000/ ,000 Each Person / Each Occurrence | B. Property Damage ,000 Each Occurrence |

**27.**                    **INFORMATION FOR FILINGS**

| Filings Required | Motor Carrier or Permit Number | Applicant's Name and Address exactly as it appears on each Permit. |
|---|---|---|
| ☐FHWA | MC | ColBERT BRyan McGuiff |
| ☑Form E | | dBA BEAR Creek MOvERS |
| ☐Oversized/Overweight | | 1565 Co Rd 73 |
| ☐Hazardous | | S/oComB, Al 36375 |
| ☐ St. OF AL - GA + FL | | |

I hereby certify that the information contained in this application is true and agree that a misrepresentation of any of the facts by me will constitute reason for the company to void or cancel any policy issued on the basis of this application, and will hold the company harmless for the action taken. I also agree that if a policy is issued pursuant to this application, the application and any elections or rejections, which are included with the application and signed by me, may be relied upon by the company as accurate and shall become a part of the policy.

I recognize that all or part of my operations are under the Department of Transportation oversight requiring me to adhere to their rules and regulations. I acknowledge that DOT's rules and regulations are understood by me and I will adhere to the rules and regulations including but not limited to driver hiring, vehicle inspection and maintenance, and hours of service.

**Signature of Applicant** _Colbert Bryan McG_ x    **Signature of Agent of Applicant** _Jerry Parker_

**Type or Print Applicant Name** ColBERT BRyan McGuiff   **Address of Agent** PO 5022 Dothan Al 36302

**Title or Relationship to Applicant** OwNER    **Date Application Completed** 11-2-05

**THIS IS NOT A BINDER    THIS IS NOT A BINDER    THIS IS NOT A BINDER    THIS IS NOT A BINDER**

Form A-101    11/18/2005 09:48 AM Page 1 of 3    (Rev. 9-2005)

470933

## THE FOLLOWING INFORMATION NECESSARY IF APPLICANT TO BE ACCEPTED

28. Insurance history for applicant for  ☑ New Venture or  ☐ Current and past 3 years.

| | From | To | Name of Insurance Carrier |
|---|---|---|---|
| Current Year | 9-8-05 | 11-2-05 | PROGRESSIVE |
| 1st Prior Year | | | |
| 2nd Prior Year | | | |
| 3rd Prior Year | | | |

29. Have you ever had insurance for this type of operation cancelled, declined or renewal refused? ☐ Yes ☑ No
If yes, give name of Insurance Companies, dates and reason for cancellation or refusal.

30. Have you filed for bankruptcy or had tax or credit liens against you in the past 3 years? ☑ Yes ☐ No  BJM

31. Have you ever had insurance with Canal? ☐ Yes ☑ No  If yes, give Policy Number

### 32. LIABILITY LOSS INFORMATION

| Show Policy Periods For Past Three Years | | | Number of Accidents | TOTAL AMOUNT INCURRED LOSSES | |
|---|---|---|---|---|---|
| | From | To | | Bodily Injury | Property Damage |
| Current Year | | | | $ | $ |
| 1st Prior Year | | | | $ | $ |
| 2nd Prior Year | | | | $ | $ |
| 3rd Prior Year | | | | $ | $ |

### 33. PHYSICAL DAMAGE LOSS INFORMATION

| Show Policy Periods For Past Three Years | | | Number of Accidents | TOTAL AMOUNT INCURRED LOSSES | |
|---|---|---|---|---|---|
| | From | To | | Collision | Fire & Theft |
| Current Year | | | | $ | $ |
| 1st Prior Year | | | | $ | $ |
| 2nd Prior Year | | | | $ | $ |
| 3rd Prior Year | | | | $ | $ |

34. Policy Period & Payment Method
☐ Financed through PFC  ☐ Annual - ☐ Full Payment or ☐ Payment Plan
☐ Until Cancelled - Monthly Bill  ☐ Short Term expiration date  ☐ No payment plan available

| 35. | Total Premium | Down payment | # Installments | Amount Enclosed (agent use only) | |
|---|---|---|---|---|---|
| Liability | 3931 | 484 | UNT | | NOV 1 4 2005 |
| Physical Damage | | | | | |

| Name | Mailing Address | Relationship to Insured |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

| Name | Mailing Address | Relationship to Insured |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Attach separate list if space above is not adequate.

**THIS IS NOT A BINDER    THIS IS NOT A BINDER    THIS IS NOT A BINDER    THIS IS NOT A BINDER**
Form A-101                          11/18/2005 09:48 AM  Page 2 of 3                  (Rev. 9-2005)

4770433

# CANAL
INSURANCE COMPANY

## APPLICATION FOR COMMERCIAL MOTOR VEHICLE INSURANCE
## LIABILITY and PHYSICAL DAMAGE

### ALABAMA SUPPLEMENTAL APPLICATION
### must be completed in conjunction with the ALL STATES Form A-101

| | |
|---|---|
| 1. Applicant Name | *ColBerT BRyaN M Guff* |
| 2. DBA, if any | *Berr Creek Movers* |

### REJECTION OF UNINSURED MOTORISTS (FAMILY PROTECTION) COVERAGE

In accordance with the provisions of 32-7-23 (a) of the Alabama Law which permit the insured named in the policy to reject the Uninsured Motorist (Family Protection) Coverage, the undersigned insured(s) does hereby reject such insurance, being the insurance provided for the protection of persons insured under this policy who would legally be entitled to recover damages from the owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom. IF THE NAMED INSURED IS AN INDIVIDUAL AND THERE IS MORE THAT ONE NAMED INSURED, ALL NAMED INSUREDS MUST REJECT SUCH COVERAGE IN WRITING.

| X | | |
|---|---|---|
| Signature of Insured | | Date |
| X | | |
| Signature of Insured | | Date |
| X | | |
| Signature of Insured | | Date |

### IMPORTANT NOTICE REGARDING THE UM COVERAGE
### FOR WHICH YOU HAVE APPLIED

THIS DOCUMENT AFFECTS YOUR LEGAL RIGHTS. IF THE POLICY FOR WHICH YOU ARE APPLYING IS A LIABILITY POLICY AND YOU HAVE NOT REJECTED UNINSURED MOTORIST COVERAGE, READ THE FOLLOWING INFORMATION CAREFULLY AND SIGN THE ACKNOWLEDGMENT OF ARBITRATION AGREEMENT.

1. THE POLICY FOR WHICH YOU HAVE APPLIED INCLUDES A BINDING ARBITRATION AGREEMENT.

2. THE ARBITRATION AGREEMENT REQUIRES THAT ANY DISAGREEMENT RELATED TO THE UM COVERAGE MUST BE RESOLVED BY ARBITRATION AND NOT IN A COURT OF LAW.

3. THE RESULTS OF THE ARBITRATION ARE FINAL AND BINDING ON YOU AND THE INSURANCE COMPANY.

4. IN AN ARBITRATION, AN ARBITRATOR, WHO IS AN INDEPENDENT, NEUTRAL, PARTY, GIVES A DECISION AFTER HEARING THE POSITIONS OF THE PARTIES.

5. WHEN YOU ACCEPT THIS UM COVERAGE, YOU AGREE TO RESOLVE ANY DISAGREEMENT RELATED TO THE UM COVERAGE BY BINDING ARBITRATION INSTEAD OF A TRIAL IN COURT INCLUDING A TRIAL BY JURY.

6. ARBITRATION TAKES THE PLACE OF RESOLVING DISPUTES BY A JUDGE AND JURY AND THE DECISION OF THE ARBITRATOR CANNOT BE REVIEWED IN COURT BY A JUDGE AND JURY.

### ACKNOWLEDGMENT OF ARBITRATION AGREEMENT

I HAVE READ THIS STATEMENT. I UNDERSTAND THAT I AM VOLUNTARILY SURRENDERING MY RIGHT TO HAVE ANY DISAGREEMENT BETWEEN THE INSURANCE COMPANY AND MYSELF REGARDING THE UM COVERAGE RESOLVED IN COURT. THIS MEANS I AM WAIVING MY RIGHT TO A TRIAL BY JURY.

I UNDERSTAND THAT UPON RECEIPT OF THE POLICY I SHOULD READ THE ARBITRATION CLAUSE CONTAINED IN THE UM SECTION OF THE POLICY AND THAT I HAVE THE RIGHT TO REJECT THIS POLICY WITHIN THREE (3) DAYS OF THE DATE OF DELIVERY IF I DO NOT WANT TO ACCEPT THE REQUIREMENT FOR ARBITRATION.

I UNDERSTAND THAT THIS SAME TYPE OF INSURANCE MAY BE AVAILABLE THROUGH AN INSURANCE COMPANY THAT DOES NOT REQUIRE THAT POLICY RELATED DISAGREEMENTS BE RESOLVED BY BINDING ARBITRATION.

| | | |
|---|---|---|
| *Colbert Bryan McM* X | 11-2-05  5pm | |
| Applicant / Insured | Date / Time | |
| *Pennilan Cullen* | 11-2-05  3pm | NOV 1 4 2005 |
| Agent | Date / Time | |

## THIS IS NOT A BINDER    THIS IS NOT A BINDER    THIS IS NOT A BINDER    THIS IS NOT A BINDER

**11/18/2005 09:48 AM**

## SCHEDULE OF OWNED AND LEASED EQUIPMENT AND RATING INFORMATION

| Unit Number | Model Year | Trade Name and Kind of Vehicle (1)(2) | Motor/Serial Number | Terminal Location | Gross Vehicle Weight | Radius | Desired Amt. of Insurance (3) | Deductible FTCAC & Collision | Indicate either Owned or Leased | | Computed Premium | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Owned | Leased | Liability | Phys Dam |
| 1 | 89 | IH  AMHWA | 1HS2DGFN7JH571292 | Slocomb | | 300 | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

NOTES: (1) Specify whether truck, tractor, trailer, bus, taxi, mobile equipment, etc.
(2) Is there specialized equipment attached to any unit, i.e. cranes, booms, buckets?
(3) Coverage written on actual cash value basis only, not to exceed this stated amount. Comprehensive coverage not written on commercial vehicles. Nov. 4 2005

Total Premium

### LIST OF DRIVERS OF INSURED VEHICLES (attach list of drivers with required information if space below is not adequate)

I understand that an essential factor in obtaining automobile insurance is the list of drivers of vehicles covered by the policy for which I am applying. I declare the attached list includes all of the drivers of vehicles requested to be covered under the policy including employees, leased employees, mechanics, family members, as well as any other person allowed to drive an insured vehicle. I agree to notify my agent of any additional drivers before they are allowed to drive an insured vehicle.

| Driver's Name | Social Security Number | Date of Birth Mo. Day Year | Driver's License State | Number | No. of Violations and Accidents Past 3 Years | No. of serious Violations and Accidents Past 7 Years (1) | Year Hired | Years of Applicable Experience | SR-22 Required? Applies to owner only. |
|---|---|---|---|---|---|---|---|---|---|
| Bryan W Croft | 420826163 | 9-22-56 | AD | 3473443 | 0 | 0 | | 10 | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

(1) Serious violations include but are not limited to DUI, homicide or assault involving an auto, leaving the scene of an accident, etc.

### LOSS PAYEES

| Unit Number | Name of Loss Payees | Complete Address |
|---|---|---|
| | | |
| | | |
| | | |

**THIS IS NOT A BINDER**   **THIS IS NOT A BINDER**   **THIS IS NOT A BINDER**   **THIS IS NOT A BINDER**

Form A-101                                        Page 3 of 3                                        (Rev. 9-2005)

470433

# CANAL
**INSURANCE COMPANY**

APPLICATION FOR COMMERCIAL MOTOR VEHICLE INSURANCE
LIABILITY and PHYSICAL DAMAGE

**ALABAMA**
Submit in Duplicate

| 1. Applicant | | Area/Phone Number | 2. This Application is for |
|---|---|---|---|
| ColBerT BRyan McGRIFF | | 334 886 2851 | ☑ Liability ☐ Physical Damage |
| dBA Bear CReek Movers | 1565 Co. Rd 73 | City SlOComB, geneva County | State AL | Zip Code 36375 |

| 4. Applicant is | 5. Legal Owner of Business | 6. Tax ID or Social Security Number |
|---|---|---|
| ☑ Individual ☐ Partnership ☐ Corporation | ColBerT Bryan M GriFF | 420 82 6163 |

7. Business is  ☐ Taxi  ☐ Bus Private  ☐ Bus Public  ☐ Trucking Private  ☐ Trucking Contract  ☑ Trucking for Hire  ☐ Other

| 8. If Trucking Business, type of cargo hauled. If Bus, number of round trips per day. (be specific) | Approx. Value Per Load | Is vehicle used to haul explosives? | ☐ Yes ☑ No |
|---|---|---|---|
| mobile Homes | 25000 | Is vehicle used to transport employees? | ☐ Yes ☑ No |

| 9. Total number of vehicles owned and/or operated by Applicant. | 10. Is Equipment lent, leased or rented to/or from others? ☐ Yes ☑ No |
|---|---|
| ___ Taxis   / Tractors   ___ Other | If YES, give unit numbers and details. |
| ___ Buses   ___ Semitrailers | |
| ___ Trucks   ___ Pleasure Cars   (include off-road equipment) | |

11. Does Applicant have other Commercial Liability Insurance in force? ☑ Yes ☐ No   If YES, give Company, number of units covered, limits and details.

yes                    ATLANTA CAS. # 100.00 SeT UP

| 12. Liability Coverage | A. Bodily Injury | B. Property Damage -OR- | Combined Single Limits |
|---|---|---|---|
| Limits Desired | 1,000,000 | 1,000,000 | ,000 |

13.                          **LIABILITY INFORMATION FOR FILINGS**

| Filings Required | Docket or Permit Number | Applicant's Name and Address exactly as it appears on each Permit. |
|---|---|---|
| ST oF AL. | | ColBerT BRyan M GRIFF |
| GA | | dBA Bear CReek Movers |
| FL | | |
| (E + H) | | |
| FHWA Docket # MC | | US DOT #: |

**THE FOLLOWING INFORMATION NECESSARY IF APPLICANT TO BE ACCEPTED**

| 14. Who was your insurance carrier last year? | 15. Who were your insurance carriers for 2 years before that? |
|---|---|
| Prog | N LA |

RECEIVED
NOV – 4 2005

16. Have you ever had insurance for this type of operation cancelled, declined or renewal refused? ☐ Yes ☑ No  If YES, give name of Insurance Companies, dates and reason for cancellation or refusal.

17. Have you ever had insurance with Canal? ☐ Yes ☑ No   If YES, give Policy Number

18.                                  **LIABILITY**

| Show Policy Periods For Past Three Years | | Number of Accidents | TOTAL AMOUNT CLAIMS PAID | | TOTAL AMOUNT UNSETTLED CLAIMS | |
|---|---|---|---|---|---|---|
| From | To | | Bodily Injury | Property Damage | Bodily Injury | Property Damage |
| | | | $ | $ | $ | $ |
| | | | $ | $ | $ | $ |
| | | | $ | $ | $ | $ |

19.                               **PHYSICAL DAMAGE**

| Show Policy Periods For Past Three Years | | Number of Accidents | TOTAL AMOUNT CLAIMS PAID | | TOTAL AMOUNT UNSETTLED CLAIMS | |
|---|---|---|---|---|---|---|
| From | To | | Collision | Fire & Theft | Collision | Fire & Theft |
| | | | $ | $ | $ | $ |
| | | | $ | $ | $ | $ |
| | | | $ | $ | $ | $ |

| 20. Desired Effective Date of Policy | 21. Expiration Date | 22. Total Premium | 23. Terms of Payment: ☐ Full payment or |
|---|---|---|---|
| 10-27-05  1201 | until | | ___ installments of $_____ and downpayment of $_____ or |
| Month Day Year  Hour  ☐ a.m. ☑ p.m. | CAncelled | $ | ☐ Until Cancelled monthly billing.   Amount enclosed: $_____ |
| 11-7-05 | | | |
| C BM | | | |

I hereby certify that the information above is true and agree that a misrepresentation of any of the facts by me will constitute reason for the company to void or cancel any policy issued on the basis of this application, and will hold the company harmless for the action taken. I also agree that if a policy is issued pursuant to this application, the application and any elections or rejections, which are included on the application and signed by me, shall become a part of the policy.

Date Application Completed   10-27-05  11-7-05        Signature of Agent of Applicant   ___

Signature of Applicant   X ColBert Bryan McG        X Address of Agent   DoThan. AL 36302

Form A-101 AL                    **THIS IS NOT A BINDER**                    Page 1                    (Rev. 10-2004)

**11/14/2005 11:03 AM**

## REJECTION OF UNINSURED MOTORISTS (FAMILY PROTECTION) COVERAGE

In accordance with the provisions of 32-7-23 (a) of the Alabama Law which permit the insured named in the policy to reject the Uninsured Motorist (Family Protection) Coverage, the undersigned insured(s) does hereby reject such insurance, being the insurance provided for the protection of persons insured under this policy who would legally be entitled to recover damages from the owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom. IF THE NAMED INSURED IS AN INDIVIDUAL AND THERE IS MORE THAT ONE NAMED INSURED, ALL NAMED INSUREDS MUST REJECT SUCH COVERAGE IN WRITING.

X _____          _____
Signature of Insured                                    Date

X _____          _____
Signature of Insured                                    Date

X _____          _____
Signature of Insured                                    Date

### IMPORTANT NOTICE REGARDING THE UM COVERAGE
### FOR WHICH YOU HAVE APPLIED

THIS DOCUMENT AFFECTS YOUR LEGAL RIGHTS. *IF* THE POLICY FOR WHICH YOU ARE APPLYING IS A LIABILITY POLICY AND *YOU HAVE NOT REJECTED UNINSURED MOTORIST COVERAGE, READ* THE FOLLOWING INFORMATION CAREFULLY *AND SIGN* THE ACKNOWLEDGMENT OF ARBITRATION AGREEMENT.

1.  THE POLICY FOR WHICH YOU HAVE APPLIED INCLUDES A BINDING ARBITRATION AGREEMENT.

2.  THE ARBITRATION AGREEMENT REQUIRES THAT ANY DISAGREEMENT RELATED TO THE UM COVERAGE MUST BE RESOLVED BY ARBITRATION AND NOT IN A COURT OF LAW.

3.  THE RESULTS OF THE ARBITRATION ARE FINAL AND BINDING ON YOU AND THE INSURANCE COMPANY.

4.  IN AN ARBITRATION, AN ARBITRATOR, WHO IS AN INDEPENDENT, NEUTRAL PARTY, GIVES A DECISION AFTER HEARING THE POSITIONS OF THE PARTIES.

5.  WHEN YOU ACCEPT THIS UM COVERAGE, YOU AGREE TO RESOLVE ANY DISAGREEMENT RELATED TO THE UM COVERAGE BY BINDING ARBITRATION INSTEAD OF A TRIAL IN COURT INCLUDING A TRIAL BY JURY.

6.  ARBITRATION TAKES THE PLACE OF RESOLVING DISPUTES BY A JUDGE AND JURY AND THE DECISION OF THE ARBITRATOR CANNOT BE REVIEWED IN COURT BY A JUDGE AND JURY.

### ACKNOWLEDGMENT OF ARBITRATION AGREEMENT

I HAVE READ THIS STATEMENT. I UNDERSTAND THAT I AM VOLUNTARILY SURRENDERING MY RIGHT TO HAVE ANY DISAGREEMENT BETWEEN THE INSURANCE COMPANY AND MYSELF REGARDING THE UM COVERAGE RESOLVED IN COURT. THIS MEANS I AM WAIVING MY RIGHT TO A TRIAL BY JURY.

I UNDERSTAND THAT UPON RECEIPT OF THE POLICY I SHOULD READ THE ARBITRATION CLAUSE CONTAINED IN THE UM SECTION OF THE POLICY AND THAT I HAVE THE RIGHT TO REJECT THIS POLICY WITHIN THREE (3) DAYS OF THE DATE OF DELIVERY IF I DO NOT WANT TO ACCEPT THE REQUIREMENT FOR ARBITRATION.

I UNDERSTAND THAT THIS SAME TYPE OF INSURANCE MAY BE AVAILABLE THROUGH AN INSURANCE COMPANY THAT DOES NOT REQUIRE THAT POLICY RELATED DISAGREEMENTS BE RESOLVED BY BINDING ARBITRATION.

_____    _____  11-2-05
Applicant / Insured                 Date / Time

_____    _____  11-2-05    KWG
Agent                               Date / Time

RECEIVED
NOV - 4 2005

Form UM-101 AL                              Page 2                          (Rev. 10-2004)

11/14/2005 11:03 AM

## SCHEDULE OF EQUIPMENT AND RATING INFORMATION

| Item or Unit Number | Year Model | Trade Name and Kind of Vehicle (1) | Motor/Serial Number | Terminal Location | Capacity Tons, Gallons Passengers | Radius Max. Miles | Date Purchase | If Used, Purchase Price | Desired Amt. of Insurance (2) | Deductible All Perils | Computed Premium | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Liability | Phys. Dmg. |
| 1 | 88 | IH | 1HSZDGFN7JH571292 | | | 300 | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

NOTES: (1) Specify whether straight truck, tractor, semitrailer, trailer, bus, taxi, etc. Describe each semitrailer directly under the tractor with which it is used.    Total Premium
(2) Coverage written on actual cash value basis only, not to exceed this stated amount. Comprehensive coverage not written on commercial vehicles.

## LIST ALL DRIVERS OF INSURED VEHICLES

| Driver's Name | Social Security Number | Date of Birth Mo. Day Year | Drivers Licenses State | Number | No. of Violations and Accidents Past 3 Years | (A) SR-22 Required? (B) State | Reason for SR-22 Filing |
|---|---|---|---|---|---|---|---|
| C. Bryan McAtiff | 420 82 6163 | 9 22 56 | al | 3473443 | 0 | 0 | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## LOSS PAYEES

| Item or Unit Number of Applicable Vehicles | Name of Loss Payees | Complete Address |
|---|---|---|
| N/A | | |
| | | |
| | | |

11/14/2005 11:03 AM

CANAL Copy of Image

## CLAIMS REPORTING INFORMATION NOTICE

# 800-452-6911

### Online Claim reporting is also available at www.canal-ins.com

**To All Canal Insureds:**

Many accidents result in damages which require immediate attention in order to prevent further loss. When a serious bodily injury, a hazardous spill which may impact the environment or damage to perishable cargo has occurred, please call the Canal Claims Reporting number listed above as soon as possible to report the claim.

When reporting a loss, please be prepared to give the following information:

* Insured name, driver and policy number
* Insured Vehicle Information (make, model and VIN)
* Exact location of the occurrence
* Description of the occurrence
* Type of loss and any environment affected
* Other persons or vehicles involved
* A contact number for someone at the scene

Please communicate these procedures to all drivers and claim reporting personnel. We appreciate your business and assistance in providing prompt notice of accidents.

D-101 CL

Copy of Image

(Rev. 1-2003)

0100815114

**CANAL INSURANCE COMPANY - NAIC 10464**
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD    State of AL

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| 470433 | 11/02/2005 | 11/02/2006 |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|
| 1986 IH TRACTOR 1HSZDGEN7JH571292 | | |

NAME OF INSURED
COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS
1565 CO. RD. 73
SLOCOMB, AL 36375

AGENT
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008
BIRMINGHAM, AL 35232

— — — — FOLD HERE — — — —

**IN CASE OF ACCIDENT**

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims@canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.
   This card must be carried in the vehicle at all times.

Form ID-1 (Rev. 9-2003)

---

**CANAL INSURANCE COMPANY - NAIC 10464**
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| VOID | | |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|

NAME OF INSURED
THIS IS NOT A VALID ID CARD

AGENT

— — — — FOLD HERE — — — —

**IN CASE OF ACCIDENT**

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims@canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.
   This card must be carried in the vehicle at all times.

Form ID-1 (Rev. 9-2003)

---

**CANAL INSURANCE COMPANY - NAIC 10464**
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| VOID | | |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|

NAME OF INSURED
THIS IS NOT A VALID ID CARD

AGENT

— — — — FOLD HERE — — — —

**IN CASE OF ACCIDENT**

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims@canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.
   This card must be carried in the vehicle at all times.

Form ID-1 (Rev. 9-2003)

---

**CANAL INSURANCE COMPANY - NAIC 10464**
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| VOID | | |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|

NAME OF INSURED
THIS IS NOT A VALID ID CARD

AGENT

— — — — FOLD HERE — — — —

**IN CASE OF ACCIDENT**

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims@canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.
   This card must be carried in the vehicle at all times.

Form ID-1 (Rev. 9-2003)

Copy of Image

0100815114

CANAL INSURANCE COMPANY - NAIC 10464
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD    State of AL

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| 470433 | 11/14/2005 | 11/02/2006 |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|
| 1988 IH TRACTOR 1HSZDGFN7JH571292 | | |

NAME OF INSURED
COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS
1565 CO. RD. 73
SLOCOMB, AL 36375

AGENT
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008
BIRMINGHAM, AL 35232

— — — — — FOLD HERE — — — — —

IN CASE OF ACCIDENT

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims @canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.
   This card must be carried in the vehicle at all times.

Form ID-1                                    (Rev. 9-2003)

---

CANAL INSURANCE COMPANY - NAIC 10464
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| VOID | | |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|
| | | |

NAME OF INSURED
THIS IS NOT A VALID ID CARD

AGENT

— — — — — FOLD HERE — — — — —

IN CASE OF ACCIDENT

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims @canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.
   This card must be carried in the vehicle at all times.

Form ID-1                                    (Rev. 9-2003)

---

CANAL INSURANCE COMPANY - NAIC 10464
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| VOID | | |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|
| | | |

NAME OF INSURED
THIS IS NOT A VALID ID CARD

AGENT

— — — — — FOLD HERE — — — — —

IN CASE OF ACCIDENT

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims @canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.
   This card must be carried in the vehicle at all times.

Form ID-1                                    (Rev. 9-2003)

---

CANAL INSURANCE COMPANY - NAIC 10464
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| VOID | | |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|
| | | |

NAME OF INSURED
THIS IS NOT A VALID ID CARD

AGENT

— — — — — FOLD HERE — — — — —

IN CASE OF ACCIDENT

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims @canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.
   This card must be carried in the vehicle at all times.

Form ID-1                                    (Rev. 9-2003)

Copy of Image

0100815207

**CANAL INSURANCE COMPANY - NAIC 10464**
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD   State of AL

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| 470433 | 06/29/2006 | 11/02/2006 |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|
| 1989 INTERNATIONAL TRACTOR 1HTLAZPM3KH638466 | | |

NAME OF INSURED
COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS
1565 CO. RD. 73
SLOCOMB, AL 36375

AGENT
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008
BIRMINGHAM, AL 35232

— — — — —FOLD HERE— — — — —

**IN CASE OF ACCIDENT**

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims@canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.

   This card must be carried in the vehicle at all times.

Form ID-1                                           (Rev. 9-2003)

---

**CANAL INSURANCE COMPANY - NAIC 10464**
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| VOID | | |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|

NAME OF INSURED
THIS IS NOT A VALID ID CARD

AGENT

— — — — —FOLD HERE— — — — —

**IN CASE OF ACCIDENT**

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims@canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.

   This card must be carried in the vehicle at all times.

Form ID-1                                           (Rev. 9-2003)

---

**CANAL INSURANCE COMPANY - NAIC 10464**
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| VOID | | |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|

NAME OF INSURED
THIS IS NOT A VALID ID CARD

AGENT

— — — — —FOLD HERE— — — — —

**IN CASE OF ACCIDENT**

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims@canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.

   This card must be carried in the vehicle at all times.

Form ID-1                                           (Rev. 9-2003)

---

**CANAL INSURANCE COMPANY - NAIC 10464**
Bodily Injury and Property Damage Liability
IDENTIFICATION CARD

| POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|
| VOID | | |

| YEAR | MAKE/MODEL | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|

NAME OF INSURED
THIS IS NOT A VALID ID CARD

AGENT

— — — — —FOLD HERE— — — — —

**IN CASE OF ACCIDENT**

1. Obtain names, addresses, and phone numbers of persons involved and witnesses, a police report number, and any insurance information on the other vehicles.

2. Make no statement about the accident to anyone except the police or a representative of Canal Insurance Company.

3. Promptly notify CANAL INSURANCE COMPANY, P.O. Box 7, Greenville, SC (29602) by:
   • calling (800) 452-6911;
   • e-mailing claims@canal-ins.com;
   • faxing (864) 679-2518; or
   • notifying your agent.

   This card must be carried in the vehicle at all times.

Form ID-1                                           (Rev. 9-2003)

Copy of Image

0100816947

Copy of Image

# ENDORSEMENT

## GENERAL CHANGE

IT IS AGREED THAT POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED IS CANCELLED.

REASON FOR CANCELLATION: INSURED'S REQUEST
CALCULATION METHOD: 90% PR
CANCELLATION MONTH: NOVEMBER
TOTAL EARNED PREMIUM IN CANCELLATION MONTH: 87
# OF DAYS UNEARNED: 22

ANNUAL PREMIUM AT TIME OF CANCELLATION: $3,931.00

Policy Cancelled

90% PR 1 -

ADDITIONAL PREMIUM: _____      RETURN PREMIUM: __SEE BELOW__

11/9/2006 - 12/1/2006 Breakdown for policies under installment premium payment plan:
XXXXXXXXXXXX __-241.00_____      ESCROW DEPOSIT _____-656.00_____
The remaining __monthly__ installments due will change by __-328.00_____ from__328.00_____
to____0.00_____ beginning with the Installment due ____12/1/2006____

Policy Number __470433_____ Endorsement Effective Time 12:01 AM _____ Endorsement Effective Date __11/09/2006_

Insured __COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS_____ Expiration Date __Until Cancelled_

Issue Date __11/14/2006_ Authorized Signature _____
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008

### ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

## Canal Insurance Company

Greenville, South Carolina

Form E-1can

Copy of Image

(Rev. 12-2001)

0100817999

# Status Summary Sheet

Copy of Image

# Liability

| Vehicle # | Year / Trade Name / Model / Body Type<br>Motor Vehicle Identification # (VIN) | Radius (miles)<br>Garage Location<br>Status | Limit of Liability | Monthly /<br>Annual<br>Premium |
|---|---|---|---|---|
| 1.0 | 1988 IH TRACTOR<br>1HSZDGEN7JH571292 | 300<br>SLOCOMB, AL | CSL/SPLIT 1,000,000<br>UM 20/40 | 328.00 /<br>3,931.00 |
| 1.1 | 1988 IH TRACTOR<br>1HSZDGEN7JH571292 | 300<br>SLOCOMB, AL<br>MODIFIED 11/14/2005 | CSL/SPLIT 1,000,000<br>UM 20/40 | -328.00 /<br>-3,931.00 |
| 1.2 | 1988 IH TRACTOR<br>1HSZDGFN7JH571292 | 300<br>SLOCOMB, AL<br>MODIFIED 11/14/2005 | CSL/SPLIT 1,000,000<br>UM 20/40 | 328.00 /<br>3,931.00 |
| 2.0 | ANY MOBILE HOME WHILE SINGULARLY ATTACHED TO A<br>SCHEDULED TRACTOR | SLOCOMB, AL | | |

Policy Number __470433__   Filings __YES__   Summary Issue Date __11/14/2005__

Insured __COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS__   Expiration Date __UNTIL CANCELLED__

Issuing Agent __ALABAMA PUBLIC AUTO INS AGCY LIC#A043008__

# Canal Insurance Company
Greenville, South Carolina

Copy of Image

Form E-69Ls

(Rev. 6-1998)

0100815207

Copy of Image

# Change of Vehicle Endorsement - Liability

It is agreed that policy to which this endorsement is attached is amended
(1) to EXCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/ Trade Name/Model/ Body Type | Motor Vehicle Identification # | Annual Premium |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

(2) to INCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/Trade Name/Model/Body Type / Motor Vehicle Identification #(VIN) | Radius (miles) | Garage Location | Annual Premium |
|---|---|---|---|---|
| 3 | 1989 INTERNATIONAL TRACTOR 1HTLAZPM3KH638466 | 300 | SLOCOMB, AL | 3,931.00 |

PR 1 -

ADDITIONAL PREMIUM:     __SEE BELOW__          RETURN PREMIUM: _____

| | |
|---|---|
| 6/29/2006 - 8/1/2006 | Breakdown for policies under installment premium payment plan: |

DOWN PAYMENT ___350.00_____          ESCROW DEPOSIT _____656.00_____

The remaining ___monthly___ installments due will change by __328.00_____ from__328.00_____

to ____656.00_____ beginning with the Installment due ____8/1/2006_____

Policy Number ___470433_____ Endorsement Effective Time XXXXXXX 9:51 AM ____ Endorsement Effective Date __06/29/2006__

Insured __COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS_____          Expiration Date __Until Cancelled__

Issue Date __07/05/2006__ Authorized Signature _____

ALABAMA PUBLIC AUTO INS AGCY LIC#A043008

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

# Canal Insurance Company

Copy of Image

Form E-3L          Greenville, South Carolina          (Rev. 4-1994)

0100816927

# Status Summary Sheet

Copy of Image

## Liability

| Vehicle # | Year / Trade Name / Model / Body Type / Motor Vehicle Identification # (VIN) | Radius (miles) / Garage Location / Status | Limit of Liability | Monthly / Annual Premium |
|---|---|---|---|---|
| 1.0 | 1988 IH TRACTOR 1HSZDGEN7JH571292 | 300 SLOCOMB, AL | CSL/SPLIT 1,000,000 UM 20/40 | 328.00 / 3,931.00 |
| 1.1 | 1988 IH TRACTOR 1HSZDGEN7JH571292 | 300 SLOCOMB, AL MODIFIED 11/14/2005 | CSL/SPLIT 1,000,000 UM 20/40 | -328.00 / -3,931.00 |
| 1.2 | 1988 IH TRACTOR 1HSZDGFN7JH571292 | 300 SLOCOMB, AL MODIFIED 11/14/2005 | CSL/SPLIT 1,000,000 UM 20/40 | 328.00 / 3,931.00 |
| 2.0 | ANY MOBILE HOME WHILE SINGULARLY ATTACHED TO A SCHEDULED TRACTOR | SLOCOMB, AL | | |
| 3.0 | 1989 INTERNATIONAL TRACTOR 1HTLAZPM3KH638466 | 300 SLOCOMB, AL ADDED 6/29/2006 9:51 AM | CSL/SPLIT 1,000,000 UM 20/40 | 328.00 / 3,931.00 |

Policy Number ___470433___   Filings __YES__  Summary Issue Date __06/29/2006__

Insured __COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS__   Expiration Date __UNTIL CANCELLED__

Issuing Agent __ALABAMA PUBLIC AUTO INS AGCY LIC#A043008__

# Canal Insurance Company

Greenville, South Carolina

Copy of Image

Form E-69Ls

(Rev. 6-1998)

0100816947

# Change of Vehicle Endorsement - Liability

It is agreed that policy to which this endorsement is attached is amended
(1) to EXCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/ Trade Name/Model/ Body Type | Motor Vehicle Identification # | Annual Premium |
|---|---|---|---|
| 3 | 1989 INTERNATIONAL  TRACTOR * ADDED IN ERROR | 1HTLAZPM3KH638466 | -3,931.00 |

(2) to INCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/Trade Name/Model/Body Type Motor Vehicle Identification #(VIN) | Radius (miles) | Garage Location | Annual Premium |
|---|---|---|---|---|
| PR 1 - | | | | |

ADDITIONAL PREMIUM: _____     RETURN PREMIUM:  SEE BELOW

6/29/2006 - 8/1/2006 Breakdown for policies under installment premium payment plan:
XXXXXXXXXXX  -350.00_____     ESCROW  DEPOSIT _____ -656.00_____
The remaining __monthly__ installments due will change by __-328.00____ from__656.00_____
to___328.00_____ beginning with the Installment due ____8/1/2006_____

Policy Number __470433_____ Endorsement Effective Time XXXXXX 9:51 AM  Endorsement Effective Date _06/29/2006_

Insured  COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS_____     Expiration Date _Until Cancelled_

Issue Date __07/11/2006 Authorized Signature _____
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

# Canal Insurance Company

Greenville, South Carolina

Form E-3L     (Rev. 4-1994)

0100817000

## Status Summary Sheet

Copy of Image

## Liability

| Vehicle # | Year / Trade Name / Model / Body Type<br>Motor Vehicle Identification # (VIN) | Radius (miles)<br>Garage Location<br>Status | Limit of Liability | Monthly /<br>Annual<br>Premium |
|---|---|---|---|---|
| 1.2 | 1988 IH TRACTOR<br>1HSZDGFN7JH571292 | 300<br>SLOCOMB, AL<br>MODIFIED 11/14/2005 | CSL/SPLIT 1,000,000<br>UM 20/40 | 328.00 /<br>3,931.00 |
| 2.0 | ANY MOBILE HOME WHILE SINGULARLY ATTACHED TO A<br>SCHEDULED TRACTOR | SLOCOMB, AL | | |

Policy Number ___470433_____ Filings __YES__ Summary Issue Date __06/29/2006_____

Insured __COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS_____ Expiration Date __UNTIL CANCELLED

Issuing Agent ___ALABAMA PUBLIC AUTO INS AGCY LIC#A043008_____

# Canal Insurance Company
Greenville, South Carolina

Form E-69Ls

Copy of Image

(Rev. 6-1998)

0100817000

Copy of Image

# Certificate of Insurance

This is to certify that the **Canal Insurance Company** has issued to the named insured herein a policy of insurance which provides, subject to its provisions and during the effective period, coverage as hereinafter described. The coverage and limits of liability indicated on this certificate apply only to the operation of motor vehicles described herein.

| CERTIFICATE ISSUED TO: | INSURED: |
|---|---|
| ALABAMA DEPARTMENT OF TRANSPORTATION PERMIT OFFICE P O BOX 303050 MONTGOMERY, AL 36130-3050 | COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS 1565 CO. RD. 73 SLOCOMB, AL 36375 |

LOCATION OF OPERATIONS: SLOCOMB, AL        RADIUS: 300 miles of Location.

PER POLICY SCHEDULE

| POLICY NUMBER:  470433 | LIMITS OF LIABILITY: |
|---|---|
| KIND OF INSURANCE: AUTO LIABILITY | $1,000,000 CSL |

EFFECTIVE DATE OF CERTIFICATE: 12:01 AM    11/16/2005 TO UNTIL CANCELLED

This certificate is issued as a mere courtesy to the named insured and the party at whose request the certificate is issued. This certificate does not make the party requesting it an additional insured or give that party any rights under the policy. This certificate is not a part of the insurance policy and is not intended to affirmatively or negatively alter, extend or rescind any of the existing terms, conditions or coverage of the above mentioned policy.

In the event of cancellation of such policy, the Company will attempt to notify the party at whose request certificate is issued, but the Company shall not be liable in any way for failure to give such notice.

*Estelle G Smith*

ALABAMA PUBLIC AUTO INS AGCY LIC#A043008        Authorized Representative

# Canal Insurance Company

Greenville, South Carolina

Form K-16

Copy of Image

(Rev. 5-1991)

0100815207

Copy of Image

# Certificate of Insurance

This is to certify that the **Canal Insurance Company** has issued to the named insured herein a policy of insurance which provides, subject to its provisions and during the effective period, coverage as hereinafter described. The coverage and limits of liability indicated on this certificate apply only to the operation of motor vehicles described herein.

| CERTIFICATE ISSUED TO: | INSURED: |
|---|---|
| ALABAMA DEPARTMENT OF TRANSPORTATION PERMIT OFFICE P O BOX 303050 MONTGOMERY, AL 36130-3050 | COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS 1565 CO. RD. 73 SLOCOMB, AL 36375 |

LOCATION OF OPERATIONS: SLOCOMB, AL                    RADIUS:

PER POLICY SCHEDULE

*Policy Cancelled* (stamp)

| POLICY NUMBER: 470433 | LIMITS OF LIABILITY: $0 CSL |
|---|---|
| KIND OF INSURANCE: AUTO LIABILITY | |

EFFECTIVE DATE OF CERTIFICATE: 12:01 AM    11/16/2005 TO UNTIL CANCELLED

This certificate is issued as a mere courtesy to the named insured and the party at whose request the certificate is issued. This certificate does not make the party requesting it an additional insured or give that party any rights under the policy. This certificate is not a part of the insurance policy and is not intended to affirmatively or negatively alter, extend or rescind any of the existing terms, conditions or coverage of the above mentioned policy.

In the event of cancellation of such policy, the Company will attempt to notify the party at whose request certificate is issued, but the Company shall not be liable in any way for failure to give such notice.

*Estelle E. Smith*

ALABAMA PUBLIC AUTO INS AGCY LIC#A043008              Authorized Representative

# Canal Insurance Company

Greenville, South Carolina

Form K-16                    Copy of Image                    (Rev 5-1991)

0100817999

Copy of Image

~ NOTICE OF CANCELLATION ~

| | |
|---|---|
| Kind of Policy: | **LIABILITY** |
| Policy No.    470433 | Effective: 11/2/2005 |

Insurance Company
CANAL INSURANCE COMPANY
PO BOX 7
GREENVILLE, S.C. 29602

Cancellation will take effect at:
9/28/2006          12:01 A.M.
(Date)          (Hour-Standard Time at Insured's Address)

Date of Mailing:    8/23/2006

Name and Address of Insured
470433

COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS
1565 CO. RD. 73
SLOCOMB, AL 36375

Issued through Agency or Office at: BIRMINGHAM, AL

Agent of Insured:  DIVERSIFIED INSURANCE

You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above. The return premium, if any, will be refunded as soon as practicable by the agent from whom the policy was purchased. This cancellation can be rescinded only by written notice to you signed by a company representative.

REASON FOR CANCELLATION:  INSURED'S REQUEST:  NON-PAYMENT TO GENERAL AGENT

Agent of Insured
DIVERSIFIED INSURANCE
P O BOX 5622
DOTHAN AL 36302

*Linda J. Hogan*
Authorized Representative
Linda J. Hogan  SP/ 8/23/2006

TO LIENHOLDER, MORTGAGEE, CITY LICENSE AUTHORITY OR ASSIGNED RISK PLAN, OR OTHER THIRD PARTY:
You are hereby notified that the agreement under the Loss Payable Clause payable to you as Lienholder or the agreement to provide notice, which is a part of the above policy, issued to the above insured, is hereby cancelled in accordance with the conditions of the policy, said cancellation to be effective on and after the hour and date mentioned above.

General Agent
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008
PO BOX 321215
BIRMINGHAM, AL 35232

Authorized Representative

(Rev. 2-1999)

Form D-58-p                HDCS61        FLIN561

010081739

Copy of Image

Policy Number:   470433

Insured Name:   COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS

I hereby certify that I personally caused to be mailed in the U.S. Post Office at BIRMINGHAM, AL on the Date of Mailing above at 11:14 AM , the original notice of cancellation reproduced on page 1 and at said time received from the U.S. Post Office a Postal Receipt maintained as business records of the Company.  I also caused to be mailed Third Party Notices to those shown below.

Signed: _Linda J. Hogan_____

Notices sent to: (* denotes Certificate of Mailing;   ** denotes Certified Mail)

    *COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS, 1565 CO. RD. 73, SLOCOMB, AL 36375

    ALABAMA PUBLIC AUTO INS AGCY LIC#A043008, PO BOX 321215, BIRMINGHAM AL 35232

    DIVERSIFIED INSURANCE, P O BOX 5622, DOTHAN AL 36302

Copy of Image

(Rev. 2-1999)

0100817390

Copy of Image

## NOTICE OF CANCELLATION

| | |
|---|---|
| Insurance Company | CANAL INSURANCE COMPANY<br>PO BOX 7<br>GREENVILLE, S.C. 29602 |

| Kind of Policy: | LIABILITY | |
|---|---|---|
| Policy No. | 470433 | Effective: 11/2/2005 |

| Cancellation will take effect at: | |
|---|---|
| 9/28/2006 | 12:01 A.M. |
| (Date) | (Hour-Standard Time at Insured's Address) |

| Date of Mailing: | 8/23/2006 |
|---|---|

| | |
|---|---|
| Name and Address of Insured 470433 | COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS<br>1565 CO. RD. 73<br>SLOCOMB, AL 36375 |

Issued through Agency or Office at: BIRMINGHAM, AL

Agent of Insured: DIVERSIFIED INSURANCE

You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above. The return premium, if any, will be refunded as soon as practicable by the agent from whom the policy was purchased. This cancellation can be rescinded only by written notice to you signed by a company representative.

REASON FOR CANCELLATION:  INSURED'S REQUEST:  NON-PAYMENT TO GENERAL AGENT

| | |
|---|---|
| Agent of Insured | DIVERSIFIED INSURANCE<br>P O BOX 5622<br>DOTHAN AL 36302 |

*Linda J. Hogan*
Authorized Representative
Linda J. Hogan  SP/ 8/23/2006

TO LIENHOLDER, MORTGAGEE, CITY LICENSE AUTHORITY OR ASSIGNED RISK PLAN, OR OTHER THIRD PARTY:
You are hereby notified that the agreement under the Loss Payable Clause payable to you as Lienholder or the agreement to provide notice, which is a part of the above policy, issued to the above insured, is hereby cancelled in accordance with the conditions of the policy, said cancellation to be effective on and after the hour and date mentioned above.

Authorized Representative

(Rev. 2-1999)

Copy of Image

Insured Copy

Form D-58-p

0100817390

## NOTICE OF CANCELLATION

| | |
|---|---|
| Insurance Company | CANAL INSURANCE COMPANY<br>PO BOX 7<br>GREENVILLE, S.C. 29602 |

| Kind of Policy: | LIABILITY | |
|---|---|---|
| Policy No. | 470433 | Effective: 11/2/2005 |
| Cancellation will take effect at:<br>9/28/2006<br>(Date) | | 12:01 A.M.<br>(Hour-Standard Time at Insured's Address) |
| Date of Mailing: | 8/23/2006 | |
| Issued through Agency or Office at: BIRMINGHAM, AL | | |
| Agent of Insured: | DIVERSIFIED INSURANCE | |

| | |
|---|---|
| Name and Address of Insured<br>470433 | COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS<br>1565 CO. RD. 73<br>SLOCOMB, AL 36375 |

You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above. The return premium, if any, will be refunded as soon as practicable by the agent from whom the policy was purchased. This cancellation can be rescinded only by written notice to you signed by a company representative.

REASON FOR CANCELLATION: INSURED'S REQUEST: NON-PAYMENT TO GENERAL AGENT

| | |
|---|---|
| General Agent | ALABAMA PUBLIC AUTO INS AGCY LIC#A043008<br>PO BOX 321215<br>BIRMINGHAM AL 35232 |

*Linda J. Hogan*
Authorized Representative
Linda J. Hogan SP/ 8/23/2006

TO LIENHOLDER, MORTGAGEE, CITY LICENSE AUTHORITY OR ASSIGNED RISK PLAN, OR OTHER THIRD PARTY:
You are hereby notified that the agreement under the Loss Payable Clause payable to you as Lienholder or the agreement to provide notice, which is a part of the above policy, issued to the above insured, is hereby cancelled in accordance with the conditions of the policy, said cancellation to be effective on and after the hour and date mentioned above.

| | |
|---|---|
| Agent of Insured | DIVERSIFIED INSURANCE<br>P O BOX 5622<br>DOTHAN AL 36302 |

Authorized Representative

(Rev. 2-1999)

0100817390

Policy Number: 470433

Insured Name: COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS

I hereby certify that I personally caused to be mailed in the U.S. Post Office at BIRMINGHAM, AL on the Date of Mailing above at 11:14 AM , the original notice of cancellation reproduced on page 1 and at said time received from the U.S. Post Office a Postal Receipt maintained as business records of the Company. I also caused to be mailed Third Party Notices to those shown below.

Signed: _Linda J. Hogan_

Notices sent to: (* denotes Certificate of Mailing;   ** denotes Certified Mail)

    *COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS, 1565 CO. RD. 73, SLOCOMB, AL 36375
    ALABAMA PUBLIC AUTO INS AGCY LIC#A043008, PO BOX 321215, BIRMINGHAM AL 35232
    DIVERSIFIED INSURANCE, P O BOX 5622, DOTHAN AL 36302

Form D-58

(Rev. 2-1999)

0100817390

NOTICE OF CANCELLATION

| | |
|---|---|
| Insurance Company | CANAL INSURANCE COMPANY<br>PO BOX 7<br>GREENVILLE, S.C. 29602 |

| Kind of Policy: | LIABILITY | |
|---|---|---|
| Policy No. | 470433 | Effective: 11/2/2005 |

Cancellation will take effect at:
9/28/2006                    12:01 A.M.
(Date)          (Hour-Standard Time at Insured's Address)

| Date of Mailing: | 8/23/2006 |
|---|---|

Issued through Agency or Office at: BIRMINGHAM, AL

| Name and Address of Insured 470433 | COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS<br>1565 CO. RD. 73<br>SLOCOMB, AL 36375 |
|---|---|

Agent of Insured: DIVERSIFIED INSURANCE

You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above. The return premium, if any, will be refunded as soon as practicable by the agent from whom the policy was purchased. This cancellation can be rescinded only by written notice to you signed by a company representative.

REASON FOR CANCELLATION: INSURED'S REQUEST: NON-PAYMENT TO GENERAL AGENT

| Agent of Insured | DIVERSIFIED INSURANCE<br>P O BOX 5622<br>DOTHAN AL 36302 |
|---|---|

*Linda J. Hogan*
Authorized Representative
Linda J. Hogan  SP/ 8/23/2006

TO LIENHOLDER, MORTGAGEE, CITY LICENSE AUTHORITY OR ASSIGNED RISK PLAN, OR OTHER THIRD PARTY:
You are hereby notified that the agreement under the Loss Payable Clause payable to you as Lienholder or the agreement to provide notice, which is a part of the above policy, issued to the above insured, is hereby cancelled in accordance with the conditions of the policy, said cancellation to be effective on and after the hour and date mentioned above.

| General Agent | ALABAMA PUBLIC AUTO INS AGCY LIC#A043008<br>PO BOX 321215<br>BIRMINGHAM,AL 35232 |
|---|---|

Authorized Representative
General Agent Copy

(Rev. 2-1999)

Form D-58-p

010081739C

161105678

Policy Number:  470423-1
Insured Name:   COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS

I hereby certify that I personally caused to be mailed in the U.S. Post Office at BIRMINGHAM, AL on the Date of Mailing above at 11:14 AM , the original notice of cancellation reproduced on page 1 and at said time received from the U.S. Post Office a Postal Receipt maintained as business records of the Company.  I also caused to be mailed Third Party Notices to those shown below.

Signed: _Linda J. Hogan_____

Notices sent to: (* denotes Certificate of Mailing;   ** denotes Certified Mail)

   *COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS, 1565 CO. RD. 73, SLOCOMB, AL 36375
   ALABAMA PUBLIC AUTO INS AGCY LIC#A043008, PO BOX 321215, BIRMINGHAM AL 35232
   DIVERSIFIED INSURANCE, P O BOX 5622, DOTHAN AL 36302

Copy of Image

Form D-58

(Rev. 2-1999)

0100817390

161106524

Copy of Image

## NOTICE OF REINSTATEMENT

| Policy Number | Effective Date of Cancellation | Effective Date of Reinstatement | Date of Notice |
|---|---|---|---|
| 470433 | 9/28/2006 | 9/7/2006 | 9/7/2006 |

THE CANCELLATION NOTICE TERMINATING THIS
POLICY ON THE DATE SHOWN IS HEREBY RESCINDED
AND THE POLICY IS REINSTATED ON THE DATE OF
REINSTATEMENT INDICATED.

INSURED:
COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS
1565 CO. RD. 73
SLOCOMB, AL 36375

_Estelle & Smith_

Authorized Representative

AGENT:
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008
PO BOX 321215
BIRMINGHAM, AL 35232



CANAL
INSURANCE
BOX 7  GREENVILLE, SOUTH CAROLINA  29602

Home Office Copy

City License Authority or Loss Payee:

Form D-8

Copy of Image

(Rev. 3-2002)

0100617531

161106524

Copy of Image

## NOTICE OF REINSTATEMENT

| Policy Number | Effective Date of Cancellation | Effective Date of Reinstatement | Date of Notice |
|---|---|---|---|
| 470433 | 9/28/2006 | 9/7/2006 | 9/7/2006 |

THE CANCELLATION NOTICE TERMINATING THIS
POLICY ON THE DATE SHOWN IS HEREBY RESCINDED
AND THE POLICY IS REINSTATED ON THE DATE OF
REINSTATEMENT INDICATED.

INSURED:
COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS
1565 CO. RD. 73
SLOCOMB, AL 36375

_Estelle E. Smith_
Authorized Representative

AGENT:
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008
PO BOX 321215
BIRMINGHAM, AL 35232



CANAL
INSURANCE
BOX 7   GREENVILLE, SOUTH CAROLINA 29602

Insured Copy

City License Authority or Loss Payee:

Form D-8

Copy of Image

(Rev. 3-2002)

0100817531

Copy of Image

# NOTICE OF REINSTATEMENT

| Policy Number | Effective Date of Cancellation | Effective Date of Reinstatement | Date of Notice |
|---|---|---|---|
| 470433 | 9/28/2006 | 9/7/2006 | 9/7/2006 |

THE CANCELLATION NOTICE TERMINATING THIS POLICY ON THE DATE SHOWN IS HEREBY RESCINDED AND THE POLICY IS REINSTATED ON THE DATE OF REINSTATEMENT INDICATED.

INSURED:
COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS
1565 CO. RD. 73
SLOCOMB, AL 36375

*Estelle E. Smith*

Authorized Representative

AGENT:
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008
PO BOX 321215
BIRMINGHAM, AL 35232



CANAL INSURANCE
BOX 7   GREENVILLE, SOUTH CAROLINA 29602

Producing Agent Copy

City License Authority or Loss Payee:
DIVERSIFIED INSURANCE
P O BOX 5622
DOTHAN AL 36302

Copy of Image

Form D-8

(Rev. 3-2002)

0100817531

161106524

Copy of Image

## NOTICE OF REINSTATEMENT

| Policy Number | Effective Date of Cancellation | Effective Date of Reinstatement | Date of Notice |
|---|---|---|---|
| 470433 | 9/28/2006 | 9/7/2006 | 9/7/2006 |

THE CANCELLATION NOTICE TERMINATING THIS POLICY ON THE DATE SHOWN IS HEREBY RESCINDED AND THE POLICY IS REINSTATED ON THE DATE OF REINSTATEMENT INDICATED.

INSURED:
COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS
1565 CO. RD. 73
SLOCOMB, AL 36375

*Estelle E. Smith*

Authorized Representative

AGENT:
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008
PO BOX 321215
BIRMINGHAM, AL 35232



# CANAL
## INSURANCE
BOX 7  GREENVILLE, SOUTH CAROLINA  29602

Agent Copy

Notice sent to:

City License Authority or Loss Payee:

Copy of Image

Form D-8

(Rev. 3-2002)

0100817531

NOTICE OF CANCELLATION

| | |
|---|---|
| **Insurance Company** | CANAL INSURANCE COMPANY<br>PO BOX 7<br>GREENVILLE, S.C. 29602 |

| Kind of Policy: | LIABILITY | |
|---|---|---|
| Policy No. | 470433 | Effective: 11/2/2005 |

Cancellation will take effect at:
11/9/2006                          12:01 A.M.
(Date)          (Hour-Standard Time at Insured's Address)

| Date of Mailing: | 10/4/2006 |
|---|---|

Issued through Agency or Office at: BIRMINGHAM, AL

| Agent of Insured: | DIVERSIFIED INSURANCE |
|---|---|

| | |
|---|---|
| **Name and Address of Insured**<br>470433 | COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS<br>1565 CO. RD. 73<br>SLOCOMB, AL 36375 |

You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above. The return premium, if any, will be refunded as soon as practicable by the agent from whom the policy was purchased. This cancellation can be rescinded only by written notice to you signed by a company representative.

REASON FOR CANCELLATION:  INSURED'S REQUEST
                                             MOVING COVERAGE

| | |
|---|---|
| **Agent of Insured** | DIVERSIFIED INSURANCE<br>P O BOX 5622<br>DOTHAN AL 36302 |

*Linda J. Hogan*
Authorized Representative
Linda J. Hogan  SP/  10/4/2006

TO LIENHOLDER, MORTGAGEE, CITY LICENSE AUTHORITY OR ASSIGNED RISK PLAN, OR OTHER THIRD PARTY:
You are hereby notified that the agreement under the Loss Payable Clause payable to you as Lienholder or the agreement to provide notice, which is a part of the above policy, issued to the above insured, is hereby cancelled in accordance with the conditions of the policy, said cancellation to be effective on and after the hour and date mentioned above.

| | |
|---|---|
| **General Agent** | ALABAMA PUBLIC AUTO INS AGCY LIC#A043008<br>PO BOX 321215<br>BIRMINGHAM,AL 35232 |

Authorized Representative

(Rev. 2-1999)

Form D-58-p                                                                                   010081772'

161107951

Policy Number: 470433

Insured Name: COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS

I hereby certify that I personally caused to be mailed in the U.S. Post Office at BIRMINGHAM, AL on the Date of Mailing above at 11:43 AM , the original notice of cancellation reproduced on page 1 and at said time received from the U.S. Post Office a Postal Receipt maintained as business records of the Company. I also caused to be mailed Third Party Notices to those shown below.

Signed: _Linda G. Hogan_

Notices sent to: (* denotes Certificate of Mailing;   ** denotes Certified Mail)

*COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS, 1565 CO. RD. 73, SLOCOMB, AL 36375
ALABAMA PUBLIC AUTO INS AGCY LIC#A043008, PO BOX 321215, BIRMINGHAM AL 35232
DIVERSIFIED INSURANCE, P O BOX 5622, DOTHAN AL 36302

Copy of Image

(Rev. 2-1999)

0100817727

161107951

NOTICE OF CANCELLATION

| | |
|---|---|
| Insurance Company | CANAL INSURANCE COMPANY<br>PO BOX 7<br>GREENVILLE, S.C. 29602 |

| Kind of Policy: | LIABILITY | |
|---|---|---|
| Policy No. | 470433 | Effective: 11/2/2005 |

Cancellation will take effect at:
11/9/2006          12:01 A.M.
(Date)          (Hour-Standard Time at Insured's Address)

| Date of Mailing: | 10/4/2006 |
|---|---|

Issued through Agency or Office at: BIRMINGHAM, AL

| Agent of Insured: | DIVERSIFIED INSURANCE |
|---|---|

| | |
|---|---|
| Name and Address of Insured<br>470433 | COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS<br>1565 CO. RD. 73<br>SLOCOMB, AL 36375 |

You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above. The return premium, if any, will be refunded as soon as practicable by the agent from whom the policy was purchased. This cancellation can be rescinded only by written notice to you signed by a company representative.

REASON FOR CANCELLATION:  INSURED'S REQUEST
                          MOVING COVERAGE

| | |
|---|---|
| Agent of Insured | DIVERSIFIED INSURANCE<br>P O BOX 5622<br>DOTHAN AL 36302 |

_Linda J. Hogan_
Authorized Representative
Linda J. Hogan  SP/  10/4/2006

TO LIENHOLDER, MORTGAGEE, CITY LICENSE AUTHORITY OR ASSIGNED RISK PLAN, OR OTHER THIRD PARTY:
You are hereby notified that the agreement under the Loss Payable Clause payable to you as Lienholder or the agreement to provide notice, which is a part of the above policy, issued to the above insured, is hereby cancelled in accordance with the conditions of the policy, said cancellation to be effective on and after the hour and date mentioned above.

Authorized Representative

(Rev. 2-1999)

0100817727

161107951

Copy of Image

# ~NOTICE OF CANCELLATION~

| | |
|---|---|
| Insurance Company | CANAL INSURANCE COMPANY<br>PO BOX 7<br>GREENVILLE, S.C. 29602 |

| | |
|---|---|
| Kind of Policy: | LIABILITY |
| Policy No. | 470433 Effective: 11/2/2005 |

Cancellation will take effect at:
11/9/2006      12:01 A.M.
(Date)     (Hour-Standard Time at Insured's Address)

| | |
|---|---|
| Date of Mailing: | 10/4/2006 |

| | |
|---|---|
| Name and Address of Insured<br>470433 | COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS<br>1565 CO. RD. 73<br>SLOCOMB, AL 36375 |

Issued through Agency or Office at: BIRMINGHAM, AL

| | |
|---|---|
| Agent of Insured: | DIVERSIFIED INSURANCE |

You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above. The return premium, if any, will be refunded as soon as practicable by the agent from whom the policy was purchased. This cancellation can be rescinded only by written notice to you signed by a company representative.

REASON FOR CANCELLATION:   INSURED'S REQUEST
                                     MOVING COVERAGE

| | |
|---|---|
| General Agent | ALABAMA PUBLIC AUTO INS AGCY LIC#A043008<br>PO BOX 321215<br>BIRMINGHAM AL 35232 |

*Linda J. Hogan*
Authorized Representative
Linda J. Hogan   SP/ 10/4/2006

TO LIENHOLDER, MORTGAGEE, CITY LICENSE AUTHORITY OR ASSIGNED RISK PLAN, OR OTHER THIRD PARTY:
You are hereby notified that the agreement under the Loss Payable Clause payable to you as Lienholder or the agreement to provide notice, which is a part of the above policy, issued to the above insured, is hereby cancelled in accordance with the conditions of the policy, said cancellation to be effective on and after the hour and date mentioned above.

| | |
|---|---|
| Agent of Insured | DIVERSIFIED INSURANCE<br>P O BOX 5622<br>DOTHAN AL 36302 |

Authorized Representative

Copy of Image

Form D-58-p

Producing Agent Copy

(Rev. 2-1999)

0100817727

Policy Number: 4704250
Insured Name:  COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS

I hereby certify that I personally caused to be mailed in the U.S. Post Office at BIRMINGHAM, AL on the Date of Mailing above at 11:43 AM , the original notice of cancellation reproduced on page 1 and at said time received from the U.S. Post Office a Postal Receipt maintained as business records of the Company.  I also caused to be mailed Third Party Notices to those shown below.

Signed:  _Linda J. Hogan_

Notices sent to: (* denotes Certificate of Mailing;  ** denotes Certified Mail)

  *COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS, 1565 CO. RD. 73, SLOCOMB, AL 36375
   ALABAMA PUBLIC AUTO INS AGCY LIC#A043008, PO BOX 321215, BIRMINGHAM AL 35232
   DIVERSIFIED INSURANCE, P O BOX 5622, DOTHAN AL 36302

Form D-58

(Rev. 2-1999)

0100817727

161107951

NOTICE OF CANCELLATION

| Insurance Company | CANAL INSURANCE COMPANY<br>PO BOX 7<br>GREENVILLE, S.C. 29602 |
|---|---|

| Kind of Policy: | LIABILITY | |
|---|---|---|
| Policy No. | 470433 | Effective: 11/2/2005 |

| Cancellation will take effect at: | |
|---|---|
| 11/9/2006 | 12:01 A.M. |
| (Date) | (Hour-Standard Time at Insured's Address) |

| Date of Mailing: | 10/4/2006 |
|---|---|

| Name and Address of Insured 470433 | COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS<br>1565 CO. RD. 73<br>SLOCOMB, AL 36375 |
|---|---|

Issued through Agency or Office at: BIRMINGHAM, AL

Agent of Insured: DIVERSIFIED INSURANCE

You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above. The return premium, if any, will be refunded as soon as practicable by the agent from whom the policy was purchased. This cancellation can be rescinded only by written notice to you signed by a company representative.

REASON FOR CANCELLATION:    INSURED'S REQUEST
                            MOVING COVERAGE

| Agent of Insured | DIVERSIFIED INSURANCE<br>P O BOX 5622<br>DOTHAN AL 36302 |
|---|---|

_Linda J. Hogan_
Authorized Representative
Linda J. Hogan  SP/ 10/4/2006

TO LIENHOLDER, MORTGAGEE, CITY LICENSE AUTHORITY OR ASSIGNED RISK PLAN, OR OTHER THIRD PARTY:
You are hereby notified that the agreement under the Loss Payable Clause payable to you as Lienholder or the agreement to provide notice, which is a part of the above policy, issued to the above insured, is hereby cancelled in accordance with the conditions of the policy, said cancellation to be effective on and after the hour and date mentioned above.

| General Agent | ALABAMA PUBLIC AUTO INS AGCY LIC#A043008<br>PO BOX 321215<br>BIRMINGHAM, AL 35232 |
|---|---|

Authorized Representative

Form D-58-p

(Rev. 2-1999)

0100817727

161107951

Policy Number:  470433.

Insured Name:  COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS

I hereby certify that I personally caused to be mailed in the U.S. Post Office at BIRMINGHAM, AL on the Date of Mailing above at 11:43 AM , the original notice of cancellation reproduced on page 1 and at said time received from the U.S. Post Office a Postal Receipt maintained as business records of the Company.  I also caused to be mailed Third Party Notices to those shown below.

Signed:  _Linda J. Hogan_____

Notices sent to: (* denotes Certificate of Mailing;   ** denotes Certified Mail)

   *COLBERT BRYAN MCGRIFF DBA BEAR CREEK MOVERS, 1565 CO. RD. 73, SLOCOMB, AL 36375
    ALABAMA PUBLIC AUTO INS AGCY LIC#A043008, PO BOX 321215, BIRMINGHAM AL 35232
    DIVERSIFIED INSURANCE, P O BOX 5622, DOTHAN AL 36302

(Rev. 2-1999)

01008177:

Bear Creek Sale
Robin McGriff (Owner)
P. O. Box 193
Malvern, Al. 36375
(334)886-2851~ Fax (334)886-2854

# Bill OF Sale
## State of Alabama:

KNOW ALL MEN BY THESE PRESENTS, THAT I, <u>BEAR CREEK Sale</u>, . IN
CONSIDERATION OF <u>$ 14,485.00</u> DOLLARS IN HAND/TRADE PAID BY _Lucy Van
Palmore. THE RECEIPT WHEREOF IS HEREBY ACKOWLEDGED, BO HEREBY
BARGAIN, SELL, AND CONVEY UNTO THE SAID, Lucy Van Palmore, THE
FOLLOWING DESCRIBED PERSONAL PROPERTY, TO WIT:

2000 Redman            Serial # 11437033

| | |
|---|---|
| Price | $ 13,000.00 |
| Sale Tax | $ 260.00 |
| Decal | $ 25.00 |
| Title | $ 00.00 |
| Moving | $ 1,200.00 |
| Total Payment Due | $ 14,485.00 |

AND I HEREBY COVENANT WITH THE GRANTEE THAT I AM THE LAWFUL OWNER
OF SAID PROPERTY, AND THAT IT IS FREE FROM ENCUMBRANCES, AND THAT I
HAVE A GOOD AND VALID RIGHT TO SELL THE LAWFUL CLAIMS OF ALL PERSONS.
WITNESS MY HAND THIS THE __21_ DAY OF ____February___ ,2006.
USED MOBILE HOMES SOLD AS IS NO WARRANTY-NO SERVICES CONTRACT.
BEAR CREEK PARK WILL NOT BE RESPONSIBLE FOR ANY REPAIRS, SERVICE WORK
OR ACCIDENTS.

_____                    _____
Seller                                     Purchaser

Lien Holder:                               _____
None
                                           Purchaser

STATE OF <u>ALABAMA</u>
COUNTY OF

_____
NOTARY PUBLIC
MY COMMISSION EXPIRES: <u>05-27-2009</u>

0001
1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         SOUTHERN DIVISION
4
5    CIVIL ACTION NUMBER  1:07CV410-MHT
6  CANAL INSURANCE COMPANY,
7
8      Plaintiff(s),
9  v.
10  FRANK LONDON COOK; COLBERT
11  BRIAN McGRIFF; LOWE'S HOME
12  CENTERS, INC.; L.G. SOURCING,
13  INC.; and BEAR CREEK MOVERS,
14  LLC.,
15      Defendant(s).
16
17      DEPOSITION TESTIMONY OF:
18        COLBERT B. MCGRIFF
19
20  Commissioner:
21  Renny D. McNaughton
22  September 14, 2007
23  Dothan, Alabama
0002
1      S T I P U L A T I O N
2      IT IS STIPULATED AND AGREED by and
3  between the parties through their respective
4  counsel that the deposition of Colbert B.
5  McGriff, may be taken before Renny D.
6  McNaughton, Court Reporter and Notary
7  Public, State at Large, at the offices of
8  Merrill Harrison & Adams, P.C., 153 South
9  Oates Street, Dothan, Alabama, on the 14th
10  day of September, 2007, commencing at
11  approximately 10:00 a.m.
12      IT IS FURTHER STIPULATED AND AGREED
13  that the signature to and the reading of the
14  deposition by the witness is waived, the
15  deposition to have the same force and effect
16  as if full compliance had been had with all
17  laws and rules of Court relating to the
18  taking of depositions.
19      IT IS FURTHER STIPULATED AND AGREED
20  that it shall not be necessary for any
21  objections to be made by counsel to any

22  questions, except as to form or leading
23  question and that counsel for the parties
0003
 1  may make objections and assign grounds at
 2  the time of trial or at the time said
 3  deposition is offered in evidence, or prior
 4  thereto.
 5      In accordance with Rule 5(d) of the
 6  Alabama Rules of Civil Procedure, as
 7  amended, effective May 15, 1988, I Renny D.
 8  McNaughton, am hereby delivering to Mr.
 9  Wells the original transcript of the oral
10  testimony taken the 14th day of September,
11  2007, along with exhibits.
12       Please be advised that this is the
13  same and not retained by the Court Reporter,
14  nor filed with the Court.
15
16
17
18
19
20
21
22
23
0004
 1          I N D E X
 2      EXAMINATION BY:          PAGE NO.
 3  Mr. Wells               6, 24
 4  Mr. Couch                 18
 5  Mr. Adams                 24
 6
 7          E X H I B I T S
 8  Defendant's
 9  No. 1
10
11
12
13
14
15
16
17
18
19

20
21
22
23
0005
1        A P P E A R A N C E S
2   FOR CANAL INSURANCE COMPANY :
3   David R. Wells
4   Miller, Hamilton, Snider & Odom, L.L.C.
5   505 20th Street North, Suite 1200
6   Financial Center
7   Birmingham, Alabama 35203
8   205-226-5200
9   FOR FRANK LONDON COOK :
10  Steven William Couch
11  Hollis & Wright, P.C.
12  Financial Center, 505 North 20th Street,
13  Suite 1500
14  Birmingham, Alabama 35203
15  205-324-3600
16  FOR COLBERT BRIAN McGRIFF :
17  Samuel L. Adams
18  Merrill Harrison & Adams, P.C.
19  153 South Oates Street
20  Dothan, Alabama 36302
21  334-792-0965
22
23
0006
1        I, Renny D. McNaughton, a Court
2   Reporter of Greenville, Alabama, and a
3   Notary Public for the State of Alabama at
4   Large, acting as Commissioner, certify that
5   on this date, pursuant to the Alabama Rules
6   of Civil Procedure, and the foregoing
7   stipulation of counsel, there came before me
8   at the offices of Merrill Harrison & Adams,
9   P.C., 153 South Oates Street, Dothan,
10  Alabama, commencing at approximately 10:00
11  a.m. on the 14th day of September, 2007,
12  Colbert B. McGriff, witness in the above
13  cause, for oral examination, whereupon the
14  following proceedings were had:
15
16        COLBERT B. McGRIFF,
17  being first duly sworn, was examined and

18  testified as follows:
19          EXAMINATION
20  BY MR. WELLS:
21    Q    Mr. McGriff, we just met.  My
22  name is David Wells, and I'm one of the
23  attorneys that represents Canal Insurance
0007
 1  Company with respect to the declaratory
 2  judgment action that has been filed.  I'm
 3  here to take your deposition this morning.
 4  As we said before we started, I don't think
 5  we're going to be here a real long time.
 6    Okay.  I know you have been deposed
 7  once in the underlying lawsuit.  Sort of the
 8  same ground rules that applied to that
 9  deposition apply here.  What I really need
10  from you is a verbal response, a yes or a no
11  or an explanation.  This gentleman is taking
12  down everything we say, and while you and I
13  understand head nods, it's a little bit
14  harder for him.
15    A    Yes.
16    Q    I will try to ask you intelligent
17  questions.  I can't promise that's always
18  going to happen.  If I ask you something
19  that you don't understand what I'm asking
20  you, please let me know and I will try to
21  re-ask it.
22    A    Okay.
23    Q    If you answer, I'm going to
0008
 1  assume that you understood; is that fair?
 2    A    Yes.
 3    Q    All right.  With that being said,
 4  can you give me your full name, please?
 5    A    Colbert Brian McGriff.
 6    Q    And, Mr. McGriff, where do you
 7  live?
 8    A    1565 County Road 73, Slocomb,
 9  Alabama.
10    Q    And who lives with you at that
11  address?
12    A    My wife and children.
13    Q    What's your wife's name?
14    A    Robin McGriff.  Beverly Robin
15  McGriff.

16      Q    And your children?
17      A    We have Garrett Elton German,
18  stepson.  We have Joseph Brian McGriff.
19  He's an adopted child.  And we have Harrison
20  Jason McGriff is our biological child.
21      Q    Okay.  Where do you currently
22  work, sir?
23      A    Houston County Board Education.
0009
1      Q    What do you do for the Board of
2  Education?
3      A    Transportation maintenance
4  supervisor.
5      Q    How long have you worked in that
6  position?
7      A    That position, about seven years.
8      Q    In addition to working for the
9  Houston County Board of Education, do you
10  have any businesses that you run or own?
11      A    Yes.
12      Q    How many?
13      A    Bear Creek Sales.  Bear Creek
14  Movers, or however it's listed here on this
15  policy here.  Do you want me to read it off
16  here so that we can be more specific.
17          (Whereupon, Defendant's
18      Exhibit Number 1 was marked and
19      attached to the deposition.)
20  BY MR. WELLS:
21      Q    I'm going to mark Defendant's
22  Exhibit 1.  And that's a copy of the policy
23  that was provided to me by Canal as the
0010
1  policy at issue here that was attached to
2  our declaratory judgment.
3          MR. ADAMS:  Off the record.
4          (Off the record.)
5  BY MR. WELLS:
6      Q    Mr. McGriff, you and your
7  attorney looked at what I marked as
8  Defendant's Exhibit 1, which I will
9  represent to you is a copy of the Canal
10  policy at issue in the declaratory judgment
11  action.  Have you seen that policy before?
12      A    Yes, sir.
13      Q    Okay.  And you were telling me

14  about the businesses that y'all own.  And
15  with respect to the Canal policy,
16  Defendant's Exhibit 1, the insured is
17  Colbert Brian McGriff, d/b/a, or doing
18  business as Bear Creek Movers?
19      A    Yes.
20      Q    And then you also mentioned you
21  own Bear Creek Sales?
22      A    That wouldn't be in conjunction
23  with this, would it?
0011
 1      Q    I'm actually -- I'm just trying
 2  to find out what other businesses you might
 3  own besides working for the Houston County
 4  Board of Education.
 5      A    Okay.  Bear Creek Sales.
 6      Q    What kind of business is Bear
 7  Creek Sales?
 8      A    Sells mobile home.
 9      Q    And you own that along with your
10  wife?
11      A    I reckon you could say we do.
12  We're married, so yes.
13      Q    Okay.  Does she run that
14  business?
15      A    Yes.
16      Q    Bear Creek Movers, and that's
17  obviously a business you own?
18      A    Yes.
19      Q    And you do business as Bear Creek
20  Movers.  It's really Colbert Brian McGriff
21  doing business as Bear Creek Movers?
22      A    Yes, sir.
23      Q    And the Bear Creek Movers, what
0012
 1  type of business is that?
 2      A    Transport mobile homes, move,
 3  setup.
 4      Q    With respect to Bear Creek
 5  Movers, you applied for insurance through
 6  Canal with respect to a vehicle, I guess,
 7  used in connection with that business;
 8  correct?
 9      A    Yes.
10      Q    And according to Defendant's
11  Exhibit 1, you took out the insurance and it

12  went into effect on November 2nd, 2005.
13  Does that sound about right?
14      A   That sounds about right.
15      Q   At the time you took out the
16  insurance with Canal, the vehicles listed
17  for which you applied for insurance was a
18  1998 IH tractor?
19      A   Yes, sir.
20      Q   Do you still own that vehicle?
21      A   Yes, sir.
22      Q   Between November 2nd, 2005, and
23  March 30th, the date of the incident giving
0013
 1  rise to the underlying lawsuit, did you
 2  insure any other vehicles with Canal?
 3      A   Not that I know of.  I don't
 4  recollect any other vehicles being insured
 5  with Canal.
 6      Q   The 1988 IH tractor, can you
 7  describe that vehicle for me?
 8      A   It's a International.  It's like
 9  a cut down semi truck to transport mobile
10  homes.
11      Q   In some depositions I've read in
12  the underlying case there has been reference
13  to a tow truck.  Is that a separate vehicle
14  or is that the IH --
15      A   Tow truck or toter truck?
16      Q   Well, and that's one of the
17  reasons I'm deposing you.  I'm trying to
18  clear that up.  How it was written in the
19  transcript, they refer to it as a tow truck.
20  But that's what I'm trying to find out.  Did
21  you own a separate vehicle, a true tow truck
22  with Bear Creek Movers?
23      A   For the mobile home -- purpose of
0014
 1  moving mobile homes, it was an
 2  International, and they refer to it as a
 3  toter truck.
 4      Q   That's what I was going to ask
 5  you.  The only vehicle that you own for Bear
 6  Creek Movers that you used to move the
 7  mobile homes from place to place was the
 8  1998 IH tractor?
 9      A   Yes.

10    Q   Okay.  On March 30th of 2006, the

11  date of this accident, is my understanding

12  correct that the 1998 IH tractor was

13  actually being driven by Lee Cook coming

14  back from Double Springs?

15    A   Yes, sir.

16    Q   The IH tractor was not present at

17  the site where this incident occurred?

18    A   No, sir.

19    Q   And it was not attached to the

20  mobile home that fell on Mr. Cook?

21    A   No, sir.

22    Q   And my understanding is that the

23  mobile home that's the basis of the

0015

1  underlying lawsuit had been moved out there

2  a few days earlier?

3    A   I don't remember what day.  It

4  might have been the day before, a couple

5  days, two days earlier.

6    Q   But as of March 30th of 2006, the

7  1988 IH tractor was no longer attached to

8  the mobile home?

9    A   No longer attached.

10    Q   And when I refer to the "mobile

11  home," that's the Redmond home that fell on

12  Mr. Cook giving rise to the underlying

13  lawsuit.

14    A   Yes.

15    Q   And, I guess, just to make sure

16  so I get this on the record, speaking with

17  your attorney, you have now -- there's been

18  another claim presented by the woman who

19  purchased the mobile home?

20    A   Yes, sir.

21    Q   And have you seen the lawsuits or

22  has a lawsuit been filed against you with

23  respect to the damage to the mobile home?

0016

1      THE WITNESS:  Have we actually

2      got a lawsuit filed?

3  Q   Do you know?

4  A   I know --

5    MR. ADAMS:  For the record -- and

6    he doesn't know, but I was told

7    that it was going to be and it was

8        going to be joined in the case up
9     in Henry County.
10       MR. WELLS:  But there hadn't been
11       an actual complaint or amended
12       complaint filed as far as you
13       know?
14       MR. ADAMS:  I haven't gotten it
15       yet.
16  BY MR. WELLS:
17     Q    So you don't know what type of
18  damages that lady is claiming as we sit here
19  today?
20     A    No, sir, I sure don't.
21     Q    On March 30th of 2006, did Bear
22  Creek Movers have any employees other than
23  yourself?
0017
1     A    Well, Lee and LaDon, and had
2  David Brasher there.
3     Q    And you considered those
4  employees of Bear Creek Movers?
5     A    Well, we paid them under contract
6  labor.
7     Q    And I'm just trying --
8     A    Listen, any time that you hire
9  with a contractor or not, you're responsible
10  for whoever.  You know, they were employees
11  of Bear Creek Movers.
12     Q    That would be Lee Cook, LaDon
13  Cook, and then you said David brasher?
14     A    David Brasher was more of a
15  part-time, in and out type thing.
16     Q    He would help out when you needed
17  him?
18     A    Yes.
19     Q    And as far as moving the mobile
20  homes from site to site, would Lee cook
21  primarily be the one that drove the IH
22  tractor?
23     A    Yes.  Generally speaking, a lot
0018
1  of times Lee and LaDon would deliver the
2  house, and either Lee would help LaDon back
3  it up onto the site, or vice versa, LaDon
4  would back them up or pull them up onto the
5  site to get them positioned.

6      Q   Mr. McGriff, in preparation for
7   your deposition this morning, other than
8   talking to your attorney, did you do
9   anything else?
10      A   No, sir.  Just read over this
11   policy.
12      Q   I told you it would be short.
13   That's all I needed.
14              EXAMINATION
15   BY MR. COUCH:
16      Q   Mr. McGriff, my name is Steve
17   Couch.  I represent Frank Cook in this
18   lawsuit we're here about today.  I've just
19   got a few short questions.  I read your
20   deposition in your other lawsuit, in the
21   underlying lawsuit, as well, and in there
22   you described Mr. Cook as an independent
23   contractor.  Do you remember saying that?
0019
1      A   Yes, sir.
2      Q   Okay.  In fact, I think you
3   stated, correct me if I'm wrong, that
4   Mr. Cook was paid by the job?
5      A   Yes, sir.
6      Q   Is that right?  Paid cash or
7   check, whatever?  Y'all didn't hold out any
8   taxes; is that right?
9      A   Yes, sir.  They were 1099.
10      Q   All right.  Sir, there was
11   certainly no type of work uniforms or
12   anything else that y'all supplied to folks
13   like Frank Cook, were there?
14      A   No, sir.
15      Q   And when you say he's an
16   employee, I mean you're not making any type
17   of legal definition of employee?
18      A   No, sir.
19      Q   Do you disagree with the
20   testimony you gave in your earlier
21   deposition that was taken on November the
22   8th, 2006, with respect to Mr. Cook being an
23   independent contractor?
0020
1      A   No, sir.  I don't think I would
2   disagree with that.
3      Q   Okay.  I mean you were telling

4  the truth back then, were you not?
5      A    Yes.
6      Q    Indeed in your answers to
7  interrogatories, you also described Mr. Cook
8  as an independent contractor; is that right?
9      A    Yes.
10     Q    All right.  Do you have -- of the
11  true employees that you have over there at
12  Bear Creek, do you have less than five?
13     A    Yes.
14     Q    Okay.  Let me ask you about this
15  accident.  Well, strike that.  Let me take a
16  step back, and I want to ask about the
17  mobile home moving business.  I've never
18  been in it.  I have driven some KWs before.
19  I've driven some tractor-trailers.  As I
20  understand from reading the depositions and
21  my own experience, when you're transporting
22  a mobile home, you've got to hook it up to
23  what you call your toter truck?
0021
1      A    Yes, sir.
2      Q    And that's the IH, the one that's
3  described in this insurance policy?
4      A    A truck specifically designed to
5  haul mobile homes.
6      Q    Right.  And when you're taking
7  the mobile home out, you hook the toter
8  truck up to the mobile home, that's one of
9  the things you do; is that right?
10     A    Yes.
11     Q    And you drive it to wherever it's
12  going to be delivered?
13     A    Yes, sir.
14     Q    In other words, you've got to
15  stop, get out, inspect the site?
16     A    Yes, sir.
17     Q    In other words, you've got to
18  unload the mobile home at some point, do you
19  not?
20     A    Yes, sir.
21     Q    Now, when you stop your truck to
22  drop off the mobile home and you get out,
23  you inspect the site for what, stability?
0022
1      A    Just inspect the site to make

2   sure that water is not going to run under
3   the mobile home or stay under the house, you
4   know, any time and make sure that it's, you
5   know, hard enough there to back up on.
6       Q   Right.  In other words,
7   stability?
8       A   Yeah, stability.
9       Q   Okay.  And then if, I guess, in
10  your experience you deem it safe for the
11  mobile home to sit on that site, you then
12  back the truck up onto the site?
13      A   Yes, sir.
14      Q   Is that right?
15      A   Yes, sir.
16      Q   And then you will stop your
17  vehicle.  And as I understand it, there's
18  some piers that go up, tie downs that go
19  down; is that right?
20      A   Yes, sir.
21      Q   And everything I've just
22  described from stopping at the site,
23  inspecting the site for stability, to
0023
1   backing the truck and the tractor over onto
2   the site, setting up the piers, tying it
3   down, that's all part of the unloading
4   process; is that right?
5           MR. WELLS:  Object to the form.
6       A   Yes, sir.
7       Q   And as I understand the unloading
8   process, the unloading work, the work that
9   we've been talking about as unloading, that
10  is not finished, is it not, until that
11  mobile home has the piers set up and the tie
12  downs set up, hold the mobile home stable,
13  and then the truck is disconnected; is that
14  right?
15      A   That's right.
16      Q   That is when the unloading
17  process is complete?
18      A   That's when it's completed.
19      Q   All right.  Sir, that's all I
20  have.  Thank you.
21          MR. ADAMS:  I don't have
22          anything.
23

0024
1           FURTHER EXAMINATION
2   BY MR. WELLS:
3       Q    Just real quick.  On the date of
4   the accident giving rise to the underlying
5   lawsuit on March 3rd, 2006, the 1988 IH
6   tractor was no longer attached to the mobile
7   home; correct?
8       A    No, sir, it wasn't.
9       Q    And, in fact, it was, the best I
10  can tell, somewhere on either 65 or 231
11  headed south?
12      A    Yes, sir.
13      Q    Thank you.
14          (Off the record.)
15           EXAMINATION
16  BY MR. ADAMS:
17      Q    Just one thing.  What you took
18  out to that place in Henry County or what
19  was out there at that trailer at the -- I
20  mean at the place where the accident
21  occurred, what would you define that as?
22      A    A trailer.
23      Q    Okay.  That's all.
0025
1           DEPOSITION CONCLUDED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

```
22
23
0026
 1              CERTIFICATE
 2  STATE OF ALABAMA
 3  COUNTY OF BUTLER
 4      I hereby certify that the above and
 5  foregoing deposition was taken down by me in
 6  stenotype and the questions and answers
 7  thereto were transcribed by means of
 8  computer-aided transcription, and that the
 9  foregoing represents a true and correct
10  transcript of the testimony given by said
11  witness upon said hearing.
12      I further certify that I am neither of
13  counsel, nor of kin to the parties to the
14  action, nor am I in anywise interested in
15  the result of said cause.
16
17  _____
            RENNY MCNAUGHTON
18      Notary Public
19      My Commission Ends 11/06/07
20
21
22
23
```

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CANAL INSURANCE COMPANY,     )
                             )
      Plaintiff,             )
                             )
v.                           )        CIVIL ACTION NO.:
                             )        1:07-cv-410-MHT
FRANK LADON COOK;            )
COLBERT BRIAN MCGRIFF;       )
LOWE'S HOME CENTERS, INC.;   )
L.G. SOURCING, INC.;         )
REDMOND HOMES, INC.; and     )
BEAR CREEK SALES, L.L.C.,    )
                             )
      Defendants.            )

## AFFIDAVIT OF RAY G. HELMER, P.E.

1.     My name is Ray G. Helmer, P.E. I am over nineteen (19) years of age and have qualifications as outlined in my CV attached hereto.

2.     As part of my work history and experience, I have been responsible for and participated in the proper unloading, set-up, and delivery of modular dwelling units. My experience also includes understanding and implementing proper site development and preparation for the delivery, set-up, and unloading of modular dwelling units.

3.     I have studied the discovery propounded and answered by the parties thoroughly and in detail in this matter, as well as all deposition testimony given in connection with the underlying lawsuit and hereby acquired personal knowledge of the facts attested to herein. I am qualified by education, training, experience, and personal knowledge to attest to the opinions and facts contained in this Affidavit.



PLAINTIFF'S
EXHIBIT
B

4.    It is my professional opinion that the accident made the basis of this lawsuit resulted from the following actions or failures to act by Bear Creek Sales, L.L.C. or their employees/agents:

(a)    unloading the subject mobile home at a site which was not inspected prior to unloading;

(b)    failing to ensure that the unloading site was stable prior to unloading;

(c)    failing to ensure that an agent/employee of Bear Creek Sales, L.L.C. who was certified in mobile home set-up was present to oversee the delivery, unloading, and set-up process;

(d)    failing to ensure that the unloading site was properly compacted prior to unloading;

(e)    failing to ensure that the site was level prior to unloading the subject mobile home;

(f)    failing to ensure that the tractor used to deliver the mobile home stayed connected to the mobile home during unloading and set-up to provide adequate stability.

5.    While the foregoing is the opinion that the undersigned intends to express in this case, there may be additional acts and omissions of which the undersigned is unaware at this time or that will depend on further discovery.

6.    I have personal knowledge of the facts to which I attest herein, and my opinions set forth in this Affidavit are based upon my professional education, training, experience, review of all relevant discovery undertaken in this case, and my review of

2

relevant and widely accepted engineering literature. I have read this Affidavit in its entirety, and further attest that it is true and correct.

_____
Ray G. Helmer

SWORN TO AND SUBSCRIBED before me this ___ day of _____, 2007.

_____
Notary Public

Commission expires: _____

SABRINA CRESPIN
Notary Public
STATE OF TEXAS
My Comm. Exp. March 29, 2010



3

**Ray G. Helmer**
Licensed Professional Engineer
Civil & Structural Engineering Consultant
9314 Bankside Drive
Houston, TX 77031-1713
(713) 777-7611
FAX (713) 774-6881
E-mail: HelmerEng@houston.rr.com
www.helmer-engineering.com

## ENGINEERING EXPERIENCE

As a Licensed Professional Engineer in Texas, Alabama and Ohio, Ray G. Helmer has acted as a Consultant, Chief Engineer, Senior Project Engineer and Lead Engineer in the planning, design and construction of multi-million dollar projects for half a century. These include commercial and industrial sites and buildings, single and multi-family residential sites and buildings, highways, major drainage projects and aviation facilities.

## ACADEMIC QUALIFICATIONS

- B.S. in Civil Engineering, Virginia Military Institute (VMI) (1954)
- Licensed Professional Engineer in Ohio (1959), Texas (1982) and Alabama (2006)
- Registered Environmental Professional
- Commissioned Officer, U.S. Army Corps of Engineers

## ENGINEERING EMPLOYMENT

### Civil Engineer, Olin Mathieson Chemical Corp., East Alton, Illinois

- Engineer in Plant Engineering Department. This plant manufactures aluminum, ammunition and explosives. Performed surveys and prepared maps of existing utilities including sewer, water, storm drainage, gas, electric and compressed air.

### U.S. Army Corps of Engineers

- Military Engineering at Fort Riley, Kansas and Fort McCoy, Wisconsin. Supervised construction of frame buildings for storage of vehicles and supplies.

1

**1957-60, Civil Project Engineer, Dodson Lindblom Associates, Columbus, Ohio**

- US Route 127 Upgrade, Dayton/Cincinnati, Ohio
- Rickenbacker and Wright Patterson Air Force Bases, Ohio

**1960-60  Civil Engineer, Greenland Contractors, Thule, Greenland**

- Estimator and negotiator for Greenland Contractors during construction of Ballistic Missile Early Warning System for U.S. Army Corps of Engineers. Made cost estimates, proposals, and negotiated contract changes with the Corps of Engineers. The project included a number of very large radar antennas and support buildings.

**1960-67, Chief Highway Engineer, Brill Engineering Corporation, Columbus, Ohio**

- Interstate 270, Columbus, Ohio
  Conceptual, preliminary and final design of Interstate 270, a 55-mile circumferential highway around Columbus, Ohio, for Ohio Department of Transportation. This was a six- to seven-year engagement.

**1967-71,  Senior  Transportation  Engineer,  Mid-Ohio  Regional  Planning Commission, Columbus, Ohio; and  Chief Transportation Engineer, Richland County Regional Planning Commission, Mansfield, Ohio**

- Responsible for comprehensive county-wide transportation studies under the auspices of the US Federal Highway Administration and the US Department of Housing and Urban Development.

**1971-79,  Regional  Construction  Engineer-Manager,  Cardinal  Industries,  Inc., Columbus, Ohio**

- Multi-Unit Apartment and Motel Projects, Ohio and Pennsylvania
  Responsible for design and construction of sixty (60) apartment and motel projects in Ohio and Pennsylvania, totaling 3000 housing units. Each of these projects included concrete or asphalt paving, concrete sidewalks, building foundations, carpentry, electric service and wiring, plumbing, air conditioning, water service lines, sanitary sewers, storm sewers and culverts, fencing, landscaping, painting and other construction tasks. I was the regional Construction Manager who was responsible for all aspects of design and construction of these projects including advertising for bids, evaluating bids, awarding contracts, managing the construction, receiving invoices from

2

contractors, verifying quality and quantity of completed construction, approving contractor invoices, and making final punchout inspections.

**1980-81, Regional Engineer, National Corrugated Steel Pipe Association, Des Plaines, Illinois (now Washington, D.C.)**

- Drainage Standards, Multiple States
  Regional engineer covering states of Ohio, Michigan, Indiana, Kentucky and West Virginia for National Corrugated Steel Pipe Association; assisted public agencies and consulting engineering firms in development of drainage standards and specifications

**1981-88, Principal Civil Engineer, Bovay Engineering Corporation, Houston, Texas**

- US 290 Extension, Houston, Texas

- I-10 Interchange, El Paso, Texas

- Hardy Toll Road, Houston, Texas

- City of Houston – Lead Engineer on design of West Tidwell Road from Ella to North Shepherd including street paving, 108-inch storm sewer, water, and sewer relocations.

- City of Houston – Lead Engineer on design of improvement of Cavalcade from Lockwood to Homestead including street paving, drainage, water and sewer utilities.

- Harris County – Lead Engineer on an extension and improvement of Greens Road from West Hardy Road across a branch of Greens Bayou and Missouri Pacific Railroad including paving and drainage improvements.

- Water Distribution/Sewer and Irrigation, Tanajib, Saudi Arabia
  Lead Engineer on design of water distribution, sanitary sewer and irrigation systems for an entire new city at Tanajib in Saudi Arabia.

- Plant Site Grading, Paving and Utilities, Illinois
  Project engineer on design of plastics manufacturing plants at Manteno and Grant Park, Illinois, including site grading, drainage, paving and utilities.

- Haul Road and Civil Improvements, Jewett, Texas
  Project engineer on design of haul road and civil improvements for tipple and conveyor from the tipple to the power plant for a lignite mine at Jewett, Texas, for

3

Houston Lighting and Power Company. This project included engineering design of concrete sidewalk, grading and drainage along the mile-long conveyor system.

**1989-90, Coordinating Engineer, Binkley and Barfield, Inc., Houston, Texas**

- Urban Arterial System Upgrade, Texas
  Coordinating Engineer on a $60 million project to improve 14 miles of major urban arterial to a seven (7) lane typical section.

**1991-92, Senior Civil Engineer, John Brown Engineers and Constructors, Houston, Texas**

- Roads and Water Management, Saudi Arabia
  Managed engineering design of 14-mile access highway, earthmoving and compaction, drainage, water and sewer systems, and airport to FAA standards for a grass roots oilfield (75 wells) in Saudi Arabia for Aramco.

**1993-2002, Senior Project Manager, Ratnala & Bahl, Inc., Engineers, Architects and Surveyors, Houston, Texas**

- $10 Million Bridge Project for New George Bush Turnpike north of Dallas, Texas. Design of five Interstate-type bridges for three new interchanges on new George Bush Turnpike north of Dallas, Texas. The project included detailed bridge and retaining wall design, and engineering design of pavements, drainage, traffic signals, highway lighting.

- Sanitary Gravity Sewers, Fort Worth, Texas
  Senior Project Engineer on design of 8- to 30-inch sanitary gravity sewers involving open cut and tunneling (in rock) in an extremely adverse environment on a hillside in a river valley in City of Fort Worth, Texas.

- Water System Improvement, Fort Worth, Texas
  Senior Project Engineer on design of water system improvements for City of Fort Worth, Texas. This project constructed "loops" (connections) between the ends of a number of dead-end water lines. The objective was to increase water pressure and eliminate stale water.

- $10 Million Street and Storm Sewer Improvement, Houston, Texas
  Design of a $10 million major street and storm sewer improvement project on Austin Street in the Houston, Texas, central business district including five-lane

4

concrete street paving, dual 9-foot by 8-foot box storm sewer, water and sewer adjustments.

- Roadway and Bridge Improvement, Harris County, Texas
  Senior Project Manager on design of a roadway and bridge improvement project linking two parks across an aqueduct for Harris County, Texas. The project includes roadway paving, bridge, 2,000 lineal feet of retaining walls, grading, drainage.

- Street Improvement, Fort Worth, Texas
  Senior Project Manager on design of a street improvement project in a hilly area in City of Fort Worth, Texas. The project includes design of street paving, storm sewers, sanitary sewers, and 8- to 16-inch water distribution lines.

- Houston Hobby Airport Pavement/Runway Rehabilitation
  Senior Project Manager on $10 million Houston Hobby Airport Pavement Rehabilitation project on Runways 4/22 and 12L/30R and Taxiways "A", "E", "J", "K", "L" and "M". The pavement rehabilitation includes concrete panel replacement, joint sealing, asphalt patching, crack sealing, spalled concrete repair, sealing of concrete surfaces, installation of expansion joints, light can replacements, signs and pavement markings, all to FAA standards. The project also includes pavement rehabilitation at several tenant transition pavement areas and the Southwest Airlines air cargo building, as well a turnaround for large fire trucks at the ARFF facility.

## PROFESSIONAL AFFILIATIONS

- American Society of Civil Engineers (Vice President of the Houston Branch)
- National Society of Professional Engineers
- Institute of Transportation Engineers
- Engineers Council of Houston (Past President)
- American Water Works Association
- Water Environment Federation

## AWARDS

- Professional Service Award from the American Society of Civil Engineers (ASCE)

5

Page 1

```
01
02   ALABAMA
03
04   FRANK LADON COOK, )
05                    )
06       Plaintiff,   )
07   v.               )  CV-06-042H
08   BEAR CREEK SALES, )
09   L.L.C., et al., )
10                    )
11       Defendants.   )
12
13   S T I P U L A T I O N
14           IT IS STIPULATED AND
15   AGREED, by and between the parties through
16   their respective counsel, that the
17   discovery deposition of
18   *******************************************
19   RANDY LEE COOK, JR.
20   *******************************************
21           may be taken before Paul
22   Moore, Commissioner, at the offices of
23   Merrill, Harrison & Adams, LLC, Dothan,
```

Page 2

01   Alabama, on the 8th day of November, 2006.
02              IT IS FURTHER STIPULATED
03   AND AGREED that it shall not be necessary
04   for any objections to be made by counsel to
05   any questions, except as to form or leading
06   questions and that counsel for the parties
07   may make objections and assign grounds at
08   the time of trial or at the time said
09   deposition is offered in evidence.
10              IT IS FURTHER STIPULATED
11   AND AGREED that notice of filing of the
12   deposition by the Commissioner is waived.
13
14
15
16
17
18
19
20
21
22
23

Page 3

01   I N D E X
02
03   EXAMINATION BYPAGE
04   Mr. Hollis  7
05   Mr. Stewart 94
06   Mr. Ritchey   131
07   Mr. Lee   154
08   Mr. Adams   167
09   Mr. Hollis   170
10   Mr. Lee   177
11   Mr. Ritchey   181
12   Mr. Hollis   184
13   Mr. Ritchey   185
14   Mr. Lee   194
15   Mr. Ritchey        195
16
17   EXHIBITS:
18   Plaintiff's 1  - 2006 Statutory Law 13
19   Plaintiff's 2  - 2005 Statutory Law17
20   Plaintiff's 3  - Drawing - Trailer62
21   Plaintiff's 4  - Pad advertisement84
22   Plaintiff's 5  - Statement   176
23   Defendant's 1  - Drawing - Jack Plate99

Page 4

```
01
02   EXHIBITS:
03   (continued)
04
05   Defendant's 2  - Drawing - Placement   127
06   Defendant's 3  - Redman's Installation
07              Manual   131
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 5

```
01   A P P E A R A N C E S
02
03   APPEARING ON BEHALF OF THE PLAINTIFF:
04   L. ANDREW HOLLIS, JR.
05   HOLLIS & WRIGHT, P.C.
06   505 NORTH 20TH STREET, SUITE
07   BIRMINGHAM, ALABAMA 35202
08
09   APPEARING ON BEHALF OF THE DEFENDANTS:
10   SAMUEL L. ADAMS
11   MERRILL, HARRISON & ADAMS, LLC
12   POST OFFICE BOX 1690
13   DOTHAN, ALABAMA 36302
14
15   CHARLES A. STEWART, III
16   BRADLEY, ARANT, ROSE & WHITE, LLP
17   401 ADAMS AVENUE, SUITE 780
18   MONTGOMERY, ALABAMA 36104
19
20   WILLIAM L. LEE, IV
21   LEE & McINISH, P.C.
22   POST OFFICE BOX 1665
23   DOTHAN, ALABAMA 36302
```

Page 6

```
01  APPEARING ON BEHALF OF THE DEFENDANTS:
02  (continued)
03
04  GREGORY S. RITCHEY
05  RITCHEY & RITCHEY, P.A.
06  POST OFFICE DRAWER 590069
07  BIRMINGHAM, ALABAMA 35259-0069
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 7

```
01   EXAMINATION BY MR. HOLLIS:
02      Q    Would you state your name, please,
03   sir?
04      A    Randy Lee Cook, Jr.
05      Q    Randy, where do you live?
06      A    Headland.
07      Q    Headland.  What's your address?
08      A    234 County Road 340, Headland,
09   Alabama.
10      Q    And what's your phone number over
11   there?
12      A    334-797-2431.
13      Q    Okay.  Is that your home phone?
14      A    No, sir, that's my cell, I don't
15   have a home number.
16      Q    Okay.  And what's your social
17   security number?
18      A    ███████████
19      Q    Have you ever been in trouble with
20   the law?
21      A    No, sir.
22      Q    Is Frank Ladon Cook kin to you?
23      A    Yes, sir.
```

Page 8

```
01    Q    And what's the kin?
02    A    My cousin.
03    Q    Okay.  Sort of tell me - - are y'all
04  first cousins, second cousins, or what?
05    A    First cousins.
06    Q    First cousins.  Did y'all sort of
07  grow up together?
08    A    Not really, just within the last ten
09  years maybe.
10    Q    Okay.  Do y'all get together
11  socially?
12    A    We did, yes, sir.
13    Q    Do you still do that?
14    A    Sometimes, not as much.
15    Q    He's not married, is he?
16    A    No, sir.
17    Q    Are you married?
18    A    Yes, sir.
19    Q    What's your wife's name?
20    A    Jessica Ann.
21    Q    Jessica Ann.  And is she - - you
22  live in Henry County, don't you?
23    A    Yes, sir.
```

Page 9

```
01    Q   Have you ever lived in Houston
02  County?
03    A   No, sir.
04    Q   You got any kin folks in Houston
05  County?
06    A   No, sir.
07    Q   Does your wife have any kin folks in
08  Houston County?
09    A   No, sir.
10    Q   All right.  Now, tell me a little
11  bit about yourself, like what's your
12  educational background?
13    A   GED.
14    Q   GED?
15    A   Yes, sir.
16    Q   All right.  And tell me about your
17  work experience?
18    A   In towing mobile homes, or before?
19    Q   Just before.
20    A   Before.  Qualico Steel a couple
21  months we were there, farming, tree
22  service, was there four or five years.  And
23  then, got in the mobile home business.
```

Page 10

```
01      Q    Okay.  Tell me about your connection
02   with the mobile home business, how did you
03   get into that?
04      A    Brother-in-law.
05      Q    And who's that?
06      A    Michael Traywick.
07      Q    Michael Traywick, okay.  Where does
08   he presently live?
09      A    Echo, Alabama.
10      Q    And do you know his address in Echo?
11      A    No, sir.
12      Q    All right.  And tell me how he got
13   you into this business?
14      A    I just got tired of messing with the
15   tree service business and called him up.
16   We'd been talking before.  I called him up
17   and asked him did he need some help, and he
18   said yeah, he didn't have nobody working
19   with him, so I went.
20      Q    Okay.  What kind of - - did he have
21   a business where he installed trailers, or
22   sold them, or - -
23      A    No, sir, just installed.  We moved
```

Page 11

01   and installed.
02      Q   Okay.  Did y'all do this for other
03   companies?
04      A   We did companies every now and then.
05      Q   Okay.  But he was mainly sort of an
06   independent contractor?
07      A   Yes, sir.  Mostly public.
08      Q   What do you mean "public"?
09      A   As far as individuals, not companies
10   and stuff like that.
11      Q   Okay.  In other words, somebody
12   would buy a trailer from one of the
13   dealerships here in Dothan, and they would
14   contact him to install it?
15      A   Yes, sir.
16      Q   All right.  Was he a certified
17   installer?
18      A   Yes, sir.
19      Q   Okay.  What does that mean?
20      A   It means, you go to class - - take a
21   class on how, you know, the general
22   knowledge of setting one up and all.  But
23   the class really don't tell you all that

Page 12

01  much.  And pay your fees and all, and then
02  he's certified - - they give you a sticker.
03      Q   Okay.  Who gives you those classes?
04      A   The State of Alabama, I guess.
05      Q   Have you ever been certified
06  yourself?
07      A   Yes, sir, here recently.
08      Q   How recently?
09      A   Three months ago.
10      Q   Okay.  You weren't - - were you
11  certified when your cousin got hurt?
12      A   No, sir.
13      Q   All right.  Mr. Traywick, do you
14  know when he got his certification?
15      A   No, sir, he's been a long time.
16      Q   Okay.  When you got your
17  certification, did you use any kind of book
18  or anything?
19      A   Yes, sir.
20      Q   What was the name of that book?
21      A   The Alabama State Code Book.
22      Q   Okay.  And do you remember reading
23  in there that any time a trailer was

Page 13

01  installed, such as the one where your
02  cousin was hurt, that it would have to be
03  - - there would have to be somebody that
04  was certified there to do that?
05      A   No, sir, I didn't see that in there.
06      Q   You didn't see that when you took
07  that course?
08      A   No, sir.
09  (Plaintiff's Exhibit 1 was marked for
10  identification and a copy of the same
11  is attached hereto as evidence)
12      Q   (BY MR. HOLLIS) I'm going to show
13  you what I've marked as Plaintiff's Exhibit
14  1.
15      MR. HOLLIS: And if it's okay with
16  y'all, I'm just going to mark these
17  exhibits - - not one for every one of them,
18  I'm just going to be continuous with the
19  marking of them.  Is that okay with
20  everybody?
21      MR. LEE:  Yes.
22      Q   (BY MR. HOLLIS) Okay.  I show you
23  Plaintiff's Exhibit Number 1 and ask you if

Page 14

01   you've ever seen that document?
02      A    Yes, sir.
03      Q    When did you first see this?
04      A    When I worked with Michael Traywick
05   I've seen it, I've never really read
06   through it though.
07      Q    Okay.  This is called the Alabama
08   Manufactured Housing Commission Statutory
09   Law; is that right?
10      A    Yes, sir.
11      Q    All right.  And you've got a
12   complete copy there, haven't you?
13      A    Yes, sir.
14      Q    If I could, if you'd look at Page 49
15   of that.
16      A    (Witness complies)
17      Q    Under Paragraph Number 1 it says "no
18   manufactured home or manufactured building
19   shall be installed within the state unless
20   such installation is done by a certified
21   installer in accordance with the
22   manufacturer's approved installation plan,
23   or the Commission's minimum standards."

Page 15

```
01   Now, I'm sure you've had the occasion to
02   install a mobile home where the
03   manufacturer had a recommended installation
04   procedure; is that right?
05     A   If it's a new home, yes.
06     Q   Okay.  Now, what is the Commission's
07   minimum standards, what is that?  Is that
08   included in these documents, in this Code?
09     A   I don't understand what you're
10   asking me.
11     Q   Okay.  What I'm trying to find out,
12   it looks like there's two sources of how to
13   install one of these - -
14     A   Yes, sir.
15     Q   - - the manufacturer can give you
16   what they recommend, like on a new trailer?
17     A   That's correct.
18     Q   Okay.  Then if you don't have that,
19   then it's saying that you do it according
20   to the Commission's minimum standards, what
21   are those minimum standards?
22     A   Second-hand homes go by this.  It
23   depends on the conditions and where you're
```

Page 16

01  at, the locations.
02      Q    Basically, if it's a second-hand
03  home, you go by what Plaintiff's Exhibit
04  Number 1 - - you've got the entire book
05  there before you?
06      A    Yes, sir.
07      Q    Okay.  If I could, I'd just like to
08  - - is that your only copy?
09          MR. ADAMS:  That's the only copy I
10  have here.
11          MR. HOLLIS: Okay.  I'd just like to
12  mark that as - - could I put a 2 on it, and
13  then make a copy of it - - he'll make a
14  copy of it and give it back to you?
15          MR. ADAMS:  That's the 2006 though,
16  that was after the time of - -
17          MR. HOLLIS: Well, this is okay, I
18  don't think it's - -
19          MR. RITCHEY:  Do you want a 2005?
20          MR. HOLLIS: If you've got - - has
21  anybody got one?
22          MR. RITCHEY:  Yeah, I've got a 2005.
23          MR. HOLLIS: Okay.  And do you want

Page 17

01  this back?
02      MR. RITCHEY:  No, that's okay.
03  (Plaintiff's Exhibit 2 was marked for
04  identification and a copy of the same
05  is attached hereto as evidence)
06    Q   (BY MR. HOLLIS) I've marked this as
07  - - this would appear to be the 2005, which
08  would be the one that would have been
09  applicable when your cousin got hurt.  Now,
10  in this - - back to Plaintiff's Exhibit 1,
11  it says "an officer or employee of the
12  business who possesses a certificate of
13  training from the Commission must be
14  present during the entire installation
15  process."  Now, back when your cousin was
16  injured, I think it was March the 9th; is
17  that right?
18    A   Yes, sir.
19    Q   Okay.
20      MR. RITCHEY:  30th.
21      THE WITNESS: 30th.  I thought it was
22  around there.
23    Q   (BY MR. HOLLIS) March 30th of this

Page 18

01  year, who were you employed by?
02      A    Bear Creek, Bryan and Robin McGriff.
03      Q    Okay.  You were an employee of
04  theirs?
05      A    Well, sub.
06      Q    Sub?
07      A    Yes, sir.
08      Q    Well, tell me about that, did they
09  pay your taxes?
10      A    No, sir, I pay my own taxes.
11      Q    Okay.  Did you pay for your
12  workman's comp?
13      A    No, sir.
14      Q    Okay.  Tell me what kind of
15  arrangement you had with your cousin prior
16  to March 30th of 2006 relating to
17  installation of trailers?
18      A    Just he lost his job at his other
19  place, called me up and said, you know,
20  "you got something I can do", I said, "I'll
21  call Robin and Bryan and ask them", and
22  they said "yes, we can use him, because he
23  had a driver's license, we need somebody to

Page 19

```
01  drive the service truck and all." So, I
02  told him to come on out.
03      Q   All right.  Were y'all in sort of a
04  transition period?  By that I mean where
05  they were going to start withholding your
06  taxes and things like that during this
07  period of time, I'm talking about Bear
08  Creek?
09      A   No, sir.
10      Q   Are you saying that on March 30th
11  that you nor your cousin were employees of
12  Bear Creek?
13      A   Well, we worked with them or for
14  them, but we don't - - we didn't - - they
15  didn't take no taxes out on us.
16      Q   Okay.  Did y'all have a separate
17  company?
18      A   No, sir.
19      Q   Y'all did not have a separate
20  company at all?
21      A   No, sir.
22      Q   How did you get paid?
23      A   Through Robin.
```

Page 20

```
01    Q    What would they do - -
02    A    Bear Creek Movers.
03    Q    Would they do it per job, or per
04  hour, or how did they pay you?
05    A    Per job.
06    Q    Per job.  How much did they pay
07  y'all per job?
08    A    Well, we got - - each one of us got
09  paid differently.
10    Q    Okay.  Well, how much would you get
11  paid per job?
12    A    Two, three hundred dollars a
13  trailer, single wide.
14    Q    And then, would you have to pay the
15  other employees out of that?
16    A    No, sir.
17    Q    Did y'all have a crew that normally
18  installed trailers?
19    A    No, sir.
20    Q    Okay.  Well, tell me who else - -
21  I'm trying to get a feel for exactly how
22  your set up was.  Were you a separate
23  company?  You weren't a separate company?
```

Page 21

```
01    A   No, sir.
02    Q   Did you consider yourself an
03  employee of Bear Creek?
04    A   Well, I guess.  They paid me by the
05  job, and they paid Ladon by the job.
06    Q   All right.  And did you ever hear
07  them say, or refer to y'all as independent
08  contractors?
09    A   They had said, yes, sir.
10    Q   What?
11    A   Yes, sir, they have said that.
12    Q   They've said that since or before
13  the accident?
14    A   Before the accident.
15    Q   That y'all were independent
16  contractors?
17    A   Yes, sir.
18    Q   Did you ever sign any kind of
19  contract with them, or anything like that?
20    A   No, sir.
21    Q   Okay.  Now, how many people were
22  involved in helping Bear Creek install
23  their trailers?  There was you - -
```

Page 22

```
01    A    Me, Ladon, my brother Teague.
02    Q    Teague?
03    A    Yes, sir.  A guy named David.
04    Q    David, what was his last name?
05    A    I'm not sure.
06    Q    What about Teague, where does he
07  live?
08    A    He lives in Headland.
09    Q    Okay.  What's his address?
10    A    I'm not sure.
11    Q    Do you know his phone number?
12    A    He don't have one.
13    Q    All right.  Who else?
14    A    And a Mexican guy named Sedro.
15    Q    Sedro?
16    A    Yes, sir.
17    Q    Do you know Sedro's last name?
18    A    No, sir.
19    Q    Do you know where Sedro is now?
20    A    No, sir.
21    Q    Have you seen him?
22    A    I seen him the day before yesterday.
23    Q    Okay.  What was he doing?
```

Page 23

```
01     A    Just riding on his truck.
02     Q    All right.  He hasn't been working
03  with y'all since this accident?
04     A    No, sir.
05     Q    Okay.  Tell me, leading up to
06  Ladon's injury, what you remember about
07  this job?  How did y'all get contacted to
08  do it?
09     A    Well, it was sitting on our lot, or
10  Robin's lot, and she sold it to them.  We
11  moved - -
12     Q    Sold it to who?
13     A    To the landowner, whoever - - I
14  don't know their names, I just move them.
15     Q    Okay.
16     A    Sold it to them, we moved it, and I
17  put it in there.  And Ladon and two other
18  guys was going to go behind me and set it
19  up because I had to go to north Alabama to
20  pick up a new one.
21     Q    Okay.  Now, do the rules and
22  regulations - - well, let me ask you this:
23  Were you there during any portion of the
```

Page 24

01  set up by Ladon and these - - who were the
02  people setting this trailer up?
03      A    Ladon, David and Sedro.
04      Q    Sedro, okay.  Were any of those
05  three people certified?
06      A    No, sir.
07      Q    None of them were certified.  What
08  about with Bear Creek, was there anybody
09  certified that worked for them on March the
10  30th?
11      A    No, sir.
12      Q    They were not certified?
13      A    Bryan McGriff is the only certified
14  one.
15      Q    Okay.  Bryan McGriff was certified?
16      A    Yes, sir.
17      Q    Well, he was an owner of Bear Creek,
18  wasn't he?
19      A    Yes, sir.
20      Q    Okay.  Do you know if he was present
21  at any time this trailer was being
22  installed?
23      A    I'm not sure.

Page 25

```
01    Q   To your knowledge was he?
02    A   No, sir.
03    Q   Okay.  Now, do the rules and
04  regulations also require that any time you
05  do an installation you have to put a
06  sticker on there that you have actually
07  installed it, sort of a certification?
08    A   Yes, sir, you have to put one on
09  every trailer before you start setting it.
10    Q   Okay.  Before you start setting it.
11  Why do you have to do that?
12    A   Well, if the state inspector comes
13  up he can look and see who's setting the
14  home, and know who he's dealing with.
15    Q   All right.  Now, do you know if such
16  a sticker was put on this particular unit?
17    A   I'm not sure.
18    Q   Okay.  You're not sure?
19    A   No, sir.
20    Q   Did you ever go out and see this
21  unit?
22    A   No, sir.
23    Q   Even before or after it was
```

Page 26

01  installed?
02      A    No, sir, not - - I moved it there
03  and dropped it in the location.  And that's
04  the only time I've seen it since then.
05      Q    And when did you do that?
06      A    I'm not quite sure on no dates.
07      Q    What day of the week did this thing
08  happen?
09      A    I'm not sure either.
10      Q    Okay.  But you were in north
11  Alabama?
12      A    Yes, sir, Double Springs.
13      Q    All right.  How did you find out
14  about the accident?
15      A    On my way back David called me, when
16  I was coming back into town.
17      Q    Okay.  What did David tell you?
18      A    That the trailer had fell and had my
19  cousin pinned in the back.
20      Q    All right.  Now, you know, they were
21  using two jacks out there, are you aware of
22  that?
23      A    That's what they told me.

Page 27

```
01    Q    Okay.  What kind of jacks were they,
02 do you remember that?
03    A    Cobalt.
04    Q    Cobalt.  Do you remember when they
05 had been purchased?
06    A    The day before.
07    Q    Who purchased them?
08    A    Bryan and Robin.
09    Q    Bryan?
10    A    McGriff and Robin McGriff.
11    Q    They both went and purchased them?
12    A    Yes, sir.  Well, they was - - Bryan
13 McGriff, they was together.
14    Q    How do you know that?
15    A    They told me, went and picked them
16 up.
17    Q    All right.  Now, were both of them
18 the same capacity?  I know they come in
19 different - -
20    A    No, sir.  It was two twelve tons and
21 two twenty tons.
22    Q    So, they bought four of them?
23    A    Yes, sir.
```

Page 28

```
01    Q    Okay.  And where did they buy them
02  from?
03    A    Lowe's.
04    Q    Lowe's.  So, they were brand new?
05    A    Yes, sir.
06    Q    Now, how many were being used on the
07  trailer that was being installed by your
08  cousin?
09    A    Two.
10    Q    Two.  Were both of them ten, both of
11  them twenty, or - -
12    A    Both of them was twelve, that I'm
13  aware of.
14    Q    Both of them were twelve?
15    A    Yes, sir.
16    Q    Okay.  Now, I wanted to ask you: One
17  of the - - we went out, I forget, since the
18  accident happened, and had it lifted up,
19  and we were only able to find one of those
20  jacks.
21    A    Yes, sir.
22    Q    Do you know what happened to the
23  other one?
```

Page 29

01    A    No, sir.
02    Q    Did you use the other jack at any
03  time after the accident?
04    A    No, sir, I don't use Cobalts no
05  more.
06    Q    That's not my question.  Have you
07  ever made a statement to anybody that that
08  other jack that was under that trailer the
09  day this accident happened, that you did
10  use it after this accident and it wouldn't
11  work, it kept bleeding off on you?  Did you
12  ever make a statement like that?
13    A    No, sir, not on - - not on one of
14  them.
15    Q    Did you make a statement about any
16  jack not working correctly?
17    A    Yes, sir.  The Cobalt, I made it - -
18  someone else from your office had talked to
19  us not - - well, a little while back.
20    Q    Okay.  And what did you tell them?
21    A    That it was bleeding down, that's
22  the reason why we got new ones.
23    Q    Okay.  You're talking about that it

Page 30

```
01   was bleeding down before the accident - -
02        MR. STEWART:  Object to the form.
03     Q   (BY MR. HOLLIS)  - - or after the
04   accident?
05     A   No, before the accident.  Off our
06   old ones, that's the reason why we
07   purchased new ones because the old ones
08   weren't working.
09     Q   All right.  Do you know what
10   happened to the one that the - - there was
11   only one found out there when we lifted the
12   trailer.  What about the other one, do you
13   know what happened to it?
14     A   No, sir.
15     Q   Do you know if it's been used since
16   then by Bear Creek?
17     A   Not to my knowledge, no, sir.
18     Q   Do you have any knowledge of what
19   happened to that jack at all?
20     A   No, sir.
21     Q   Okay.  I've got your statement here
22   that you gave us, it's a recorded
23   statement, and I want to read it to you and
```

Page 31

01   see if you recall these questions being
02   asked and answered by you, okay?  The
03   person from my office said "okay, and I
04   understand - - I know you weren't there at
05   the accident when it happened, but you
06   worked at Bear Creek for awhile, so I'm
07   asking your general knowledge of the set-up
08   procedure, have you used these jacks
09   before?"  "No, not the ones that was up
10   underneath the mobile home, not the Cobalt
11   jacks or whatever, no.  Never used those,
12   no.  Never used them in any other set up.
13   I've used them since then, and they're no
14   good."  "Okay, why do they - - what's the
15   fault?"  "Other than they - - I done blowed
16   two seals in them and they just fall, and
17   then the third one, it won't even pick up
18   no more.  I mean, these are brand new
19   jacks, we just bought them."  "Okay.  So,
20   from what you know about the accident,
21   there's something wrong, these jacks aren't
22   performing to the level of what the
23   manufacturer says they can?"  "To my

Page 32

```
01   knowledge, yeah.  I mean, I've seen it.  I
02   didn't know that's what was happening to
03   begin with, but since I've used them the
04   last couple of days, to my knowledge,
05   that's what I would think it would be."  Is
06   that what you told - -
07       A   It don't sound like all of it, but
08   some of it, yes, sir.
09       Q   Okay.  All right, I think this was
10   taken on the 13th day of April, so this was
11   about two weeks after the accident.  Okay.
12   Now, did you ever see any of these Cobalt
13   jacks that were bought, I guess the 29th?
14   You said they were bought the day before
15   Ladon's injury, right?
16       A   Yes, sir.
17       Q   Okay.  So, that would have been the
18   29th of March.  Okay.  Now, after the
19   accident, did you ever have the occasion to
20   use one of those four jacks?
21       A   Twenty ton, yes, sir.
22       Q   The twenty ton?
23       A   Yes, sir.
```

Page 33

01    Q   Is that the one where you had the
02  seals blew?
03    A   The seals, yes, sir.
04        MR. STEWART:  Object to the form.
05    Q   (BY MR. HOLLIS) Two of the seals
06  blew out?
07    A   Yes, sir.
08        MR. STEWART:  Object to the form.
09    Q   (BY MR. HOLLIS) Okay.  Now, where
10  were you using those?
11    A   I don't remember, I do so many.
12    Q   Okay.  Do you know if those are
13  still there with the - - the company still
14  has those?
15    A   They may be still on the service
16  truck, I'm not quite sure if we took them
17  out or not.
18    Q   Okay.  All right.  What evidence do
19  you have that either one of the jacks that
20  were under the trailer on the 30th had
21  anything to do with this trailer falling?
22        MR. STEWART:  Object to the form.
23    A   I don't have none.

Page 34

01    Q    (BY MR. HOLLIS) You don't have any?
02    A    No, sir, I'm not - - I wasn't there,
03  I don't know.
04    Q    When you say they "blew out a seal",
05  what does that mean?
06    A    Just start leaking around the seals,
07  around the tops, and generally.
08    Q    And what would that do?  They would
09  just generally - -
10    A    They would slowly leak out.
11    Q    Okay.  And when that would occur,
12  what would you have to do?
13    A    Get another jack.  That's all I can
14  tell you, you get another jack.
15    Q    Could that be pretty dangerous, for
16  that to be lowering, and could it cause a
17  trailer to get unbalanced and actually
18  fall?
19       MR. STEWART:  Object to the form.
20    A    Yes, sir.  It could cause a shift.
21    Q    (BY MR. HOLLIS) Okay.  Do you know
22  about what this trailer weighed that they
23  were - -

Page 35

```
01    A   No, sir.
02    Q   - - installing that day?  And you
03  say that the two jacks out there were the
04  twelve tons?
05    A   I'm assuming, yes, sir.
06    Q   You don't know that for sure?
07    A   No, sir.
08    Q   So, it could have been a twelve ton
09  and a twenty ton, it could have been - -
10  you just really don't know, do you?
11    A   No, sir.  I wasn't there.
12    Q   Okay.  Now, tell me what generally
13  is the procedure that y'all are instructed
14  to follow, in terms of installing a second-
15  hand trailer like this one?
16    A   You start out, you measure off the
17  whole trailer, you set piers every six foot
18  apart on a - -
19    Q   You set periods?
20    A   A pier.
21    Q   A pier?
22    A   Yes, sir.
23    Q   Now, tell me what a pier is?
```

Page 36

01     A    Well, it's got - - you've got your
02    bottom foundation, which you level and
03    everything.  Then you build your blocks up
04    on it to the frame, after you've water
05    leveled it.
06     Q    Now, what is water leveling?
07     A    Where you level out the frame of the
08    trailer underneath.  You have to go through
09    and - - we've got a water level, and you
10    set it up, and you get your highest point
11    pretty much, or your lowest point of your
12    land.  Wherever your trailer - - the lowest
13    part where the trailer's going to sit,
14    that's what you get.  And then, you go from
15    there and you start water leveling out each
16    one of them, just like you're - - say you
17    take a level and put it inside the house
18    and you try and level it that way, but
19    that's not - - that's not accurate, you
20    have to use a water level to level the
21    frame.
22        MR. ADAMS:  You want to see a water
23    level?  I've got one back in the back.

Page 37

01      MR. RITCHEY:  Is that just a level
02  with a little bead of air in it?
03      THE WITNESS: No, sir.  It's got
04  actual water with food coloring in it.
05  He'll get one and show you.
06      MR. ADAMS:  Is this one?
07      THE WITNESS:  Yes, sir.  I'm not
08  familiar with that one, but that is one.
09    Q   (BY MR. HOLLIS) Okay.  Tell me how
10  that works?
11      MR. HOLLIS:  You got pictures of it?
12  Can I put the pictures in?
13      MR. ADAMS:  Well, he said that's not
14  like they used, but you can look at it and
15  see.
16      THE WITNESS: Well, mine's just an
17  old cheap thing.  That thing right there is
18  a couple hundred dollars.  I use a gas jug
19  and a water line, and food coloring, and a
20  shut-off valve is all I use, with a magnet
21  stuck to it.  Stick it on the frame.
22    Q   (BY MR. HOLLIS) Okay.  Well, tell me
23  how this fancy one works?

Page 38

```
01      A   Really, to tell you the truth, I
02   really don't know.  I had a man tell me not
03   too long ago how it worked, and I really
04   can't tell you.  He just said it's
05   basically the same thing we do.  What you
06   do is you get your - - you set it up and
07   you can level it digitally, you set your
08   level and you get the height, and you
09   program it into the scale thing here in the
10   front.  All right.  Once it shows that,
11   then you can take and set it on each pier,
12   and you build each pier up to the height
13   that it - - that the beep thing goes off
14   on.
15      Q   Okay.  Now, you know, I've seen
16   these people use these little thing, they
17   have a little bubble in them, you know,
18   when they're leveling, it isn't anything
19   like that, is it?
20      A   No, sir.  No, sir.
21      Q   Okay.  What you're - - basically,
22   when you hit the water, or you're doing the
23   water level, you're just trying to get the
```

Page 39

01   trailer at the same height or level, isn't
02   that what you're - - isn't that the goal
03   you're doing?
04       A   Yes, sir, getting the trailer level.
05       Q   Okay.  Now, what are these things
06   right here, what is that (indicating)?
07       A   That's ABS pads.
08       Q   Now, what are those for?
09       A   They're the foundation - - the
10   plastic pads there, the foundation pads.
11   There's several different ones.  That
12   there's six-foot plastic pad there.
13       Q   All right.  Now, are there only
14   certain pads that are approved by the
15   Commission?
16       A   All of them, that I'm aware of, are.
17       Q   Are approved, do they have to have
18   some kind of identification on them showing
19   that they're approved by the Commission?
20       A   No, sir, not that I'm - - not that
21   I'm aware of.
22       Q   All right.  Now, what about - - you
23   know, that sticker you said that any

Page 40

01  installer has to put on there when they're
02  installing it?
03      A    Yes, sir.
04      Q    Did you ever see that sticker on
05  this trailer?
06      A    No, sir.
07      Q    Did you ever see one with Mr.
08  McGriff's name on it on this trailer?
09      A    No, sir.
10      Q    You never did. But that would be the
11  custom and practice to do that, right?
12      A    Yes, sir.
13      Q    And the sticker goes on there by the
14  person that is actually the licensed person
15  to do the installation, right, that's who
16  the sticker is?
17      A    Yes, sir.
18      Q    And those stickers are numbered,
19  aren't they?
20      A    Yes, sir.
21      Q    I mean, you get them from the
22  Commission, they're numbered, they're
23  unique, so that, like you said, an

Page 41

01  inspector comes by, they can track them?
02    A   He knows exactly who set it up, just
03  by the number on it.
04    Q   Okay.  So, if you had a sticker that
05  was on this trailer and it had Mr.
06  McGriff's name on it, and it had one of
07  those numbers on it that, you know, like
08  you get from the Commission, that would
09  tell the inspector that Mr. McGriff was the
10  certified inspector for this trailer,
11  right?
12    A   Yes, sir.
13    Q   Okay.  All right.  And to your
14  knowledge, even though he was the certified
15  inspector, he never went out and had
16  anything to do with the installation of
17  this trailer, did he?
18    A   Not to my knowledge, on that one,
19  no, sir.
20    Q   Now, did you ever go out and look at
21  the trailer after you got back?
22    A   No, sir.
23    Q   You never did?

Page 42

01    A    No, sir.
02    Q    And you haven't seen it since you
03 took it out there the day you drove it out
04 there; is that right?
05    A    That's correct.
06    Q    All right.  Now, back to this
07 Plaintiff's Exhibit 1 and 2, and would I be
08 correct, if that sticker was on there and
09 it had Mr. McGriff's name on it, that if he
10 was not present during the entire
11 installation process that he would have
12 violated this statute?
13        MR. ADAMS:  Object to the form.
14    Q    (BY MR. HOLLIS) Go ahead.
15    A    I don't understand what you're
16 asking.
17    Q    Well, the statute says "an officer
18 or employee of the business who possesses a
19 current certificate of training from the
20 Commission must be present during the
21 entire installation process"; was there any
22 such person there?
23    A    Not to my knowledge.

Page 43

```
01        MR. ADAMS:  Object to the form.
02     Q   (BY MR. HOLLIS) Okay.  "The owner or
03  purchaser of the manufactured home or
04  manufactured building is not allowed to
05  install said home or building unless the
06  owner or purchaser is a certified
07  installer."  In other words, if somebody
08  buys a mobile home, either used or new,
09  they can't install it themselves unless
10  they're themselves a certified installer,
11  right?
12     A   That's correct.
13        MR. ADAMS:  Object to the form.
14     Q   (BY MR. HOLLIS) And then it says "if
15  the manufacturer's plans are unavailable
16  for installation, then the home must be
17  installed according to the minimum
18  standards as established by the Commission
19  or according to the installation plans
20  drawn up and approved by a registered
21  engineer."  And if you can, look at Number
22  2 and see if you can find out - - point to
23  me these minimum standards that are
```

Page 44

01  established by the Commission to install a
02  trailer?
03      A   I'm not really familiar with the
04  book too much.
05  (Off the record)
06      Q   (BY MR. HOLLIS) Have you found
07  something?
08      A   Yes, sir.  Between 55 and - - yeah,
09  55 and I know 58, there's the frame, and
10  here's the anchoring and all right there.
11      Q   Okay.  Now, what experience did
12  Ladon, Sedro, and was the other guy named
13  David?
14      A   Yes, sir.
15      Q   What experience did they have in
16  installing a trailer on the 30th day of
17  March of 2006?
18      A   Ladon had set up four I know by
19  himself, and he set up several with me.
20      Q   Was Ladon a certified installer?
21      A   No, sir.
22      Q   Was David a certified installer?
23      A   No, sir.

Page 45

```
01    Q   Was Sedro a certified installer?
02    A   No, sir.
03    Q   Was there any certified installer
04   out there during the time they were
05   installing this trailer?
06    A   No, sir.
07    Q   All right.  Now, he had done four,
08   I'm talking about Ladon?
09    A   Yes, sir.
10    Q   What about David, had he done any?
11    A   Just with Ladon.
12    Q   Okay.  And what about Sedro?
13    A   Just with Ladon.
14    Q   Who trained Ladon to set up a
15   trailer?
16    A   Me.
17    Q   Okay.  Tell me how you told him to
18   do it?
19    A   Go through, set all your bottom
20   piers first, the foundation.  Then you go
21   through and get your height that you want
22   it.  All right.  You water level all your
23   piers off, if you can.  If they're going to
```

Page 46

01  be lower than what - - if it's going to
02  have to come down a little bit, you can go
03  ahead and set everything you have to.  All
04  right.  Then, you put - - on a heavy house,
05  you would take a jack and put it behind the
06  wheels and in front of the wheels on each
07  side of the home.
08      Q    Now, why are you doing that?
09      A    Well, on that particular home there
10  it's a heavy house.  It's vinyl and
11  shingle.  On metal on metal it ain't quite
12  as heavy, but it requires that you do that
13  because it's a heavy home.  On any of them
14  that's sixteen-by-eighty.
15      Q    Okay.  When you use the jack, did
16  you give him any specific instructions as
17  to - - you don't just put it on the ground
18  and start jacking?
19      A    Oh, no, sir.  No, sir.  You've got
20  to build a solid foundation on the ground,
21  which you use wood, and then you stack wood
22  in a single stack up, and then you pick the
23  trailer - - the mobile home up.  You put

Page 47

01   the jack in the center of the I-beam.
02       Q    Okay.  Center of the I-beam on - -
03   or what is the purpose of using the jack?
04   Is that to get the wheel and axle out from
05   under it?
06       A    Well, yes, sir, if it's got to come
07   down, that's the purpose of it.
08       Q    Okay.  And you always use these
09   jacks to do that?
10       A    Yes, sir.
11       Q    All right.  Did y'all ever use any
12   other manufactured jacks, other than
13   Cobalt?
14       A    Yes, sir.  We've used Husky.
15       Q    And who makes the Husky?
16       A    Home Depot.
17       Q    Okay.  Were the Cobalt jacks, the
18   four that were bought on the 29th of March,
19   did those belong to Bear Creek?
20       A    Yes, sir.
21       Q    Okay.  And they were bought by Bear
22   Creek?
23       A    Yes, sir.

Page 48

01    Q    Okay.  They didn't belong to you, or
02  David - -
03    A    No, sir.
04    Q    - - or Ladon, or Sedro, right?
05    A    No, sir.
06    Q    Okay.  So, this was equipment that
07  was provided by Bear Creek for y'all - -
08  for them to install this unit, right?
09    A    Yes, sir.
10    Q    Now, who installed the other things,
11  like the wood, the blocks, those support
12  things, etc., who provided those?
13    A    Bear Creek.  You know, they got
14  everything we needed.
15    Q    When you would go to work, would you
16  typically go to work at Bear Creek's
17  location?
18    A    Yes, sir.
19    Q    Where were they located?  Where was
20  their headquarters?
21    A    In Slocomb.
22    Q    Okay.  What - - where in Slocomb?
23    A    I'm not - - I don't know their

Page 49

01  address, it was their home.
02      Q   It was their home?
03      A   Yes, sir.
04      Q   They just operated out of their
05  home?
06      A   Yes, sir.
07      Q   What kind of business did they have?
08      A   I don't know.
09      Q   Well, did they - - did they sell new
10  trailers?
11      A   No, sir, mostly used.
12      Q   Okay.  Well, what would they do,
13  would they buy repossessed trailers, and
14  then sell them to people, or how did they
15  do that?
16      A   Yes, sir.
17      Q   That's mainly what they were doing?
18      A   Yes, sir.
19      Q   And then, they would get y'all to
20  install them?
21      A   Yes, sir.
22      Q   How many were y'all doing, say, on
23  average, a month back in March?

Page 50

```
01    A   Four a week.
02    Q   Four a week?
03    A   Yes, sir.
04    Q   Okay.  And so, for you, four a week
05    would be about twelve hundred dollars a
06    week that you would get gross?
07    A   Yes, sir.
08    Q   Did they have any other things that
09    they did in that business, other than buy
10    and install trailers?
11    A   No, sir.
12    Q   All right.  Now, when you got your
13    certification from the Commission, did you
14    get all your training here in Dothan, or
15    did you have to go to Montgomery, or how
16    did you do that?
17    A   For my certification or for - -
18    well, I - - I've always been trained, I've
19    been in mobile homes for six, right at
20    seven years now, almost.  And I learned
21    through Michael Traywick, and then they
22    didn't really - - I didn't really get just
23    no training, I just went and took the test.
```

Page 51

01   They just give you a test, let you watch a
02   movie and give you a test, that's just - -
03   I went to Gardendale.
04       Q    Okay.  So, you went to Birmingham?
05       A    Yes, sir.
06       Q    All right.  Now, back to Plaintiff's
07   Exhibit 1, Paragraph Number 2 on Page 49 it
08   says "all ground anchors and tie down
09   devices must be installed according to the
10   anchor manufacturer's installation
11   instructions for their respective ground
12   anchors and tie down devices.  No ground
13   anchor or tie down device shall be used to
14   anchor a manufactured home or manufactured
15   building to the ground unless that ground
16   anchor or tie down device has received the
17   Commission's approval.  All manufacturers
18   of ground anchors and tie down devices must
19   meet the Commission requirements regarding
20   anchor and tie down manufacture and
21   installation."  Now, what is an anchor and
22   tie down?
23       A    The anchor you drill in the ground,

Page 52

```
01   then a strap wraps around the frame, comes
02   back down and you take a split bolt, slide
03   it inside the anchor, then you tighten it
04   up and pull until it is tight.
05       Q    Okay.  What is the purpose of the
06   anchor and the tie down devices?
07       A    To fasten the mobile home to the
08   ground in case of hurricane purposes or
09   tornado purposes.
10       Q    Okay.  Do you actually pour cement
11   in that hole?
12       A    No, sir, you just drill them in the
13   ground.
14       Q    Okay.  Do you know if anchors or tie
15   downs, had they even gotten to that point
16   in the installation of this mobile home?
17       A    I don't know if they had or not.
18       Q    Now, Paragraph 3, it says "all
19   installers shall purchase installation
20   decals from the Commission and place said
21   decal on each home or building so
22   installed.  This decal shall denote the
23   date of installation and the name and
```

Page 53

01    certification number of the installer.
02    Decal must be placed on the home or
03    building immediately upon site location and
04    prior to installation.  Installation decals
05    shall not be transferred, they must be used
06    by the certified installer who purchased
07    them."  Now, this goes back to what we were
08    saying, or talking about earlier.  If there
09    was one of these installation decals on
10    this trailer, and it showed that Mr.
11    McGriff had signed off on that, that would
12    have actually been complying with this
13    section of the Code, right?
14        MR. ADAMS:  Object to the form.
15    Q   (BY MR. HOLLIS) In other words, he
16    was doing what the Code said do?
17    A   Yes, sir.
18    Q   In other words, he had purchased or
19    got one of the decals, he evidently had put
20    it on before they started installing it,
21    and his name appeared on that decal?
22    A   If it was on there - -
23    Q   Yeah.

Page 54

01    A    - - is that what you're saying?
02    Yes, sir.
03    Q    Okay.  Now, Number 4, it says "no
04    person, retailer or manufacturer shall
05    employ any person, firm or corporation as
06    an installer who is not certified as
07    required by this section."  Would it be a
08    correct statement that when you, Sedro,
09    David and your cousin were hired to install
10    the particular trailer that resulted in the
11    injury to Ladon, that none of y'all were
12    certified installers?
13    A    That's correct.
14    Q    Okay.  And it goes on to say,
15    "violation of this section may be punished
16    by the imposition of a fine against the
17    violator in the amount of not more than
18    five hundred dollars for each home
19    installed by an uncertified installer."
20    Were you aware of that?
21    A    No, sir.
22    Q    Okay.  Now, do you know if the - -
23    if your cousin, Ladon, David or Sedro were

Page 55

01  at all familiar with the minimum
02  requirements of Plaintiff's Exhibit Number
03  2 for the installation of the trailer that
04  was involved when Ladon was injured on
05  March 30th of 2006?
06      A   Repeat that, please?
07      Q   Okay.  What I'm asking you, you said
08  there were certain parts of Plaintiff's
09  Exhibit 2 that I have right in front of
10  you, and I think you specified - - I read
11  through you, and it said if the
12  manufacturer doesn't provide the
13  installation instructions, then you look to
14  this Commission requirements for minimum
15  standards - -
16      A   Yes, sir.
17      Q   - - to install it.  And then, you
18  specifically referred me to, I think Page
19  55 and some other sections of this as being
20  the minimum requirements that the
21  Commission has for installation; is that
22  correct?
23      A   Yes, sir.

Page 56

```
01     Q    Now, what I'm asking you is: Did
02  your cousin, did David or Sedro, to your
03  knowledge, have knowledge of these minimum
04  requirements in Plaintiff's Exhibit Number
05  2?
06     A    Not through that - - there they
07  didn't.
08     Q    Okay.  All right.  Now, do you know
09  - - I think I asked you this, but I wanted
10  - - I want to be sure it's on the record:
11  Did Bear Creek sell any trailers, mobile
12  homes retail, or were they mainly in the
13  second-hand market?
14     A    Second-hand market.
15     Q    Okay.  Now, after you got back from
16  north Alabama on March the 30th, you said
17  - - do I recall that you said David had
18  told you about the accident?
19     A    Yes, sir.
20     Q    How did he do that?
21     A    He just - - he told me that - -
22     Q    I mean, by telephone, or - -
23     A    Telephone, yes, sir.
```

Page 57

```
01    Q   Okay.  Did you have a telephone, a
02  mobile telephone at that time?
03    A   Yes, sir.
04    Q   Okay.  Is that the same number you
05  gave me earlier?
06    A   Yes, sir.
07    Q   Did he call you on that mobile
08  phone?
09    A   Yes, sir.
10    Q   And where did - - where were you
11  when he finally got you?
12    A   I was in Bertha, which is right next
13  to Echo.
14    Q   And where is that?
15    A   Just not far out of Headland, close
16  to Abbeville.
17    Q   Okay.  So, you weren't too far from
18  where they were?
19    A   No, sir.
20    Q   So, he called you and what did he
21  say?
22    A   He said that the trailer had fell
23  and pinned my cousin down, they got it off
```

Page 58

01  of him and he can't feel his legs.
02      Q   Okay.  Did you go to the hospital to
03  see your cousin?
04      A   Yes, sir.
05      Q   Did you ask David, when he called
06  you, "how did this happen, what happened"?
07      A   I didn't ask him until after he had
08  - - until he had come to the hospital and
09  seen me there.
10      Q   Okay.  All right.  You go to the
11  hospital, correct?
12      A   Yes, sir.
13      Q   Okay.  Now, tell me, were you able
14  to see your cousin right away?
15      A   Yes, sir.
16      Q   Where was he?
17      A   He was in the emergency room.
18      Q   Did you talk to him?
19      A   No, sir.
20      Q   You didn't talk to him.  What were
21  they doing to him in the emergency room?
22      A   He was laying on a bed, and they had
23  his neck brace on and everything, and he

Page 59

```
01   was just laying there.
02       Q    Okay.  You weren't out there when he
03   was lifted and transported to the hospital,
04   right?
05       A    No, sir.
06       Q    Did you talk to a doctor there at
07   any time?
08       A    No, sir.
09       Q    Was any of his family members there?
10       A    Yes, sir.
11       Q    Who was there?
12       A    His dad, his mom, uncles, aunts.
13       Q    Okay.  Tell me everybody you
14   remember being there?
15       A    That was in the room at the time?
16       Q    Yeah.
17       A    His dad, Willie Cook.  His mom, my
18   dad, my mom.
19       Q    What's your dad's name?
20       A    Randy Cook.
21       Q    Okay.  And what's your mom's name?
22       A    Tammy Cook.
23       Q    Okay.  And who else?
```

Page 60

```
01    A    Me, my wife.
02    Q    What's your wife's name?
03    A    Jessica.
04    Q    Okay.
05    A    And that's all I recall there.
06    Q    All right.  Now, what do you - -
07   were there any conversations?  Did David,
08   Sedro, did either one of those come to the
09   hospital?
10    A    They did a day or two after the
11   accident.
12    Q    Okay.  Did you talk to anybody on
13   March the 30th about what had happened out
14   there?
15    A    I think I called David and talked to
16   him later on that day.
17    Q    On your phone?
18    A    Yes, sir.
19    Q    Okay.  And did he have a mobile
20   phone?
21    A    Yes, sir.
22    Q    Okay.  Tell me what you remember of
23   that conversation?
```

Page 61

```
01      A   He said that Ladon had it tacked up
02   a little bit higher than what it needed to
03   be, and they pulled the tires and axles off
04   of it after they set all of the piers.
05   They pulled them off, axles and tires out,
06   both sides.  And David said Ladon had
07   crawled up under the front side and was
08   digging a pier and told David to go around
09   the back side and set the back piers where
10   the axles was at, because there are piers
11   that go in between them sometimes.  So, he
12   sent David around back.  Well, David come
13   around the back and - - he said he leaned
14   down and went up under to dig, and about
15   the time he went to dig the trailer had
16   fell.
17      Q   Okay.  David said about the time he
18   started to dig?
19      A   Yes, sir, about when he ducked down
20   and went to get up underneath there, he
21   said his head was up under the edge of it,
22   and then all of a sudden he just heard a
23   loud noise, and he said he looked up and
```

Page 62

01  seen the trailer down on the ground.
02      Q    Okay.  All right.  Did he tell you
03  anything about the condition of the ground,
04  like was it wet?
05      A    No, sir, he didn't - - he didn't
06  tell me nothing.
07      Q    Did he indicate, or give you any
08  opinion as to what he thought caused the
09  trailer to fall on Ladon?
10      A    No, sir, there wasn't - - he never
11  told me nothing on anything he thought it
12  might be.
13      Q    Okay.  Now, if you would, sort of
14  draw the trailer.  And the reason I'm
15  asking you to do this, you said, you know,
16  they were at various points when they did
17  this, that and the other.  And what I want
18  to do is - - and I'm going to go ahead and
19  mark this as Plaintiff's Exhibit 3.
20  (Plaintiff's Exhibit 3 was marked for
21  identification and a copy of the same
22  is attached hereto as evidence)
23      Q    (BY MR. HOLLIS) And if you can, just

Page 63

01  draw the trailer as best - - and I know
02  you're not an artist, but just draw the
03  trailer basically as it would have looked
04  just sitting out there.
05      MR. ADAMS:  Are you talking with the
06  wheels and everything?
07      MR. HOLLIS: Yeah, with the wheels
08  and everything.
09    A   (Witness complies)
10    Q   Now, if you can - - okay.  Was the
11  - - when you left the trailer, after you'd
12  taken it out there, did it still have the
13  tongue on it?
14    A   Yes, sir.
15    Q   Okay.  And what was - - what kind of
16  trailer was this?
17    A   Redman.
18    Q   Redman.  And where did the tongue
19  come from?  Was it a part of the trailer?
20    A   Yes, sir.
21    Q   In other words, it was built into
22  the trailer?
23      MR. RITCHEY:  Object to the form.

Page 64

01    A   I'm not quite sure if it was built
02  in or if it was - - or if it was bolted on.
03  Some bolt on, some weld on.
04    Q   (BY MR. HOLLIS) Okay.  You just
05  don't remember?
06    A   No, sir.
07    Q   Do you remember what end of the
08  trailer that was on?
09    A   Yes, sir, this end here
10  (indicating).
11    Q   Okay.  Go ahead and put that on
12  there, if you will.
13    A   (Witness complies).
14    Q   Okay.  Now, I think you - - you're
15  like you're looking at the side, right?
16    A   Yes, sir.  I'm looking at the front
17  door right here.
18    Q   Okay.  Let's assume you're looking
19  down on the trailer.
20    A   Oh, okay.  Okay.
21    Q   So, if you'll do that.
22    A   (Witness complies).
23    Q   Okay.  Now, when you left the

Page 65

01   trailer - - did you take it out there on
02   the 29th or the 30th, do you remember?
03       A    I think it was a day or two before
04   that maybe, I'm not quite sure.
05       Q    Okay.  When you left it there, was
06   it uneven, the trailer was uneven?
07       A    It didn't look like it was too
08   uneven, no, sir.
09       Q    Okay.  Was there anything you did to
10   - - do y'all call this the tongue?
11       A    Yes, sir.
12       Q    Okay.  And did you do anything to
13   the tongue before you left?
14       A    Yes, sir.
15       Q    What did you do?
16       A    I blocked underneath the tongue jack
17   on it.  It has a tongue jack that you can
18   - -
19       Q    Now, what is a tongue jack?
20       A    Well, it's where - - if you set it
21   down, you know, you set it on a jack, you
22   know, just like a regular trailer jack, a
23   little wind jack.  Well, this mobile home

Page 66

01  has the same thing, but it twists down like
02  this (indicating), and it goes straight
03  down.  Well, take two boards and lay long
04  ways up underneath it, and you cross over
05  it, and then you criss-cross your wood
06  across the top of it, and then you let your
07  tongue down on it.
08      Q    Okay.  And that's to support the
09  tongue?
10      A    Yes, sir.  That's to support it so
11  it don't go sink all the way to the ground.
12      Q    All right.  Now, I know a boat,
13  sometimes, you know, on the front there's a
14  thing you can rev it up and rev it down, is
15  that sort of what you were doing with this
16  tongue?
17      A    Basically.  But I was just building
18  it up and making it stable for whenever
19  they come back, you know, that it wouldn't
20  be in the ground, the tongue wouldn't fall
21  completely to the ground.
22      Q    Okay.  And is that customarily in
23  installation?

Page 67

01    A    Yes, sir, it's just take them to a
02 lot, drop them off, do the same thing.
03    Q    All right.  Now, where would the
04 axle and the wheels be on that trailer?
05    A    I can't remember if it had split, or
06 if it had two of them.  Majority of the
07 time it's right here (indicating), and it
08 should have two right there (indicating).
09    Q    All right.  Now, where had they put
10 the supports, or the - - what did you call
11 them that you put around to start with?
12    A    Piers.
13    Q    Piers.  Where were the piers?
14    A    They should be one two foot there
15 and then every six foot apart underneath
16 the home.
17    Q    Okay.  So, would you put "tires and
18 axle" and identify both of those?  Just
19 write that out, if you will.
20    A    (Witness complies).
21    Q    And then, for this, just put a
22 little mark right there (indicating) and
23 put these are the - - what do you call

Page 68

```
01   them, the piers?
02       A   Piers.
03       Q   Okay.
04       A   (Witness complies).
05       Q   Okay.  Now, that would have been all
06   the way around?
07       A   Yes, sir.
08       Q   Okay.  Now, where were the jacks
09   located during the installation, or do you
10   know?
11       A   I don't know.
12       Q   Okay.  Now, when you talked to
13   David, tell me what he said had happened?
14   Tell me what he said had happened.
15       A   He said that Ladon was here
16   (indicating), and they'd pulled these tires
17   and - -
18       Q   Okay.  Now, when you say "here" are
19   you saying - - to me, this is the back side
20   of the trailer, this is where the trailer
21   is facing out towards the woods?
22       A   No.
23       Q   Okay.  Is this toward the house?
```

Page 69

01    A    This is towards the house, this is
02  toward the woods (indicating).
03    Q    Okay.  Let's put "woods" right here
04  (indicating).
05    A    (Witness complies).
06    Q    And let's put "house" up here
07  (indicating).
08    A    (Witness complies).
09    Q    Okay.  All right.  And then, this
10  would - - I don't know what's north and
11  south, but Ladon would have been on the
12  house side?
13    A    That's correct.
14    Q    Near these tires, right?
15    A    Yes, sir.
16    Q    The front tire - - the front - - the
17  tires closest to the tongue?
18    A    I do not know.
19    Q    All right.  Tell me - - go ahead and
20  tell me exactly what David said, and try to
21  put where David was saying Ladon was when
22  this was happening?
23    A    He never did say exactly if he was

Page 70

```
01   at the front side axles or the back side
02   axles.
03       Q    But he was on the house side of the
04   trailer?
05       A    That's correct.
06       Q    All right.  Now, where was David?
07   Where did you - -
08       A    David was right here (indicating)
09   with Ladon, Ladon - -
10       Q    He was on the house side somewhere
11   around the - - one of those sets of tires?
12       A    Yes, sir.  Yes, sir.  And then,
13   Ladon was under - - digging a pier
14   underneath it, with it still jacked up with
15   no tires and axles on it.
16       Q    With no tires and axles on it?
17       A    That's correct.
18       Q    They had already been taken off?
19       A    They had - - they had pulled them
20   off.
21       Q    Okay.  Now, is that customary, that
22   you would do piers after you had removed
23   the tires and axle?
```

Page 71

01    A   Yes, sir.  After it is set on the
02  blocks you pull the tires, you let the home
03  down on the blocks, and then you - - after
04  you have the home settled on the blocks,
05  then you pull your axles out and set your
06  piers in between the axles.
07    Q   Okay.  Well, if you had taken the
08  axles and the tires out, why did you have
09  to jack it back up?
10    A   You shouldn't have to jack it back
11  up after that.
12    Q   Well, why were they jacking it back
13  up?
14    A   They jacked it up to clear the
15  tires, to take the tires off of it.
16    Q   Okay.  So, that's why they had
17  jacked it up?  If they - - in other words,
18  they had jacked it up, they took the tires
19  and axle off - - out, and then we're here
20  with - - that's when David starts saying
21  what happened, right?
22    A   That's correct.
23      MR. STEWART:  Object to the form.

Page 72

```
01      A   He said Ladon was here setting a
02   pier under the house side.  Then Ladon
03   instructed David to go around and come
04   under the other side and set the piers on
05   the woods side underneath the frame where
06   the tires and axles was at.
07      Q   (BY MR. HOLLIS) Okay.  And David
08   said he did that?
09      A   David said he went around there and
10   leaned down to crawl up underneath the
11   house to set the pier, and when he went to
12   go to crawl up under it the trailer had
13   fell.
14      Q   Had already fell?
15      A   Yes, sir.  Before he ever made it up
16   under there.  He said his head was up
17   underneath the edge of the house when it
18   shifted and fell.
19      Q   Now, did he say when it fell it just
20   fell directly down?  Did it - - did he say
21   it sort of, you know, fell toward the
22   woods, or fell toward - -
23      A   It fell toward the house.  It
```

Page 73

01  shifted toward the house and fell.
02      Q   Shifted toward the house.  Okay.
03  Now, did he mention whether there was a
04  jack on the woods side?
05      A   Yes, sir.  There was a jack on both
06  sides.  It was picked up off the piers
07  completely.
08      Q   Okay.  Now, which one did he say
09  that he felt like Ladon had raised the jack
10  a little too high?
11      A   I don't remember if he told me or
12  not.  I'm not even sure if Ladon was the
13  one who set up the jacks.  I don't know,
14  they didn't tell me.
15      Q   Okay.  He just said the jacks were a
16  little high?
17      A   Yes, sir.
18      Q   Okay.  He didn't say who did it?
19      A   Yes, sir.
20      Q   He just said that they were a little
21  high?
22      A   Yes, sir.
23      Q   Okay.  Then he said that he - -

Page 74

01   after having the discussion with Ladon, he
02   comes around to the woods side between
03   where the two tires and axles had been, and
04   he had leaned down to get up under there to
05   put that - -
06       A    The last two piers there, yes, sir.
07       Q    - - the last two piers there?  And
08   the trailer shifted and fell toward the
09   house?
10       A    Towards the house side.
11       Q    Okay.  And did he say it fell on
12   Ladon?
13       A    Yes, sir.  He said the outside of
14   the house had Ladon pinned.  One of the
15   outriggers coming off the house that helps
16   support the outside walls had come down and
17   caught Ladon in the lower part of his back
18   and he was on his knees, stuck underneath
19   it.
20       Q    All right.  Did he describe how they
21   ever got the trailer off of him?
22       A    He said a skidder, which you know,
23   is involved in wood clearing and all.  A

Page 75

```
01   man was over in the woods over here
02   clearing woods out, timber, and he - - they
03   - - Sedro or David, one, had hollered for
04   them, and they brought the skidder through
05   there and picked up the house with the
06   blade.
07      Q    Okay.  What end did they pick up the
08   house from?
09      A    They said the tail end back here,
10   I'm not sure if they caught it on the side,
11   the very back end, or this side, or what,
12   but they said they picked it up towards the
13   tail end of the house.
14      Q    And did they say they were able to
15   pick it up enough so they could get Ladon
16   out of there?
17      A    They said the first time it slipped
18   off the blade.  And they had it up a little
19   bit, but they couldn't get Ladon out fast
20   enough, that it slipped off the blade.  But
21   the second time they come up on it and
22   pulled it - - picked it completely up off
23   of him and got him out from under there.
```

Page 76

01     Q    Okay.  Did they say what condition
02  Ladon was in prior to them lifting it the
03  first time?
04     A    Said Ladon couldn't talk, he was
05  like he was choking on something and all.
06  And he - - they said they don't know if he
07  passed out or not.
08     Q    Okay.  This was before the skidder
09  even got there?
10     A    Yes, sir.
11     Q    Okay.  Now, after the skidder got
12  there and attempted to lift it the first
13  time, was there any discussion about Ladon,
14  you know, saying anything, what his
15  condition was physically, or anything like
16  that?
17     A    No, sir.
18     Q    Do you know of anything that would
19  indicate that his injury was made worse by
20  them lifting the trailer up and it falling
21  that first time?
22     A    I'm not sure.  I don't know, I
23  wasn't there.  I don't know how it fell or

Page 77

```
01   what.
02      Q   Okay.  All right.  But what - - was
03   it your understanding that the entire
04   weight of the trailer fell on Ladon the
05   first - - I mean, when it - -
06      A   No, sir.  The outside wall is what
07   caught, and not the frame underneath.  It
08   was like he was trying to back out and it
09   caught him in the back, the outside wall.
10      Q   Okay.  Caught him in the back?
11      A   Yes, sir.
12      Q   Was he on his stomach?
13      A   He was on his knees.
14      Q   On his knees.
15      A   Yes, sir.
16      Q   And it just sort of stamped his
17   back?
18      A   It mashed him into the ground, you
19   know.  When he was on his knees it mashed
20   him down and pushed all the way in and
21   mashed him into the ground a little bit.
22      Q   Okay.  And then, after the trailer
23   had slipped off of the skidder, and then
```

Page 78

01  they went back under, and this time they
02  were able to lift it off of him?
03      A    To my understanding, yes, sir.
04      Q    And then, they were able to get him
05  out from under there?
06      A    Yes, sir.
07      Q    And what was his condition then, or
08  do you know?
09      A    I do not know.  They said they laid
10  him out on the ground, laid him flat on his
11  back.  And he started talking a little bit
12  to them and told them he couldn't feel his
13  legs, to call his mom, I think they said,
14  first.  And to get somebody out there for
15  him.
16      Q    Okay.  To you knowledge, did anybody
17  investigate this accident?
18      A    Not to my knowledge.
19      Q    Are you aware of any insurance
20  requirements that the Commission requires
21  for people installing trailers?
22      A    No, sir.
23      Q    Are you familiar with installation

Page 79

```
01  report forms?
02      A    Yes, sir.
03      Q    What are those?
04      A    That's where you turn in a locator,
05  and you send it to the state inspector
06  showing where the home is at, where it was
07  set up, and giving him directions out
08  there.  He goes, looks at the home, checks
09  what - - the inspector checks what we've
10  done, makes sure all our blocks are six
11  foot on center, makes sure the house is
12  level, makes sure we used the right
13  materials, the right anchors.  And he'll
14  send back in a report to us saying what was
15  correct, what was incorrect, do we need to
16  fix anything, or was everything good.
17      Q    Okay.  So, the way that would work
18  is you would first of all have the
19  installer put the certificate - -
20      A    Yes, sir.
21      Q    - - or the decal on the thing?
22      A    Yes, sir.
23      Q    Then you would have the people that
```

Page 80

01  would install it, they'd come in and
02  install it?
03      A    Yes, sir.
04      Q    Then they would submit what is
05  called a installation report form, which
06  would go to the state?
07      A    Yes, sir.  I call it a locator,
08  that's what I've always heard it called is
09  locator.
10      Q    Okay.  Which would mean that every
11  trailer that is installed is ultimately
12  inspected by somebody from the state?
13      A    Yes, sir.
14      Q    And so, this locator or report would
15  be an indication to the state, "hey, we
16  installed this trailer, will you come
17  inspect it"?
18      A    Yes, sir.
19      Q    And they will send somebody, and
20  then they will send you - - or who would
21  they send their - - would they send it to
22  Bear Creek?
23      A    Yes, sir.  Within ten days he'll be

Page 81

01   - - the state inspector will be there to
02   check the home, and he'll send a form back
03   to Bear Creek saying if everything was
04   right, or if anything was wrong that we
05   needed to go back and fix, a cracked block,
06   anything.
07      Q   Okay.  Now, the owner of the trailer
08   cannot move in until all of these
09   inspections have been cleared, right?
10      A   I don't reckon so.  They can move
11   in.  I've never seen one where they
12   couldn't move in, where they've never - -
13   you know, they've been in it whenever we
14   went back out to fix anything that's ever
15   been wrong.
16      Q   Do you now get an installer's
17   certificate - - I mean, a certification
18   certificate?
19      A   No, sir, I'm under Bryan McGriff,
20   under his license, under his certificate.
21   I went and took the trainee course, and - -
22      Q   The trainee course?
23      A   Yes, sir.  That's where - - saying

Page 82

01  that I work under Bryan McGriff.
02      Q   All right.  And when did you
03  complete that?
04      A   A couple months ago, three months
05  ago, I think.
06      Q   Okay.  So, you were - - you actually
07  don't have a installer's certification
08  yourself?
09      A   No, sir.
10      Q   Okay.  Bryan has got that, and they
11  have a category called trainee?
12      A   Yes, sir.
13      Q   And that's what you went and took
14  the course under, but you never really got
15  a official installer's certification
16  certificate?
17      A   Not my own.  I'm certified under
18  Bryan.  Bryan McGriff does not have to be
19  on the site as long as I'm there - -
20      Q   Okay.
21      A   - - and I can use his sticker.
22      Q   Now, where does the statute say that
23  a trainee can do that?

Page 83

01    A   It's somewhere in the book.
02    Q   Do you want to see if you can find
03  it?
04    A   I'll see if I can.
05       MR. ADAMS:  If you'll look back on
06  Page 49 it said that.
07       MR. HOLLIS: 49?
08       MR. ADAMS:  Page 49, which you were
09  reading about, employee - - officer or
10  employee of the business.
11    A   Yeah, who obtained - - "who
12  possesses a current certificate of training
13  or purchaser of manufactured home."
14    Q   (BY MR. HOLLIS) Okay.  So, when this
15  trailer was being installed though, there
16  was nobody - - there was nobody out there
17  that actually complied - - number one,
18  McGriff wasn't out there, we know he wasn't
19  out there?
20    A   Yes, sir.
21    Q   And we know that three of the people
22  out there, David, Ladon and Sedro, they
23  weren't - - they hadn't gone and got their

Page 84

01  training certificate, like you had, so they
02  could work under McGriff?
03      A    That's correct.
04      Q    So, there was no compliance with
05  this statute, in terms of an installer on
06  the day that this accident occurred?
07          MR. ADAMS:  Object to the form.
08      A    No, sir.
09      Q    (BY MR. HOLLIS) Okay.
10  (Plaintiff's Exhibit 4 was marked for
11  identification and a copy of the same
12  is attached hereto as evidence)
13      Q    (BY MR. HOLLIS) Now, Plaintiff's
14  Exhibit Number 4, is this those pads that
15  we were talking about?
16      A    Different types, yes, sir.
17      Q    Okay.  Does the Commission have to
18  - - actually have to certify a pad before
19  you can use it?
20      A    Yes, sir, it has to be certified by
21  the state, yes, sir.
22      Q    And how do they - - how do you know
23  it's been certified when you're using them?

Page 85

```
01      A    When they sell them to us.  It has
02   to be certified.  Any mobile home supplies
03   place that sells like this pad or that pad,
04   they know that it's certified by the State
05   of Alabama.
06      Q    Do you know who made the pads that
07   were out there on the day the accident
08   occurred?
09      A    No, sir.
10      Q    Okay.  Now, did you ever talk to
11   Sedro about what happened out there?
12      A    No, sir.
13      Q    Did you ever talk to Ladon about
14   what happened out there?
15      A    No, sir.
16      Q    Did you ever talk to anybody else
17   about what happened out there, other than
18   David?
19      ANo, sir.
20      Q    Okay.  Do you know a Richard Smith?
21      A    I know of him, but I do not know
22   him, no, sir.
23      Q    How do you know him?
```

Page 86

01    A    Just through other installers.
02    Q    Is he an installer too?
03    A    Yes, sir, he's a mover.
04    Q    Okay.  Do you know of any documents
05    that people like Bear Creek have to keep,
06    like dealer monthly use sales reports, that
07    they have to turn in to the state?
08    A    I don't know nothing about it, no,
09    sir.
10    Q    Okay.  Do you know if anybody did
11    any soil classifications for the purpose of
12    determining the design loads, specification
13    and holding powers of anchors and tie down
14    devices on this particular trailer?
15    A    No, sir.
16    Q    Do you know of any test probe that
17    was done with a device to do such for
18    measuring the torque of the soil to assist
19    in evaluating the holding capacity of the
20    soils underneath the trailer that fell on
21    March the 30th of 2006?
22    A    No, sir.
23        MR. ADAMS:  Object to the form.

Page 87

01    Q   (BY MR. HOLLIS) Do you know of any
02  test that was done to measure the
03  synonymous with moment of force when
04  distributed around the shaft of the test
05  probe; do you know anything that was done
06  for that?
07       MR. ADAMS:  Object to the form.
08    A   No, sir.
09    Q   (BY MR. HOLLIS) Do you know if there
10  was any professional engineer that was
11  consulted regarding the installation of
12  this trailer?
13    A   No, sir.
14    Q   Now, on Page 57, these are the
15  minimum blocking standards, and it says
16  "pier foundation shall be installed
17  directly under the mainframe of the home or
18  the building."  Back on Page 3 you have
19  identified the piers, and it says "the
20  piers shall not be further apart than six
21  feet on center when using minimum pier
22  foundation of sixteen inches by sixteen
23  inches by four inches concrete pad or

Page 88

```
01  equivalent, and the minimum soil bearing
02  capacity of two thousand pounds PSF, and
03  piers shall be no more than two feet from
04  each end of the frame."  Now, do you know
05  if all the piers complied with this minimum
06  pier foundation requirement?
07      A   On that home there?
08      Q   Right.
09      A   I do not know.
10      Q   Okay.  Do you know if they - - was
11  any test done to determine the minimal soil
12  bearing capacity of two thousand pounds
13  PSF, do you know if there was any - -
14      A   No.
15      Q   - - test done on that?
16      A   No.
17      Q   Does this require that that be done
18  before one of these is officially
19  installed?
20      A   I'm not sure, I've never done it
21  before.
22      Q   You've never done it?
23      A   No, sir.
```

Page 89

01    Q   Now, "the minimum pier foundation
02  shall be a sixteen inch by sixteen inch by
03  four inch concrete pad pre-cast or poured-
04  in-place concrete slab." Which were they
05  using out there, a concrete pad, a pre-
06  cast, or poured-in-place concrete slab?
07    A  They used plastic pad, which is
08  these right here (indicating).
09    Q  Are you talking about on Page - - on
10  Plaintiff's Exhibit Number 4?
11    A  Yes, sir. But I'm not sure if
12  that's the right size, because some of them
13  - - there's a bunch of different sizes in
14  plastic pads that you can use.
15    Q  Then it goes on to say "the minimum
16  soil bearing capacity for the minimum pier
17  foundation is two thousand pounds. If the
18  actual soil bearing capacity is greater
19  than two thousand pounds, an assumed value
20  of two thousand pounds must be used to
21  determine pier spacing." Do you know why
22  that requirement is in here?
23    A  No, sir.

Page 90

01    Q    And it says "in a soil bearing
02  capacity below these values, the pier
03  foundations must be increased in size
04  according to the bearing load and the soil
05  bearing capacity of the soil."  In other
06  words, if you don't have this two thousand
07  pounds soil capacity, you have to put the
08  piers closer together, don't you?
09    A    Yes, sir, I think so.
10    Q    Okay.  But to your knowledge, there
11  was never any test done to see if this soil
12  had the capacity for the two thousand PSF?
13    A    No, sir.
14    Q    How would you do that test?
15    A    I'm not sure, I've never done it.
16    Q    You've never done it?
17    A    No, sir.
18    Q    "Two eight inch by sixteen inch by
19  four inch concrete pads are considered
20  minimum.  All debris, grass, grass site and
21  other foreign material that would be under
22  the footers must be removed before the
23  footings or pier foundations are

Page 91

01   installed." Now, in Number 3 it says
02   "piers may be manufactured with load
03   bearing supports or devices that must be
04   approved for the loads and use intended, or
05   piers shall be constructed of regular eight
06   inch by eight inch by sixteen inch concrete
07   blocks." What was being used in this
08   particular installation?
09       A    Eight inch by eight inch by sixteen
10   blocks, open cells.
11       Q    Okay. And do you know if that was
12   adequate for the size and weight of this
13   particular building, considering that
14   apparently nobody knew whether this had the
15   two thousand pound PSF soil bearing
16   capacity?
17       A    I reckon it was adequate because
18   that's the only thing we've ever used. We
19   don't never - - you don't - - I've never
20   seen nothing else, besides what they build
21   houses with on blocks.
22       Q    Okay. Then you've got minimum
23   anchoring standards, installation anchors

Page 92

01  and tie down devices, standards for
02  manufacture of anchor and tie down devices.
03  Do you know the name of the homeowner of
04  this particular - - who this particular
05  trailer was being sold to?
06      A    No, sir.
07      Q    Now, have you talked to anybody else
08  about this accident, other than David?
09      A    No, sir.
10      Q    And other than the person that I had
11  come down that took a recorded statement
12  from you; have you talked to anybody else
13  about what happened?
14      A    No, sir, not about what happened.
15      Q    Okay.
16      MR. ADAMS:  Well, you talked to me
17  this morning.
18      MR. HOLLIS: Well, I don't mean your
19  lawyer, but - -
20      MR. ADAMS:  Well, I'm not his
21  lawyer.
22      MR. HOLLIS: Oh, that's right, you're
23  not.  What did you talk to Sam about?

Page 93

01     MR. ADAMS:  To find out what was
02  happening.
03     Q   (BY MR. HOLLIS) What did y'all talk
04  about?
05     A   Just basic setting up.
06     Q   Setting up?
07     A   Basic set up of a mobile home.
08     Q   Okay.  All right.  Do you have an
09  opinion as to what happened out there on
10  that date that caused this thing to fall?
11     A   No, sir.
12     Q   You don't?
13     A   No, sir.
14     Q   Are they taking taxes out of your
15  pay now?
16     A   No, sir.
17     Q   Still not doing it.  Do they pay you
18  with a check or cash?
19     A   Pay me with cash, but I sign for it.
20  Like they give me a check, but they cash it
21  so I don't have to go to the bank and try
22  and do it.
23     Q   Okay.  They charge you to do that

Page 94

01 for you?
02   A   No, sir.
03   Q   How long have they been in this
04 business?
05   A   Mobile home moving?
06   Q   Yes.
07   A   A year, a little over a year.  We
08 started in October - - September.
09     MR. HOLLIS: That's all I have right
10 now.
11     MR. ADAMS: Take a break.
12 (Short break)
13 EXAMINATION BY MR. STEWART:
14   Q   Mr. Cook, we met before your
15 deposition began, but my name is Chuck
16 Stewart.  I represent Lowe's in this case.
17 Have you ever talked to anybody at Lowe's
18 about this case?
19   A   No, sir.
20   Q   Okay.  Have you ever had anybody
21 from Lowe's try to talk to you?
22   A   No, sir.
23   Q   And the investigator that came out

Page 95

01   from Andy's office, did he have like a tape
02   recorder?
03      A   I think he did.
04      Q   And met with you in person?
05      A   Yes, sir.
06      Q   And did you get a copy of your
07   statement?
08      A   No, sir.
09      Q   Have you asked for a copy of your
10   statement?
11      A   No, sir.
12      Q   Did you know you were entitled to a
13   copy of your statement?
14      A   No, sir.
15      Q   If you get a copy of your statement,
16   would you mind if I had a copy of it too?
17      A   That'll be fine.
18      Q   Okay.  I'm trying to figure out if
19   you've ever bought one of these Cobalt
20   jacks yourself?
21      A   No, sir.
22      Q   And the Cobalt jacks that you said
23   were being used on the day of your cousin's

Page 96

01  injury, they had been bought the day
02  before?
03      A   Yes, sir.
04      Q   Okay.  Were you there when they were
05  bought?
06      A   No, sir.
07      Q   Do you know whether Bear Creek had
08  ever purchased any Cobalt jacks before?
09      A   I don't remember.  I think we had
10  bought some before.
11      Q   Okay.
12      A   I don't really remember, to tell you
13  the truth.
14      Q   Okay.  I mean, as you sit here
15  today, do you recall if this was the very
16  first time that Bear Creek had ever bought
17  Cobalt jacks?
18      A   I'm not sure, to tell you the truth.
19      Q   Okay.  Is there a particular brand
20  that you recall, now, starting with the day
21  of your cousin's injury and going back in
22  time, that y'all had used in terms of
23  jacking up homes?

Page 97

```
01      A   We've used several jacks, different
02  type, different names.
03      Q   Can you tell me the names of the
04  other jacks?
05      A   Husky, Craftsman, some Chinese ones,
06  I don't know what they was, ordered from
07  the - - from the mobile home sales places,
08  we've ordered some through them, but I
09  don't know what they was, they didn't
10  really say no name on it I can recall.
11      Q   Why do you say they're Chinese, did
12  they have Chinese symbols on them or
13  something?
14      A   Well, yeah, some of them was in
15  Chinese, I reckon.
16      Q   Okay.  Husky, Craftsman, this
17  Chinese one, anything else you can think
18  of?
19      A   No, sir.
20      Q   Do you know why the Cobalt jacks
21  were bought by Bear Creek?
22      A   Mr. Bryan, he likes buying stuff
23  from Lowe's, he likes Cobalt and stuff like
```

Page 98

```
01  that.
02      Q   Okay.  And do you know whether Mr.
03  Bryan still uses Cobalt jacks?
04      A   I don't know.
05      Q   Okay.  And does Cobalt make anything
06  else that y'all use in setting up or
07  transporting homes?
08      A   No, sir, I don't think I've bought
09  any sockets or anything to use from them.
10      Q   Okay.  Have you ever had any type of
11  device that sits on top of the ram that you
12  use for jacking up homes?
13      A   Yes, sir, we had jack plates.
14      Q   Tell me what a jack plate is?
15      A   What I always use, I didn't know
16  that they had them that you could - - you
17  could get and use up under there, but I've
18  always used a piece of metal flat bar,
19  about six, seven inches long, eight inches
20  long.  I've had half-inch thick, a little
21  wider than the beam itself.  And I always
22  use them to jack up as my jack plates when
23  the frames look weak or thin, or whatever.
```

Page 99

01    Q   I don't have any graph paper, but
02  can you draw for us what you're talking
03  about when you talk about a jack plate?
04    A   (Witness complies).
05    Q   Okay.  And let's mark this
06  Defendant's 1.
07  (Defendant's Exhibit 1 was marked for
08  identification and a copy of the same
09  is attached hereto as evidence)
10    Q   (BY MR. STEWART) And this is your
11  drawing of the jack plate?
12    A   Yes, sir.
13    Q   Where does the jack actually go on
14  this drawing?
15    A   In the center.
16    Q   And would it go in the center of
17  this plate that you've drawing and sort of
18  come toward the bottom of the page?
19    A   Yes, sir.
20    Q   So, this jack plate sits on top like
21  a "T" on top of the ram?
22    A   Yes, sir.
23    Q   And then, when you - - how does it

Page 100

01  stay on top of the ram?
02      A    When you jack the jack - - you just
03  hold it up there in place and get your jack
04  in the center of the beam, and then you
05  jack the jack up until it's firm up against
06  it, and make sure you're in the center of
07  the beam, and then you jack it.
08      Q    Okay.  So, there's no kind of
09  coupling device between the ram and the
10  plate?
11      A    No, sir.  It's just flat.
12      Q    Okay.  And you're just relying on
13  the pressure coming from the jack to hold
14  it in place?
15      A    Yes, sir.
16      Q    Does the - - the jack plate, does it
17  run parallel to the I-beam, or cross side?
18      A    Parallel.
19      Q    Okay.  So, it's running the length
20  of it?
21      A    That's right.
22      Q    And why do you use a jack plate?
23      A    Well, to support the frame.

Page 101

01   Sometimes some frames are a little bit
02   weaker after they get age on them, and some
03   of them can't handle the stress of it.  And
04   it keeps from - - if you get on one side or
05   the other, you know, of the frame itself,
06   it could bend the lip of the frame.  So,
07   you put the jack plate to avoid all that.
08   That helps stabilize it up underneath the
09   frame.
10      Q   Okay.  So, you've got - - what
11   you've got is the jack is coming up into an
12   I-beam?
13      A   That's correct.
14      Q   And if the ram of the jack gets to
15   either side on that I-beam it might
16   actually bend the flange of the I-beam?
17      A   Yes, sir.
18      Q   And what would happen if it did
19   that?
20      A   Well, it would fold up inside - -
21   the frame right there, it would fold the
22   flange in.
23      Q   Okay.  And then what would happen?

Page 102

01    A    Possible movement.
02    Q    Okay.  Have you had that happen
03  before?
04    A    No, sir.
05    Q    Have you ever known anybody to get
06  injured this same way before?
07    A    No, sir.
08    Q    Okay.  And by "this same way", I
09  mean like Ladon Cook got hurt?
10    A    No, sir.
11    Q    Okay.  Do the Husky, or Craftsman,
12  or the Chinese jack manufacturers all have
13  a ram that comes out of the jack?
14    A    Yes, sir.
15    Q    Do all of them have a ram about the
16  same size, or are any of them wider?
17    A    I believe they're all about the same
18  size.  I ain't never really paid attention
19  to that too much, but I think they're all
20  about the same size.
21    Q    Okay.  Have you ever bought,
22  yourself, a jack from Husky, Craftsman, or
23  the Chinese manufacturer?

Page 103

01    A    No, sir.
02    Q    Okay.  And in each case, has the
03  buyer of the jack been Bear Creek, as far
04  as you're concerned?
05    A    No, sir.  A few of them has been
06  Bear Creek, but just from my previous
07  employer, he bought most of - -
08    Q    And who was that?
09    A    Michael Traywick.
10    Q    And how does he - - where does he do
11  business?
12    A    At his house in Echo.
13    Q    Okay.  That's the guy you were
14  talking about in Echo?
15    A    Yes, sir.
16    Q    Have you worked for any other set up
17  company before?
18    A    No, sir.
19    Q    Bear Creek do anything differently
20  after this accident with Mr. Cook?
21    A    No, sir, we just always like we
22  have, take as much precaution as we can.
23    Q    Okay.

Page 104

01    A   We - -
02    Q   Go ahead, I'm sorry.
03    A   We have a trans-lift now, which we
04  pick up the home with.
05    Q   And is a trans-lift that long
06  machine that you - -
07    A   Yes, sir.
08    Q   - - slide up under the house - -
09    A   Yes, sir.
10    Q   - - that lifts both sides at the
11  same time?
12    A   Yes, sir.
13    Q   Okay.  How long have y'all had a
14  trans-lift?
15    A   I'm not really sure.  Some time
16  after Ladon got hurt we got it.  We found
17  out about it, we didn't even know about it
18  until right after that.
19    Q   Who's "we"?
20    A   Me or Bear Creek Movers.
21    Q   Okay.  This mobile home supplier
22  that you talked about, who is that?  Where
23  are they located?

Page 105

01    A    Courtney's in Dothan there.
02    Q    And does it supply any type of
03  business, other than mobile home movers and
04  installers?
05    A    I don't know what all - - who all
06  they supply.  I know they're mostly just
07  mobile home supplies.  We've bought stuff
08  from them several times.
09    Q    Where are they located in Dothan?
10    A    On Ross Clark Circle, right there by
11  K-Mart on the north side.
12    Q    Okay.  Is that the only one you know
13  of?
14    A    Yes, sir.
15    Q    If I understand your testimony, you
16  have no evidence that one of the jacks that
17  were under the house had anything to do
18  with this accident - -
19    A    No, sir.
20    Q    - - is that right?
21    A    I don't have no idea if it does or
22  not.
23    Q    Okay.  And has anyone told you that

Page 106

01    one of these jacks was bleeding down on the
02    day of Mr. Cook's accident?
03        A    No, sir.
04        Q    Or that anything happened with one
05    of those jacks on the day of the accident?
06        A    No, sir.
07        Q    Okay.  And have you ever seen the
08    instruction manuals that come with the
09    Cobalt jacks?
10        A    Yes, sir.  I've looked through them.
11        Q    And did you see in the instruction
12    manuals that they're not supposed to be
13    used for construction?
14        A    No, sir.
15        Q    You didn't?
16        A    No, sir.
17        Q    Okay.  Did you see in the
18    instruction manual that they're not
19    supposed to - - that you're not supposed to
20    crawl up under any structure that you've
21    jacked up?
22        A    Yes, sir.
23        Q    And what are you supposed to do, if

Page 107

```
01   not crawling up under something that has a
02   jack under it?
03      A   Well, you're supposed to scotch it
04   up.  You know, build something up in case
05   something falls.
06      Q   And is that your normal practice?
07      A   Yes, sir.
08      Q   And was that your practice back
09   then?
10      A   Yes, sir.
11      Q   And is that what you taught Ladon to
12   do?
13      A   Yes, sir.
14      Q   Do you know why he didn't have
15   anything scotching it up that day?
16      A   No, sir.
17      Q   What would you use to scotch it up?
18      A   Blocks.  You can put up a temporary
19   pier.  You're supposed to have all the
20   piers set to start with anyways.
21      Q   Piers should be set up before you
22   remove the wheels?
23      A   That's correct.  Oh, yeah.
```

Page 108

```
01    Q   Are the jacks used at all in putting
02  the piers in place, or are they just used
03  to lift the trailer and remove the tires
04  and axles?
05    A   They're just used to lift the mobile
06  home and remove tires and axles, and
07  letting the mobile home down or up.
08    Q   Do you use the jacks at any other
09  time, other than to remove the tires and
10  axles?
11    A   Not unless we're - - well, no, just
12  jack it up, change the tires, that's about
13  it.  And picking up and letting down the
14  mobile home.
15    Q   Okay.  Now, when you say "picking up
16  and letting down the mobile home", are you
17  picking up and letting down the mobile home
18  with jacks when you're putting the piers
19  in?
20    A   No, you put the piers in first.  You
21  have everything water leveled first, then
22  you jack the home up, pull the tires off of
23  one side, let that side down.  Then you go
```

Page 109

```
01   to the opposite side and jack it up, pull
02   the tires off of it, let it down on the
03   piers.  All the way on the piers.  And make
04   sure everything's leveled out.  Make sure
05   it's sitting down on the piers good before
06   you ever take the axles off of it.
07      Q   So, you put - - you position the
08   home on the actual lot or slab where you're
09   going to leave the home first?
10      A   That's correct.
11      Q   And then you put piers in place
12   under the home; is that right?
13      A   Every six foot, yes, sir.
14      Q   And that's the next step?
15      A   That's correct.
16      Q   And then, after you've got the piers
17   in place, you are going to have to lift up
18   the frame of this home to take the wheels
19   and axles off, but when you lower it back
20   down it's going to sit down on the piers
21   that are already there?
22      A   That's correct, if it has - - unless
23   it has to go a little bit higher than what
```

Page 110

01   - - it just depends on the lay of the land,
02   if it runs off or something.
03      Q   Okay.  And what do you do in those
04   cases?
05      A   Well, if it goes a little bit higher
06   you jack it up a little higher, keep
07   everything wedged up, and you water level
08   it out and wedge it off.
09      Q   Okay.  So, you would use jacks in
10   that situation before you took the wheels
11   and tires off?
12      A   Yeah, you could lift the house with
13   it.  That's what we usually do, lift the
14   house.  See, you lift the house to wedge it
15   off, it just depends on how - - it's hard
16   for me to describe what I'm trying to - -
17   it's easy for me to show you, but.  You
18   pick the home up, if it shows - - if the
19   water level shows it's got to go higher,
20   you pick the home up a little bit higher,
21   you wedge them off, or you let it down.
22   You take the tires off of it and let it
23   down.

Page 111

01    Q   And when you - - when you say you
02  lift up the house a little bit more and
03  wedge it off, you've got the house sitting
04  there on piers, but it's a little un-level,
05  so you're going to try to level the house?
06    A   That's correct.
07    Q   And you'll put a jack under the I-
08  beam of the home and jack it up a little
09  until it gets level?
10    A   That's right.
11    Q   And then you put in wood to - - is
12  that what you do?
13    A   Yes, sir.
14    Q   Would put in these wood pieces that
15  are actually shaped like a door stop?
16    A   Yeah, a wedge.  Yes, sir.
17    Q   Is that what you're talking about
18  when you say "wedge it off"?
19    A   Yes, sir.
20    Q   Okay.  But when you do that, you've
21  still got piers that if the house falls or
22  shifts it's going to land on those piers?
23    A   Yes, sir, you're supposed to.

Page 112

01    Q    Okay.  And then, you're not supposed
02  to take the wheels and axles off the house
03  until after the house has been set on the
04  piers?
05    A    Well, sometimes, in some situations,
06  if the house gets lowered down, you pull
07  the tires off, but you leave the axles on.
08  You lower the house down on the blocks, and
09  when you get it all leveled down on your
10  blocks, when you've got everything wedged
11  off, then you pull your axles and tires
12  off.  I mean, you pull your axles off, not
13  your tires, but you already have your tires
14  off, to let it down.  And then you pull - -
15  you don't pull your axles off until the
16  last.
17    Q    Okay.  And do you know if that was
18  being done in this case?
19    A    To my knowledge it wasn't.  They - -
20  David had said that the house was picked up
21  higher than the blocks, nothing was wedged
22  up, tires and axles was pulled off, and
23  they was under there working on it with two

Page 113

01  jacks.
02      Q    In your opinion, is that a dangerous
03  situation?
04      A    Yes, sir.
05      Q    And is that the way that you taught
06  Ladon Cook how to do a house?
07      A    No, sir.
08      Q    Now, you said that after the
09  accident that happened to Ladon Cook, but
10  before your statement was taken on April
11  13, that you had used Cobalt jacks and had
12  them bleed out, or what did you say?
13      A    Yes, sir.  Some of the seals
14  sometimes will bleed out.  It'll be like
15  they're busted, but they'll bleed down, and
16  the fluid will come out from around the top
17  of the jack, or the jack plunger itself.
18      Q    And you had that happen between the
19  time of Mr. Cook's injury and April 13th,
20  two weeks later?
21      A    I don't remember if we did or not,
22  it's been so long ago since I took my
23  statement and all.  Might have, that's all

Page 114

01  I can say, I don't remember.
02      Q   Well, do you remember this morning
03  when Andy was reading your testimony back
04  to you - -
05      A   Yes, sir.
06      Q   - - from that statement?
07      A   From using the jacks.
08      Q   And you had said that you had had
09  two twenty tons blow their seals out?
10      A   Yes, sir.
11      Q   Okay.  And I thought I understood
12  you that you said that happened between the
13  time of Mr. Cook's injury and April 13?
14      A   It probably did, yes, sir.
15      Q   Okay.  But as far as being anymore
16  precise than that, you don't know when?
17      A   No, sir.
18      Q   Do you remember what job you were
19  on?
20      A   No, sir.
21      Q   Do you remember where you were
22  located when it happened?
23      A   No, sir.  I do - - I do so many, I

Page 115

```
01   have a hard time keeping up with them.
02       Q    Okay.  Was it the same job that the
03   two jacks blew out on?
04       A    No, sir.
05       Q    Are you sure they were Cobalt jacks?
06       A    Yes, sir.  That's all we had on the
07   truck at the time.
08       Q    Okay.  And do you know how old the
09   Cobalt jacks were?
10       A    Well, the two twenty tons I know was
11   new, they're the ones they got right before
12   Ladon's accident.  But we had one old one
13   that was, I don't know, six months old,
14   five months old.
15       Q    You had one old Cobalt jack?
16       A    Yes, sir.
17       Q    Did you have two twenty-ton Cobalt
18   jacks on the service truck after Ladon's
19   accident?
20       A    Yes, sir.
21       Q    Okay.
22       A    I think so.
23       Q    And you also had one old Cobalt jack
```

Page 116

```
01   on the service truck after Ladon's
02   accident?
03       A   Yes, sir.
04       Q   And do you know whether it was the
05   new one or the old one that had the seals
06   blow on it?
07       A   All of them.
08       Q   All three of them blew?
09       A   Yes, sir.  Not all at the same time,
10   but they all three was - - they didn't - -
11   I don't know if they blew, they was
12   leaking.  It was coming out from around the
13   top of the jack and out the seals.
14       Q   And when did this occur?
15       A   After Ladon's accident.
16       Q   Okay.  But before your statement was
17   given?
18       A   Yes, sir.
19       Q   And have you had it happen after
20   your statement was given, ever again?
21       A   Well, I haven't - - I don't use
22   Cobalt no more.
23       Q   Okay.  Have you ever had it - - so,
```

Page 117

```
01   after April 13 you haven't had it happen,
02   and that's 2006?
03      A    I don't think so.  I bought Husky
04   after that, I think.  That's all I've been
05   using.
06      Q    Okay.  Do you know what caused the
07   seals to leak on those three Cobalt jacks?
08      A    No, sir.
09      Q    Do you know whether the Cobalt jacks
10   had ever been used before?
11      A    No, sir, I don't know if they was or
12   not.
13      Q    Did all three of those Cobalt jacks
14   leak, or was it just one or two of them?
15      A    No, all three of them leaked.
16      Q    And do you know whether one of those
17   three Cobalt jacks was being used on the
18   day of Ladon Cook's accident?
19      A    I don't know.
20      Q    Do you know if there was ever a
21   similar problem with the twelve-ton jack?
22      A    Well, yeah, they - - the twelve and
23   twenties both leaked.  I mean, the ones
```

Page 118

```
01   that I've used before and the ones that I
02   used after.  But I don't know.
03       Q    Are you saying that all jacks leak?
04       A    Not all of them.  The Husky ones,
05   they held up good.  The Craftsman ones,
06   they didn't really hold up that good.  But
07   the Husky ones held up.
08       Q    So, you've had the Craftsman leak
09   too?
10       A    Yes, sir.
11       Q    And how about the Chinese
12   manufactured?
13       A    No, sir, their's, the pins usually
14   come out of them, you usually lose the pins
15   out of the plunger and all.
16       Q    Okay.  But you've never had a
17   problem with the Husky jack; is that right?
18       A    No, sir, never had a problem.
19       Q    Okay.  Does the Craftsman leak in
20   the same way that the Cobalt does?
21       A    Some of them, yes, sir.  We didn't
22   use very many of them.  I don't think we
23   used but one or two of them, because as
```

Page 119

01   they started doing that I stopped using
02   them, because they get to where you can't
03   use the - - or you can't jack them no more,
04   because the plungers, they don't - - for
05   some reason they didn't hold up very good
06   to me.
07       Q   Okay.  When they - - when you say
08   the seal blows out on them, are you - -
09   mean, are you using that as a technical
10   description of what happens, or do you know
11   why they leak out?
12       A   No, sir, I'm just talking about the
13   seal around the main - - the main neck of
14   it that comes out, the main shaft.  It just
15   starts leaking right there.  So, the only
16   thing that I know of right there is just,
17   you know, the seal right around the top.
18       Q   So, it's leaking where the ram comes
19   out of the base?
20       A   Yes, sir.
21       Q   Okay.  And can you describe the
22   leaking?
23       A   The fluid will come out the top, and

Page 120

01   then the jack will start letting down a
02   little bit by itself, it'll ease down
03   slowly.
04      Q   When you say the fluid comes out of
05   the top, does it - - does it leak out - -
06      A   Yeah, it just - -
07      Q   - - like running water, or does it
08   spray out?
09      A   No, it just leaks out slowly, like
10   real slow running water.
11      Q   How much do you think will leak out,
12   in your experience?
13      A   I don't really know.
14      Q   I mean, is it a tablespoon?
15      A   A little more than that, it'll come
16   down the side of the jack, a lot of it will
17   come out.
18      Q   Okay.  And how much, I mean, two
19   tablespoons, three tablespoons?
20      A   Yes, sir, probably around there, a
21   little more, little less.
22      Q   And you said the jack will ease down
23   slowly - -

Page 121

```
01    A   Yes, sir.
02    Q- - when it does that?
03    A   In some cases, yes, sir.  I've had
04  them do it.
05    Q   Did you have it do it with a Cobalt
06  jack?
07    A   Yes, sir.
08    Q   And when you say "ease down slowly",
09  how fast are you talking about?
10    A   Just real slow.  You barely will
11  notice it, but when you come back and check
12  your water level, it'll be down.
13    Q   Okay.  Have you ever had a house
14  shift or fall because of this leaking?
15    A   No, sir.
16    Q   And have you ever talked to anybody
17  at Lowe's about it?
18    A   No, sir.
19    Q   Never take them back for a warranty
20  replacement?
21    A   No, sir, usually we just - - well,
22  no, we just usually go buy another one.
23    Q   Can you fill these jacks up with
```

Page 122

01  hydraulic fluid?
02      A    You can, but I don't.
03      Q    Why is that?
04      A    Because whenever they start leaking
05  down they ain't no good to me no more.
06      Q    Okay.  Will any jack eventually leak
07  through time, in your experience?
08      A    Some of them, yes, sir.
09      Q    Even ones not made by Cobalt?
10      A    Yes, sir.
11      Q    Okay.  I was taking notes and
12  listening to you, and I know you've been
13  through some of this already with Andy, and
14  I apologize.  But sometimes when you're
15  taking notes you don't get it all down,
16  because you sort of talk fast.
17      A    Oh, sorry.
18      Q    That's okay.  You said that you put
19  a - - that the procedure you use for jacks
20  is you put a jack before and after each
21  axle?
22      A    No, not each axle, a set of axles.
23  Well, the whole set, you know, you put a

Page 123

01    jack in front of them and a jack behind
02    them.
03        Q    Okay.  So, if on like Plaintiff's
04    Exhibit 3 where you've drawn this - - the
05    trailer that Mr. Cook was under, you would
06    have a jack back here behind - -
07        A    Right up close - -
08        Q    - - this set of axles (indicating)?
09        A    Yes, sir.  As close as I can get to
10    the axle.
11        Q    You'd have another set on the front
12    side of those axles?
13        A    Yes, sir.  Either there or right
14    behind that front tire - - that back - -
15    that front set there, right behind that
16    tire, and right behind that tire there
17    (indicating).
18        MR. RITCHEY:  Chuck, can I make a
19    suggestion?
20        MR. STEWART: Yeah.
21        MR. RITCHEY:  Can we get him to draw
22    in the two I-beams, and then make a circle
23    where the jacks ought to go?

Page 124

01         MR. STEWART: I don't have a problem
02   with that, if Andy doesn't.
03         MR. ADAMS:  Do you want to make a
04   copy of that exhibit before you do it?
05   (Off the record)
06         THE WITNESS: Well, just, all of it's
07   in where you look at the trailer.  I mean,
08   if it's got two sets of axles here and two
09   sets of axles here (indicating), you set it
10   one behind the back axle, you set one
11   behind the front axle.  If it's got four
12   axles in a row, you set one in the very
13   front of them, you set one at the tail end
14   of the.  See, and it's got different axles
15   in different places.
16     Q   (BY MR. STEWART) Do you know how
17   many axles this trailer had?
18     A   I think it had four.  Two in the
19   front, and two in the back, if I'm not
20   mistaken.
21     Q   Okay.  And if you've got two and two
22   like that, you put one behind the very last
23   tire?

Page 125

```
01      A    Yes, sir.
02      Q    And you put one in between the
03  second and the third; is that what you're
04  saying?
05      A    That's correct.  Closest to the
06  second.
07      Q    Closest to the second.  So, really
08  behind - - you're putting it behind the
09  sets of axles?
10      A    That's correct.
11      Q    And do you put it on not only the
12  front side of the home, but also the back
13  side of the home?
14      A    Yes, sir.  Oh, yeah, you put - - but
15  you don't do them at the same time.
16      Q    Okay.  You don't do them at the same
17  time?
18      A    No, sir.  You do one side at a time.
19      Q    Get it level - -
20      A    You get it to - - you get both - -
21  you get all of it water leveled out as best
22  as you can.  All right.  You jack one side
23  up.  All right.  You pull the tires off of
```

Page 126

01   it, you ease it down on the blocks.  Then
02   you go to the other side, you do the same
03   thing that you did on the front side, you
04   jack it up a little bit, pull your tires
05   off, then you ease that side down on the
06   blocks, where everything's touching the
07   blocks.  And then you pull your axles out.
08       Q    And when you're talking about
09   jacking up that house to pull those wheels
10   out, how far up are you actually talking
11   about jacking it up?
12       A    Just high enough to clear the tires.
13   If you've got to come down with the whole
14   house, just high enough that the tires are
15   - - they don't have no pressure on them,
16   and they're just a little bit up.  You
17   know, you don't have to - - you could just
18   take the pressure off of them.  You can
19   jack it up just enough to take the pressure
20   off, and then you pull the tire off, and
21   then you can ease it back down just as soon
22   as you get them out.
23       Q    So, if you like - - let's mark this

Page 127

01  Defendant's Exhibit 2, and I'm going to put
02  the "2" right over to the right.
03  (Defendant's Exhibit 2 was marked for
04  identification and a copy of the same
05  is attached hereto as evidence)
06      Q    (BY MR. STEWART) I'm going to give
07  you Defendant's 2.  Now, this is another
08  copy of Plaintiff's Exhibit 3 that you and
09  Mr. Hollis talked about, but I'm putting a
10  "2" on this one so that you can draw the
11  axles on there with that green pen, and
12  then I'll get you to take a red pen and put
13  where you put the jacks.
14      A    All right.  I'll draw the beam down
15  there.
16      Q    Okay.  So, you've got the green
17  beams, the green axles, and then would you
18  take this red pen and put where you say the
19  right positioning is for the jack?
20      A    (Witness complies).
21      Q    Okay.  And those red circles aren't
22  on the beams, do you want them to be on the
23  beams?

Page 128

01    A    Oh, yes, sir.  I'm sorry.
02    Q    So, they - -
03    A    I'll "X" that out and put it right
04    there.
05    Q    Okay.  And when you're doing it, do
06    you always use that jack plate that you
07    described?
08    A    Yes, sir.
09    Q    Okay.  So, we were talking about
10    when you jack the house, you want to jack
11    it up just high enough to take the pressure
12    off the tires, just - - and then you pull
13    the tire off?
14    A    That's correct.
15    Q    And once you've got both tires off,
16    or all four tires, in this case, on one
17    side - -
18    A    Yes, sir.
19    Q    - - then you lower it back down?
20    A    That's correct.
21    Q    Then you go to the other side and
22    you jack it up just enough to take the
23    pressure off the tires?

Page 129

```
01    A   That's correct.
02    Q   Pull the tires off, and then you
03  lower it back down?
04    A   That's right.
05    Q   Okay.  And then, once you've got it
06  lowered down and it's sitting on the piers,
07  you can take the axles off without using
08  the jacks, can't you?
09    A   That's correct.
10    Q   And is that what you do?
11    A   Yes, sir.
12    Q   Okay.  Have you ever had a house
13  just to slip off a jack on you?
14    A   No, sir.
15    Q   Have you ever placed a jack on wood
16  before jacking something up?
17    A   Are you talking about on the ram
18  itself, or underneath the jack?
19    Q   Underneath the jack.
20    A   Oh, yes, sir, that's what you - -
21  you've got to have something up underneath
22  it, a foundation up underneath it to jack
23  on.
```

Page 130

01     Q    And what type of wood do you use
02   when you do this?
03     A    Two-by-eight-by sixteens.  Just the
04   same thing as like a block, regular
05   concrete block, same size.
06     Q    Do you use treated or untreated?
07     A    Treated.
08     Q    So, the jack is used to raise the
09   home to remove the tires, but not to
10   support the home; is that what you're
11   saying?
12     A    Well, I mean, you pick it up and it
13   supports it until you get it down on the
14   blocks.
15     Q    But you don't support the home on
16   jacks to get the piers under it?
17     A    No, sir.  No, sir.  I'll put the
18   piers up under it before I ever pick it up
19   with a jack.
20     Q    Okay.  Have you ever heard of a
21   house falling like this before?
22     A    No, sir.
23        MR. STEWART: That's all I've got for

Page 131

01  right now.
02  EXAMINATION BY MR. RITCHEY:
03      Q    I'm Greg Ritchey, I represent Redman
04  Homes.  Have you ever seen a homeowner's
05  manual before, or homeowner's instructions?
06      A    Yes, sir.
07      Q    Okay.  I want to mark as Defendant's
08  Exhibit 3, if I could just pass this over,
09  guys.
10  (Defendant's Exhibit 3 was marked for
11  identification and a copy of the same
12  is attached hereto as evidence)
13      Q    (BY MR. RITCHEY) A copy of Redman's
14  Manufactured Home Installation Manual.  Is
15  that similar to the one that you've seen
16  before?
17      A    Yes, sir.
18      Q    What kinds have you seen before, or
19  what other manufacturers?
20      A    I don't know.  I don't keep up with
21  the names of them when I do them.  Like I
22  said, we do so many that, I mean, I can't
23  keep up with them.  I've done a few new

Page 132

01 ones, and that's the only ones that I've
02 seen them in is new ones.
03     Q    Okay.  Have you ever done a Redman?
04     A    No, sir.
05     Q    Okay.  Did you review the
06 instructions?
07     A    Not in these, I didn't.
08     Q    Not Redman's, I take it?
09     A    Not Redman's, no, sir.
10     Q    Okay.  Were you aware that the state
11 requires that Redman, and other
12 manufacturers provide the state with a copy
13 of their set-up instructions?
14     A    I didn't know that, no, sir.
15     Q    Were you aware you could ask them
16 for a copy of it if you needed it?
17     A    I didn't know.
18     Q    Okay.  The - - you had mentioned
19 earlier about putting in the - - putting
20 the jacks underneath the frame, and you've
21 marked those places.  In Redman's manual it
22 recommends that you place a minimum of
23 twelve - - and this is on Page 20, if you

Page 133

01    want to follow.  "Placement of twelve-ton
02    rated jacks under the I-beam in front of
03    and behind the axle assembly."
04        A    Did you say it was on Page 20?
05        Q    Page 20.  It's on the top right-hand
06    side, 592.1.
07        A    Okay.
08        Q    And it appears that that's what
09    you're - - where you're putting two right
10    on your diagram?
11        A    Yes, sir.
12        Q    Okay.  And that's how you taught
13    Ladon?
14        A    Yes, sir.
15        Q    Okay.  It also mentions in Redman's
16    manual you should also place another
17    twelve-ton jack at least every twenty feet
18    along the remainder of the I-beam.  Do you
19    typically do that?
20        A    No, sir.
21        Q    Okay.  This was a, I think a
22    seventy-six foot one.  Do you know how many
23    other jacks you would need?

Page 134

01    A    No, sir.
02    Q    Okay.  And I think the next - -
03  well, a couple sentences down, it says
04  "locate the jacks directly under the
05  vertical web of the I-beam", and then it
06  says "do not jack on the seam of the twin
07  I-beam"?
08    A    Yes, sir.
09    Q    When it's saying vertically under
10  the web, it's like the "I" part of it?
11    A    That's correct.
12    Q    Not the flange?
13    A    Yes, sir.
14    Q    Okay.  And then, it also mentions
15  using a three-eighths inch thick steel
16  plated C-channel or equivalent plate, and I
17  think you said you use a bigger one?
18    A    Yes, sir, we use a half inch.
19    Q    And did you teach that also to
20  Ladon?
21    A    Yes, sir.
22    Q    Have you seen any set ups that Ladon
23  was working on where he used those plates?

Page 135

01     A    Yes, sir.
02     Q    Okay.  Were those plates available?
03     A    Yes, sir, they're in the service
04  truck.
05     Q    They're in the service truck.  How
06  many are in the service truck?
07     A    I think we had eight at one time,
08  but lost two of them, so we've got six.
09     Q    Six.  What else is on that service
10  truck?
11     A    All the tools to set up a house
12  with, and blocks.
13     Q    How many jacks were on that service
14  truck at the time, do you know?
15     A    Good or bad?
16     Q    Good ones.
17     A    I really don't remember now.  We had
18  two bad ones that we didn't use no more,
19  and we had them new ones, and - -
20     Q    New ones being the four?
21     A    Yes, sir, the new four ones, four of
22  them.  And might have had one more, I'm not
23  - - I'm not really quite sure.

Page 136

01    Q   So, you had at least two twenty ton,
02   two twelve ton, and then one extra?
03    A   Yes, sir, but I'm not sure what
04   size.
05    Q   Okay.  I want to also direct your
06   attention to Page 21, the Figure 5.2 is
07   that water level, is that what you were
08   talking about?
09    A   Yes, sir.
10    Q   All right.  And then, Figure 5.1 is
11   the blocking - - I guess, the safety
12   blocking recommended behind the axle area,
13   the hitch end; do you see that?
14    A   Yes, sir.
15    Q   And I think earlier you had
16   mentioned that when you left the house you
17   had under the tongue put some criss-cross
18   wood?
19    A   Yes, sir.
20    Q   Okay.  Can you explain that?
21    A   Well, you take and you get - - just
22   like when you're jacking you put two pieces
23   down, level on the ground.  You got - -

Page 137

01  then you cross one, one across the top of
02  that, and then I cross another one across
03  that the opposite way.  That keeps it from
04  splitting the wood straight down the
05  center.  It's - - the grains are crossed.
06      Q    What kind of wood do you use?
07      A    The treated lumber, two-by-six - -
08  two-by-eights-by-sixteen.
09      Q    Okay.  Do you see where it says on
10  the right-hand side of Figure 5.1, it says
11  "typical blocking is four-by-six timbers,
12  five feet long"?
13      A    Yes, sir.
14      Q    Is that what you did?
15      A    No.  I don't use them.
16      Q    You don't use that, okay.  I guess,
17  then you were using a two-by-six?
18      A    Two-by-eight.
19      Q    Two-by-eight.  Just a flat piece of
20  wood?  Okay.  And then, what did - - then
21  you criss-crossed, how did you - - how many
22  two-by-eights did you stack up?
23      A    Three.

Page 138

01    Q    Three, okay.
02    A    I think three on top of that, if I'm
03 not mistaken.
04    Q    And did you have any blocks, or
05 anything else on top of that?
06    A    No, just wood.
07    Q    Okay.  Just wood.  So, basically,
08 all you were doing - - that wasn't there to
09 keep the house from falling as it's being
10 lifted, that was just more or less to keep
11 the tongue from going into the ground?
12    A    That's just - - yeah, temporary,
13 until they come out to set it up.
14    Q    Okay.  So, that - - if I can direct
15 your attention, I guess, now to bullet
16 Number 2 on Page 20, it talks about the
17 safety support timbers installed underneath
18 the home, you weren't installing those when
19 you just dropped the house?
20    A    No, sir.
21    Q    Okay.  You were just basically
22 supporting the tongue?
23    A    Yes, sir.

Page 139

01    Q    Okay.  Did you - - do you ever do
02  these type of - - or take these type of
03  safety precautions when you're setting
04  houses?
05    A    Yes, sir.  I always put something
06  else underneath both sides of the tongue.
07  Even though I got that jack wedged off, I
08  put stuff underneath both sides of the
09  tongue in case it moves one way or the
10  other, you know, or that wood splits.
11    Q    Okay.  Do you also put any type of
12  safety blocking or timbers behind the axle
13  areas, like as shown in Figure 5.1?
14    A    No, sir.  I don't - - not with the
15  tires and all on it, I don't.
16    Q    Okay.  You see the jack with the
17  stand?
18    A    Yes, sir.
19    Q    Did y'all have - - do you see at the
20  top it looks like a U-channel?
21    A    Yes, sir.
22    Q    Okay.  Did y'all have anything like
23  that on the service truck?

Page 140

```
01    A    No, sir.
02    Q    You just used the plates?
03    A    Yes, sir.
04    Q    Okay.  If you had to estimate, how
05  many homes have you set up in the past?
06    A    I don't know.  A lot.  I really
07  couldn't tell you an estimate on it.
08    Q    How many do you think that Ladon has
09  either participated in, or set up himself?
10    A    We do about four a week, and he'd
11  been working with us since October.  So,
12  whatever that comes up to until he got hurt
13  is the only thing I can tell you.
14    Q    Four a week.  He started in October
15  of '05?
16    A    Yes, sir.
17    Q    Until the end of March, '06?
18    A    Yes, sir.
19    Q    Okay.  And of those, were you pretty
20  much there every time?
21    A    Yes, sir.
22    Q    Other than, I think, two you said?
23    A    I think he set up four by himself
```

Page 141

01  that I wasn't there.
02      Q    And when you were there, and if it
03  - - let's assume it's a single wide, was he
04  putting four jacks in or around the axle
05  area?
06      A    Yes, sir.  Whenever we was there - -
07  when I was there he would put them there
08  where they're supposed to be.
09      Q    Okay.  And did you ever see him pull
10  off the wheels and the axles with the
11  entire house jacked up on both sides?
12      A    No, sir.
13      Q    Would he always pull off the tires
14  first, and then drop it down onto the
15  piers?
16      A    Yes, sir.
17      Q    And make sure it's level again?
18      A    Yes, sir.
19      Q    And then, pull the axles off?
20      A    Yes, sir.
21      Q    Okay.  When he was working with you,
22  would he always use jack plates?
23      A    Yes, sir.

Page 142

```
01      Q    Did you ever explain to him that if
02   you don't use jack plates it can bend the
03   flange?
04      A    I never explained it to him, but he
05   knew.
06      Q    He knew?
07      A    Yes, sir.
08      Q    Well, how did he know?
09      A    Just he worked with metal all - -
10   most of his - - well, ever since he was out
11   of high school, he's always worked with
12   metal, he's a fabricator.
13      Q    Okay.  So, he would, in your
14   opinion, know that if you were jacking on
15   the side of that I-beam and not directly
16   underneath it, it would bend it?
17      A    Yes, sir.
18      Q    I guess he would know that it would
19   add structural strength to the entire
20   jacking process by using the plates, those
21   half-inch plates?
22      A    Yes, sir.
23      Q    Did he fabricate any of those for
```

Page 143

01  you?
02      A   No, sir.  No, sir.  I just bought
03  some half-inch plate a little bit wider
04  than the beam, and I cut them down to the
05  size I needed them.
06      Q   Okay.  All right.  When you came out
07  to the property to drop the house, can you
08  describe what the land looked like where
09  you were going to site the house?
10      A   They had had a pad built up for it,
11  and it was a little soft, the pad was a
12  little soft when I backed it in there.  But
13  it was - - it was pretty close to level, it
14  wasn't real bad off.  It might have been a
15  little bit off on the woods side, but not
16  bad, bad.
17      Q   Did it appear to you that a lot of
18  trees and debris had been moved?
19      A   Yes, sir.  Yes, sir, there had been
20  some trees and stuff removed from the area.
21      Q   Did you see any large stumps?
22      A   I didn't see none.
23      Q   And you said a pad built up, what do

Page 144

```
01  you mean by a "pad"?
02     A   They brought dirt in - -
03     Q   Just brought dirt in?
04     A   - - and built it up.  Yes, sir.
05  They brought dirt in and built it up on top
06  of the grass and everything that was there,
07  or tree stumps, or whatever they took out.
08  There was some trees and small brush and
09  stuff down there that they had cleared off.
10  And then, they had put them pad - - put the
11  pad down.  The dirt, they had brought it
12  in, and then they leveled it out and kind
13  of crowned it off just a little bit, so
14  water couldn't get up under the house.
15     Q   Okay.  Could you tell if it had been
16  compacted?
17     A   No, sir, I couldn't really tell.  It
18  wasn't - - it wasn't compacted good if it
19  was.
20     Q   And you say that because you were
21  having trouble backing it in?
22     A   When I backed it in, it was kind of
23  soft because it made a little bit of ruts
```

Page 145

01    in it.  When it goes in there, it was soft
02    feeling whenever I was out there looking at
03    the location.
04        Q    Okay.  How high should you - - or I
05    guess, what's the safe height, I guess, the
06    highest that you should go up with piers
07    safely?
08        A    There ain't really no safe height.
09    You're supposed to keep something wedged up
10    underneath it at all times.  There ain't
11    really - - but if you're going to take
12    tires and axles off, I don't know really of
13    any safe height that you can go over.
14        Q    So, any time you start putting it
15    up, you need to immediately get something
16    underneath there to - -
17        A    If you've got tires and axles off,
18    most definitely.  But if you ain't got
19    tires and axles off, you can jack it up to
20    clear the tires or stuff like that, it
21    ain't going to hurt nothing.
22        Q    Because the tires and axle will keep
23    it from falling all the way to the ground?

Page 146

01     A    Yes, sir.  Well, if it falls it
02  ain't going nowhere.
03     Q    Okay.  So, it's going to - - it
04  would maybe go a few inches?
05     A    Maybe.
06     Q    Okay.  Have you ever set up a house
07  in kind of windy conditions?
08     A    Yes, sir.
09     Q    Does it shift a little bit in the
10  wind?
11     A    Sometimes.  Most of the time that
12  happens when you're pulling it.
13     Q    Yeah.  But you've seen that happen
14  though before with some wind on it?
15     A    They shift a little bit, yeah, not
16  too bad.  You ain't going to - - maybe a
17  quarter-of-an-inch or so I've had shift
18  before from windy locations.
19     Q    Okay.  It appeared to us when we
20  were out at the house that the one jack we
21  were able to find had a two piece - - two
22  two-by-sixes on the ground.
23     A    Two-by-eight.

Page 147

01    Q    Two-by-eights, I'm sorry.  Two-by-
02 eights on the ground.  And then, stacked on
03 top were another three two-by-eights.
04    A    Was they stacked - - they were
05 stacked vertical with the frame, the bottom
06 two, right?
07    Q    The bottom two were vertical with
08 the frame, yes.
09    A    And then, the three were standing
10 straight up, horizontal of the frame?
11    Q    Yes.
12    A    Okay.
13    Q    Well, not standing straight up,
14 laying flat.
15    A    Or laying on it, yes, sir.
16    Q    Okay.  And the jack was on top of
17 that.  Is that typically the way you do
18 that?
19    A    Yes, sir.
20    Q    Okay.  When you set houses, do you
21 sometimes leave the home hooked to the
22 truck?
23    A    Yes, sir, sometimes.

Page 148

```
01     Q   You couldn't do it this time,
02   because you had to go pick up another - -
03     A   Yes, sir.
04     Q   - - another home somewhere?
05     A   Yes, sir.
06     Q   Okay.
07   (Off the record)
08     Q   (BY MR. RITCHEY) You had mentioned
09   at the time when you were at the hospital
10   and you said Willie Cook, who is Ladon's
11   father - -
12     A   Yes, sir.
13     Q   - - and his mom?
14     A   Yes, sir.
15     Q   I didn't get her name?
16     A   Virginia.
17     Q   Virginia.  Virginia Cook also?
18     A   I don't know if her last's name is
19   - - I don't think her last name is Cook
20   anymore.
21     Q   Okay.  She's re-married?
22     A   Yes, sir.
23     Q   In the police report that we have
```

Page 149

01    seen it appears that a statement was made
02    that after the house fell they attempted to
03    jack up the house with one of the jacks,
04    but couldn't do it, then they went and got
05    the skidder.  Did David Brasher or Sedro,
06    did he ever say anything, or anybody ever
07    say anything about that?
08        A    No, they just said something about
09    they had tried to get a jack and get over
10    there, but there was no way they could do
11    anything for him, so they got the skidder
12    over there.
13        Q    Okay.  Is that what they - - who
14    said that?
15        A    David told me that.
16        Q    Did he say where he got the jack?
17        A    No, sir.
18        Q    Okay.  So, you don't know if it was
19    one that was on the truck, or one that was
20    underneath the house?
21        A    No, sir, I don't know.
22        Q    Okay.  All right.  When using the
23    plastic pads, those ABS pads, does the

Page 150

01  state, in their, I guess their rules and
02  regulations that I think is marked as
03  Plaintiff's Exhibit 2, do they specifically
04  say you can use those?
05      A    They don't specifically say it, but
06  I mean, we've bought them, and I'm assuming
07  they wouldn't be able to sell it at a
08  mobile home store if it wasn't certified to
09  use here.
10      Q    Okay.  Have you used those before in
11  other - -
12      A    Oh, yes, sir.  I use - - I use all
13  different type sizes and types of plastic
14  pads.
15      Q    Okay.  And when you were, I guess
16  showing Ladon how to set the houses, was it
17  clear to him that he should use the tires
18  and axles on until the house is completely
19  set?
20      A    Yes, sir, that's the way we've
21  always set it.
22      Q    And then, only lift it up high
23  enough to get the tires off?

Page 151

```
01    A   Yes, sir.
02    Q   And then, level it out?
03    A   You can level it.  If it's going to
04  be - - if the home's going to be dropped
05  down a little lower than what the tires
06  are, you can pick the home up, you can - -
07  you can level all the piers out before you
08  ever even take and jack it up.  And you can
09  pick it up a little bit, pull your tires
10  off, let one side down, go to the opposite
11  side, pick it up a little bit, take the
12  tires off, and let that side down, so that
13  it rests on the piers.
14    Q   But you should never have both sides
15  jacked up at the same time?
16    A   No.  No.
17    Q   And did you hear that that may have
18  been - - that that happened in this
19  particular case, did anybody say that that
20  was going on?
21    A   No, but David told me that it was
22  - - both sides was jacked up, and it had
23  tires and axles on it, that was it.
```

Page 152

```
01    Q    Okay.  Is that wrong?
02    A    No, that's wrong.
03    Q    Have you ever told Ladon?
04    A    No, sir.
05    Q    Okay.  Have you ever done that in
06  any of your set ups?
07    A    No, sir.
08    Q    You didn't teach him that?
09    A    No, sir.
10    Q    Okay.  If the flange of that I-beam
11  is bent up some, is it your opinion that
12  the jack wasn't properly placed underneath
13  it?
14    A    Yes, sir.
15    Q    And to avoid that, I guess that's
16  why you use the jack plates?
17    A    Yes, sir.
18    Q    Have you ever had a flange of an I-
19  beam bent using a jack plate?
20    A    Not using a jack plate, I haven't.
21    Q    Okay.  Only when you don't use it?
22    A    Yes, sir.  Well, I've had one or
23  two, in past years, bend a little bit on
```

Page 153

01   the corners, but not nothing serious.
02   Because it could bend a little bit, but you
03   could see it before it goes and you can
04   stop.
05     Q   Do you always use jack plates?
06     A   Not all the time.  Depends on the
07   type of house and how heavy it is.  You
08   know, like a vinyl, shingle, you know, I
09   would.  But on metal-on-metal, if it don't
10   feel heavy when I'm pulling it, then I
11   don't usually use it.
12     Q   This was a vinyl, shingle though?
13     A   Yes, sir.
14     Q   Okay.  And you taught Ladon to use
15   those jack plates?
16     A   Yes, sir.  We just about used them
17   every time.
18     Q   Okay.  Did you see any problem with
19   the house that you could - - that you could
20   say that Redman was at fault for it
21   falling?
22     A   No, sir.
23      MR. RITCHEY: That's all.

Page 154

01    EXAMINATION BY MR. LEE:
02        Q    Mr. Cook, I'm Will Lee, I represent
03    Mills Timber.  I need to get some general
04    information from you first.  Have you ever
05    been arrested for anything?
06        A    No, sir.
07        Q    Do you know if your cousin, Mr.
08    Ladon Cook, has been arrested for anything?
09        A    I don't know.
10        Q    Do you know - - how often do you see
11    Mr. Cook, or have you seen Mr. Cook since
12    the accident?
13        A    I've seen him four or five times.
14        Q    When's the last time you saw him?
15        A    Two months ago.
16        Q    In your opinion, what is the status
17    of his physical condition, how is he doing?
18        A    He's doing okay, he gets around
19    pretty good.  But he goes through
20    depression, I reckon, where he don't like
21    it, what happened to him and everything.
22        Q    Did you say depression?
23        A    I reckon you would say that.  He

Page 155

01  gets a little down when he talks to me,
02  calls me on the phone and stuff.
03      Q    Has he ever told you he was
04  depressed?
05      A    He never come out and said it.
06      Q    Do you know what his daily
07  activities are?
08      A    No, sir.
09      Q    He is married?
10      A    No, sir.
11      Q    Do you know where he lives?
12      A    Midland City.
13      Q    Does he live by himself?
14      A    No, he lives with his mother.
15      Q    When you've seen him, you said he
16  gets around okay, or gets around good, I
17  think is what you said?
18      A    He gets around all right, I reckon,
19  the best you can in a wheelchair.
20      Q    You indicated that the area when you
21  backed up the home was a little soft?
22      A    Yes, sir.
23      Q    Had you ever been to that site,

Page 156

01  either before or after the accident, other
02  than the one occasion when the home was
03  delivered?
04      A   No, sir.
05      Q   And when you say it was a little
06  soft, had there been any rain?
07      A   I don't recall.
08      Q   And you noticed the condition of
09  that pad when you - -
10      A   When I pulled it in, yes, sir, you
11  could feel it when you backed up on
12  something that's a little soft.  You know,
13  you can tell it kind of lugged down the
14  truck a little bit, and then when you try
15  to pull forward or whatever.
16      Q   And you did see some debris that had
17  apparently been removed from that area?
18      A   They had pushed it up in a pile
19  around the back of the house and on the
20  other end, I believe.
21      Q   Was it your understanding that some
22  trees had been removed from that site?
23      A   I don't know for sure.  I never

Page 157

01  asked nobody or nothing, I just seen what
02  was there and down and piled up and cut up.
03      Q    Did you see trees?
04      A    There was small trees and stuff
05  around there.
06      Q    And some other debris as well?
07      A    Yes, sir.  Vines and stuff like
08  that, small brush.
09      Q    And that pad, it was obvious to you
10  that that pad was soft?
11      A    It felt a little soft.  You know, it
12  wasn't like real soupy or muddy or nothing,
13  but it was soft.
14      Q    And you said you had delivered the
15  home two or three days before the accident?
16      A    I believe so.
17      Q    And that pad being soft, was that
18  something that would be obvious to Ladon
19  when he went out there, as well?
20      A    Yes, sir.
21      Q    Just a few moments ago you said that
22  Mr. Brasher stated to you that he tried to
23  get a jack from under - - up under the

Page 158

01  house after - -
02      A   Oh, no, sir.  No, sir, not from
03  under the house.
04      Q   I'm sorry, let me rephrase it.  You
05  had a discussion with Mr. Brasher who
06  stated they were unable to get a jack up
07  under the home to try to lift it after it
08  had fallen on your cousin?
09      A   Yes, sir.  Yes, sir.  Well, they - -
10  they went to attempt, but they didn't put
11  up under there or nothing, that he told me.
12  They just - - which they said they was
13  going to try to, but there was no time.
14  They hollered for the man on the skidder.
15      Q   And so, there was no way for David
16  or Sedro to get that home off of your
17  cousin?
18      A   Not that I know of, no, sir.
19      Q   There was no equipment and no tools
20  that they had present where they could have
21  lifted the home up to get it off of your
22  cousin?
23      A   No, sir.

Page 159

```
01    Q    And that is when Mr. Brasher went to
02  the people that were doing some logging
03  work nearby?
04    A    Yes, sir.  They was right behind
05  where the trailer was at, logging right
06  there.
07    Q    And that's what Mr. Brasher told
08  you?
09    A    Yes, sir.
10    Q    Now, the skidder was used to lift
11  the home off of Mr. Cook, your cousin?
12    A    Yes, sir.
13    Q    And there would be no way for the
14  home to have been lifted off of your cousin
15  but for that skidder, would you agree?
16    A    Yes, sir.  It was - - they said he
17  was choking, they had no choice.
18    Q    David told you that your cousin was
19  choking?
20    A    Yes, sir.
21    Q    Is that correct?
22    A    Yes, sir.
23    Q    And would your cousin have died if
```

Page 160

```
01   the skidder was not used to lift the home
02   off of him?
03      A    Hard to say.  I feel that he
04   probably would have.
05      Q    And you just told us earlier, I
06   believe, that your cousin did not make any
07   statements of any kind - -
08      A    Not that - -
09      Q    - - until after he'd been pulled out
10   from under the home?
11      A    Yes, sir.  The only thing he said
12   was he couldn't feel his legs.
13      Q    And that was after he was pulled out
14   from under the home?
15      A    Yes, sir.
16      Q    And I think you said he also said
17   "call my mother"?
18      A    Yeah.  Call somebody, call - - I
19   believe they said he said "call my mother"
20   or "call somebody", but I'm pretty sure he
21   said "call my mother".
22      Q    And there was no way for your cousin
23   to get out from under that home except for
```

Page 161

01  that skidder being used?
02      A   That's correct.
03      Q   And who is it that indicated to you
04  that the home may have slipped the first
05  time?
06      A   David said it shifted, that's it.
07      Q   I'm sorry.  Shifted when the skidder
08  was being used?
09      A   Oh, no, sir.  No, sir.
10      Q   Did you have some discussion with
11  him about the skidder being used?
12      A   Yes, sir.  He said that they picked
13  it up with the skidder, and it slipped off
14  the blade the first time, when they tried
15  to get it up off of him, it slid off the
16  blade because they didn't have it - - they
17  couldn't get up underneath it enough.  They
18  tried to get up underneath it and pick it
19  up without damaging the home, and they
20  couldn't do it, because when they tried to
21  pick up on it it slipped off.  And the
22  second time is when they got into it and
23  just picked it on up off of him.

Page 162

```
01     Q    Do you have any knowledge as to how
02  high the home had been lifted - -
03     A    No, sir.
04     Q    - - even if it had been lifted that
05  first time?
06     A    I don't know.
07     Q    Did David ever tell you where he or
08  Sedro were when the skidder was used to
09  first try to lift the home?
10     A    No, sir.
11     Q    Did you have any discussions with
12  your cousin on the day of the accident?
13     A    No, sir.
14     Q    Not before it happened?
15     A    No, sir.
16     Q    Have you told us of all the training
17  that your cousin had associated with
18  setting up mobile homes?
19     A    Yes, sir.
20     Q    You've never had any discussion
21  whatsoever with your cousin about how the
22  accident happened?
23     A    No, sir.
```

Page 163

01    Q   Have you ever had any conversations
02  with anyone associated with or employed by
03  Mills Timber?
04    A   No, sir.
05    Q   Have you ever heard of any
06  statements made by anyone associated with
07  or employed by Mills Timber about this
08  accident or anything to do with the
09  accident?
10    A   No, sir.
11    Q   Do you have any knowledge, or do you
12  contend that Mills Timber or any of their
13  employees did anything wrong which caused
14  this accident?
15    A   No, sir.
16    Q   Do you commend what Mills Timber
17  did?
18    A   Oh, yes, sir.
19    Q   Do you believe your cousin would be
20  worse off today if it wasn't for the people
21  at Mills Timber?
22    A   Yes, sir.
23    Q   You've never had any conversation

Page 164

01  with Sedro about how this happened?
02     A   No, sir.
03     Q   And you've told us of all
04  conversations that you've had with anyone
05  about this accident?
06     A   Yes, sir.
07     Q   The manner in which that home was
08  being set up immediately before it fell on
09  your cousin, you have never actually done
10  set-up work in that same manner yourself,
11  have you?
12     A   You talking about jacking it up,
13  taking the axles and tires out from under
14  it, and then letting it down?
15     Q   Yes, sir.
16     A   No.
17     Q   And you said earlier that's
18  dangerous?
19     A   Yes, sir.
20     Q   And your cousin knew that was
21  dangerous?
22     A   Yes, sir.
23     Q   And you told him that was dangerous?

Page 165

01    A    Yes, sir.
02    Q    And you told him not to do that?
03    A    Yes, sir.
04    Q    And you told him not to do that
05    before this accident occurred?
06    A    Yes, sir.  You know, the whole time
07    through when he was learning how to do it
08    with me.
09    Q    And he saw you, for that period of
10    time, from October - -
11    A    Yes, sir.
12    Q    - - up until March?
13    A    Yes, sir.
14    Q    If the tires and axles had been on
15    that home when it fell, it would not have
16    fallen on your cousin?
17    A    It wouldn't have never got him.
18    Q    Did Mr. Brasher make any statement
19    to you about hearing a creaking noise
20    before the home fell?
21    A    I don't think so.  He said he heard
22    a swishing noise where it was going down,
23    you know.  That was - - that's all he said

Page 166

01   to me.
02      Q   So, if there's a incident report
03   prepared by the police department
04   pertaining to this and a reference to a
05   creaking noise, that's not something Mr.
06   Brasher would have told you?
07      A   I don't think he told me that, you
08   know.  I'm not really sure.  I don't - - I
09   don't remember that part in the
10   conversation.
11      Q   Do you know - - can you show us on
12   any of these diagrams, exactly where Mr.
13   Brasher was at the time the home fell?
14      A   Well, he told me - - this is the
15   house side, this is the wood side.
16      Q   Now, you're referring to Defendant's
17   Exhibit 2?
18      A   Yes, sir.
19      Q   Okay.
20      A   Mr. Brasher was supposed to be back
21   here (indicating) setting a pier.  He said
22   he was back here on the back side part of
23   the woods, and Ladon was on the front side

Page 167

01   of the house.
02        MR. LEE: That's all I have.  Thank
03   you.
04   EXAMINATION BY MR. ADAMS:
05      Q    Has anybody ever told you how high
06   up off the blocks that end of the trailer
07   was?
08      A    No, sir.
09      Q    What's the purpose of keeping the
10   tires and axles on a mobile home when
11   they're setting it?
12      A    Safety purposes.  In case it falls.
13      Q    Okay.  And once you take - - well,
14   and I think you've already gone through
15   this, and I won't belabor it, because I
16   can't talk much today.  But how high do you
17   normally raise a mobile home to take the
18   tires off?
19      A    Just high enough to clear the tire.
20   I don't - - every house is a different
21   height.  Just high enough that you take the
22   - - you don't even have to clear the tire
23   off the ground, just as long as it's got

Page 168

01  pressure relief.
02      Q   Is it basically like when you change
03  a tire on a car?
04      A   Yes, sir.
05      Q   Do the same thing, you don't jack it
06  too high, you just jack it enough to - -
07      A   Just enough – -
08      Q   - - be able to move the - -
09      A   Just enough to pull the tire off,
10  yes, sir.
11      Q   Okay.  Now, what do you do after you
12  take the tires off?
13      A   You ease one side of the house down
14  on the blocks.  And then, you go to the
15  other side and you pull the tires off the
16  other side.  Then you ease that side down
17  on the blocks.
18      Q   Okay.  And at that point, is the
19  mobile home stable?
20      A   Once it gets on the blocks, yes,
21  sir.
22      Q   Have you ever had one shift after
23  that point?

Page 169

```
01    A    No, sir.
02    Q    Okay.  Now, with the axles, and I
03  understand that the axles run all the way
04  across; is that correct?
05    A    Yes, sir.
06    Q    When the axles are on there, how far
07  from the ground are the axles when they're
08  set on blocks?
09    A    That just depends on the height of
10  the ground.  Because see, some - - some
11  pads is crowned off, some of them will be
12  almost touching the crown, up between the
13  pad.  Some of them just a little bit.  It's
14  not very high off the ground.
15    Q    Okay.  What do you do then at that
16  point, after you've taken the tires off?
17    A    Once you get it down on the blocks?
18    Q    Down on the blocks.
19    A    Then you can pull your axle.  You
20  usually pull the axle off where the pier's
21  going to be first.  Say, if you've got two
22  axles in the front, and the second axle in
23  back, they've got a pier that goes right
```

Page 170

01   there.  You'll pull that axle off first,
02   and then set that pier, then take the water
03   level and wedge it off.  Check and make
04   sure it's level, wedge it off, then you
05   pull the rest of them out.
06      Q   All right.  But then you go to the
07   other side and do the same thing; is that
08   correct?
09      A   Yes, sir.
10      Q   Have you ever, at any time when you
11   were setting a mobile home with Bear Creek
12   or for Mr. Turner - -
13      A   Traywick.
14      Q   Traywick, I'm sorry.  - - Mr.
15   Traywick, ever had both sides of a mobile
16   home jacked up with two twelve-ton jacks at
17   the same time?
18      A   Not - - not without tires and axles.
19      Q   Okay.
20      MR. ADAMS:  That's all.  Thank you.
21   FURTHER EXAMINATION BY MR. HOLLIS:
22      Q   You said that y'all had a service
23   truck, right?

Page 171

```
01    A    Yes, sir.
02    Q    Who owned that service truck?
03    A    Bear Creek.
04    Q    And they provided that to you to
05  drive around in?
06    A    Yes, sir.
07    Q    And they provided all the equipment?
08    A    Yes, sir.
09    Q    Who paid the gas for that truck?
10    A    Bear Creek.
11    Q    Who provided the insurance for that
12  truck?
13    A    Bear Creek.
14    Q    Who provided the - - who did any
15  repairs on those trucks that needed to be
16  done?
17    A    Bear Creek.
18    Q    Could you take that truck home with
19  you every day?
20    A    Not every day, just sometimes when a
21  job was close to my house we'd take it home
22  and we'd drive from there to the job.
23    Q    How many trucks did they have?
```

Page 172

01    A    Two.
02    Q    Two?
03    A    Yes, sir.
04    Q    Did they have one out there where
05    Ladon and them were doing the work on the
06    March 30th?
07    A    Ladon drove the service truck out
08    there with him.
09    Q    Okay.  Which one?
10    A    I drove the tow truck to pick up the
11    mobile home.  Ladon took the service truck
12    with the tool box, with all the equipment
13    on it.
14    Q    Did you only have one service truck?
15    A    Yes, sir, all we've got is one
16    service truck.
17    Q    Okay.  And you got one tow truck?
18    A    Yes, sir.
19    Q    And Bear Creek owns the tow truck?
20    A    Yes, sir.
21    Q    They pay for the gas?
22    A    Yes, sir.
23    Q    They pay for the insurance?

Page 173

```
01     A    Yes, sir.
02     Q    They pay for all repairs on the
03  truck?
04     A    Yes, sir.
05     Q    And that's true of the service
06  truck, right?
07     A    Yes, sir.
08     Q    All right.  Now, did you go out to
09  the service truck and pick it up out there?
10     A    No, sir.
11     Q    Who did?
12     A    I'm not really sure.
13     Q    Okay.  Now, when you picked it up
14  - - or you were talking about whether there
15  was two twelve-ton jacks on that service
16  truck after the accident, or whether there
17  was two twenty ton?
18     A    Yes, sir.
19     Q    What is your recollection of what
20  was on that truck after the accident?
21     A    I'm not really sure.  I didn't
22  really pay attention to it.  I know for
23  sure there was two twenty tons.
```

Page 174

01    Q    Two twenty tons?
02    A    Yes, sir.
03    Q    Okay.  Did you understand they were
04  using two twelve tons to do what they were
05  doing on this trailer, or were they using a
06  twelve ton and a twenty ton?
07    A    I don't know.
08    Q    You don't know.  But you do know
09  there were twenty ton on the service truck
10  afterwards?
11    A Yes, sir.
12    Q    Did you ever see a twelve ton?
13    A    There was our old twelve ton still
14  on there.
15    Q    But you didn't see one of the newer
16  ones on there - -
17    A    No, sir.
18    Q    - - or do you remember?
19    A    I didn't see no newer one.
20    Q    Did you ever use a newer twelve ton
21  after the accident?  The ones where you
22  said the seal was breaking out, was that
23  the twelve ton or the twenty ton?

Page 175

01      MR. STEWART:  Object to the form.
02    A    That was all three of them.  The two
03  twenties, and the twelve ton, but the
04  twelve ton was an older one, it's like six
05  months I think.
06    Q    (BY MR. HOLLIS) Okay.  Well, which
07  one, in your statement, did you - - where
08  you said that it was leaking and going
09  down, which - - was that the twenty tons,
10  the new twenty tons?
11    A    I believe so.
12    Q    All right.  And David is David
13  Brasher; is that right?
14    A    Yes, sir, I think that is his last
15  name, since you mentioned it.
16    Q    All right.  I have had transcribed
17  the statement that you gave to John Godwin.
18    A    Yes, sir.
19    Q    And it's here, and I want you to
20  read over that and see if there is anything
21  in there that is inaccurate about what you
22  said on April the 13th of 2006, which was
23  two weeks after this accident occurred.

Page 176

```
01     A   (Witness complies).
02         MR. HOLLIS: Do y'all want to take a
03   break while he does this?
04         MR. STEWART:  Yeah, I'd like to read
05   it too.
06   (Short break)
07   (Plaintiff's Exhibit 5 was marked for
08   identification and a copy of the same
09   is attached hereto as evidence)
10     Q   (BY MR. HOLLIS) You've looked at
11   Plaintiff's Exhibit Number 5.
12     A   Yes.
13     Q   Is there anything in here that's
14   incorrect, Lee?
15     A   About taking the axles and tires off
16   first, I don't remember really saying that.
17   Now, I might have.  When they talked to me,
18   it was late that night anyways.  That's
19   pretty much going to be it right there.
20         MR. STEWART:  Where is that - -
21   excuse me, but I was just trying to figure
22   out - - catch up with you.
23         MR. HOLLIS:  Page 2.
```

Page 177

01    Q   (BY MR. HOLLIS) So, that - - you
02 would have a little disagreement with that?
03    A   Yes, sir.
04    Q   Okay.
05       MR. HOLLIS:  That's all.  Let the
06 record reflect every exhibit that I have
07 marked and referred to, I hereby offer as
08 an exhibit.
09       MR. STEWART:  I don't have any
10 objection.  Same with mine that I've
11 marked.
12 FURTHER EXAMINATION BY MR. LEE:
13    Q   Do you know if there were any - - or
14 was any additional work that your cousin
15 was going to do later on the day of this
16 accident?
17    A   I don't remember if he was or not.
18    Q   Do you have any knowledge at all, as
19 to what his plan or schedule was for that
20 day?
21    A   No, sir.  He had - - he had two to
22 set up, and I think they had already went
23 to one and was coming to that one.  I can't

Page 178

01    remember.  But I don't know - - don't know
02    of anything else he had to that day.
03        Q    If this happened around 11:25 in the
04    morning, it's your understanding that he
05    would have already set up one home prior to
06    this particular one?
07        A    I don't know.  I don't know.  It
08    just depends on how fast they'd done that
09    one that morning.
10        Q    Do you have any knowledge as to what
11    he had done before arriving at the lot
12    where this particular home was?
13        A    No, sir.
14        Q    How long does it normally take to
15    set up a home?
16        A    Good working conditions, two hours,
17    two-and-a-half hours if it's already
18    sitting there and it ain't going to be bad
19    to level out or do it.  About two-and-a-
20    half hours.
21        Q    And that's if you - - a group of
22    three people - -
23        A    Yes, sir.

Page 179

01    Q   - - such as your cousin and Mr.
02 Brasher and Sedro?
03    A   Yes, sir.
04    Q   Was your cousin in a hurry, or in a
05 rush?
06    A   I don't know.
07    Q   Has anyone ever told you that he was
08 in a hurry or in a rush at about the time
09 of this accident?
10    A   David had mentioned that he was in a
11 hurry, but he didn't - - the second time I
12 talked to him, he didn't - - he didn't say
13 nothing about it after that.  So, I don't
14 know if he was or he wasn't.
15    Q   So, the first time you had this
16 telephone call with him and you were coming
17 back into town from north Alabama - -
18    A   Yes, sir.
19    Q   - - David stated to you that who was
20 in a rush?
21    A   That Ladon was in a hurry.
22    Q   Why was he in a hurry?
23    A   He didn't never say.  And then, he

Page 180

01    - - then he - - when I talked to him the
02    second time, he didn't say nothing else
03    about it.  Said - - did you - - "did he say
04    anything about being in a hurry", and he
05    said "no".
06        Q    Tell me exactly what it was that
07    David stated to you during that first
08    conversation about your cousin being in a
09    hurry?
10        A    That's all he said.  He just said
11    that Ladon told him to go around to the
12    other side, go ahead and set the other
13    piers, said get ready to let it down
14    because he was in a hurry, and that was it.
15        Q    Did he say anything to you about
16    being in a hurry having anything to do with
17    the accident?
18        A    He just ended the conversation at
19    that.
20        Q    Okay.
21            MR. LEE:  That's all I have.  Thank
22    you.
23            MR. RITCHEY:  I've got one follow-up

Page 181

01   question to one of Mr. Adams' questions.
02   FURTHER EXAMINATION BY MR. RITCHEY:
03      Q    You had mentioned that you lift one
04   side up, take off the tire, put it back
05   down.  And then you said you go to the
06   other side, and do you again - - I think
07   you just said you ease it down after you
08   take the tire off it.  I think you missed a
09   step.  Do you also then lift up that other
10   side?
11      A    Oh, yes, sir.  You've got to lift it
12   up to take the tire off first.
13      Q    Okay.  So, I guess what I was making
14   sure is that you only - - you're again, I
15   think you'd stated before that you lift
16   only one side at a time?
17      A    That's correct.
18      Q    Okay.  And I guess, let me walk you
19   through, you can tell me if this is right.
20   You would - - once you get your blocks set,
21   you would then, to set the last ones around
22   the axles, you would lift up one side just
23   enough to get the tire clear?

Page 182

01    A    That's correct.
02    Q    Then you would block that?
03    A    No.
04    Q    Or bring the blocks in, or would you
05    move the tire out first?
06    A    No, you take the tires out, and then
07    you ease it down on the blocks that's
08    already set.
09    Q    Okay.  And then, you put more blocks
10    in?  Or, you know, you put blocks in that
11    area?
12    A    Not until - - not until you get the
13    other side down and you get the axles out.
14    Because see, sometimes the blocks end up in
15    between where the axles was at.
16    Q    Okay.  All right.  So, you lift up
17    the one side first and take the tires off,
18    and then you ease it back down onto the
19    blocks, the piers; is that correct?
20    A    That's correct.
21    Q    Okay.  And then, you go to the other
22    side, and you lift it up again, take the
23    tires off, correct?

Page 183

01   A   Yes, sir.
02   Q   And then, you ease it back down on
03   top of the blocks?
04   A   That's correct.
05   Q   Okay.  And then, I guess you can
06   start on that same side and bring in some
07   blocks close to the axles, or do you take
08   the axles off there?
09   A   No, then you pull the axle off where
10   the pier goes.
11   Q   Okay.  So, then you - - then you
12   take the axles off while it's all sitting
13   firmly on blocks?
14   A   That's correct.
15   Q   And then you just stack the piers up
16   to the - - to the axle - - or up to the I-
17   beam on both sides?
18   A   Yeah, once you pull that axle out
19   where a pier goes at, then you level it out
20   and everything, you put your water level,
21   check and make sure it ain't got no sag in
22   it no where.  And then, you wedge it off
23   tight, and then you pull the rest of your

Page 184

01  axles off.
02     Q    Okay.  And so, you - - it's before
03  you pull your axles off you have already
04  put in the pier for that particular area?
05     A    Yeah, you just take that one off.
06     Q    Just take that one off.
07     A    Or one or two, or whatever it takes
08  to get that pier in between where the axle
09  goes.
10     Q    Okay.  So, you always still have one
11  axle on there?
12     A    Yeah.
13     Q    And after you get the house totally
14  set, totally level, then you take that last
15  axle off?
16     A    That's correct.
17     Q    Okay.
18        MR. RITCHEY:  That's all I have.
19  FURTHER EXAMINATION BY MR. HOLLIS:
20     Q    Lee, did you understand that there
21  were blocks - - that this trailer had been
22  blocked before they put the - - got the
23  tires and the axles out?

Page 185

```
01     A    Yes, sir, they - - David told me
02   that the trailer was - - it was level, the
03   blocks was all leveled out and everything.
04   They just had it about this high
05   (indicating) off the blocks.
06     Q    Okay.  But it had the blocks on
07   there?
08     A    Yes, sir.
09     Q    They had put the blocks there?
10     A    They had water leveled it out.
11     Q    Okay.  They had water leveled it
12   out, okay.  Did he mention anything to you
13   that - - anything about either him, David
14   or Sedro telling Ladon that you needed to
15   put blocks under there?
16     A    No, David didn't tell me that.
17     Q    Okay.  Have you heard anything to
18   that effect?
19     A    No, sir.
20     Q    Okay.
21        MR. HOLLIS: I think that's all.
22   FURTHER EXAMINATION BY MR. STEWART:
23     Q    Lee, I'm trying to follow you again,
```

Page 186

01   and when Andy just said that the blocks
02   were in place it was just that the house
03   was "this much too high", I think was the
04   words you used?
05      A   Yes, sir.
06      Q   And you took your hands and you
07   indicated a height.  Did you get that
08   height from David?
09      A   Yeah, David just said - - David just
10   put his hands out, he said it was about
11   that high (indicating) off the top of the
12   piers.
13      Q   Okay.  And about how high is that?
14      A   Six inches, I guess.
15      Q   And is that too high, in your
16   opinion?
17      A   That's way too high.
18      Q   And was it also that it was that
19   much high off the piers on both sides.
20      A   That's what - - that's what he said.
21      Q   That's what David said is that both
22   sides were jacked up - -
23      A   Yes, sir.

Page 187

```
01    Q    - - six inches off the piers?  Okay.
02   I'm just now looking through your statement
03   and I apologize to you, this wasn't given
04   to us until today, so this is the first
05   I've seen of it.  Do you remember when this
06   - - it says April 13, 2006, do you remember
07   when on April 13, 2006 this statement was
08   taken?
09    A    Dark.  Late that evening.  That was
10   after I got off work.  I remember it was
11   dark time.  I don't remember what time.
12    Q    And how did you come to give a
13   statement to this John Godwin?
14    A    He called me and I went over there.
15    Q    Where did he call from?
16    A    My uncle's house.
17    Q    And what's your uncle's name?
18    A    Willie, Ladon's daddy.
19    Q    Okay.  Willie Cook?
20    A    Yes, sir.
21    Q    And did you understand that you were
22   going over there to help Ladon's lawyer
23   with this case?
```

Page 188

```
01    A   I didn't - - I just know they wanted
02  to ask us some questions.
03    Q   Okay.  And who all was there?
04    A   Just the lawyer and Willie and me.
05    Q   So, there was a lawyer there?
06    A   The guy that I talked to, yes, sir.
07    Q   Oh, you're talking about John
08  Godwin?
09    A   Yes, sir.
10    Q   Okay.  Did he talk to you before he
11  turned on the recorder?
12    A   I don't remember if he did or not,
13  he might have did.
14    Q   Did he tell you the kind of
15  questions he was going to ask you once he
16  turned on the recorder?
17    A   No, sir, he just said he was going
18  to ask me some questions.
19    Q   Do you remember what time of night
20  it was?
21    A   No, sir.
22    Q   Had you had any beer that night?
23    A   No, sir.
```

Page 189

```
01     Q   Now, on Page 2 of that statement,
02   you've got it in front of you there, like
03   five questions down, it's this paragraph
04   here where it starts off: "Lee: Oh, well,
05   generally you take the tires and axles off,
06   and you know, you let one side down and let
07   the other side down, you know, that way
08   nothing can move around, but pretty much
09   pull your tires and axles and you let
10   everything down and make sure everything is
11   secure, and then you wedge off your other
12   piers and if it ain't tight, or just a
13   little loose, you make sure everything is
14   tight or whatever".
15     A   Yes, sir.
16     Q   Are you saying you would disagree
17   with that?
18     A   Yes, sir.  Because you don't take
19   your axles off, you just take your tires
20   off and let it down - - let everything down
21   and make sure everything's tight before you
22   pull your axles off.
23     Q   Is there any other part of that,
```

Page 190

01    other than taking the axles off that you
02    would change about that?
03        A    No, sir.
04        Q    And then, down at the bottom on Page
05    2, you were talking about the Cobalt jacks,
06    and you see up there where you say - -
07    right here on your statement, three
08    paragraphs up, I guess, from the bottom on
09    two.  "Other than they - - I done blowed
10    two seals in them and they just fall".
11        A    Yes, sir.  Well, I didn't mean they
12    just fall completely to the ground or
13    nothing, but they leak down, is what I
14    meant by that.
15        Q    And that's what you were talking
16    about earlier - -
17        A    Yes, sir.
18        Q    - - where they slowly lower down?
19        A    Yes, sir.  I've never had one just
20    fall completely flat down.
21        Q    Okay.  And see the next question
22    that John asked you, John Godwin, I guess
23    Mr. Hollis' investigator: "So, from what

Page 191

```
01   you know about the accident, there's
02   something wrong, these jacks aren't
03   performing to the level of what the
04   manufacturer says they can"?
05      A   Where are we at now?
06      Q   Right here on the next - - on Page
07   2, down there it says "John: Okay, so from
08   what you know about the accident, there's
09   something wrong, these jacks aren't
10   performing to the level of what the
11   manufacturer says they can"; do you see
12   that?
13      A   Yes, sir.
14      Q   Do you know where he got that from?
15      A   No, sir.
16      Q   Had you told him that the jacks
17   caused the house to fall or anything?
18      A   No, sir.
19      Q   And then, over on Page 4, come down
20   one, two, three, four, five, six, seven,
21   eight paragraphs there, it says - - it's
22   you talking, it says "David said that at
23   one time that the jacks were up too high
```

Page 192

01  for the trailer - - way the trailer was
02  sitting, you know, picked it up too high,
03  but then he said he didn't know.  He said
04  he heard a noise that could be something
05  with either the frame could have give some,
06  or the jack seal could have been leaking
07  down or something and caused it to shift or
08  what, but he said he come back and said
09  that he wasn't sure what he heard."
10     A   That's right.
11     Q   Is that you saying what he said, or
12  you thinking what he said, or - -
13     A   No, that's what he said.
14     Q   He said he heard a noise that could
15  have been the frame?
16     A   Yes, sir.  I know you asked me a
17  question awhile ago, I can't remember, it's
18  too far back.
19     Q   Okay.  I understand.  I'm not
20  criticizing you, I'm just trying to
21  understand what you were saying.
22     A   Okay.
23     Q   And so, David said that something

Page 193

01   could have given with the frame, or that
02   the jack seal could have been leaking down
03   or something - -
04      A   Yes, sir.
05      Q   - - that caused it to shift?
06      A   That's what he said at the time.
07      Q   Okay.  And did he know what among
08   those things caused it to shift?
09      A   No, sir.
10      Q   Okay.  He was just guessing at
11   possible causes?
12      A   Yes, sir.
13      Q   And do you have any information that
14   anything like that happened?
15      A   No, sir.
16      Q   Okay.  Let's see I had scribbled
17   down something back here I was going to ask
18   you, and then I'll leave you alone.  Did
19   you pay Ladon out of what you were paid, or
20   was he paid separately?
21      A   He was paid separately.
22         MR. STEWART: Thanks.  I appreciate
23   it.

Page 194

01    FURTHER EXAMINATION BY MR. LEE:
02      Q    Where was your cousin living at the
03    time of this accident?
04      A    With his mother in Midland City.
05      Q    Do you have any knowledge as to
06    whether your cousin had consumed any
07    alcohol in the twenty-four hours before
08    this accident?
09      A    No, sir.
10      Q    Do you have any knowledge as to
11    whether your cousin had consumed any drugs
12    or medications in the twenty-four hour
13    period before this accident?
14      A    No, sir.
15      Q    Back in March - - or around March
16    30, 2006, what was your cousin's habit as
17    far as drinking alcohol?
18      A    As far as I know, drinks a little
19    bit at night.  I don't know.
20      Q    Every night?
21      A    I don't know if it was every night,
22    I just know every now and then is all I
23    know.

Page 195

01      MR. LEE: That's all I have.  Thank
02  you.
03      MR. RITCHEY: I've got a couple more.
04  FURTHER EXAMINATION BY MR. RITCHEY:
05    Q    The process that I was walking
06  through a few minutes ago, about how to
07  take the tires and axles off, is that how
08  you taught Ladon?
09    A    Yes, sir.
10    Q    Okay.  And that's how - - every time
11  you've been with him, that's how y'all did
12  it?
13    A    Yes, sir.
14    Q    When we were asking about how high
15  the blocks off, if David Brasher were to
16  say that they were six to eight inches, is
17  that about what you understood him to say
18  before?
19    A    Yes, sir.  He just showed me a show
20  of hands, and I just showed y'all what he
21  showed me.
22    Q    Okay.
23      MR. RITCHEY: That's all I have.

Page 196

```
01        MR. HOLLIS: Nothing else.
02        MR. ADAMS: Nothing.
03   FURTHER DEPONENT SAITH NOT
04
05
06
07
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 197

```
01   C E R T I F I C A T E
02
03   STATE OF ALABAMA
04   JEFFERSON COUNTY
05
06        I hereby certify that the above and
07   foregoing deposition was taken down by me
08   in stenotype, and the questions and answers
09   thereto were reduced to typewriting under
10   my supervision, and that the foregoing
11   represents a true and correct transcript of
12   the deposition given by said witness upon
13   said hearing.
14        I further certify that I am neither
15   of counsel nor of kin to the parties to the
16   action, nor am I in anywise interested in
17   the result of said cause.
18
19
20        _____
21        Joe Paul Moore,
22        Commissioner and Notary Public
23
```

1

1

2

3          IN THE CIRCUIT COURT IN AND FOR

4                  HENRY COUNTY, ALABAMA

5

6  CIVIL ACTION NUMBER

7  CV-06-42

8

9  FRANK LADON COOK,

10      Plaintiff(s),

11  vs.

12  BEAR CREEK SALES, LLC, et al.,

13      Defendant(s).

14

15

16          DEPOSITION TESTIMONY OF:

17              DAVID BRASHER

18

19  December 15, 2006

20  1:25 p.m.

21

22  COURT REPORTER:

23  DEBORAH B. TOWNSEND, CSR

2

1          S T I P U L A T I O N

2              IT IS STIPULATED AND AGREED by and

3  between the parties through their respective

4   counsel that the deposition of DAVID BRASHER,

5   may be taken before Deborah B. Townsend,

6   Certified Shorthand Reporter and Notary Public,

7   State at Large, at the offices of RITCHEY &

8   RITCHEY, Birmingham, Alabama, on December 15,

9   2006, commencing at approximately 1:25 p.m.

10              IT IS FURTHER STIPULATED AND

11  AGREED that the signature to and the reading of

12  the deposition by the witness is waived, the

13  deposition to have the same force and effect as

14  if full compliance had been had with all laws

15  and rules of Court relating to the taking of

16  depositions.

17              IT IS FURTHER STIPULATED AND

18  AGREED that it shall not be necessary for any

19  objections to be made by counsel to any

20  questions, except as to form or leading

21  questions, and that counsel for the parties may

22  make objections and assign grounds at the time

23  of trial or at the time said deposition is

                                                    3

1   offered in evidence, or prior thereto.

2               In accordance with Rule 5(d) of

3   the Alabama Rules of Civil Procedure, as

4   amended, effective May 15, 1988, I, Deborah B.

5   Townsend, am hereby delivering to Greg Ritchey

6   the original transcript of the oral testimony

7   taken December 15, 2006, along with exhibits.

8          Please be advised that this is the

9    same and not retained by the Court Reporter, nor

10   filed with the Court.

11

12              EXAMINATION INDEX

13
     DAVID BRASHER
14

15      BY MR. RITCHEY                8

16      BY MR. LEE                       62

17      BY MR. POUNDSTONE           84

18      BY MR. ADAMS               102

19      BY MR. COUCH               113

20      BY MR. RITCHEY             126

21      BY MR. LEE                    127

22      BY MR. COUCH               129

23

                                                      4

1               EXHIBIT INDEX

2                                          PAGE

3    Plaintiff's

4    1     Copies of Photographs         121

5    2     Husky Jack                    130

6

7
     Lowe's
8
     1     Photograph                     85
9
     2     Photograph                     88
10
     3     Diagram                        90
11

```
12

13

14

15

16

17

18

19

20

21

22

23
```

                                                        5

```
 1              A P P E A R A N C E S

 2

 3  FOR THE PLAINTIFF(S):

 4          Steven W. Couch, Esquire

 5          HOLLIS & WRIGHT

 6          505 North 20th Street

 7          Suite 1750

 8          Birmingham, Alabama  35203

 9

10  FOR THE DEFENDANT, REDMAN HOMES:

11          Gregory S. Ritchey, Esquire

12          RITCHEY & RITCHEY

13          1910 28th Avenue South

14          Birmingham, Alabama  35209

15
```

```
16  FOR THE DEFENDANT, BEAR CREEK SALES:

17          Samuel L. Adams, Esquire

18          MERRILL, HARRISON & ADAMS

19          153 South Oates Street

20          Dothan, Alabama   36301

21

22

23
```

6

```
 1              A P P E A R A N C E S

 2

 3  FOR THE DEFENDANT, LOWE'S:

 4          Robert E. Poundstone, IV, Esquire

 5          BRADLEY, ARANT, ROSE & WHITE

 6          401 Adams Avenue

 7          Suite 780

 8          Montgomery, Alabama   36104

 9

10  FOR THE DEFENDANT, MILLS TIMBER:

11          William L. Lee, IV, Esquire

12          LEE & MCINISH

13          238 West Main Street

14          Dothan, Alabama   36302

15

16  ALSO PRESENT:

17          Tammie Webster

18

19
```

20

21

22

23

7

1          I, Deborah B. Townsend, a Certified

2    Shorthand Reporter of Birmingham, Alabama, and a

3    Notary Public for the State of Alabama at Large,

4    acting as Commissioner, certify that on this

5    date, pursuant to the Alabama Rules of Civil

6    Procedure, and the foregoing stipulation of

7    counsel, there came before me at the offices of

8    RITCHEY & RITCHEY, Birmingham, Alabama,

9    commencing at approximately 1:25 p.m. on

10   December 15, 2006, DAVID BRASHER, witness in the

11   above cause, for oral examination, whereupon the

12   following proceedings were had:

13

14

15

16                    THE REPORTER:  Usual

17   stipulations?

18                    MR. RITCHEY:  That's fine.

19                    MR. LEE:  Yes, ma'am.

20                    MR. POUNDSTONE:  Yes.

21

22

23

8

```
 1                    DAVID BRASHER,
 2  After having first been duly sworn, was examined
 3  and testified as follows:
 4                    EXAMINATION
 5  BY MR. RITCHEY:
 6       Q.    Could I get you to state your full
 7  name, please?
 8       A.    David Ray Brasher.
 9       Q.    Do you go by David?
10       A.    Yes, sir.
11       Q.    I'm Greg Ritchey, and I've talked
12  with you before, I believe, on the telephone.
13       A.    Yes, sir.
14       Q.    I represent Redman Homes, and
15  we've asked you to come here to sit for a
16  deposition.
17       A.    Yes, sir.
18       Q.    Have you ever taken a deposition
19  before?
20       A.    No, sir.
21       Q.    Or given a deposition, I should
22  say?
23       A.    No, sir.
```

9

```
 1       Q.    It's a series of questions under
 2  oath.  Your answers will be taken down by the
 3  court reporter.
```

4       A.      Yes, sir.

5       Q.      And if you'd like to get a copy of

6  the transcript, if you will let me know, I'll be

7  happy to send one to you.

8       A.      Yes, sir.

9       Q.      You'll need to answer out just

10 like you're doing.

11      A.      Yes, sir.

12      Q.      She can't get head nods and things

13 like that, so if you don't answer, I may ask you

14 to say something more.  Okay?

15      A.      Yes, sir.

16      Q.      All the gentleman or ladies or

17 whoever wants to ask questions here will have an

18 opportunity to ask you some questions.

19      A.      Yes, sir.

20      Q.      And if you don't understand my

21 questions or anyone else's, please feel free to

22 ask us to restate the question.

23      A.      Yes, sir.

                                                    10

1       Q.      It's not an endurance test or

2  anything like that.  If you need to take some

3  time to go get some water, cigarette break, or

4  whatever you want to do, just let us know, and

5  we'll be glad to let you take a break.  Okay?

6       A.      Yes, sir.

7       Q.      Can you give me your street

8    address where you're living now?

9         A.    100 Richardson Subdivision Road,

10   Parrish, Alabama  35580.

11        Q.    Is there a home phone number

12   there?

13        A.    686-9430.

14        Q.    That's 205 area code?

15        A.    Yes, sir.

16        Q.    Do you have a cell phone or

17   anything?

18        A.    No, sir.

19        Q.    Is that your grandparents'?

20        A.    Yes, sir.

21        Q.    Who are your grandparents?

22        A.    Polly and Jesse Dobbs.

23        Q.    And is that their home number?

                                                11

1         A.    Yes, sir.

2         Q.    Do you have any other telephone

3    numbers?

4         A.    My granddad's cell phone number.

5    If he's not at home, he's got his cell phone.

6         Q.    Okay.

7         A.    It's 275-2121, area code 205.

8         Q.    Okay.  Are you employed right now?

9         A.    Yes, sir.

10        Q.    Where are you employed?

11        A.    Odom Construction.  That's also

12  out of Parrish.  I don't have the correct

13  address on it.

14      Q.     How about a telephone number

15  there?

16      A.     686-7818, 205.

17      Q.     How long have you worked for them?

18      A.     Probably five, six months this

19  time.

20      Q.     Have you worked for them before?

21      A.     Yes, sir.

22      Q.     When did you work for them before?

23      A.     Two years ago.

                                                    12

1       Q.     Okay.  Are you originally from

2   Parrish?

3       A.     No, sir.  Originally from

4   Bessemer, Alabama.

5       Q.     Do you have any family members

6   still in Bessemer?

7       A.     Just cousins.

8       Q.     There are going to be some

9   questions I'm going to ask that I just have to

10  throw out there and ask.

11      A.     I understand.

12      Q.     I'm not trying to pry too much

13  into your past history, but have you ever been

14  arrested or convicted of any crimes?

15      A.     Yes, sir.

16     Q.     What is that?

17     A.     Burglary, theft of property, and

18 forgery.

19     Q.     When was that?

20     A.     '91.

21     Q.     All of them 1991?

22     A.     Yes, sir.

23     Q.     Nothing since then?

13

1     A.     '95 for the forgery.

2     Q.     Anything since '95?

3     A.     No, sir.

4     Q.     And prior to working for Odom

5 Construction, where did you work?

6     A.     Worked in Dothan at the yeast

7 plant painting.

8     Q.     How long did you work there?

9     A.     Probably about close to a year.

10     Q.     Why did you leave, I guess?

11     A.     I got my old job back with Odom

12 Construction, working out of town.

13     Q.     Do you work out of town

14 substantially all the time?

15     A.     Yes, sir.

16     Q.     I understand you may be finishing

17 up a job right now?

18     A.     Yes, sir.

19     Q.     Where is that job?

20          A.      Jasper.

21          Q.      Okay.  After that, do you know

22   where you're going?

23          A.      First of the year, we'll be

                                                                    14

1    building Alltel again, back to building Alltel

2    wireless phone stores.

3           Q.      Wireless phone stores?

4           A.      Yes, sir.

5           Q.      You do that all over Alabama or --

6           A.      Alabama, Georgia, Mississippi, and

7    Florida.

8           Q.      Okay.  Before you worked -- What

9    plant was it in Dothan?

10          A.      The yeast plant.

11          Q.      Before that, where did you work?

12          A.      Before that, I worked with Odom

13   Construction.  Before that, I spent nine and a

14   half years in prison.  I mean, I was

15   incarcerated prior to that job.

16          Q.      Prior to the Odom job?

17          A.      Yes, sir.

18          Q.      And where were you?

19          A.      You're talking about prison?

20          Q.      Yeah.

21          A.      Kilby, Draper, Staton, Elmore.

22   What was it?  Ventress down in Clayton and

23   Mobile Work Release.

15

```
1      Q.      Were you working with Lee Cook for
2  some time?
3      A.      Yes, sir.
4      Q.      When did you start working for --
5  were you working -- I guess, who were you
6  working for at that time?
7      A.      When I left my job at the yeast
8  plant, the trailer park that my in-laws live in,
9  the people that own it were needing some help,
10 you know, setting up mobile homes, because they
11 were just getting started.  I done that for
12 probably a month, month and a half.
13     Q.      Okay.  These are your in-laws?
14     A.      Not that own it.  My in-laws live
15 in the trailer park.
16     Q.      Who are the people that owned it?
17 McGriff?
18     A.      McGriff, yes, sir.
19     Q.      So you just worked with them for
20 about a month or month and a half?
21     A.      Yes, sir.
22     Q.      Do you remember when you started?
23     A.      It was the summertime.  I mean, I
```

16

```
1  can't remember.  It was this past summer.  I
2  couldn't give the exact month.
```

3  Q. Were you working for them when

4 Ladon Cook was injured?

5  A. Yes, sir.  I'd been working with

6 them about a month.

7  Q. When he got injured?

8  A. When he got hurt, yes, sir.

9  Q. How long did you stay with them

10 after that?

11  A. About a week and a half, two

12 weeks.

13  Q. Okay.  I guess, who hired you

14 or --

15  A. I can't think of her name.

16  Q. Robin McGriff?

17  A. Robin McGriff, yes, sir.

18  Q. And you were -- Were you doing odd

19 jobs?

20  A. With them?

21  Q. Yeah.

22  A. No, sir.  I was setting piers,

23 setting up mobile homes, basically.

17

1  Q. Did you have any type of license

2 or anything to set up mobile homes?

3  A. No, sir.

4  Q. Did you get any training in

5 setting up mobile homes?

6  A. I guess you'd call it training.

```
 7   Lee -- I can't think of his last name.

 8        Q.      Cook.  Does that sound right?  Lee

 9   Cook?

10        A.      I don't know if that's his last

11   name or not.

12        Q.      Okay.

13        A.      He showed me how you set -- level

14   the piers and build them up, wedge them off.

15        Q.      Did you have any formal training

16   through the Alabama Manufactured Housing

17   Commission?

18        A.      No, sir.

19        Q.      Any type of certification through

20   the Alabama Manufactured Housing Commission?

21        A.      No, sir.

22        Q.      So all your training was just

23   through Lee?
```

                                                18

```
 1        A.      Yes, sir.

 2        Q.      Are you familiar with the rules

 3   and regulations that the Alabama Manufactured

 4   Housing Commission has with regard to setup of

 5   manufactured homes?

 6        A.      No, sir.

 7        Q.      Are you familiar with any setup

 8   instructions that the different manufacturers

 9   have?

10        A.      No, sir.
```

11      Q.      Have you ever read any setup

12  instructions?

13      A.      No, sir.

14      Q.      Have you ever seen Redman's setup

15  instructions?

16      A.      No, sir.  I haven't seen any kind

17  of instructions on setting any type of mobile

18  home up.

19      Q.      About how many homes have you set

20  up or did you participate in setting up?

21      A.      I would guess 12, maybe 18 --

22  between 12 and 18.

23      Q.      Okay.  And when you were there,

                                                    19

1   were you ever the guy in charge of setting up

2   the house?

3       A.      No, sir.

4       Q.      Who usually was in charge?

5       A.      Lee.

6       Q.      Okay.  And you said he was -- he

7   explained to you how to wedge it off and things

8   like that?

9       A.      Yes, sir.

10      Q.      Can you describe for me how he

11  taught you to set up, say, a single-wide

12  manufactured home?

13      A.      Yes, sir.  You put your ball

14  jack -- you get your two ball jacks out, 12- or

15    20-ton.  He had told me it didn't matter;

16    they'll both pick them up, unless it's a double-

17    wide or something like that.

18         Q.    Okay.

19         A.    You take a piece of dirt, hold it

20    up under the frame of the trailer and drop it,

21    and that will just about tell you where the

22    center of the beam is where you can about set

23    your jack up where it won't lean this way or

                                                    20

1    lean that way.

2         Q.    Uh-huh.

3         A.    Clear a spot out and put you a

4    4 X 6 down.  You know, we didn't put no level on

5    it, but after you jack your jack up, it kind of

6    levels off.  Then you jack it up, and when you

7    get the jack right up under the I-beam of the

8    trailer, you know, to get weight on the jack,

9    then you go by with a piece of dirt and drop up

10    under there.  And that way you dig your square

11    out up under there to put your pad to start

12    setting your 8-inch blocks to build it up to

13    meet the bottom of the frame.

14         Once you get all them dug and set,

15    leveled and all, then you come back and, as you

16    jack up, you keep a piece of 2 -- not 2 X 4 --

17    it's a 2 X 6 wood between it, because you

18    don't -- you ain't supposed to have the trailer

19  frame sitting down on your 8-inch block because

20  it will crack it.

21      Q.    Okay.

22      A.    So I guess the wood is used more

23  or less for a cushion, and it distributes the

                                                    21

1  weight all the way around the 8-inch block.  And

2  as you're jacking it up, you keep your wood

3  under it and wedged off.

4      Q.    So you keep it pretty close to the

5  height of the jack?

6      A.    Yes, sir.

7      Q.    Okay.

8      A.    Once your jack is all the way up,

9  usually set it back down on the pier that you're

10  building up.  Then you take and you build -- you

11  take your jack off of the 2 X 6; you put a

12  couple more 2 X 6's on it to build the jack

13  stand up to where you can get the jack and get

14  more jack on it, if that makes sense.

15      Q.    Okay.  Is that for each pier?

16      A.    No, sir.  That's just for that

17  side of the trailer.

18      Q.    Just for that side of the trailer?

19      A.    Yes, sir.

20      Q.    Okay.

21      A.    The trailer is usually hooked to

22  the toter, which is what you pull the trailer

23  with.  The tongue of the trailer is on the

22

1  toter, and if you want to come up with the front

2  of the trailer, you go hit the button and the

3  winch picks that trailer up and then holds it

4  there while you're working the back.

5       Q.     Do you use -- Were you taught to

6  use jack plates?

7       A.     Yes, sir.

8       Q.     Okay.

9       A.     Well, not right off, I wasn't, no,

10  sir, because I wasn't working the jacks at the

11  time.

12       Q.     Okay.

13       A.     I was mostly in charge of setting

14  the piers.

15       Q.     Okay.  We've had some other people

16  testify that you would go try to set all your

17  piers and level those off before you started

18  jacking up any part of the house.  Is that --

19       A.     Yes, sir.  Yes, sir.  You set your

20  pads -- Once you get your jack to where it's got

21  a little bit of weight on it, then you go down

22  on the side of the trailer and you set each

23  pier.  We've got a guy that comes by and marks

23

1  it down the side of the vinyl.  And where that

2  mark is, you look back a little bit and kind of

```
 3   line it up on the bottom frame of the trailer.
 4   And you get under there and you drop your piece
 5   of dirt, and then you dig your pad out.
 6        We've used the plastic pads some, but
 7   we've mostly used the cap blocks, is what we
 8   call them.  We set them long-ways with the frame
 9   of the trailer too, and then you level the back
10   one up this way and then you -- left and right.
11   And then you turn your level around, you know,
12   up and down to level it that way.  Once you get
13   it leveled, you put your second cap block beside
14   it, and you level it from your other one to the
15   front one.  And then you, you know, basically
16   level it up all the way around it.  And then you
17   take and set your cap -- your 8-inch block in
18   the center of the two cap blocks which is used
19   for a pad.
20        Q.     Okay.
21        A.     When you get all that done, you
22   take -- you push your dirt up around the pad
23   that you've dug with the cap blocks.
```

<div align="right">24</div>

```
 1        Q.     Okay.  Then do you put all your
 2   piers out underneath the house before you start
 3   lifting it?
 4        A.     Yes, sir.
 5        Q.     Okay.  Do you -- when you're using
 6   the jacks, do you jack up -- were you taught to
```

7    jack up both sides at the same time or one side

8    at a time?

9         A.    It's been done both ways.  Most of

10   the time, we jack them up at the same time.  You

11   jack up a little bit on one side, and then the

12   other side you jack up on, because it's not --

13   You know, if you've got a trailer on two ball

14   jacks and you jack it up too much on one side

15   and the other side is sitting on a jack, it will

16   kick your jack out.

17        Q.    So if it's up too high?

18        A.    Yes, sir.  If it's up too high on

19   one side, it will kick the other one -- it will

20   usually kick them out.

21        Q.    Have you seen that happen?

22        A.    No, sir, I haven't.

23        Q.    All right.  Would you have your

                                                    25

1    blocks -- Well, once you get one started jacking

2    up, would you then come back in and wedge it up

3    before you start jacking it up even more?

4         A.    Yes, sir.  You've got to keep it

5    wedged off.  In case it does fall, it will come

6    down like 3/8ths of an inch or something like

7    that, instead of it being up three or four

8    inches and coming down crushing all your piers

9    and maybe falling on you.  You keep them wedged

10   off.  That's how I was taught.

11      Q.      Were you at the site at the time

12 Ladon was hurt?

13      A.      Yes, sir.

14      Q.      Can you -- I guess, let's start

15 with the beginning of that day.  I guess, when

16 did you first learn that you would be going out

17 to this particular site?  Was it that day or the

18 day before?

19      A.      We learned about doing it the day

20 before.  She told us, usually, what we do the

21 day before.  I can't remember exactly what day

22 that the accident happened, but she told us the

23 day before, you know, what we were supposed to

                                                26

1 do.  That way when we got there the next

2 morning, we could load up what we need to load

3 up, and usually, she'd tell us to pick a few

4 other things that we would need.

5      Q.      She being Robin?

6      A.      Robin, yes, sir.

7      Q.      Well, what did she tell you the

8 day before; do you recall?

9      A.      That we were going to set a

10 trailer up.  Trying to think of the little town

11 right on the other side of the yeast plant.

12              MR. ADAMS:  Abbeville.

13      A.      Abbeville.  Said we'd be going to

14 Abbeville to set up a trailer that they pulled a

15  couple days prior to us, you know, going out.

16      Q.    Okay.  Did she say who was going

17  to do what?

18      A.    Me and Ladon and the Mexican,

19  Cedro, was going to be setting it up.  Lee and

20  his brother and cousin was supposed to be off,

21  if I'm not mistaken, repo'ing a trailer --

22  repossessing a trailer.

23      Q.    Okay.  Do you recall anything else

                                                    27

1   that she said that day?

2       A.    That morning that --

3       Q.    The day before.

4       A.    No, sir.

5       Q.    And then did y'all meet in the

6   morning?

7       A.    Yes, sir.  We met at the office,

8   which is her house at the trailer park.

9       Q.    All right.  And what did y'all

10  discuss then?

11      A.    That me and Ladon and Cedro were

12  going to be setting up a trailer.  She told us

13  that three -- Her and Bryan was there at her

14  house, and it was basically told to us if three

15  men couldn't set a trailer up in a day's time,

16  then we basically had to find us another job.

17  Three people ought to be able to get a trailer,

18  you know, set up in that amount of time.

19    Q.    How many homes were y'all planning

20  to set that day?

21    A.    Me and Ladon and Cedro was

22  planning on just setting that one and then

23  taking the day off, the rest of the day, whether

                                                                            28

1  it took to 5:00 in the evening or whether we got

2  through at 10:00 that morning.

3    Q.    Do you recall anything else that

4  was discussed that morning?

5    A.    No, sir.  I mean, she had been on

6  Ladon's tail a little bit about, you know,

7  getting a little bit more done.  They was

8  already in the process of, I guess, eliminating

9  him or getting rid of him.  They had been

10  talking about firing him, I guess you would say.

11    Q.    Who had been talking about it?

12    A.    Robin and Bryan.  And out on the

13  crews, you know, guys talk, and I think the only

14  reason he was still there was because of Lee,

15  because Lee and Ladon are cousins.  And they

16  were talking about getting -- doing away with

17  him.

18    Q.    And this is --

19    A.    Bryan and Robin were talking --

20  Robin mostly was talking about doing away with

21  him.

22    Q.    Okay.  I guess can you describe

23   the weather that, the day of the incident?  Do

1   you recall?

2        A.     It was sunny.  I mean, there

3   wasn't much wind, wasn't cloudy or anything.  It

4   was real bright at -- It was a good day to go

5   fishing.

6        Q.     Did you go out to the site with

7   everybody?

8        A.     Me and Ladon and Cedro went to the

9   site.  Ladon drove the truck, the service truck,

10  and me and Cedro rode shotgun.

11       Q.     And going back to discussions that

12  morning, do you recall any other discussions

13  other than what we've discussed already?

14       A.     No.  Just about what everybody was

15  going to be doing.  Lee and them repossessing a

16  trailer.  Lee was more or less the guy in charge

17  and his brother was Teague, you know, done all

18  the lag on the double-wides, axles, things like

19  that, and water leveling.  Ladon was mostly in

20  charge of putting anchors in the ground, anchor

21  plates, setting a few pads and the axles and

22  tires.

23       Starting out, I was toting block and --

1   cap blocks, you know, for the piers to be set.

2  I can't think of Lee's cousin's name.  Anthony.

3  Anthony was the pier man.  Him and Lee would get

4  up under and set piers.  After Lee would get

5  through doing what he was doing, he'd get down

6  and help Anthony set the piers.  And I looked at

7  it and said, shoot, it can't be that hard.  So

8  then I started -- Lee showed me how to do piers,

9  and I started doing piers.

10      Q.      About what time did you get out to

11  the installation site?

12      A.      I would say 9:00, 9:30.

13      Q.      Was that the first time you saw

14  that house?

15      A.      Yes, sir.

16      Q.      Did you ever see it on the lot?

17      A.      No, sir.  Lot meaning --

18      Q.      Well, where it was on their

19  premises, the McGriffs.

20      A.      No, sir, I hadn't.  I don't

21  recall.

22      Q.      As I understand it, they

23  repossessed that home at one time.  Did you

                                                    31

1  participate in the repossession of that

2  particular house?

3      A.      No, sir.  I hadn't repossessed but

4  one trailer with them.  Maybe two.  All I've

5  done was -- as far as repossessing, I've been

6    with them twice.

7        Q.    But it wasn't this particular

8    house ever?

9        A.    No, sir.

10       Q.    I guess tell me what you did once

11   y'all all got out to the installation site.

12       A.    They got a little Ranger, which is

13   a little old cart that we usually haul the block

14   and all with, and wood and things like that.

15   Got our jacks out and set them down.  Got our

16   block and started laying them out.  Got us a

17   spot in to set our jacks up; cleared us a spot

18   out and put our 2 X 6's on.  Stretched our hoses

19   out to take the tires and axles off or getting

20   ready -- We wasn't taking them off, but we get

21   everything laid out.  Stretched the hoses out.

22       Q.    What kind of hose?

23       A.    Air hose for impact and all to

                                                    32

1    take the tires and all off.

2        Q.    Yeah.

3        A.    Set our jacks up, cleared our pad

4    out for the 4 X 6's and built it up.  Jacked the

5    jacks up to where they hit up under the frame on

6    the trailer.  Once we got that, we marked off on

7    the side of the trailer where the piers is

8    supposed to go.  They're supposed to be so many

9    feet apart.  Got through with that.  While me

10    and Ladon were up under there getting our piers

11    set, Cedro would bring our blocks.

12        Q.    Can you -- before I guess we get

13    into all the setting stuff, can you describe how

14    the lot looked to you when you went out there?

15        A.    Yes, sir.  We pulled out of the

16    little main road there, and there was a house on

17    the left with a service truck there and a

18    trailer behind it with the block and all on it.

19    And we could just about get down -- just barely

20    get down in there with that.  We didn't know how

21    they got the trailer in.

22        And anyway, you take a left and go down a

23    little-bitty driveway back in along the side of

33

1    the house, and the trailer we were going to

2    install is sitting on a little slope on the back

3    side of it.  And back behind there were -- there

4    was a logging company doing a lot of clearing,

5    land clearing and all.

6        Q.    Did you see a bunch of bushes or

7    trees that looked like had been cleared off?

8        A.    Yes, sir.  There were some on the

9    right-hand side going down the side of the

10    house.

11        Q.    Okay.

12        A.    Yes, sir.

13        Q.    Did it look like there was dirt

14  brought in for the pad?

15      A.    Yes, sir, there was.

16      Q.    There was dirt?

17      A.    Yes, sir.

18      Q.    Do you know how that dirt got

19  there?

20      A.    I don't know how it got there, no,

21  sir.  I don't know if the people that owned the

22  land brought it in or if Bear Creek brought it

23  in.  I don't know.

                                                        34

1       Q.    We've heard some testimony that

2   when the truck was coming in, it was kind of

3   soft or something.  Did you notice any of that

4   with the dirt?

5       A.    The pad we had the trailer on?

6       Q.    Yeah.

7       A.    It might have been graded off, but

8   it wasn't packed, no, sir.

9       Q.    It wasn't compacted?

10      A.    No, sir.

11      Q.    It was --

12      A.    I guess what I'm saying -- My way

13  of explaining it is bring a dump truck of dirt

14  in there, dump it, and take like a bucket off of

15  a backhoe, tilt it up, set it down and drag

16  across it to kind of level it off.  But as far

17  as -- I mean, you could have seen where it

18   scraped the top, but as far as being a packer or

19   anything like that on it, no, sir.

20        Q.     Okay.  Did it kind of give when

21   you were walking on it?

22        A.     Yes, sir.  You could leave a

23   quarter-inch footprint in it in the morning

                                                    35

1   times.

2        Q.     Yeah.  All right.  I guess if you

3   could, once you got everything laid out, did

4   y'all start putting the piers in or --

5        A.     Yes, sir.

6        Q.     At that time, did it still have

7   the wheels and axles?

8        A.     Yes, sir.

9        Q.     How was the front of the home

10   secured or how was the tongue part of the

11   home -- was anything --

12        A.      It was just sitting on -- I'm

13   going to estimate four 4 X 6's.  Not 4 X 6's.

14   I'm sorry.  2 X 6's.  They wasn't set, you know,

15   side by side.  You'd set one and then you'd cock

16   it a little bit and cock it a little bit and

17   cock it a little bit.  I mean, cocking it, make

18   a little turn on each one.  That's the only

19   thing.  You've got a jack on the tongue of the

20   trailer.  It was sitting on the 2 X 6's.

21        Q.     Okay.

22      A.      There wasn't no truck or nothing

23   to hook to it, and I always thought, you know,

                                                            36

 1   that when we set up a trailer, you always have

 2   it sitting on the toter, meaning what we pull it

 3   with.  But it wasn't.  They was using it to

 4   repossess a trailer.

 5      Q.      Okay.  Is that the first time

 6   you've ever done one without it being on the

 7   toter?

 8      A.      Yes, sir.

 9      Q.      Was anybody in charge that day?

10      A.      Ladon, he'd been out -- Now, from

11   my understanding, he hadn't been out there but

12   five or six months doing the job, so he was out

13   there the longest.  I assumed he was in charge.

14   Now, he drove the truck; he knowed what was

15   going on and all, what needed to be done.  So I

16   guess Robin and them felt like he was there long

17   enough, you know, to know what he was doing.

18      Q.      Was anybody directing -- Was he

19   directing what to do here or --

20      A.      Yes, sir.  I mean, like I say, get

21   out and we know what to do, get everything laid

22   out.  And after you get it all laid out, then

23   you start your jacking, you know, after you get

                                                            37

 1   your piers and all set.  Because once you get

2  your jack up, it's kind of rough to build up one

3  pier and then have to go get your material and

4  bring back and start another one.  That's where

5  Cedro come in, to keep your materials laid out.

6       Q.     So when you say that you get all

7  your materials laid out, are you -- I guess the

8  wheels and axles are still on it?

9       A.     Yes, sir.

10      Q.     And it's got some blocking in the

11 front?

12      A.     Yes, sir.

13      Q.     So it's --

14      A.     The only thing keeping the tongue

15 of the trailer from being on the ground is the

16 four or five 2 X 6's which the tongue jack is

17 sitting on.

18      Q.     Okay.  And then when you say you

19 lay out all the piers, are you laying the piers

20 out underneath the frame?

21      A.     Yes, sir.  We lay our material on

22 the side of the trailer.  That way when we're up

23 under the trailer digging and leveling

                                                    38

1  everything up, all we've got to do is turn

2  around back here and grab what we want, slide it

3  up under there and set it up, instead of having

4  to get out and stand up and go over here and get

5  it, yes, sir.

6       Q.      So before you start jacking, do

7    you pretty much bring all those blocks and piers

8    underneath and lay them out under the frame?

9       A.      Yes, sir.

10      Q.      Is it basically wedged up there as

11   tight as you can get it where it sits

12   originally?  I guess, do you wedge it off to

13   where it's --

14      A.      It does get wedged off every time

15   you jack up.  We try to jack it up enough to

16   where you can get a 2 X 6 up under it, and if

17   not, we've got thinner boards, which is probably

18   a 1 X 6, that you keep in there.  And if it's

19   still loose under there, you take your wedge and

20   kind of hit it with the butt of your hand to

21   wedge it off.  The only time we use a hammer to

22   wedge it off is after it's been water leveled,

23   and, you know, ready to set all the way down.

                                                     39

1       Q.      Okay.  Who was handling the jacks

2    that day?

3       A.      Me and Ladon.

4       Q.      Did you set some jacks?

5       A.      I set -- We didn't use but two.  I

6    set one and Ladon set one.

7       Q.      If you're looking -- There's a

8    house that was in front of this home?

9       A.      Yes, sir.

10      Q.      And then there are woods behind

11  the home, correct?

12      A.      Yes, sir.

13      Q.      What side did you set your jack

14  on, the house side or the woods side?

15      A.      The woods side.

16      Q.      And what side did Ladon set his

17  jack on?

18      A.      The house side, which is the high

19  side.

20      Q.      The high side.  Okay.  And did you

21  use a jack plate?

22      A.      No, sir.

23      Q.      Did Ladon use a jack plate?

                                                    40

1       A.      No, sir.

2       Q.      Did y'all have the jack plates

3   there on the truck?

4       A.      Yes, sir.  They were, yes, sir.

5       Q.      Is there any reason why you didn't

6   use them?

7       A.      No, sir.

8       Q.      Is it safer to use them?

9       A.      From what I've been told, yes,

10  sir, it is.  I've been told that if you don't

11  get your ball jack in between the I-beam of the

12  trailer, that the lip, it will push the lip up

13  and the trailer will fall.

14          Q.      Who told you that?

15          A.      Lee.

16          Q.      Lee did?

17          A.      Yes, sir.

18          Q.      Did he tell Ladon that?

19          A.      I didn't hear him tell him that,

20     but he's preached it enough to know.  But we

21     have jacked several of them without the jack

22     plate for the simple fact they get moved around

23     and, you know, just not be there.

                                                    41

1          Q.      Yes.

2          A.      But that particular job, no, sir.

3          Q.      All right.  If I'm understanding

4     you correctly, you lay out -- you get all of

5     your piers underneath the I-beams?

6          A.      Yes, sir.

7          Q.      And at that point, while you have

8     your piers underneath the I-beams, are you

9     jacking on it at all?

10          A.      Yes, sir.  You've got to jack it

11     up to build your piers up.

12          Q.      Do you do that for each pier or

13     around each pier?

14          A.      Well, the pier closest to you

15     usually calls for more wood because it's closer

16     to the jack.  So if I'm jacking on one side and

17     Lee is on the other side, Cedro is usually

18  pushing wood up under there.  But that comes in

19  to where the toter is, and if it's on -- if the

20  tongue of the trailer is on the ground and

21  you're jacking in the back, you're just jacking

22  up the back, the back end is going to be higher

23  than the front.

                                                        42

1       Q.      Describe for me how y'all did the

2  jacking that day or how y'all set things out.

3       A.      Well, I mean, like I said, we come

4  in and got all our material laid out.  I got on

5  the low side, which is the woods side, and Ladon

6  got on the high side.  After we got our wood,

7  blocks, cap blocks and all, laid on the side

8  where we wouldn't have to keep running back and

9  forth, I'd get on one side and he'd get on the

10  other.  We'd each, you know, look up under the

11  trailer, and we're jacking, not fast because you

12  can't jack them fast.  I'd take two or three

13  pumps on the jack at the same time Ladon would

14  take two or three pumps on the jack at the same

15  time.

16       Q.      And this was without any blocks

17  underneath the house?

18       A.      No.  We had our piers built up to

19  the bottom of the frame.

20       Q.      Oh, okay.  So before you started

21  jacking, you built the piers up to the bottom of

22   the frame?

23        A.      Yes, sir.

                                              43

1        Q.      Okay.

2        A.      And while we're jacking, Cedro

3   would come by and put the wood -- wedge it off

4   is what we call it.  But you jack it up so high

5   to where you can either get a 1 X 6 under it or

6   a 2 X 6 under it, and then wedge it off.  Then

7   you move down to the next one.  If the first

8   pier took a 2 X 6 and a wedge, the pier next to

9   it might take just a 2 X 6, and the pier up from

10   it might take a 1 X 6 and a wedge, if that makes

11   any sense.

12        Q.      I think so.  Were you wedging off

13   from the back to the front?

14        A.      Yes, sir.

15        Q.      How high did you have the home off

16   of the piers when y'all were jacking it up?

17        A.      No more than -- At the time -- I

18   mean, at times, no more than two inches, just

19   where we'd get our wood up under to wedge it

20   off.

21        Q.      And then what -- then you would --

22        A.      Well, if we run out of jack, we'd

23   wedge the piers off, bring the jacks down, take

                                              44

1    the jacks out from under the trailer with the

2    axles and tires still on them, and build our

3    jack pier up to where we could release the valve

4    on the jack and push the neck of it down in

5    there and tighten our little thing up and screw

6    this up to where it meets the trailer frame

7    again and then start jacking again.

8          Q.     All right.  On the day of the

9    incident, you'd gotten it to the point where you

10   had all of the piers wedged off?

11         A.     Yes, sir.

12         Q.     And at that time, you'd only

13   lifted it up one or two inches at the most?

14         A.     Yes, sir.

15         Q.     What happened after you got all

16   those piers -- Were the tires and axles still on

17   it?

18         A.     Yes, sir.

19         Q.     Okay.

20         A.     Tires and axles is usually the

21   last thing that we take off before we sit it

22   down.  We leave the tires and axles on it while

23   we're water leveling, and after the water

                                                    45

1    leveling gets -- after the trailer has been

2    water leveled, then we usually take the tires

3    and axles off.  That way all we have to do is

4    just set it back down.

5       But as soon as we get the tires and axles

6    off, we've usually got two to four piers that we

7    set that we couldn't get under because the tires

8    and axles were on it.  So when we take the tires

9    and axles off, we've usually got anywhere from

10   two to four piers left that we have to set.

11       Q.    Okay.  On that day, I guess, once

12   you got past getting everything wedged off --

13   And then you got it all leveled, water leveled,

14   right?

15       A.    Yes, sir.

16       Q.    And at that time, the wheels and

17   axles are still on?

18       A.    Yes, sir.

19       Q.    What was done next?  Is that when

20   you started building it -- or jacking it up

21   more?

22       A.    No, sir.  After we got it water

23   leveled, the tires and axles were already off

                                            46

1    the ground.  It's usually just kept on there for

2    safety measures in case it did fall.  Ladon was

3    finishing up water leveling, and me and Cedro

4    took the tires and axles off.

5       The way we do that, we take the tires

6    off, lay them to the side, go to the other side

7    and take the tires off, lay them to the side.

8    When we get them off, we take the tires and set

9   them up next to the truck.  Then we come back

10  and take -- drop the axles.  We take the bolts

11  out of the axles, and they fall down on the

12  ground there.

13       When we get that done, we snatch the

14  axles out from under it, and then we get up

15  under there and start building our piers to have

16  them water leveled to set back down.  And then

17  we leave.  We probably didn't have 30, 40

18  minutes left when the trailer fell.

19       Q.    Explain to me how -- Were the

20  tires and axles off at the time that it fell?

21       A.    They were.  When I was pulling the

22  axle out, I heard a creaking sound, you know,

23  (demonstrating).  It was a long one,

                                                    47

1   (demonstrating) for a second.  And me not

2   thinking much about it and snatched the tires

3   and axles out, and that's when me and Ladon

4   started, you know, setting our piers.

5        And I was crawling out, because I had

6   finished my side, and I was going over to help

7   Ladon on his.  And I just took my head out from

8   under it -- out from under the I-beam, but it

9   was still under the trailer.  And I don't

10  know -- I know it fell, but at the time, I said,

11  well, it couldn't have fell.  You know, I come

12  out from under it, and I thought something was

13    wrong because wasn't nobody hollering to see if

14    I was all right or anything.

15        And I run around and sure enough was.  I

16    don't want this to sound funny or nothing, but

17    it looked just about like on the Wizard of Oz,

18    if y'all have seen it.  It looked about like

19    that there.  And just a gut-wrenching, sick

20    feeling.  And I went over there and hollered for

21    Ladon seeing if he was all right.  He wasn't

22    saying nothing, but I could hear him

23    (demonstrating).

                                                    48

 1        I didn't know what to do.  I remembered

 2    the guys logging had just come off of break and

 3    just started their little old machine back --

 4    their skidder up.  I run down there and told

 5    them the trailer fell on one of my men over

 6    here; if you could, you know, come over here and

 7    help.  They come around through there with the

 8    skidder and tried to get up under it, you know,

 9    to get it up off of him, but it kept wallowing.

10        I told them, I said, you know -- I guess

11    he was thinking that, you know, he was going to

12    tear the trailer up.  I told him I didn't care

13    about the trailer; just get up under it and get

14    it off of him.  Anyway, it come on out with it.

15    He got on up under it and picked it up

16        Q.    How high off the blocks was the

17    home at the time it fell?

18         A.    How high off the blocks?  What do

19    you mean?

20         Q.    How high was it jacked up off the

21    blocks?

22         A.    Ladon probably had it -- Shoot, it

23    wasn't high, because he was water leveling that

                                                    49

1    side while me and Cedro finished getting the

2    axles out.  He got it built up or was fixing to

3    attempt to build it up on the back side to water

4    level it on the last two piers -- or the piers

5    in the middle.  I say the middle, right there at

6    the end.  That was the only corner we had left

7    to do.  I would say two, two and a half inches.

8         Q.    Okay.  I think when I talked with

9    you the first time, I wrote down that you said

10    it was about six to eight inches off the piers.

11         A.    No.  It fell off -- It fell six or

12    eight inches from the piers.  If y'all took

13    pictures of it, one side of the trailer, the

14    piers were still up.  I mean, the trailer didn't

15    even touch them.

16         Q.    Was the whole home off the piers?

17         A.    No, sir.  The front side wasn't;

18    the back side was.

19         Q.    The whole back side was off the

20    piers?

21      A.      Yes, sir.

22      Q.      Both sides of it were jacked up

23  off the piers?

50

1       A.      No, sir.  The trailer was sitting

2  kind of funny.  Borrow a piece of this paper?

3       Q.      Yeah.

4       A.      Anyway, it was sitting -- I don't

5  know -- it was sitting -- If that's level, it

6  was sitting kind of like this here.  The whole

7  side here --

8                   MR. COUCH:  Where's the front

9  on the piece of paper?

10      A.      The front is here.  The tongue

11  is --

12                   MR. LEE:  The front is where

13  the tongue is?

14      A.      The tongue is the front, yeah.

15      Q.      Okay.

16      A.      It was sitting like this, because

17  this -- at least end here was what he was water

18  leveling.

19      Q.      The back end?

20      A.      Yes, sir.  He had jacked it up to

21  build his pier up to bring it back down.  He had

22  water leveled the back here on his pier.  He

23  didn't water level the trailer.  He got it up to

51

1   where he could water level the pier.  The

2   correct way to do it would be put your magnet up

3   with the water level and bring it to the very

4   bottom of the frame of the trailer.

5        Well, on the back side here, he was water

6   leveling to the top of the pier.  They had it --

7   I don't know if he had it up a couple of inches

8   to where he could get his board and work with it

9   and all.  I don't know.  It was sitting like

10  that, and all he had to do was just let it down

11  on it.  Me and Cedro was pulling the axles on

12  the front side of the -- on the house side of

13  the trailer, and I heard that noise again, that

14  (demonstrating).

15       Something ain't right here, Cedro.  I got

16  to looking.  The front side was on there, and I

17  looked at the back and it wasn't even on -- the

18  piers wasn't even on there.  The piers wasn't --

19  the trailer wasn't on the piers there.

20       Q.   Okay.

21       A.   And anyway, he said -- Ladon said,

22  we ain't got but four more piers to set; we can

23  get them and go on.  I'm thinking it was 12,

                                              52

1   12:30 at that time, somewhere in that

2   neighborhood.  I said, okay, I'll get that

3   bottom side, while he pulled the water level out

4   on the other side and wrapped it back up.

5        I started digging my piers while Cedro

6    was bringing my material around.  I got mine

7    leveled and built up, you know, to the bottom of

8    the -- right there at the bottom of the frame.

9    I guess about two inches.  I said, all right,

10   I've got this one ready to be water leveled, and

11   he's over there digging -- Ladon is over on the

12   other side starting on his piers.

13       So I was going to come around there and

14   help him on them piers so he can come back

15   around and let the trailer down on the woods

16   side in the back where I can start building my

17   piers up where the axles were.

18       And anyway, I was helping him.  He said,

19   I'll get it.  I said, well, okay.  When I come

20   back around to get my shovel and all out and to

21   push my dirt around the piers on the back

22   side -- You ain't supposed to have dirt -- you

23   ain't supposed to have your block and all -- I

                                                  53

1    was getting my materials out from under there as

2    far as my shovel, level, I think my extra wood,

3    and he'd just put his other ones in.  And I

4    heard that noise again (demonstrating), that

5    creaking sound.  And about that time, I grabbed

6    my shovel and all and was fixing to turn and

7    come out, and it was (demonstrating).  And you

8    know, it just -- I don't know.  It come down.

9    It fell.

10       Q.     If I'm understanding you

11   correctly, the back side of the home on the

12   woods side was jacked up off the piers on that

13   side?

14       A.     Yes, sir.  On that back corner,

15   yes, sir.

16       Q.     And was it resting on the piers on

17   the front side of the home, or was it also just

18   on the jack itself?

19       A.     No, sir.  It was resting on the

20   piers on the front and the jack itself.

21       Q.    Okay.

22       A.     The piers on the house side, which

23   is the front of the trailer, and the jack which

                                                    54

1    was on the woods side, on my side.

2        Q.    Okay.  So it was resting on the

3    piers on the house side?

4        A.     Yes, sir.

5        Q.     And had the jack under there too,

6    right?

7        A.     Yes, sir.

8        Q.     But it hadn't been jacked up

9    enough to --

10       A.     To take the weight off the piers,

11   no, sir.

12       Q.     Okay.  But in the back side on the

13  woods side, it was completely off the piers?

14      A.      Yes, sir.

15      Q.      How far off the piers was it at

16  the furthest point?

17      A.      Where my jack was back at the

18  axles?

19      Q.      Yeah.

20      A.      It was probably two, two and a

21  half inches, and it was also off on the front

22  too.

23      Q.      So it was totally off the piers --

                                                    55

1       A.      On the woods side.

2       Q.      -- on the woods side?

3       A.      Yes, sir.

4       Q.      So the woods side is only -- I

5   guess it was tilted forward --

6       A.      Yes, sir.

7       Q.      -- toward the house side?

8       A.      That comes where my thinking ain't

9   right, because the trailer was supposed to have

10  fell downhill and not uphill.

11      Q.      Did you ever say something to

12  Ladon about it not being right?

13      A.      Yes, sir.

14      Q.      What did you --

15      A.      I told Ladon and Cedro, I said,

16  you know, this ain't right here, and that side

17    ain't even on the piers.  I told them that.

18    It's all right.  It's all right.  We ain't got

19    but just a few more minutes.

20         Q.    Who said that?

21         A.    Ladon.

22         Q.    So you told them it shouldn't be

23    completely off the piers on the back side?

                                                    56

1          A.    Right.

2          Q.    Okay.

3          A.    Cedro didn't have them all wedged

4     off on that side because it was up higher

5     because he was water leveling his piers instead

6     of water leveling on the --

7          Q.    Frame?

8          A.    -- on the frame.

9          Q.    Okay.  Had the anchors been set?

10         A.    No, sir.

11         Q.    Okay.  Understand that after it

12    fell, there's some statements that were made, I

13    think, to some police officers that an attempt

14    was made to get a jack and jack up that side of

15    the house.  Do you recall that?

16         A.    As far as getting it off Ladon?

17         Q.    Right.

18         A.    There wouldn't have been no way --

19    I don't know who would have said that.  There

20    wouldn't have been no way to get a jack up under

21  it.  It was sitting marred in the ground.

22       Q.    So the jack that was on the high

23  side of the house -- I'm sorry -- the woods side

                                                    57

1  of the house, that was still there; nobody went

2  and grabbed it to try to lift up the house?

3       A.    No, sir.  There wasn't no way.

4       Q.    And the jack that was on the woods

5  side of the house, do you recall what it looked

6  like?

7       A.    It was a red jack.

8       Q.    Okay.  And do you know what

9  happened to that jack that day?

10      A.    I was told to leave everything

11  there.

12      Q.    So you --

13      A.    Extension cords, jacks -- I did

14  load the shovel up and the level, but everything

15  else stayed there, is what the police officer

16  told me, for the insurance people.

17      Q.    So nobody ever moved that jack

18  from the back of the house?

19      A.    I never moved it and Cedro never

20  moved it.

21      Q.    So as far as you knew, it was back

22  there?

23      A.    It was to be left there, yes, sir.

58

```
1        Q.      And what color was that jack?

2        A.      Red.

3        Q.      It was definitely red?

4        A.      Oh, yes, sir.

5        Q.      I've got a jack before you here.

6   Does that look similar to that jack?

7        A.      Yes, sir.

8        Q.      Can you say 100 percent whether or

9   not it was that jack or not?

10       A.      I can't say 100 percent, no, sir.

11       Q.      Okay.  Did you ever go back out to

12  the site to retrieve any jacks?

13       A.      No, sir.  I made a statement to

14  Robin and Mr. Bryan that I didn't want to go

15  back out there.

16       Q.      Okay.  Did you consider it to be

17  pretty dangerous with the house up totally off

18  the blocks on the woods side?

19       A.      Oh, yes, sir.

20       Q.      And you said something to Ladon

21  about that?

22       A.      I mentioned it to them that I

23  didn't think this was right.  I think that was
```

59

```
1   my exact words.  This ain't right.  I'm pretty

2   sure that was my exact words.

3        Q.      Did Cedro ever say anything?
```

4      A.      Cedro hardly says much, and you

5  can't understand much of what he says.  He does

6  speak a little English.  He said -- I can't

7  remember exactly, you know -- it okay; it okay.

8  It be all right; it be all right.

9      Q.      Did he ever refuse to go under the

10  house?

11      A.      No, sir.  Because we were up under

12  the house pulling the axles out while the back

13  side was off of them.

14      Q.      Okay.

15      A.      And I remember saying something to

16  Cedro about it not being right when I heard the

17  creaking.

18      Q.      Have you read any of the materials

19  that came with the jacks?

20      A.      No, sir.

21      Q.      Okay.  One thing you mentioned

22  when I was talking to you, it was windy the day,

23  or the wind was blowing that day?

                                                60

1      A.      It wasn't gusty, but there was a

2  light breeze.  It wasn't nothing you'd want to

3  get out and fly a kite in.  I mean, it wasn't

4  anything like that.

5      Q.      Was the breeze blowing about the

6  time that the house fell?

7      A.      I'm not for sure.

8          Q.      Okay.   Do you have an opinion as

9    to why the house fell?

10                        MR. COUCH:   Object to the

11   form.

12         A.      Well, I thought about it a lot.

13   You know, when we were jacking the plate -- you

14   know, jacking the trailer up, and when you jack

15   the jack up, most all of them will sink a little

16   bit when you're jacking.  And that's usually why

17   we have to build it back up.  Whenever you take

18   and come off your jack and your piers are set,

19   it's -- it wasn't packed -- the ground wasn't

20   packed at all.

21         Q.      So you think that the soil was

22   sinking around it where the jack is?

23         A.      My opinion, yes, sir.

                                                    61

1          Q.      Do you think Redman Homes did

2    anything wrong that caused the problems with the

3    house falling?  They're the manufacturer of the

4    home, by the way.

5          A.      I mean, I'll be honest with you, I

6    really couldn't say as far as the -- anything

7    being wrong with the home.  I wouldn't think

8    so.  I think it was kind of stupid for them

9    folks to send somebody out there with a month

10   experience and a Mexican that don't know what's

11   going on and another guy that ain't been out

12  there.  It's just stupid.  And plus it being --

13  not having -- not having the toter on the end of

14  the trailer.  It's -- it's just uncalled for.

15      And what surprised me most out of

16  everything, after I called 911 and got them out

17  there, I called Robin and told her a trailer had

18  fell on him.  And you know, she was more

19  concerned about her going to lose everything she

20  had.  She said that she had to go to town and

21  take care of a few things.  She couldn't come

22  out there; she had to go take care of a few

23  things.  My understanding, what my wife's

                                                    62

1  ex-husband has told me -- he moves mobile homes,

2  been doing it for 30 or 40 years, Bruce Hartzog

3  down in Dothan -- you're always supposed to have

4  somebody out there certified or something like

5  that.  From my understanding, Mr. Bryan was the

6  only one certified out there, and I had never

7  seen him on any job out there.

8      Q.    Okay.

9      A.    I found out quick I didn't want to

10  work for them folks, because if I'd got hurt out

11  there, I'd at least want them to come and check

12  and see about me.

13      Q.    That's all I've got for right now.

14                  EXAMINATION

15  BY MR. LEE:

16      Q.      Mr. Brasher, I'm Will Lee.  I

17  represent Mills Timber.

18      A.      Yes, sir.

19      Q.      Do you understand Mills Timber is

20  the company who was doing logging work on the

21  adjacent property?

22      A.      I didn't know the name of them,

23  but I know who you're talking about, yes, sir.

                                                    63

1       Q.      Let me just first get some general

2   information from you.  What is your Social

3   Security number?

4       A.      █████████████

5       Q.      Your date of birth?

6       A.      ████████

7       Q.      Do you have any relatives in Henry

8   County?

9       A.      I'm kind of -- What area is that?

10      Q.      Henry County is Headland,

11  Abbeville --

12      A.      No, sir.  I don't have any folks,

13  to my knowledge, there, no, sir.

14      Q.      Are you married?

15      A.      Yes, sir.

16      Q.      What is your wife's name?

17      A.      Bobby Brasher, Bobby Lynn Brasher.

18      Q.      Where does Mrs. Brasher live?

19      A.      818 County Road 49, Midland City.

20     Q.    Do you know if Mrs. Brasher has

21  any relatives in Henry County?

22     A.    Would that be considered Pinkard?

23     Q.    Are her people from Midland City

                                        64

1  and that area?

2     A.    Yes, sir.

3     Q.    What's your educational

4  background?

5     A.    Mine?

6     Q.    Yes, sir.

7     A.    Quit in the eighth grade, got sent

8  to prison, got my GED in prison.

9     Q.    How old were you when you were

10  sent to prison?

11     A.    Nineteen.

12     Q.    What did you do between eighth

13  grade and when you were 19?

14     A.    Worked at Gyro's, worked for

15  Nuts & Bolts, and I got into putting in septic

16  tanks.

17     Q.    Have you ever given a deposition

18  like this before?

19     A.    I couldn't even have told you what

20  this thing meant before today.

21     Q.    Have you ever spoken with any of

22  the lawyers for Ladon Cook before today?

23            MR. COUCH:  That's me and Andy

65

1  Hollis, by the way.

2              MR. ADAMS:  And Randy Smith.

3      A.    If I had, it was on the phone for

4  this deposition.

5      Q.    Okay.  And I guess let me broaden

6  that a little bit.  Have you ever spoken with

7  either Mr. Couch or Mr. Andy Hollis or Mr. Randy

8  Smith -- those are Ladon's lawyers -- or anybody

9  that might have worked for them; an investigator

10 or someone that called you to discuss it?

11     A.    I had an investigator come to my

12 house.  I'm not sure what his name was.  I've

13 got it at home.  And then I had a guy bring a

14 subpoena to me.

15     Q.    Was that about the deposition

16 today?

17     A.    Yes, sir.

18     Q.    The investigator who came to speak

19 with you, when was that?

20     A.    It's been probably a month ago.

21             MR. RITCHEY:  The same guy

22 that brought the subpoena?

23     A.    No, sir.

66

1      Q.    Did you understand who the

2  investigator was at your house for; in other

3  words, what lawyer or what his purpose for being

4     at your home was?

5          A.     I think -- No, sir.  I'm not, no,

6     sir.

7          Q.     Did you understand that person to

8     be Ladon's lawyer -- Ladon's investigator?

9          A.     I don't want to say because I'm

10    not for sure.

11         Q.     And then you said you had spoken

12    with Ladon's lawyers or somebody from their

13    office on the telephone?

14         A.     I've had several calls from

15    several different people.  I'm not -- I'm not

16    too into lawyers and things like that.  I don't

17    want y'all to take it the wrong way.  All I want

18    to do is work and get on with my life.  I'm not

19    for sure.  I'm still trying to think of the

20    guy's name.  I know it.  He's a private

21    investigator.

22         Q.     That's okay.  You just don't know

23    who he was working for?

                                                    67

1          A.     Correct.

2          Q.     Did you give any sort of recorded

3     statement?

4          A.     No, sir.  It was all handwritten.

5          Q.     Did you sign it?

6          A.     Yes, sir, I did.

7          Q.     Do you have a copy of that?

8        A.      No, sir, I don't.

9        Q.      Again, I'm not trying to pry into

10  too much of your personal business, but going

11  back to your arrest, it was a burglary, a theft,

12  and a forgery charge?

13        A.      Yes, sir.

14        Q.      And have you been arrested for

15  anything other than those three?

16        A.      No, sir.  No, sir.

17        Q.      And you were convicted of those

18  three?

19        A.      Yes, sir.  I had a bad crack

20  addiction.

21        Q.      Was that down in Houston County,

22  Henry County?

23        A.      No, sir.  I haven't been down

                                                    68

1  there but a year and a half.

2        Q.      Where were those convictions?

3        A.      Jefferson County.

4        Q.      Okay.  Before the home fell, had

5  you had any conversations with anyone with Mills

6  Timber, employed or associated with Mills

7  Timber?

8        A.      No, sir.

9        Q.      And it's my understanding from

10  what you testified earlier, that after the home

11  fell, you then ran over there to those

12  employees?

13      A.      Yes, sir.  I went over there and

14  asked them if they could help, you know, get the

15  trailer off.

16      Q.      You said they were on break?

17      A.      They were coming off of break,

18  because the machine had just started back up.

19  There was one guy over there putting something

20  up or doing something, and the other guy was on

21  off from there.  And he hollered at the other

22  guy.  They were both black guys.  And they come

23  on back around there.  One -- They both got

                                                    69

1  there about the same time, the guy on the

2  skidder and the other guy was running.  He was

3  trying to get up under it to try to, I guess,

4  not damage the trailer, but whenever he was

5  trying to get up under it, the trailer would --

6  what would you call that, wallow?  It would

7  wallow it a little bit.

8      Q.      Just move back and forth a little

9  bit?

10      A.      Move back and forth, yes, sir.  I

11  told them, you know, don't worry about that.

12  The black guy that was not operating was saying,

13  you know, he's going to have to tear it up.  You

14  know, to get up under it to get it off, he was

15  going to have to do that to get it off of him.

16    I said, I don't care; just get it up off of

17    him.  And he went up under it and got it up.

18        I couldn't pull Ladon out by myself

19    because he -- I mean, he got it up off of him,

20    but I just wasn't able to pull him out by

21    myself.  And Cedro grabbed his other leg and we

22    pulled him out.  I know you ain't supposed to

23    move nobody, but he's got that big-old trailer

                                                        70

1    on him, and you ain't got no other choice.  That

2    trailer ain't worth Ladon's life.

3        Q.    It's your understanding that there

4    were two black men who were working for Mills at

5    the time the home fell?

6        A.    There were two black men there,

7    one in the skidder and one on the treeline, yes,

8    sir.

9        Q.    And those were the only two Mills

10    employees that you saw when you went over there?

11        A.    Yes, sir.

12        Q.    The skidder that was brought over

13    there, was that at your request?

14        A.    Yes, sir.

15        Q.    And you had asked the Mills Timber

16    employees to help lift the home?

17        A.    Yes, sir, I did.

18        Q.    You alluded earlier to the fact

19    that the home wasn't worth Mr. Ladon Cook's

20  life.  And I think what you meant, you were

21  telling them, damage the home; do whatever it

22  takes to get the home off of him?

23       A.    I didn't understand the alluded,

                                                          71

1  yes, sir.

2       Q.    So if the Mills Timber people had

3  not come over to help --

4       A.    Ladon probably would have died.

5       Q.    -- the home would have remained on

6  Ladon?

7       A.    Oh, yes, sir.

8       Q.    Because y'all had no other way to

9  get the home off of him?

10       A.    There was no other way, no, sir.

11       Q.    And Mr. Ladon Cook would have died

12  if the Mills Timber employees didn't come over

13  there and help; is that true?

14       A.    I'm not going to say he would have

15  died, but my opinion, yes, sir, he wouldn't have

16  been there much longer, yes, sir.

17       Q.    Do you believe that the Mills

18  Timber employees saved Mr. Ladon Cook's life by

19  coming over there and helping?

20       A.    Oh, there's no doubt in my mind.

21       Q.    There's been -- Do you know the

22  names of either one of those Mills Timber

23  employees?

72

```
 1        A.      No, sir.  We've tried to find it,

 2   me and my wife, you know, I guess, to buy them

 3   lunch or something like that, but we never could

 4   get up with them.  I didn't never want to go

 5   back over there.  I've even suggested to Robin

 6   and Bryan, you know, they could, you know, at

 7   least send something; they saved Ladon's life.

 8   But whether anything was done, I don't know.

 9        Q.      You trying to find the names of

10   those employees, that was to thank those two men

11   for helping --

12        A.      Yes, sir.

13        Q.      -- Ladon and help save his life?

14        A.      Yes, sir.

15        Q.      I believe you said y'all only were

16   setting up that one home that day?

17        A.      Yes, sir.

18        Q.      And there wasn't a second home

19   that y'all had to set up at another location

20   that day?

21        A.      Not that I was aware of, no, sir.

22        Q.      At the time that the home fell,

23   the individuals out there were Mr. Ladon Cook,
```

73

```
 1   you, and Cedro, and then the two Mills Timber

 2   employees on the adjacent property, the property
```

3    next door?

4         A.    Correct.

5         Q.    Was anyone else present at the

6    time the home fell?

7         A.    No, sir.

8         Q.    Had you seen any other people out

9    there that day before the home fell?

10        A.    There was an older black man that

11   lives in one of the houses there.  There was a

12   couple of other guys.  I don't know if they were

13   working with the logging company back there that

14   come to take break with the other two guys.  But

15   the time I went around there, that was the only

16   two I seen.

17        Q.    Those other two logging people,

18   they might have been doing some work before the

19   home fell.  Is that what you're saying?

20        A.    Well, they were on break.  And

21   when I run back around there, one had just

22   cranked the skidder back up, and the other one

23   was walking back that way.

                                              74

1         Q.    The old black man that you saw, do

2    you know if he actually witnessed the home

3    falling?

4         A.    No, sir, he didn't.

5         Q.    Do you know his name?

6         A.    No, sir, I don't.

7      Q.      Do you know if he lives in one of

8  the homes nearby?

9      A.      Yes, sir, he does.

10     Q.      Does he live in the home that's

11  right there?

12     A.      No, sir.  Not right in front of

13  the trailer.  The house next to the one that's

14  in front of the trailer.

15     Q.      Do you recall any statements he

16  made that day?

17     A.      Yes, sir.  Somebody kept calling

18  him on his cell phone, prank calling, and him

19  cussing like a dog out there.

20     Q.      Have you had any conversations

21  with him since then?

22     A.      No, sir, I haven't.

23     Q.      Are you aware of any witnesses or

75

1  have you learned of any witnesses since the day

2  of the accident?

3      A.      No, sir, I haven't.

4      Q.      Had any conversations with anybody

5  who may be a witness since the day of the

6  accident?

7      A.      I've called to check on Ladon a

8  time or two, you know, see how he was doing.

9  I've been one time to see him in the hospital.

10     Q.      Have you spoken with Cedro about

11   what happened?

12        A.     No, sir.

13        Q.     Have you spoken with Ladon about

14   the accident?

15        A.     No, sir.

16        Q.     Have you and Ladon had any

17   discussions insofar as how the home fell or what

18   caused the home to fall?

19        A.     No, sir.

20        Q.     So the substance of y'all's

21   communications would have just been -- or

22   talking with him would have just been about how

23   he's doing and things of that nature?

                                                              76

1        A.     Yes, sir.

2        Q.     Have you spoken with anybody about

3   how the home fell?

4        A.     Just my granddad and, you know,

5   grandma.

6        Q.     Have you told them anything

7   differently as to what you believe caused the

8   home to fall other than what you testified to

9   Mr. Ritchey earlier?

10        A.     No, sir, I haven't.  The only

11   thing that might have been added was a few

12   minutes ago about the toter being hooked to the

13   front of the trailer.  That's probably the only

14   thing I have added.

15      Q.      Were you looking at Mr. Ladon Cook

16  at the time the home fell?

17      A.      No, sir.

18      Q.      I believe you indicated you

19  were -- your head was under the trailer and you

20  were just in the process of crawling out at the

21  time the home fell?

22      A.      Yes, sir.

23      Q.      Do you recall that Mills Timber or

                                                        77

1   its employees did anything that caused Mr. Ladon

2   Cook to be injured?

3       A.      No, sir.

4       Q.      Do you believe that Mills Timber

5   or its employees did anything wrong?

6       A.      Oh, no, sir.  No, sir.  Not at

7   all.

8       Q.      There has been a reference to the

9   home possibly being lifted one time and then

10  falling back down on Ladon and --

11      A.      No, sir.

12      Q.      -- then lifted a second time.

13      A.      No, sir.  When it was lifted --

14      Q.      Let me ask you this.  I'm sorry to

15  interrupt you.  Did that happen?

16      A.      No, sir.

17      Q.      Assuming that Mr. Ladon Cook were

18  to have testified that the home was lifted up

19    and dropped back down on him and then lifted up

20    and then he was pulled out from under the home,

21    would that be a true statement or an untrue

22    statement?

23        A.      No, sir.  It wouldn't be a true

                                                                    78

1    statement.

2        Q.      It would not be?

3        A.      No, sir.  Because when the tractor

4    guy was there lifting it up, you know; he was

5    trying to get up under it, it wasn't lifting.

6    It just wallowed.  I told him to hold on, hold

7    on.  And then he dug his bucket up under the

8    trailer and picked it up, and it cleared Ladon

9    just a little bit.  And we drug him out, and the

10    trailer slid off of the bucket and then went

11    back on the ground after we had Ladon three or

12    four foot out from under the trailer.

13        Q.      When the Mills Timber skidder came

14    over there to the trailer --

15        A.      Yes, sir.

16        Q.      -- were you on the ground next to

17    Ladon?

18        A.      Yes, sir.

19        Q.      Were you able to look and see

20    Ladon the entire time that the Mills Timber

21    skidder was in the process of trying to lift the

22    home?

23        A.    Yes, sir.

1        Q.    And you had a clear view of the

2    home and of Ladon as the Mills Timber skidder

3    was trying to lift the home up?

4        A.    Yes, sir.

5        Q.    And you're absolutely certain that

6    the home was not lifted and dropped on him?

7        A.    I'd be willing to bet my life on

8    it.

9        Q.    So the very first time that the

10    home was lifted off of Mr. Ladon Cook --

11        A.    We pulled him out.

12        Q.    How many times did you hear a

13    creaking noise before the home fell?

14        A.    Two, maybe three times.

15        Q.    In relation to when the home fell

16    and the first creaking noise, how much time

17    elapsed?  How many minutes or seconds was it?

18        A.    Three, four minutes.

19        Q.    What about the second time?

20        A.    That's in between the first and

21    the third -- second, third time.  I heard it two

22    or three times.  I'll say three times.  In three

23    minutes, I heard it -- I heard it the first

1    time, you could start the time, and the last

2    time I heard it, the third time, about three

3    minutes had elapsed.

4         Q.    The middle time, how much time was

5    it before the home fell?

6         A.    The middle time?

7         Q.    Yes, sir.  I understand the first

8    time was three to four minutes before it fell.

9    The second time would have been how many minutes

10   before it fell?

11        A.    Probably a minute, minute and a

12   half.

13        Q.    And then the third time?

14        A.    About three minutes.  And I mean,

15   that's all I heard.  I didn't hear it again.

16   And after that, we done had our axles out and

17   was over on the other side.  We done had our

18   piers set, and it come down.  I mean, I'm going

19   to say after I heard it that third time, five,

20   six, seven minutes.

21        Q.    Maybe I've confused myself.

22        A.    Me too.

23        Q.    The first time was five to seven

                                                81

1    minutes before, and the next time was three to

2    four minutes before, and the last time was one

3    minute before the fall.  Is that what you're

4    saying?

5         A.    What I'm saying is if it's 12:00

6    and I heard a creak, about a minute and a half,

7  which would be 12:01, 12:02, give or take, I

8  heard it again.  At 12:03, I heard it a third

9  time.  Okay.  About eight after 12, the trailer

10  would have fell.  That's --

11      Q.      Was Mr. Ladon Cook in a hurry --

12      A.      I would think --

13      Q.      -- immediately before the home

14  fell?

15      A.      Yes, sir.  We were all in a hurry.

16      Q.      Do you believe that Mr. Ladon

17  Cook's being in a hurry contributed to this

18  accident?

19      A.      No, sir, I don't.  I honestly

20  don't.  If he was in a hurry, he'd have jacked

21  it all the way up with both jacks, no piers set,

22  get up under there and water level the piers,

23  and set them down on the piers, instead of water

                                                    82

1  leveling the bottom of the trailer and building

2  the piers up.

3      Q.      Would you agree that Mr. Ladon

4  Cook did not set up the home properly?

5      A.      I agree.  I agree on every job we

6  were on, that it hadn't been set up properly on

7  all of them.

8      Q.      And you agree that that did

9  contribute to the home falling?

10      A.      Yes, sir.

11      Q.      That's all I have.  Thank you.

12                      MR. COUCH:  Mr. Brasher, do

13      you need a break before I ask my questions?

14                      MR. ADAMS:  I'd like to.

15                      02:38 p.m.

16                      (Brief recess.)

17                      02:54 p.m.

18                      EXAMINATION (continued)

19      BY MR. LEE:

20      Q.      Mr. Brasher, did you or do you

21      know of any statements made by any of the Mills

22      employees there at the scene that day?

23      A.      Yes, sir.  One of them was worried

83

1       about, you know, damaging the trailer.  Said he

2       didn't want to damage the trailer.  I told him,

3       you know, it didn't matter, you know; just get

4       it up off of him.

5       Q.      Other than that, are there any

6       statements that you're aware of those -- either

7       of those two Mills employees making?

8       A.      No, sir.

9       Q.      Was Cedro next to you the entire

10      time when the home was attempted to be lifted?

11      A.      No, sir.

12      Q.      Where was he?

13      A.      Standing over by the service

14      truck.  Service truck was pulled in to the back

15   of the trailer the long ways.  You know, not the

16   woods side but between the trailer and the

17   house, pulled in.

18        Q.     The ground where the home was set

19   up, you indicated earlier that it had not been

20   compacted?

21        A.     Yes, sir.

22        Q.     And you said that when you walked

23   on it, the ground would leave a footprint?

                                                    84

1         A.     Yes, sir.

2         Q.     How far would your foot go in the

3    ground when you walked on it?

4         A.     Along the edges, you could walk in

5    it, and I would just roughly guess a quarter

6    inch.  You know how ground, when it gets -- I'm

7    just using this for an example -- when it gets

8    wet and ice comes up on it, and when it melts,

9    it's fluffy.  That's what I'm getting at.

10        Q.     And Mr. Ladon Cook had also walked

11   on that same ground before the home fell?

12        A.     Yes, sir.  From my understanding,

13   when you go set a lot up, you're supposed to

14   have somebody go out and inspect it to make sure

15   it's where you can have a trailer to sit on it.

16        Q.     Thank you.

17        A.     Yes, sir.

18                        EXAMINATION

19   BY MR. POUNDSTONE:

20        Q.     Mr. Brasher, my name is Bobby

21   Poundstone, and I represent Lowe's.

22        A.     Lowe's?

23        Q.     Lowe's, the home improvement

                                                    85

1    store.

2         A.     Oh, yes, sir.

3         Q.     If you don't mind, if I just can

4    approach you.  I'm certainly not trying to

5    intimidate you or anything like that.  I just

6    want to show you a rough drawing that I've done

7    of a rectangle representing the trailer and

8    labeled the house side and the woods side that

9    we've talked about -- or you've talked about in

10   your deposition today.

11        A.     Yes, sir.

12        Q.     I'm going to show you what I'm

13   going to mark as Lowe's Exhibit 1 just so we can

14   keep up.

15               (WHEREUPON, Lowe's Exhibit Number

16   1 was marked for identification and is attached

17   to the original transcript.)

18        A.     That's correct.

19        Q.     Which side of the trailer does

20   that represent?

21        A.     That represents the house side.

22        Q.     Okay.  That's the house side of

23  the trailer?

86

1       A.      Yes, sir.

2       Q.      I believe you testified earlier

3  that one of the jacks that y'all were using that

4  day was a red jack similar to the one sitting on

5  the table today?

6       A.      Yes, sir.  It was on the woods

7  side.

8       Q.      Would you take that pen for me and

9  just make an R approximately on that trailer

10  where that red jack would have been?

11       A.      Can I add some drawing to this?

12       Q.      Certainly.

13       A.      All right.  I'm going to attempt

14  to draw the tires and axles.

15       Q.      Okay.

16       A.      That's three on the house side,

17  and it might not be correctly straight across,

18  but that's three on the woods side with your

19  axle going across.  Okay.  Between the back tire

20  and the middle tire is where we usually set our

21  jack, depending on the length of the trailer

22  behind the axles.  On this particular one here,

23  it was sitting -- the jack was sitting somewhere

87

1  right here, which I'll make an R there.

2        Q.      Okay.  Super.  Thank you.

3        A.      There or do you want me to put it

4   somewhere else?

5        Q.      No.  That's fine.  If you would,

6   just so -- it's hard to say that's an R -- just

7   draw an arrow down to there where that jack is.

8        A.      (Witness complies.)

9        Q.      Perfect.  Do you remember what the

10   other jack on the side looked like?

11       A.      On the other side?

12       Q.      Yes.

13       A.      It was a Kobalt.

14       Q.      What color was that jack?

15       A.      It was, I want to say, black or

16   blue.  Some folks might call it dark blue,

17   20-ton jack.

18       Q.      I'm going to show you what I'm

19   going to mark as Lowe's Exhibit 2, which is a

20   photograph of a jack that was recovered from

21   underneath the trailer at inspection.  I just

22   want to ask you:  Does that look like the other

23   jack that was on the site?

                                                88

1                (WHEREUPON, Lowe's Exhibit Number

2   2 was marked for identification and is attached

3   to the original transcript.)

4        A.      Yes, sir.  That was on the house

5   side, probably, I would say, right across from

6   the other one we had.  It would be right in

7   here.

8        Q.    Just like you did the other one,

9   will you make a B right there.

10       A.    B?

11       Q.    B to indicate the black jack.

12       A.    (Witness complies.)

13       Q.    Thank you.  If I understand your

14  testimony -- Before we do that, do this for me:

15  At the time that the trailer fell, where was

16  Mr. Ladon Cook?

17       A.    He was right here in this area.

18  I'm going to just circle it right in here and

19  put an L.

20       Q.    Just do like you did and just make

21  an arrow and write Ladon right there?

22       A.    (Witness complies.)

23       Q.    And if you would, do the same

                                                    89

1   thing for me for you and, if you know, Cedro.

2        A.    Okay.  Cedro with an S or with a

3   C?

4        Q.    We can do it with a C.  That's

5   fine.

6        A.    This is going to be the service

7   truck.

8        Q.    Okay.  And that C right there is

9   Cedro, correct?

10          A.     Yes, sir.

11          Q.     Now, if I understood your

12   testimony earlier correct -- and correct me if

13   I'm wrong -- I think you said that at the time

14   that the trailer fell on Ladon, Mr. Cook, that

15   the house side of the trailer was on the pier,

16   correct?

17          A.     Yes, sir.

18          Q.     And is it also correct that the

19   woods side of the trailer was not on the pier

20   and was being supported by the red jack that

21   we've marked with an R right here to indicate;

22   is that correct?

23          A.     Correct.

                                                    90

1          Q.     Thank you.

2                  MR. POUNDSTONE:  And if nobody

3   objects, I would like to mark his drawing as

4   Lowe's Exhibit 3.

5                  MR. COUCH:  If we do object,

6   are you not going to mark it?

7                  MR. POUNDSTONE:  I'm planning

8   on marking it anyway.

9                  MR. COUCH:  Okay.  I'm just

10   wondering.

11                 (WHEREUPON, Lowe's Exhibit Number

12   3 was marked for identification and is attached

13   to the original transcript.)

14          Q.     Mr. Brasher, was Lee Cook at that

15   site at all on that day?

16          A.     No, sir.  I want to add to it,

17   while I was there, no, sir.  And I was there

18   probably four or five hours, because when we

19   left, I hadn't been back and all.  There was

20   probably five or six hours more of day that they

21   could have come back.  I'm not saying they did,

22   but while I was there, no, sir.

23          Q.     And were you there the whole time

                                                             91

 1   that Ladon was at the site?

 2          A.     Correct.  Yes, sir.

 3          Q.     Just so we're clear, the axles and

 4   wheels, were they still under the trailer when

 5   it fell?

 6          A.     No, sir.

 7          Q.     They had been removed?

 8          A.     Yes, sir.

 9          Q.     And I believe you testified

10   earlier that your general procedure would be to

11   set all the piers that you could before removing

12   the wheels and axles; is that correct?

13          A.     Correct.

14          Q.     And I think you also testified

15   that generally there would be a certain number

16   of piers that you could not set while the wheels

17   and axles were there because they would be in

18  the way; is that correct?

19      A.    Correct.  You couldn't get it up

20  under the frame of the trailer because the axles

21  were there.

22      Q.    Okay.  Now, also -- correct me if

23  I'm wrong -- I think earlier that you testified

                                                    92

1   that Ladon was finishing up water leveling some

2   piers while you and Cedro were removing the

3   tires and axles; is that correct?

4       A.    Yes, sir.

5       Q.    Were those piers the ones that

6   could be done before the tires and axles were

7   removed, or were those the ones that you

8   couldn't get to until they were removed?

9       A.    The water leveling?

10      Q.    Yes.

11      A.    No, sir.  Them is the ones that

12  were already done, because we couldn't get them

13  up under there because you can't get them up

14  under there with the tires and axles on, and you

15  can't put them up under there because the tires

16  and axles are in the way.  And pulling them out,

17  you might bump them and they'd be out of line

18  and whatever.

19      Q.    Okay.  This is a question more for

20  my education, probably, than anything else, but

21  going through some materials getting ready for

22    the deposition today, I came across the term

23    scorching up.  Does that mean anything?

93

1                    MR. RITCHEY:  Scotching up.

2         Q.    Scotching up.  I'm sorry.

3         A.    I mean, I've heard scotching a lot

4    in my profession, but I haven't heard it used

5    out there.  It's always been wedged.  That might

6    be what you're referring to; I'm not for sure.

7    But we wedge -- wedge up the piers to the

8    trailer.

9         Q.    Scotching up is not a term that

10    you're familiar with in your work?

11        A.    No, sir.  No, sir.  Not unless

12    you're scotching a tire.

13        Q.    Do you recall ever telling Lee

14    Cook that you thought the mobile home was jacked

15    up too high at the time the accident occurred?

16        A.    Yes, sir.

17        Q.    Tell me when you told Lee Cook

18    that.

19        A.    At the emergency room at the

20    hospital.

21        Q.    Okay.  And tell me specifically

22    what you remember being said in that

23    conversation?

94

1         A.    Basically, that the way it was

2    done on the back side, water leveling the pier

3    instead of the trailer was wrong because, you

4    know, you jack your trailer up, and it's all

5    supposed to be scotched off.  If you water level

6    a pier -- You're really not supposed to water

7    level a pier, because when your trailer sits

8    back down, it could be a little bit off there.

9    And if you've got water in the house, it could

10   run to that corner.  Be too low, too high.  That

11   wasn't the correct way to do it.

12        Q.    But did you use the terminology

13   with Mr. Lee Cook that you thought the trailer

14   was jacked up too high?

15        A.    Yes, I did.

16        Q.    How about Mr. Bryan McGriff, did

17   you ever tell him that as well?

18        A.    No, sir.  I hadn't seen Bryan on

19   any job but that one there.  There was a double-

20   wide we were setting up, you know, that he was

21   doing work after he got off from the bus for

22   them.

23        Q.    There's been some testimony in

                                              95

1    this lawsuit that would indicate that either you

2    or Cedro may have refused or declined to go

3    underneath the mobile home that day.  And I

4    think you've said today that that was not the

5    case.  Could you clarify that just one more

6  time?

7        A.      I've got no problem clarifying

8  it.  After I seen what happened, I told them I

9  would not be back up under a mobile home unless

10  I thought and knowed that it would be safe.

11        Q.      But did you decline at any time

12  during that day while y'all were working to go

13  under the mobile home?

14        A.      If I'm not mistaken, I told Robin

15  and Bryan at their house after it happened, you

16  know, after I heard the creak, when I told them

17  I heard the (demonstrating) noise, that I

18  wouldn't be going back up under them no more

19  like that unless I knowed they were safe and put

20  up right.  That's when they bought their 30-,

21  $40,000 machine that they could afford and

22  couldn't afford to pay me after them two weeks

23  when I wouldn't do what they wanted me to do.

                                                    96

1        Q.      Do you remember when the Kobalt

2  jack that was used on the mobile home was

3  purchased?

4        A.      No more than a week earlier,

5  because we'd been having -- we'd been having

6  problems out of them jacking up halfway.  And

7  then they would stop, and they wouldn't jack up

8  no more no matter how far you pumped it.  They

9  would take the handle of the jack and run it

10  here on the side of the jack, the nipple part

11  here, and break (demonstrating).  Did y'all hear

12  that?  Now, it would have jacked -- I'm sorry if

13  I got that on anybody.  But that jack would not

14  jack up no more if I had jacked it on up.

15        I done got oil everywhere.  But this jack

16  here has been laid down.  In all the service

17  trucks or whatnot, ever when they're laid down

18  or something like that, they don't jack up like

19  they're supposed to.  But I have been told that

20  if the jacks do get laid down, that they won't

21  work.

22        Boy, that went everywhere.  I am sorry.

23        Q.    Just so we're clear, you're

                                                    97

1  talking about problems with other jacks, not the

2  Kobalt jack that had been bought within the week

3  of that day, correct?

4        A.    To my understanding, it's all ball

5  jacks, whether they're Kobalt or any of the

6  others.  If they're laid down on the side for a

7  period of time, they will not fully jack all the

8  way up.  But I had never seen one of them fall

9  for that reason.

10        Q.    And just so we're clear, you don't

11  know of any problems that happened with the

12  Kobalt jack in question; is that correct?

13        A.    No, sir.

14      Q.      And it was a new -- it was a new

15  jack, correct?

16      A.      It was a new jack, yes, sir.

17      Q.      Do you know if it had even been

18  used on another job prior to this day?

19      A.      They were fresh out of the box.

20      Q.      And was the box there that day?

21      A.      It was at their office.

22      Q.      But this was the first job it was

23  used on.  Is that your memory?

                                                        98

1       A.      Yes, sir.  To my memory, yes, sir.

2           I'm sure glad that thing popped like that

3   because y'all folks would have thought I was

4   crazy.

5               MR. COUCH:  I wish I had known

6   you were going to do that.  I would have told

7   you to stop.

8               MR. POUNDSTONE:  That was

9   supposed to be inspected and not messed with.

10      A.      But anyway, you take --

11              MR. POUNDSTONE:  I want that

12  on the record.

13      A.      But you could take the handle of

14  the jack when it stops jacking and pry down a

15  little bit to where it can get air to do what it

16  just done and put the nipple back in, and then

17  it will go on up.

18    Q.    Okay.  And again, for the record,

19  who actually set up the red jack on the trailer?

20    A.    I set the red jack up.

21    Q.    And Ladon set up the Kobalt jack;

22  is that correct?

23    A.    Yes, sir.

                                              99

1    Am I allowed to ask questions or make a

2  statement?  Probably not.

3    Q.    If you want to get out of here,

4  you'll get out a lot quicker if you just answer

5  the questions.

6    A.    No, sir.  It ain't got nothing to

7  do with that.  I'd just like to ask one.  I

8  don't know if you -- That trailer was sitting on

9  them jacks for a period of an hour and a half,

10  two hours.  If something was wrong -- In my

11  opinion, if something was wrong with the jack --

12  I don't know.  My opinion is the ground was too

13  soft, and that's what -- the wood sinking.

14  That's my opinion.  I don't know if it's worth a

15  hill of beans or not.

16    Q.    Okay.

17    A.    But if it had been anything else,

18  I mean, it wouldn't have -- You ain't talking

19  but just that much I-beam on a jack, and if the

20  wind is blowing hard enough, it should have fell

21  way before then.  It just -- I think it was just

22    the ground not being packed.

23        Q.      Okay.  Let me ask you this:  Are

100

1    you aware or were you aware that Mr. Ladon Cook

2    previously lost a job at a welding company for

3    drinking on the job?

4        A.      I've heard tell of it.  I don't

5    want to be no smart alec about it, but what

6    folks do with their other jobs and all, I could

7    really -- I don't want to sound smart or

8    nothing, but I could care less what you done

9    yesterday or last year on your job.  If you work

10    good, I really -- I don't judge anybody.  I just

11    judge folks by how they work and treat me.

12    That's my opinion.

13        Q.      Sure.

14            MR. COUCH:  Amen, brother.

15        Q.      And what I wanted to get out of

16    that was the follow-up question:  Did you ever

17    know him to drink on the job while y'all worked

18    together?

19        A.      I hadn't seen him, no, sir.

20        Q.      By any chance, were you with Ladon

21    the night before the accident?

22        A.      No, sir, I wasn't.  I hadn't ever

23    spent time away from the job with any of them.

101

1  It ain't that I didn't associate with them; it's

2  just they wasn't my crowd of people to hang out

3  with.  They was fine to work with and all.

4          (Off-the-record discussion.)

5      Q.      Earlier in your testimony, you

6  mentioned that the McGriffs were contemplating

7  getting rid of Ladon?

8      A.      Yes, sir.

9      Q.      Do you know any specific reasons

10  of why, you know, they weren't satisfied with

11  his work?

12      A.      It was basically the -- I don't

13  know.  He's the type person if he didn't think

14  something was done right or something wasn't

15  going fast enough or had too much to do, you

16  know, he didn't mind voicing his opinion.  I

17  guess the same reason they got rid of me; I

18  voiced my opinion.  I've learned to live, and

19  I'm going to let you know what I think about you

20  and what's going on.  If you're not happy with

21  that, then I'll just go on about my business.

22      Q.      What I'm asking:  You don't know

23  of any specific reasons, instances that they

                                                    102

1  had?

2      A.      Well, I mean, she would push us to

3  get more done and all.  And not only Ladon; me

4  and a couple of others would say, you know,

5  we're doing the best we can.  And he didn't mind

6  telling her that, and I think that's -- My

7  opinion is I think that's why she was wanting to

8  get rid of him, because he didn't mind telling

9  her what was on his mind and how he felt about

10  things.

11       Q.     I don't have anything else.  Thank

12  you.

13                    EXAMINATION

14  BY MR. ADAMS:

15       Q.     Why did Robin and Bryan at Bear

16  Creek get rid of you?

17       A.     My opinion that they got rid of me

18  after this happened, I called her and told

19  her -- she told me she couldn't come down there

20  right now; she had to go to town and take care

21  of a few things.  And I told Lee and them how

22  shitty that I thought that was.  And it might

23  not -- that next -- Well, no, not the next day.

                                              103

1  I don't know if I took off that following day or

2  not.

3       But anyway, the next day that I come back

4  to work that morning, she called me in her

5  office, and she told me, she said, look, if

6  anybody asks, Bryan was on the job and he had to

7  go to town to get some parts, if anybody asks.

8  I said, look, Robin, I'm not going to lie for

9   you; I'm not going to lie for Ladon; I'm not

10   going to lie for none of them.  I'm going to

11   tell the truth.  And I think that's the reason

12   she got rid of me, because I wasn't going to lie

13   for them.

14        Then Lee, said, you know, if you can, you

15   know, you need to tell them he was there and he

16   had to leave to go get some parts and come

17   back.  I said, Lee, I'm not going to lie for

18   her, you, or Ladon or none of them.  I told

19   Lee's mama and daddy -- stepdaddy in the parking

20   lot of the hospital the same thing.

21        And then the excuse she give me was she

22   didn't have enough work for me to keep me on,

23   but yet they can afford to buy a 30-, $40,000

                                                    104

1   machine.  That don't make good sense to me, and

2   it kind of leaves a bad taste in my mouth for

3   them.

4        Q.    How much did they pay you for

5   setting up a house?

6        A.    She started out paying me -- I've

7   never been paid by a house.  She started me out

8   at $80 a day for about two, maybe three weeks.

9   And then that $80 a day, 14, 16 hours a day,

10   don't add up to squat, and I went and asked her

11   for a raise.  And so she moved me from $80 a day

12   to $90 a day working the same hours.

13        Q.      So you were making $90 a day no

14   matter what -- whether you set up one house or

15   five houses?

16        A.      Correct.

17        Q.      And if y'all got that one house

18   out there in Abbeville set up that day, that

19   would be a day's work?

20        A.      Yes, sir.

21        Q.      And you'd have gotten $90 no

22   matter whether or not you worked from, I guess,

23   from 7:30, 8:00 in the morning until noon or

                                                        105

1    7:30, 8:00 in the morning until dark that day?

2         A.      We've worked up to 11:00 at night

3    on houses.

4         Q.      I know.

5         A.      Yes, sir.

6         Q.      I understand that.  But that one

7    job, you were going to get $90 that day,

8    regardless?

9         A.      Yes, sir.

10        Q.      What did Ladon say he was going to

11   do that day after y'all left there?

12        A.      He was going somewhere.  I can't

13   remember where he was going, but he had

14   something he was going to do that evening.

15        Q.      Had something he needed to do that

16   day?

17      A.      That evening, yes, sir.

18      Q.      And you don't remember what he

19 said, though?

20      A.      Not exactly, no, sir.

21      Q.      Okay.

22      A.      He was wanting to be off by five

23 that evening.  He had something to do that

106

1 evening.

2      Q.      And on the woods side of the

3 house -- And I want to clear that again.  You

4 were back there, Mr. Brasher --

5      A.      Yes, sir.

6      Q.      -- with the red jack?

7      A.      Yes, sir.

8      Q.      And the red jack had the piers --

9 on this side, on the woods side, had the trailer

10 up off of those piers; is that correct?

11      A.      Yes, sir.

12      Q.      How many piers on the back side

13 back here were away from the -- from the tires

14 and axles?

15      A.      Two, maybe three.

16      Q.      From where the tires and axles

17 were all the way to the back?

18      A.      To the back, yes, sir.  And they

19 were probably -- it's hard to say -- eight, ten,

20 12 back up this way, you know.

21      Q.      Going back toward the tongue end?

22      A.      Toward the tongue, yes, sir.  All

23 of these had been set; all of these had been

107

1 set.  I'm going to say two or three.  I'm going

2 to say three because here on the end needs them

3 too.  And these were set (indicating).  We had

4 two, I think, up under here to do.

5      Q.      Still had four piers total, two on

6 the house side and two on the woods side; is

7 that correct, where the tires and axles go?

8      A.      Yes, sir.

9      Q.      Why was the mobile home jacked up

10 on that end having it up off of those blocks and

11 off of your -- I called it scotching or wedging?

12      A.      Yes, sir.

13      Q.      Why was it up off of there?  Did

14 you need to have it up off of there?

15      A.      Didn't need to, no, sir.

16      Q.      Whose idea was it to take it up

17 off of there?

18      A.      Ladon's.

19      Q.      And Ladon is the one that told you

20 to take it up off and put your other two blocks

21 up under there?

22      A.      I didn't jack it up at that time.

23 When they were getting water leveled, we were

108

1  over here pulling the axles and all out.

2      Q.    So Ladon is the one that jacked it

3  up where it was up off of those blocks?

4      A.    Yes, sir.

5              MR. LEE:  For the record,

6  you're talking about the woods side of the

7  house?

8      Q.    I mean by the woods side.  And

9  he's the one that did that?

10     A.    Yes, sir.

11     Q.    Was the other side -- and I mean

12 the house side -- was it up off of the blocks?

13     A.    No, sir.

14     Q.    It was still sitting on the

15 blocks?

16     A.    Yes, sir.

17     Q.    So basically --

18     A.    If it was off the blocks, it

19 couldn't have been no more than a 16th or an

20 8th.

21     Q.    Just a hair?

22     A.    Just a hair, yes, sir.

23     Q.    So this mobile home, how far off

                                                109

1  of the blocks was it on the woods side?

2      A.    About two, two and a half inches

3  up.

4      Q.    Do you think that's safe?

5          A.     No, sir, I don't.

6          Q.     Why would he have done that?

7          A.     I wouldn't even want to try to

8   give you an answer to that.  I mean, I honestly

9   wouldn't.

10         Q.     Okay.  Had Lee ever told y'all not

11  to take it up off the blocks like that?

12         A.     Yes, sir, he has.

13         Q.     And had Bryan ever told you not to

14  take it up off the blocks like that?

15         A.     Bryan hadn't, no, sir.  The only

16  thing Bryan has ever said to me was use the jack

17  plates; use the jack plates.

18         Q.     And y'all didn't use the jack

19  plates?

20         A.     No, sir.  Like I said earlier, we

21  put maybe 12 or 15 trailers up.  We might have

22  used jack plates on three of them.

23         Q.     Do you think the jack on your side

                                                    110

1   could have slipped and that could have caused

2   that creaking sound you described to us?

3          A.     My opinion?

4          Q.     Could it have?

5          A.     Well, undoubtedly, it did slip,

6   yes, sir.

7          Q.     So it slipped off of that --

8   slipped off of that --

```
 9      A.      Oh, you're talking about off the

10  frame?

11      Q.      Off the frame.

12      A.      No, sir.  No, sir.  I don't think

13  it did slip.

14      Q.      Even though it was at an angle?

15  And it had to be at an angle, didn't it?

16      A.      It had to -- Can I borrow this?

17      Q.      Yes, sir.

18              MR. LEE:  Sure.

19      A.      If it's up like that and that jack

20  is up there, if it slipped off, that trailer

21  would have fell on my side.  The jack over here,

22  in my opinion, if it was sinking, it would fall

23  down like that and kick out.
```

                                        111

```
 1      Q.      Okay.  So you're saying, in your

 2  opinion as to what happened that day, was that

 3  the jack on the house side of the mobile home

 4  slipped and caused the house to fall on Ladon;

 5  is that correct?

 6      A.      I don't know if it did.  I'm

 7  saying, my opinion, the pier that this jack was

 8  sitting on sunk.

 9      Q.      Either sunk, slipped, or whatever?

10      A.      Yes, sir.  Uh-huh.

11      Q.      It moved --

12      A.      Right.
```

13        Q.        -- for some reason.

14        A.        Right.

15        Q.        We don't know what reason.  We

16    don't know what reason for sure.

17        A.        Well, my opinion is, yes, sir, it

18    sunk and slipped, yes, sir.  That's my opinion.

19        Q.        Sunk and slipped.  And when the

20    home was up that way, up --

21        A.        Cockeyed, yes, sir.

22        Q.        -- cockeyed, that that mobile home

23    I-beam couldn't have ever set level on that --

                                                      112

1    what I call the eye of the jack?

2        A.        Correct.  Yes, sir.

3        Q.        And it would have been at some

4    angle, and we don't know what angle it was at

5    the time because the woods side was jacked up?

6        A.        Right.  Yes, sir.

7        Q.        And it was jacked up higher than

8    the other side?

9        A.        It had to have been, because the

10    trailer fell forward.  It fell uphill.

11        Q.        Fell uphill?

12        A.        Yes, sir.

13        Q.        Okay.  Do you think -- And I'm

14    going to go back to something else, and I ought

15    not to probably get into this.

16        Well, I'm not going to do that, just step

17   off into something I don't want to.

18        A.     The frame of the trailer ought to

19   be able to tell the tale.

20        Q.     I ain't going back over that.

21        A.     Well, if your frame is sitting

22   like that and it slips, if this out here has got

23   more pressure on it, it ought to have dug into

113

1    the frame of the trailer.

2         Q.     And ought to have bent the lip of

3    the I-beam up, hadn't it?

4         A.     It should have, yes, sir.

5         Q.     All right.  That's all I have.

6    Thank you.

7         A.     Yes, sir.

8                     EXAMINATION

9    BY MR. COUCH:

10        Q.     Hopefully, I won't take that

11   long.  You say this trailer on the date of the

12   accident fell uphill; in other words, toward

13   the --

14        A.     House.

15        Q.     -- house side, which is depicted

16   in Defendant's Exhibit 3 there in front of you;

17   is that right?

18        A.     Yes, sir.

19        Q.     And I thought I heard you say that

20   the woods side of the trailer, the side of the

21    trailer you were on, that was jacked up higher

22    than the other side?

23         A.    Yes, sir.

                                                        114

 1         Q.    Is that -- Did I hear you right

 2    that Ladon jacked up the woods side of the

 3    trailer, or did you do that?

 4         A.    No.  I jacked the woods side of

 5    the trailer up to put my piers under there.

 6    When we pulled the tires and axles out from

 7    under it, he jacked it up a little more to get

 8    his wood up under there to water level the

 9    piers.

10         Q.    I got you.  Let me ask you this:

11    Were y'all setting the trailer up -- and I say

12    y'all; you and Ladon and Cedro -- were y'all

13    setting it up, in your belief, the way that Lee

14    had trained y'all to do it?

15         A.    Besides the jack plate, yes, sir.

16         Q.    Well, the jack plate, now, as I

17    understand it, that goes between the top of the

18    jack that's supposed to -- In other words, it

19    goes between the trailer and the top of the

20    jack.  Is that what it's supposed to do?

21         A.    Yes, sir.

22         Q.    Let me ask you this:  Even without

23    a jack plate, if you've got the -- if the

115

1  foundation or the plot is sitting there and

2  stable and you've got your piers up, even

3  without a jack plate, if the trailer comes down,

4  aren't the piers supposed to catch it?

5         A.      Yes, sir.  Supposed to.

6         Q.      I heard you say something about --

7  talking about this conversation you had with

8  Mrs. McGriff, and what she wanted you to say was

9  that Bryan was on the job.  Bryan, that's her

10  husband?

11         A.      Correct.

12         Q.      Is he the certified trailer

13  installer out there?

14         A.      From my understanding, he's the

15  man that's supposed to be there to put the

16  sticker on and make sure the job is done right.

17         Q.      Was he there that day?

18         A.      He hadn't been on none of the

19  jobs, none, except one.  And that was after

20  dark.

21         Q.      I also heard you say that when

22  y'all got out there, there was -- there was not

23  a toter set up under the tongue of this

116

1  trailer.  What's a toter?

2         A.      Toter is a -- A better term is, I

3  guess, the big rig.  It's the machine they use

4    to drive -- to pull the trailer with from one

5    spot to another, which is the diesel truck.

6         Q.    Right.

7         A.    It's to hook to the tongue of the

8    trailer to pick it up to keep it from teeter-

9    tottering, I guess you'd say.

10        Q.    Is it supposed to do that during

11   installation or set up?

12        A.    From my understanding, yes, sir,

13   it's supposed to always be hooked to the toter.

14        Q.    In your experience in setting up

15   trailers from Bear Creek or the McGriffs, has

16   there always, other than this occasion, been a

17   toter up at the tongue of the trailer?

18        A.    Yes, sir.

19        Q.    And you say that's part of the

20   truck that delivers the trailer, I guess?

21        A.    Yes.  It is the truck that

22   delivers the trailer.

23        Q.    So whoever the delivery person is

117

1    keeps the toter under the trailer?

2         A.    Yes, sir.

3         Q.    Okay.  As I understood this, you

4    were actually underneath this trailer and

5    crawling out at the time that it fell?

6         A.    Yes, sir.

7         Q.    Okay.  So, I mean, is it fair to

8    say that you weren't doing anything different

9    than Mr. Cook was doing; unfortunately, he

10   didn't get out before it fell?

11        A.    Correct.

12        Q.    Okay.  When you went out there and

13   were walking across this plot where the trailer

14   was sitting on, could you see ruts there in the

15   dirt?

16        A.    You could see where the trailer

17   was backed in.

18        Q.    And I guess this goes without

19   saying.  The delivery person is the one who, I

20   guess, backed this particular trailer on this

21   plot?

22        A.    Yes, sir.  Most of the time, he

23   delivers the trailers and either Anthony or

                                              118

1    Teague, which is his brother, gets in and backs

2    it up, and he guides them in.  But that

3    particular plot there was easy digging.  What

4    I'm getting at, if it was packed, you know,

5    you'd spend seven, eight, maybe ten minutes on

6    each pad shoveling to get it level to where you

7    could set your blocks.  Them pads there, two,

8    two and a half minutes, you can dig down and

9    level it up to be able to move to the next one.

10        Q.    Which indicated what, if anything,

11   to you?

12          A.      That it wasn't packed.  It was

13   soft.

14          Q.      Is that something you think, in

15   your opinion, that the delivery person could

16   have seen when they came out?

17          A.      Yes, sir.

18          Q.      Anything, in your opinion, that

19   would have prevented them from seeing that?

20          A.      Only reason they wouldn't have

21   seen that there is if they didn't go look at it.

22          Q.      Okay.  Mr. Brasher, would you

23   consider yourself an employee or an independent

                                                    119

1    contractor of Bear Creek?

2           A.      I'd consider myself an employee.

3    I asked for raises, and she give me a raise one

4    time.  I would think a subcontractor would have

5    a contract or something.

6           Q.      Let me ask you this:  Did you --

7    There were some photographs produced in this

8    case.  I've got black and white copies.  Did you

9    take some photographs after this accident?

10          A.      Yes, sir, I did.

11          Q.      Where did you get the camera?

12          A.      From a volunteer fire department

13   man, I guess.

14          Q.      And what did you do with the

15   photographs after you took them?

16          A.      I give them to Robin.

17          Q.      Mrs. McGriff?

18          A.      Yes, sir.

19          Q.      I'm going to show you these two

20   sheets of paper with photographs on them.  Are

21   those the photographs you took?

22          A.      Yes, sir.  That first page is.

23   And I don't know about them there.  I didn't

                                                        120

1    take them.  I've got a whole row of them, and I

2    had a bunch of them taken.

3           Q.      Whose handwriting is that on the

4    bottom of those?

5           A.      Not mine.  You can tell mine.  I'm

6    not no -- I'm not no good at writing.  I print a

7    lot because I don't write too good.

8           Q.      To the best of your recollection,

9    how many photographs did you take?

10          A.      How many is on a roll, a Polaroid

11   pack?

12          Q.      I don't know.

13          A.      However many is on a Polaroid

14   pack.

15          Q.      You took the whole pack?

16          A.      Yes, sir.  I set that block up

17   under there right here, that 8-inch block that

18   showed the clearance, and it wasn't all the way

19   on the frame of the trailer because the trailer

20    was all the way sitting on the ground.

21          Q.    This was after it fell?

22          A.    This is probably an hour -- 45

23    minutes to an hour after it fell.

                                                    121

1           Q.    I'm going to mark these two sheets

2     of paper as Plaintiff's Exhibit 1 and attach

3     them to your deposition.  As I understood, you

4     know that you took these three here?

5                 (WHEREUPON, Plaintiff's Exhibit

6     Number 1 was marked for identification and is

7     attached to the original transcript.)

8           A.    I definitely took them.  These

9     here -- I might have took this one here.  But

10    these here, no, sir, I don't remember taking

11    them.

12          Q.    All right, David.  Let me just

13    make sure this reads back.  So the sheet of

14    paper with three photographs, you know you took?

15          A.    Yes, sir.

16          Q.    The sheet of paper with six

17    photographs on it, you think you may have

18    taken --

19          A.    The one yes, sir.

20          Q.    -- the one in the middle row,

21    right-hand column?

22          A.    Yes, sir.

23          Q.    This one right here.  Why don't we

122

1  just -- I'm going to put an X by the one you

2  think you took.

3       A.    Okay.  That's about the only thing

4  I can write.

5       Q.    Why did you take those

6  photographs, Mr. Brasher?

7       A.    Just to show how low it was, how

8  bad it was; that the trailer was sitting on the

9  ground.  I figured Ladon might want them later

10  on, you know, if he lived, just to see them or

11  have them put up.

12       Q.    Did you have a job title out there

13  at Bear Creek?

14       A.    Some folks referred to it as a

15  do-boy, do this and do that.  That's not being

16  funny.

17       Q.    I've been that before myself.

18       A.    I'm still that.

19       Q.    I think I heard you say this to

20  one of the other attorneys earlier, but is it

21  correct or incorrect that you were never

22  provided any type of manuals or instructions,

23  written ones, with regard to how to set up a

123

1  trailer?

2       A.    No, sir, I wasn't.  The only thing

3  I was provided was a short shovel and a level.

4        Q.        The jacks that y'all used at Bear

5    Creek, who bought those, to the best of your

6    knowledge?

7        A.        Bear Creek Mobile Home, either

8    Bryan or Robin McGriff.

9        Q.        There are several jacks in this

10    room that were produced in this case, and

11    they're right over here.  There's several Kobalt

12    jacks and a number of red jacks.  Who made those

13    red jacks?

14                MR. RITCHEY:  Husky.

15        Q.        Husky jacks.  There is a red Husky

16    jack sitting on the table here.  Can you tell

17    us, Mr. Brasher, why that one is sitting out and

18    the other ones are not?

19        A.        Yes, sir.  To the best of my

20    knowledge, I like using them 12-ton jacks

21    because they work a lot better than the 20-tons,

22    and they're not as heavy.  The release valve to

23    let the jack down, I usually check all of them,

                                                    124

1    loosen them up and turn them with my finger for

2    the simple fact -- Lee and them does it a lot --

3    after you get your jack up, you can come off of

4    it a little bit.  If you can turn it easy with

5    your finger, it's not as hard to let them down.

6    They come down easier if the release valve on it

7    spins kind of smooth.

```
 8                  (Brief interruption.)

 9       A.      And on the other jacks, a lot of

10  them, if you twist the pipe, they come down

11  hard.  They kind of hang -- not hang up, but

12  kind of rough to turn.

13       Q.      Okay.

14       A.      The jacks I like to use, you can

15  break them loose, the release valve, and they

16  spin kind of easy with your finger.

17       Q.      Is that the jack that they used on

18  the home that day, or do you know?

19       A.      I can't be 100 percent sure, but

20  it looks like the ones I use.  And you know, it

21  spins about the way I like them to spin to

22  release.

23       Q.      So of the jacks that were produced
```

                                                    125

```
 1  in this case and are located in this room, you

 2  pulled this one out in particular.  And I

 3  thought I heard you say you can't say for 100

 4  percent certainty that that's the jack?

 5       A.      I can't be 100 percent sure, no,

 6  sir.

 7       Q.      Assuming that the jack that was

 8  used out there that day is one of the ones that

 9  have been produced, is that why you picked that

10  one out?

11       A.      Yes, sir.
```

12      Q.      Other than the conversations

13  you've already told us about you had with Robin

14  McGriff, are there any others that you've had

15  after this accident?

16      A.      No, sir.

17      Q.      Same question with Bryan McGriff.

18  Any others?

19      A.      No, sir.

20      Q.      On average, how many mobile homes

21  did you set up in a day?

22      A.      We do good to get one set up.

23      Q.      In your experience working at Bear

                                                    126

1  Creek, would Robin and/or Bryan ever encourage

2  you guys to speed up, set them up faster?

3      A.      That was every day.

4      Q.      You gave all your Polaroids you

5  took to Robin; is that right?

6      A.      Every one of them, yes, sir.

7      Q.      I think that's all the questions

8  I've got.  Appreciate it.

9                      EXAMINATION

10  BY MR. RITCHEY:

11      Q.      I've got one.  Greg Ritchey,

12  again.  I'm going to show you page 21 of Redman

13  Homes' manufactured home installation manual,

14  which has been previously marked as Defendant's

15  Exhibit 3 to another deposition.

16      A.      Yes, sir.

17      Q.      And if I can direct your attention

18  to Figure 5.1.  See the timbers or pictures with

19  the timbers?

20      A.      Yes, sir.

21      Q.      Did y'all have anything like that

22  as a safety or added support?

23      A.      No, sir.  They were 2 X 6 boards

                                                    127

1  cut maybe 12 to 16 inches long.  I had never

2  seen nothing like that.

3      Q.      Did it have anything like the

4  front of the hitch like it's shown in the Figure

5  5.1?

6      A.      No, sir.  There's a jack on the

7  end of this tongue here.  It's centered in

8  between that center of the 2 X 6 16-foot-long

9  board.  It's set all the way on the ground.  I

10  haven't ever seen nothing like that.

11      Q.      Okay.  That's all.

12                      EXAMINATION

13  BY MR. LEE:

14      Q.      Who came to the scene after the

15  home fell?

16      A.      The paramedics.  And then probably

17  two and a half, three hours later, Bryan showed

18  up with my daddy-in-law and brother-in-law.

19      Q.      And your daddy-in-law is who?

20      A.      Jimmy Metcalf.

21      Q.      And your brother-in-law?

22      A.      Craig Ingram.

23      Q.      Do you know if Ladon Cook had

128

1  consumed any alcohol in the 24 hours before the

2  accident?

3      A.      Not to my knowledge, no, sir.

4      Q.      Do you believe Ladon was under the

5  influence of alcohol at the time the home fell?

6      A.      I don't think he was under the

7  influence of alcohol then, no, sir.

8      Q.      Do you know if Ladon had consumed

9  any drugs or medicine in the 24 hours before the

10 home fell?

11      A.      I have no knowledge of it, no,

12 sir.

13      Q.      Did you have any knowledge or do

14 you have any knowledge as to Ladon's habit of

15 drinking alcoholic beverages immediately before

16 the home fell or in the one month before the

17 home fell?

18      A.      I had never seen him drink.

19      Q.      Do you recall any statements made

20 by -- Let me back up.  Do you know of his habit

21 of drinking in the one month before the

22 accident?

23      A.      I've heard tales.

129

1      Q.      What have you heard about his

2  drinking?

3      A.      That he drinks a lot.

4      Q.      Do you recall any statements made

5  by Ladon Cook there at the homesite after the

6  home fell?

7      A.      Did I have a conversation with him

8  after the fall?

9      Q.      Do you recall any statements that

10  he made to you or anyone after the home fell?

11      A.      The only thing he said was, call

12  my mama; tell her what happened.  That was it.

13      Q.      That's all I have.  Thank you,

14  sir.

15                    EXAMINATION

16  BY MR. COUCH:

17      Q.      Who was there left on site when

18  you left that day, if anybody?

19      A.      Bryan McGriff.  I'm not sure about

20  my daddy-in-law, but I know Bryan was.  And that

21  was it.

22      Q.      Did he ever tell you what he was

23  doing there after you left or what he did, if

130

1  anything?

2      A.      No, sir, he didn't.

3     Q.    Did he ever tell you whether or

4  not he took anything from the scene?

5     A.    No, sir, he didn't.

6     Q.    That's all I have.

7           MR. RITCHEY:  Do you want him

8  to put his name, maybe, on this tag that's on

9  this so we know which one it is?

10          MR. COUCH:  Oh, yeah.  Let's

11  do that.  In fact, let me do this:  I'm going to

12  mark that as Plaintiff's 2, and I'll leave the

13  tag on there if you guys trust me to do that.

14          (WHEREUPON, Plaintiff's Exhibit

15  Number 2 was marked for identification and

16  retained by counsel.)

17          MR. RITCHEY:  That's fine.

18

19

20          03:42 p.m.

21

22      FURTHER DEPONENT SAITH NOT

23

                               131

1      C E R T I F I C A T E

2

3  STATE OF ALABAMA)

4  JEFFERSON COUNTY)

5

6        I hereby certify that the above

 7  and foregoing deposition was taken down by me in

 8  stenotype, and the questions and answers thereto

 9  were transcribed by means of computer-aided

10  transcription, and that the foregoing represents

11  a true and correct transcript of the deposition

12  given by said witness upon said hearing.

13          I further certify that I am

14  neither of counsel nor of kin to the parties to

15  the action, nor am I in anywise interested in

16  the result of said cause.

17

18

19          DEBORAH B. TOWNSEND, CSR

20          Certificate No. AL-CSR-207

21

22  My Commission expires

23  March 3, 2008

Page 1

```
01
02   ALABAMA
03
04   FRANK LADON COOK, )
05                    )
06      Plaintiff,   )
07   v.             )  CV-06-042H
08   BEAR CREEK SALES, )
09   L.L.C., et al., )
10                    )
11      Defendants.   )
12
13   S T I P U L A T I O N
14          IT IS STIPULATED AND
15   AGREED, by and between the parties through
16   their respective counsel, that the
17   discovery deposition of
18   ********************************************
19   BRYAN McGRIFF
20   ********************************************
21          may be taken before Paul
22   Moore, Commissioner, at the offices of
23   Merrill, Harrison & Adams, LLC, Dothan,
```

Page 2

```
01   Alabama, on the 8th day of November, 2006.
02            IT IS FURTHER STIPULATED
03   AND AGREED that it shall not be necessary
04   for any objections to be made by counsel to
05   any questions, except as to form or leading
06   questions and that counsel for the parties
07   may make objections and assign grounds at
08   the time of trial or at the time said
09   deposition is offered in evidence.
10            IT IS FURTHER STIPULATED
11   AND AGREED that notice of filing of the
12   deposition by the Commissioner is waived.
13
14
15
16
17
18
19
20
21
22
23
```

Page 3

01   I N D E X
02
03   EXAMINATION BYPAGE
04   Mr. Hollis  6
05   Mr. Stewart 81
06   Mr. Ritchey97
07   Mr. Lee   104
08
09   EXHIBITS:
10   Plaintiff's 6  - License    10
11   Plaintiff's 7  - Installer Certificate15
12   Plaintiff's 8  - Retail Certificate21
13   Plaintiff's 9  - Installer Certification21
14   Plaintiff's 10 - Sales Report22
15   Plaintiff's 11 - Installation Report23
16   Plaintiff's 12 - Property Locator 25
17   Plaintiff's 13 - Declination Letter27
18   Plaintiff's 14 - Answers to
19          Interrogatories28
20   Plaintiff's 15 - Deposition Notice62
21   Defendant's 4  - Cobalt information92
22
23

A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFF:
L. ANDREW HOLLIS, JR.
HOLLIS & WRIGHT, P.C.
505 NORTH 20TH STREET, SUITE
BIRMINGHAM, ALABAMA 35202

APPEARING ON BEHALF OF THE DEFENDANTS:
SAMUEL L. ADAMS
MERRILL, HARRISON & ADAMS, LLC
POST OFFICE BOX 1690
DOTHAN, ALABAMA 36302

CHARLES A. STEWART, III
BRADLEY, ARANT, ROSE & WHITE, LLP
401 ADAMS AVENUE, SUITE 780
MONTGOMERY, ALABAMA 36104

WILLIAM L. LEE, IV
LEE & McINISH, P.C.
POST OFFICE BOX 1665
DOTHAN, ALABAMA 36302

Page 5

```
01   APPEARING ON BEHALF OF THE DEFENDANTS:
02   (continued)
03
04   GREGORY S. RITCHEY
05   RITCHEY & RITCHEY, P.A.
06   POST OFFICE DRAWER 590069
07   BIRMINGHAM, ALABAMA 35259-0069
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 6

01   EXAMINATION BY MR. HOLLIS:
02      Q   Would you state your name, please?
03      A   Colbert Bryan McGriff.
04      Q   Do you want me to call you Mr.
05   McGriff, Bryan?
06      A   You can call me Bryan.
07      Q   Okay.  Bryan, tell me where you
08   reside?
09      A   1565 County Road 73, Slocomb,
10   Alabama.
11      Q   All right.  And what's your
12   telephone number there?
13      A   334-886-2851.
14      Q   Do you have a cell phone too?
15      A   Yes, sir.
16      Q   What's that number?
17      A   726-2653.
18      Q   Do you have any other cell phones
19   that you normally use?
20      A   No, I'm just using this.  It belongs
21   to the County.
22      Q   Okay.  Do you - - the cell phone
23   belongs to the County?

Page 7

```
01     A    Yes.  I work for the Houston County
02  Board of Education.
03     Q    And you do this trailer thing on the
04  side?
05     A    Yes, sir.
06     Q    All right.  And how long have you
07  been in the trailer business?
08     A    Probably about a year.
09     Q    How did you get into it?
10     A    Well, we got into just buying and
11  selling mobile homes, and what have you,
12  repos.  And then, Michael Traywick used to
13  - - we used to, you know, contract with him
14  to move them.  And then, we got into - -
15  Lee got where we would just - - Michael
16  would just let Lee set up mobile homes for
17  us, you know, he would - - we'd contract
18  through Michael Traywick and Lee would do
19  the set ups and what have you.  And then,
20  so Lee got into trying to promote, "well,
21  look, why don't we just do this ourselves",
22  because Michael wasn't keeping him busy
23  enough.  So, Lee's quite an impressive
```

Page 8

```
01   young man, as far as when it comes to
02   working and what have you, and what I've
03   observed and watched him do, and he's
04   always done a really good job.  And so,
05   that promoted us to get into the moving
06   portion of the business.
07      Q   What's your social security number?
08      A   ███████████
09      Q   Have you ever had any trouble with
10   the law, you ever been convicted of
11   anything?
12      A   No, sir.
13      Q   You ever been charged with anything?
14      A   No, sir.
15      Q   Okay.  Did you become a member of
16   the - - any associations or anything when
17   you started buying these repossessions and
18   moving them and setting them up?
19      A   Just, you know, the Alabama Home
20   Manufacturer people to get your license and
21   what have you to, you know, that's - -
22   that's the only place, only thing.
23      Q   What did you have to do?  Is there
```

Page 9

```
01   some process you have to go through to do
02   that with the state so you could sell these
03   used units?
04      A   Yes, sir.  Now, I didn't go through
05   the process myself for the, you know,
06   license and process for the dealer's
07   license.  But, you know, my wife, you know,
08   had done that, and she had, you know, she'd
09   been buying and selling the mobile homes
10   and what have you.  So, then it kind of - -
11   whenever we got into moving them, that's
12   whenever I got into it, and to be tested
13   and what have you on getting a license to
14   be able to move and set up mobile homes.
15      Q   All right.  When did you first get
16   that license?
17      A   Mr. Hollis, I'd have to look back
18   and see the dates.  It's whatever's on the
19   records.
20      Q   Does the Alabama Manufactured
21   Housing Commission, does that ring a bell
22   with you?
23      A   Yes, sir.
```

Page 10

01    Q    Do you have a retailer license from
02  that, or does Bear Creek have one?
03    A    Bear Creek has got - - should have a
04  retail license.
05  (Plaintiff's Exhibit 6 was marked for
06  identification and a copy of the same
07  is attached hereto as evidence)
08    Q    (BY MR. HOLLIS) Okay.  I show you
09  Plaintiff's Exhibit Number 6, and I'll ask
10  you if you recognize that particular
11  document?
12    A    Yes, sir.
13    Q    Okay.  You didn't produce that
14  document to me, did you?
15    A    Did we produce this document to him?
16  I really don't know who give it to you.
17    Q    Well, I've got your Answers to
18  Interrogatories and Request for Production
19  which asks for stuff like this that weren't
20  produced.  What I'm asking you is: Did you
21  produce this document to me in response to
22  my Interrogatories and Request for
23  Production?

Page 11

```
01      MR. ADAMS:  I thought we did.
02    Q   (BY MR. HOLLIS) All right.  What do
03  you have to do to get this license?
04    A   Well, you have to go to - - I went
05  to Gardendale and purchased, you know, your
06  insurance, and your little bond and what
07  have you, to be able to go to the class to
08  sit in the class and watch your films and
09  what have you, and to - - to get your
10  license.
11    Q   Okay.  This is actually, it looks
12  like the paperwork that led up to you
13  getting this license, which covers the
14  period through December the 31st of 2006.
15  And it's got "Robin McGriff", that is you,
16  right?
17    A   No, that's my wife.
18    Q   Okay.  Robin, does she do this kind
19  of stuff?
20    A   Do what stuff?
21    Q   Like these applications and - -
22    A   Yeah, she would - - she'd fill these
23  applications.
```

Page 12

01    Q    All right.  Is it your position, or
02  do you have any liability insurance that
03  would cover an event, such as the one where
04  Ladon was injured?
05    A    I was under the impression that I
06  did.
07    Q    Okay.  Well, in this application
08  your wife has certified that you had an
09  Alfa insurance policy for one million
10  dollars.  Is that not true?
11    A    That's incorrect on that.
12    Q    Well, then this thing that she
13  certified to the Alabama Manufactured
14  Housing Commission is false?  Do you want
15  to see this?
16    A    Well, there's no sense.  I mean, if
17  you say it's - - if that's what it is.  We
18  do have insurance, but you know, as far as
19  the Alfa, we have insurance with Alfa, and
20  we do have a million dollar liability.
21    Q    With Alfa?
22    A    It should be with Alfa.
23    Q    Okay.

Page 13

01    A    Now, we've got insurance from
02  several different places.
03    Q    Well, you've got - - it's got Old
04  Republic here, which is a bond surety
05  company.
06    A    Right.
07    Q    That's - - a bond is a little
08  different than liability.  Now, have you
09  put Alfa on notice of this accident?
10    A    We put the insurance company on
11  notice.
12    Q    Okay.  Have they refused to defend
13  you in this case, Alfa?
14    A    Yes, sir.
15    Q    Alfa has?
16    A    The insurance company that we have
17  at the time of this accident.
18      MR. ADAMS:  Off the record.
19  (Off the record)
20    A    Mr. Hollis, I believe that is my
21  wife's insurance that we're looking at
22  there for the retailer's license itself,
23  and not for the installer's license.

Page 14

01      MR. ADAMS:  Not the installer.
02      Q    (BY MR. HOLLIS) This is for the
03   retail license?
04      A    I'm assuming that's what you're
05   looking at there.  Because it's retail
06   license, and I don't have a retail license
07   to buy and sell.
08      Q    Well, does Bear Creek have one?
09      A    They should have.
10      Q    Okay.  Well, aren't you an owner of
11   Bear Creek?
12      A    Well, yes, sir.
13      Q    And this says that you've got a one
14   million dollar liability policy.  Have you
15   put Alfa on notice of this accident is what
16   I'm asking you?
17      A    I haven't put Alfa on notice with
18   that accident, no.
19      Q    You have not?
20      A    No, sir.
21      Q    Okay.
22      A    I did put Atlantic Casualty
23   Insurance on notice with this accident.

Page 15

01    Q    Did you put Old Republic on notice?
02    A    No, sir.
03    Q    You did not put Old Republic?
04       MR. ADAMS:  That's a bonding company
05  anyway.
06       THE WITNESS: Right.
07       MR. ADAMS:  Off the record.
08  (Off the record)
09  (Plaintiff's Exhibit 7 was marked for
10  identification and a copy of the same
11  is attached hereto as evidence)
12    Q    (BY MR. HOLLIS) Okay, this is Number
13  7, do you recognize that document?
14    A    Installer certificate, Geneva
15  County.  Yes.
16    Q    Okay.  What is that?
17    A    That's an installer's certificate.
18    Q    All right.  Now, is this the - -
19  were you ultimately given an installer
20  certification?
21    A    Yes, sir, that's what that is.
22    Q    Now, when you were given - - and you
23  went through this school to get your

Page 16

01  certification, did you know that the rules
02  and regulations said that if you undertook
03  to install a thing that you had to have a
04  - - somebody out there that was a certified
05  installer?
06      A    At that time, Mr. Hollis, no, I
07  didn't understand that.  I was probably
08  tested on it, you know, probably answered
09  the question right.  But there's so much
10  that they went through, mostly it was just
11  films, and you know compliances of how to
12  set up a mobile home.
13      Q    Okay.  Well, this document expires
14  December the 31st of 2006.  In this - - this
15  is with the Alabama - - this is your
16  application for installer certification,
17  re-certification and so forth, and it's got
18  your name, "Bryan McGriff doing business as
19  Bear Creek Movers", well, is the installer
20  certificate issued to you individually or
21  to Bear Creek Movers?
22      A    I'm assuming that it was issued to
23  Bear Creek Movers.

Page 17

01    Q  All right.  But y'all had a
02 certificate?
03    A  Yes.
04    Q  Okay.  And on this it says "were you
05 previously certified by the Commission",
06 and you said "yes", and you give the
07 Certification Number of 2518.  Now, when
08 you were certified, were you given the
09 instructions on how to obtain those decals
10 and put them on the trailer when y'all were
11 going to do an installation?
12    A  Just, you know, where to get them
13 from.  You'd send it off to the state and
14 they'll send you the little decals for the
15 one for trailers.
16    Q  And did you put one on this trailer
17 that is involved in this case?
18    A  Mr. Hollis, I could not tell you.  I
19 don't remember that.
20    Q  If there was one on there and it had
21 your name on it, you wouldn't dispute that?
22    A  I wouldn't dispute it, no, sir.
23    Q  Okay.  And do you know the effect of

Page 18

01    you putting that on there and that - - do
02    you know that brings any - - in any
03    obligations for you to do certain things
04    under the statute that you're acting under?
05        A    Explain what you're talking about,
06    Mr. Hollis.
07        Q    Okay.  You got certified as an
08    installer to install trailers, mobile
09    homes, and in regard to that, the Alabama
10    Manufactured Housing Commission has
11    statutory law that governs installers that
12    are certified under this statute, and what
13    you're supposed to do, when you're supposed
14    to do it, etc.  One of the things that you
15    have to do on any mobile home that you set
16    down, you have to put one of those stickers
17    on there with a certification number and
18    with your name on it, so that when the
19    inspector comes by he knows that it has
20    been certified as having been installed in
21    accordance with and under the direction of
22    a certified installer.  You knew that,
23    right?

Page 19

```
01    A   Yes, I understood that.
02    Q   Okay.  Was this mobile home - - was
03  it being installed under the direction, or
04  under the supervision of a certified
05  installer - -
06    A   No, sir.
07    Q   - - such as you?  No?
08    A   No, sir.
09    Q   Okay.  Now, under this it says your
10  surety bond, again, is Old Republic Surety
11  Company, which is a bond.  And then you've
12  got general liability coverage of
13  Diversified Insurance Financial Securities;
14  do you know who that is?
15    A   Yes, sir.
16    Q   Have they been put on notice of
17  this?
18    A   Yes, sir.
19    Q   Have they refused to defend you?
20    A   Yes, sir.
21    Q   They have.  And do you know for what
22  reason?
23    A   No, sir.
```

Page 20

01    Q    Okay.
02    A    Mr. Hollis, Diversified is an agent
03  that we go through for Dothan, but I think
04  it's a - - they underwrite it for somebody
05  else.
06    Q    And I think you're right, and I
07  think the last page has got you as the
08  insured, along with Bear Creek Movers.  I
09  think the agent is Diversified, but the
10  policy was written by Atlantic Casualty.
11    A    Yes, sir, that sounds - - that
12  sounds familiar.
13    Q    All right.  And this would have been
14  the certification certificate that you
15  would have been operating under on March
16  the 30th of 2006; is that right?
17    A    Yes, sir.
18    Q    Okay.  And just for the heck of it,
19  I'm going to put - - this is your retail
20  certificate that went from '04 to '05, and
21  again - - and on this one you again list
22  Alfa Mutual Insurance Company for your
23  retail license, you have Old Republic as

Page 21

01   the bond person, you've actually got a
02   certification in here of the coverage dates
03   by Alfa.  If you want to look at this, I'll
04   be glad to let you look at it.
05        A    That all sounds familiar.
06        Q    Okay.  That's Number 8.
07   (Plaintiff's Exhibits 8 and 9 were marked
08   for identification and copies of the
09   same are attached hereto as evidence)
10        Q    (BY MR. HOLLIS) And then, Number 9
11   is your installer certification, which was
12   identified as Plaintiff's Exhibit 9, it
13   went through December the 31st of '05.
14   Again, it's got the bond with Old Republic,
15   and Atlantic Casualty is the liability
16   carrier.  Now, who bought - - who actually
17   bought this trailer that they were
18   installing on March the 30th?
19        A    My wife.  Are you talking about who
20   bought it from - -
21        Q    Yeah, who was the buyer?
22        A    - - Bear Creek?  I couldn't tell you
23   their names, Mr. Hollis.

Page 22

```
01    Q   Was it a Bonnie Aycock ,does that
02  ring a bell?
03    A   It could be.  I wouldn't know their
04  names.
05    Q   Okay.  What about Lucy Palmore?
06    A   That sounds familiar.
07    Q   Okay.  And that would have been 272-
08  something, Abbeville - - she lived in
09  Abbeville, right?
10    A   Yes, sir, lived in Abbeville.
11    Q   Okay.  Was your license number 1659,
12  or do you know?
13    A   Whatever's on this certificate.
14    Q   I'm sorry.  Your installer
15  certification number was 2518.
16    AOkay.
17  (Plaintiff's Exhibit 10 was marked for
18  identification and a copy of the same
19  is attached hereto as evidence)
20    Q   (BY MR. HOLLIS) And I show you
21  Plaintiff's Exhibit 10, and see if you can
22  identify that document?
23    A   Mr. Hollis, it looks like a document
```

Page 23

01  that we fill out and send to the state.
02      Q    And it is called a dealer monthly
03  use sales report; is that correct?
04      A    Yes, sir.
05      Q    And does this reflect the sales that
06  you made, I guess in February of '06?
07      A    Yes.
08      Q    And you list two, one being to Mrs.
09  Palmore, that is the subject of this
10  litigation; is that right?
11      A    Yes, sir.
12      Q    All right.
13  (Plaintiff's Exhibit 11 was marked for
14  identification and a copy of the same
15  is attached hereto as evidence)
16      Q    (BY MR. HOLLIS) Now, I also show you
17  what Plaintiff's Exhibit 11 is, and ask you
18  if you can identify that document?
19      A    That's just an installation report
20  form.  I don't recognize any of the names
21  on this document.
22      Q    Okay.  Did you - - would you
23  typically have to fill out an installation

Page 24

01  report on each trailer - -
02      A   Yes, sir.
03      Q   - - that y'all install?
04      A   Yes, sir.
05      Q   Did you ever do that on the one
06  that's the subject of this litigation?
07      A   Mr. Hollis, I couldn't - - I don't
08  think we ever filled one out.
09      Q   You don't think you did.  But it
10  would be typical that you would?
11      A   It would be typical, other than that
12  case.
13      Q   All right.  Isn't this document here
14  sort of what - - as I understand it, an
15  inspector is obligated to come by at least
16  ten days after this - - you send this
17  installation report form to the state; is
18  that right?
19      A   Yes, sir.
20      Q   Okay.  And until you do that - -
21      A   There's another form that's sent in
22  too that's called a locator, that you have
23  to send in.

Page 25

01    Q    Called a property locator?
02    A    Right.  Then that's when the - -
03   that's whenever the inspector from the
04   state that will come out.
05    Q    Okay.
06   (Plaintiff's Exhibit 12 was marked for
07   identification and a copy of the same
08   is attached hereto as evidence)
09    Q    (BY MR. HOLLIS) Number 12, I know
10   this is a locator, I think for this
11   particular incident, but is that typically
12   what the locator looks like?
13    A    Yes, sir.
14    Q    All right.  This is for one that
15   y'all delivered and I guess set up down in
16   Coffee Springs; is that right?
17    A    Well, this could be, it's whatever
18   the address is on it.
19    Q    Okay.  Who is Richard Smith?
20    A    Well, that's what I - - that's
21   what's throwing me off.  I don't know why
22   Richard Smith is on any of this paperwork.
23   But we're not affiliated with Richard

Page 26

```
01  Smith.
02     Q   All right.  But this property
03  locator, is this the document that sort of
04  signals to the state inspector that he
05  needs to come inspect?
06     A   Yes, sir.
07     Q   And that shows him where to go
08  right?  And then, this installation report
09  form is after you've installed it, you send
10  this in to the state; is that right?
11     A   Yes, sir.
12     Q   Do you send them together, or do you
13  send them separately?
14     A   I believe we send them together.
15     Q   All right.  So, typically you would
16  have - - if things had gone without this
17  accident, after the 30th, or on the 30th, you
18  would have filled out both of these forms,
19  being Number 11 and 12, they would have
20  been sent to the state, and then they would
21  have had an inspector come out within ten
22  days?
23     A   Yes, sir.
```

Page 27

```
01    Q   Now, if the inspector found no
02  deficiencies, etc., would that signal that
03  the purchaser of the used trailer could
04  then move in?
05    A   Well, it's - - they send the reports
06  back to us, but the movers - - I don't
07  think there's any rule where they can't
08  move in prior to them waiting.  Because
09  generally whenever you set one up, these
10  people are wanting to go ahead and move on
11  in and not wait for ten days or what have
12  you, and wait for the inspector.  Now, the
13  only thing that they do do is they can't
14  - - they can't skirt the house for ten
15  days.
16    Q   Can't what?
17    A   Put skirting around the house where
18  the inspector can't get to it.
19    Q   Can't see underneath?
20    A   Right.  Right.
21    Q   Okay.
22  (Plaintiff's Exhibit 13 was marked for
23  identification and a copy of the same
```

Page 28

01   is attached hereto as evidence)
02      Q   (BY MR. HOLLIS) Plaintiff's Exhibit
03   Number 13, have you seen this document?
04      A   It looks like it's a document where
05   the insurance company is refusing to pay.
06      Q   Okay.  Is this something they sent
07   to you?
08      A   I'm sure they did, and I would have
09   forwarded it right on to my attorney.
10      Q   Okay.  Do you know if any action has
11   been taken in regard to that letter, such
12   as a declaratory action to clarify whether
13   there is coverage or not?  Do you know if
14   that's been done?
15         MR. ADAMS:  It hasn't been done yet.
16         MR. HOLLIS: Okay.  Do y'all
17   anticipate - -
18         MR. ADAMS:  I intend to do that, of
19   course.
20   (Off the record)
21   (Plaintiff's Exhibit 14 was marked for
22   identification and a copy of the same
23   is attached hereto as evidence)

Page 29

01    Q    (BY MR. HOLLIS) I show you what I
02  have marked as Plaintiff's Exhibit Number
03  14, and ask you if you can identify that?
04  And if this is better discussed with your
05  wife, I'll be glad to do it.
06    A    Well, some of this would be, Mr.
07  Hollis.
08    Q    Okay.  Well, let's see, she's the
09  one that signed these.  Let me just go down
10  some of them and see.  As I understand - -
11    A    Well, you want her to sit up here
12  with me?
13    Q    Well, I can't do but one at a time.
14  Let's just go down this, and we may be able
15  to cover - - as I understand it, by the
16  Answers to the Interrogatories, your
17  company was incorporated on March the 22nd
18  of 2006 in the State of Alabama to move and
19  sell mobile homes; is that right?
20    A    Yes, sir.
21    Q    And it's based out of Slocomb?
22    A    Yes, sir.
23    Q    Do y'all do the business out of your

Page 30

```
01   home?
02      A    No, the business is out of the place
03   in Slocomb.
04      Q    Okay.  Do you have a business
05   address, aside from your personal address?
06      A    Yes, sir.
07      Q    What is the business address?
08      A    Honey, can you spit that out?
09         MRS. McGRIFF: 771 East Block Terrace
10   Highway, Slocomb.
11      Q    (BY MR. HOLLIS) All right.  And as I
12   understand it, you had insurance with
13   Atlantic Casualty Insurance Company out of
14   Goldsboro, North Carolina, commercial
15   general liability coverage on the date of
16   March the 30th of 2006; is that right?
17      A    Yes, sir.
18      Q    Now, Number 4, it states "whether
19   this defendant or anyone to this
20   defendant's knowledge has secured, obtained
21   or has any knowledge of any statement or
22   recount made by any person, including
23   parties."  And it says "what has been told
```

Page 31

01  to me by a witness"; has that been told to
02  you or your wife?
03      A    That's - - some's been told to
04  myself and some's been told to my wife.
05      Q    Okay.  Tell me what you - - what has
06  been told to you?
07      A    Well, it's - -
08      Q    Let me get this clear: You were not
09  out there that day, right?
10      A    Yes, I was not out there that day.
11  I was on my way to the job site.  I was in
12  Abbeville.
13      Q    Tell me what arrangements you had
14  had - - you had made to get this trailer
15  installed?  Tell me who you contacted and
16  what was said.
17      A    To get the trailer installed?
18      Q    Right.
19      A    Well, Ladon, you know, was - - that
20  was all pre-planned from the day before,
21  that he was to go to the job site and
22  start, you know, unloading the truck and
23  getting things ready and what have you.

Page 32

01     Q    Was he an employee of yours?
02     A    We contract labor with Ladon and the
03 other boys, and what have you.
04     Q    Would that include Lee too?
05     A    That included Lee too.
06     Q    Well, was he your employee when this
07 happened, or was he an employee of somebody
08 else?
09     A    I'm assuming he's my employee
10 whenever I pay him to do a job.
11     Q    Well, did you - - did you provide
12 any worker's compensation for him?
13     A    No, sir, we didn't have no worker's
14 comp insurance.
15     Q    Now, okay, so, did you contact Ladon
16 to do this job, or did you contact Lee?
17     A    Well, contacted Lee and Ladon.  The
18 whole crew was there and we just - -
19     Q    You mean, they would come every
20 morning to your business address in
21 Slocomb?
22     A    Either there or by telephone.
23     Q    Okay.  And y'all would tell them - -

Page 33

01     A   Or we would meet up in certain
02   places.
03     Q    - - what to do?  Okay.  And I think
04   this job, Lee had already moved the trailer
05   in a couple of days before - -
06     A   Yes, sir.
07     Q   - - the 30th, right?
08     A   Yes, sir.
09     Q   So, did you tell Ladon on the 30th
10   that he was to go install this trailer?
11     A   Ladon was to meet me in Abbeville,
12   you know, that day.  And he knew that I had
13   another job that I was going to.  And so,
14   then, in fact, right whenever I was leaving
15   the other job I got the phone call that
16   this - - they had dropped - - I didn't even
17   - - I didn't think they could even get this
18   house as far as they got it, you know, with
19   the piers under it, and the process of
20   pulling the axles, since that's always the
21   last thing that they do.  But yes, sir, we
22   were - - Ladon was there installing the
23   house, but David Brasher - -

Page 34

01    Q   Well, did you give Ladon any
02  instructions that he wasn't to commence
03  installing this house until you got there?
04    A   No, sir, I did not give him no kind
05  of instructions to that.
06    Q   Was there anybody there on the
07  occasion when Ladon was severely injured
08  that had either been trained, or had a
09  installer's certification?
10       MR. ADAMS:  Object to the form.
11    Q   (BY MR. HOLLIS) Go ahead.  Was there
12  anybody there that would fall under - -
13    A   No, there was nobody there that had
14  the certification, but Ladon was probably
15  the most trained on the job.
16    Q   Well, the statute is rather clear as
17  to what is required to install a trailer,
18  and what I'm trying to find out is those
19  requirements were not complied with in this
20  case, were they?
21       MR. ADAMS:  Object to the form.
22    Q   (BY MR. HOLLIS) Is that right?
23    A   That's right.

Page 35

```
01    Q    Okay.  Now, you had gone to another
02  job site, where was that job site?
03    A    It was in Abbeville, I don't know
04  the address.  Over there at the lake.
05    Q    Okay.  Who had done - - who had done
06  the installation on that trailer?
07    A    Well, just Lee and Teague and Ladon,
08  and myself was involved with that - - with
09  that job.
10    Q    Okay.  So - -
11    A    And probably not all of them at one
12  time.  Because, you know, a couple of crew
13  went, you know, done the set up and what
14  have you, you know, just the basic set up,
15  and then the others would come in there to
16  go ahead and let's get this thing put
17  together and - -
18    Q    Well, who was at the other location
19  when you left there going to this location?
20    A    The job was completed.  And so, I
21  was just completing the job and going to
22  the next one.
23    Q    Right.  Was anybody with you?
```

Page 36

```
01    A    No, sir.
02    Q    You were by yourself.  Okay.  How
03  many trucks did y'all have?
04    A    Just a tow truck, and the service
05  truck.  Now, they had that.  I was on my
06  old - - my old van.
07    Q    Did y'all have the occasion to use
08  jacks before March 30th of 2006?
09    A    To use jacks?
10    Q    Jacks.
11    A    Any particular jacks?
12    Q    I mean, Cobalt jacks.
13    A    Before that day we haven't, that I
14  know of, no Cobalt jacks was used.
15    Q    Okay.  Who bought the Cobalt jacks
16  that were bought?
17    A    Bear Creek Movers bought the jacks.
18    Q    Who did?
19    A    Bear Creek Movers.  Myself and my
20  wife.
21    Q    Y'all went to Lowe's?
22    A    We went - - we got them at Lowe's.
23    Q    Okay.  Tell me the facts surrounding
```

Page 37

01  that.  I mean, why did you go and select
02  these particular jacks?
03      A    Well, Lowe's, Home Depot, they're
04  - - to me, they're as good as any - - the
05  rest of them.  You know, so we just - -
06  they needed some jacks, so we picked some
07  jacks up.
08      Q    Who told you they needed jacks?
09      A    Lee told us they needed some jacks.
10      Q    All right.  Why did he tell you they
11  needed jacks?
12      A    Because the other jacks were getting
13  wore out, and you know, seals had started
14  leaking and what have you, and so we went
15  by and picked up two twelve tons and two
16  twenty tons.
17      Q    What did y'all use the jacks for in
18  doing the installation process?
19      A    Lifting the house up to, you know,
20  to install the houses.
21      Q    Okay.  Had you used any other kind
22  of jacks, other than the Cobalt?
23      A    Yes, sir.

Page 38

01    Q    What other kinds had you used?
02    A    Mr. Hollis, you're going to have to
03 forgive me, all I know is - - you know, I
04 know the Cobalt jacks as being black, but
05 that's - -
06    Q    Does Husky - -
07    A    If that's a red jack, that's what
08 was - - I understand.
09    Q    Okay.  Now, you were on the way to
10 the job site, you had been at the other job
11 site in Abbeville.  What happened, how did
12 - - did somebody call you and inform you of
13 what had happened?
14    A    Yes, sir.
15    Q    Who called you?
16    A    My wife called me.
17    Q    Okay.  And somebody called her?
18    A    Yes, I think - - I'm not sure,
19 you'll have to ask her, but I think David
20 Brasher is the one that called her.
21    Q    Okay.  What did she tell you?
22    A    She told me the house fell on Ladon.
23    Q    And did you go on over there?

Page 39

01    A    Yes, sir.
02    Q    Okay.  Now - -
03    A    And by the time I got there, now,
04  Mr. Hollis, the only two there was David
05  and Sedro.
06    Q    Okay.  Had they already taken Ladon
07  to the hospital?
08    A    They had already taken Ladon to the
09  hospital.
10    Q    Okay.  Did you observe any jacks
11  there when you were there on that occasion?
12    A    I didn't.  The house was sitting on
13  the ground.  It was crunched up, as we all
14  have seen that already.  And no, sir, I
15  didn't observe - - I didn't look for no
16  jacks.  You know, I went on - - you know, I
17  did ask, you know, what happened, and of
18  course, they were excited.
19    Q    What did - - did David and Sedro
20  tell you?
21        MR. STEWART:  I'm sorry, I didn't
22  hear you because you were coughing.
23        MR. HOLLIS: I'm sorry.

Page 40

01      MR. STEWART:  I didn't hear your
02   answer.  You had asked what happened?
03      A    Yes.  I, you know, wanted to know
04   what happened, of course, you know, and
05   David had told me they had had - - they
06   jacked the house up, both sides, tried to
07   jack up the whole tail end of the house.
08   And that he kept telling Ladon that "Ladon,
09   I hear something, I hear something, we're
10   not supposed to jack it up this high", and
11   then the next thing, it fell.  You know, it
12   fell.
13      Q    (BY MR. HOLLIS) Okay.  Did he say
14   that the jacks had anything to do with it
15   falling?
16      A    No, sir, he never - - he never made
17   a comment whether the jacks had anything to
18   do with it or not.
19      Q    Did he tell you whether they were
20   using one, two, three or four jacks?
21      A    He told me they were just using a
22   jack at the tail end of the house.  And
23   this was after the fact now, this is after

Page 41

01    - - because I had went to the hospital to
02    try to check on Ladon, or what have you.
03    But David had told me that they had had the
04    whole back side of the house jacked up.
05        Q    Well, would that take one or two
06    jacks?
07        A    With two jacks, they had one on each
08    side of the house.  And he told me there
09    was a black jack under the house, and he
10    told me there was a red jack under the
11    house.
12        Q    Okay.  We know that one jack, we
13    went out there, and we found one jack.  Do
14    you know what happened to the other jack?
15        A    No, sir.  Now, during this same time
16    too, I had asked the guys about, you know,
17    the jacks that's under the house, and they
18    said they were still under the house.  I
19    said okay.  And then, I think I got a phone
20    call from you about wanting the jacks.  And
21    so, anyway, as far as I know, the jacks
22    were still under the house.
23        Q    Okay.  Did you ever see either of

Page 42

01 the jacks?
02     A    Not until they - -
03     Q    After the - - until after the - -
04 after the accident?
05     A    No, sir.
06     Q    Okay.  Do you know if there were two
07 jacks under the house when you went out
08 there and Ladon had been taken to the
09 hospital?
10     A    No, sir.
11     Q    Did you talk to Sedro?
12     A    Sedro pretty much confirmed the
13 story that David had told me about.  In
14 fact, Sedro told me that he wouldn't even
15 get under the house because he had it
16 jacked up too high.  He said "we don't do
17 it like this."  And so, he wouldn't even
18 get - - he refused to get back under the
19 house.
20     Q    Well, who was in charge out there
21 that day?
22     A    Ladon.
23     Q    Okay.  Who had not been certified?

Page 43

01    A    Yes, sir.
02    Q    And nobody else out there was
03    certified to instruct him how to install it
04    that day, correct?
05    A    Yes, sir.
06    Q    Okay.  Did you do an inventory after
07    the accident of how many Cobalt jacks you
08    had?
09    A    Yes, sir.
10    Q    How many did you have?
11    A    We had three.
12    Q    Three.  What were they ton rated?
13    A    You know, two of the jacks never
14    made it on any job sites, because they
15    stayed with me on my little van.
16    Q    Okay.  And what sizes were they?
17    A    They were twelve and twenty ton.
18    Q    So, the only two that made it to the
19    job site on the service vehicle would have
20    been the twelve and the twenty - - the
21    other twelve and the twenty?
22    A    Yes, sir.
23    Q    Because I understand you bought from

Page 44

01   Lowe's two twelve tons and two twenty tons?
02      A   Yes, sir.
03      Q   Okay.  And you're saying that two of
04   those remained in your van, two of them
05   were put on the service truck.  Okay.  So,
06   would they - - would I be correct that
07   those were the two that were being used out
08   there the day that the accident occurred,
09   if you know?
10          MR. STEWART:  Object to the form.
11      A   I couldn't tell you.  That's all I
12   could tell you, that David Brasher told me
13   there was a black jack used, and a red jack
14   used.
15      Q   (BY MR. HOLLIS) Okay.  What does
16   that signify to you, if it's a red or a
17   black?
18      A   Well, one of them's a Cobalt jack,
19   and one of them was a jack that we already
20   had.
21      Q   Okay.  Do you know where - -
22      A   I believe it's a Husky.
23      Q   - - that jack is?

Page 45

01   A   No, sir, I sure don't.
02   Q   You didn't keep it?
03   A   I've never seen it after the
04   accident.  I've never seen either one of
05   the jacks that was under the house after
06   the accident.
07   Q   But the other one was a black one?
08     MR. STEWART:  Object to the form.
09   A   Yes, sir.
10   Q   (BY MR. HOLLIS) Okay.  So, if we got
11   - - the red one would have been the Cobalt,
12   the black one would - - do you know who
13   made - - manufactured the black one?
14   A   The other way around.
15     MR. STEWART:  Object to the form.
16   Q   (BY MR. HOLLIS) What?
17   A   The other way around.
18   Q   Okay.  The black one would be the
19   Cobalt?
20   A   Yes, sir.
21   Q   And the red one would be what?
22   A   Whatever Lee and them bought.  You
23   know, that's - - that was Lee and them's

Page 46

01  jacks, the red jacks was.  This was the
02  first time that we had bought jacks to use
03  in the business, and I bought the Cobalt
04  jacks.
05      Q    Okay.  When you went to the scene
06  that day, did you see one of your installer
07  decals on the unit?
08      A    The house was - - I didn't even look
09  for an installer's decal, I looked to - -
10  they pointed out where Ladon was under the
11  house, and then the - - how the little - -
12  the skidder, what have you, the damage that
13  it done trying to pick the house up off of
14  Ladon.  And David mentioned again about
15  that, that whenever  - - the first time
16  that they picked it up, it fell, and they
17  had to pick it up again.  The second time
18  they used the little - - I reckon the piece
19  that holds the logs, and they grabbed it
20  with that so they could pick it up to keep
21  it from falling.
22      Q    Okay.  Back to Plaintiff's Exhibit
23  Number 14, I think it is.  Question Number

Page 47

01   6 was, "was an investigation or report made
02   by or for this defendant pertaining to the
03   occurrence made the basis of this lawsuit",
04   and you say, "after the accident, Abbeville
05   Police Department made a report and your
06   insurance may" - -
07       A    Adjuster.
08       Q    - - "adjuster did an investigation";
09   is that right?
10       A    Yes, sir.
11       Q    What insurance company would that
12   have been with?
13       A    Atlantic Casualty.
14       Q    Atlantic Casualty.
15       A    Yes, sir.
16       Q    All right.  And I think you actually
17   attached the police report to the - - to
18   your answers; is that right?
19       A    Is that signed?
20       Q    Yeah, you did.
21   (Off the record)
22       Q    (BY MR. HOLLIS) Okay.  If you could,
23   go to Page Number 17.  Is that the accident

Page 48

01    report, as far as you know, that the
02    Abbeville Police Department did?
03        A    As far as I know, it is.
04        Q    Okay.  And on the back, this is
05    apparently a statement that Mr. David
06    Brasher made to the police officer.  It
07    says "Mr. Brasher told RO that they were
08    almost through setting the trailer up when
09    it shifted on the blocks, all the blocks
10    were in place except where the axle had
11    been removed, and they were working that.
12    RO observed the other blocks that had been
13    put under the trailer about the middle of
14    the home.  You could see where the blocks
15    turned over and the house shifted falling
16    on Mr. Cook.  Mr. Brasher told RO that he
17    heard a creaking noise, and then the home
18    fell.  Mr. Brasher tried to jack the home
19    up to get Mr. Cook out, he could not, and
20    Mr. Brasher ran into the woods behind the
21    home where Mills Timber Company was cutting
22    trees.  They sent their loader and picked
23    the home up, and Mr. Cook was pulled out.

Page 49

01  A short while later, rescue arrived and
02  transported Mr. Cook", I guess that's
03  Southeastern - -
04    A   Alabama Medical Center.
05    Q   Okay.  You weren't there when this
06  statement was taken, were you?
07    A   No, sir.
08    Q   All right.  Now, did you ever get
09  any type of report from the adjuster of his
10  investigation of this incident?
11    A   No.
12    Q   Now, you mentioned - - I'm going to
13  go back to Number 4, and that was "any
14  witness you've talked to", you talked to
15  David, and I understand what he told you,
16  did you talk to anybody else like - -
17    A   Sedro's the only other one that was
18  there.
19    Q   Did you ever talk to Ladon about
20  what happened?
21    A   No, sir.
22    Q   Okay.  You did go to the hospital?
23    A   I went to the hospital, you know, a

Page 50

01    lot of Ladon's family was there, his step-
02    daddy was ranting and raving, and what have
03    you.  So, I left the - - I left the
04    hospital because I wasn't going to get in
05    - - I wasn't going to get into no fist
06    fights or what have you.  And I come home
07    via Sam's office and reported have you - -
08    what had happened.  And then, I wanted to
09    make sure my insurance company knew what
10    happened.
11        Q    Did you call them yourself, or did
12    you have Sam do it?
13        A    No, I called them myself, I believe.
14          MR. ADAMS: You called them, because
15    you talked to Arnie, I think.
16          THE WITNESS: Yes.
17          MR. ADAMS: Okay.  Because I wasn't
18    here that day.
19          THE WITNESS: Right.
20        Q    (BY MR. HOLLIS) Number 9, you again
21    list Mr. Brasher as somebody that might
22    know.  Number 10, your answer was "none".
23    Number 11 is "no".  And on 13 it says

Page 51

01   "please state if Frank Ladon Cook was your
02   employee on March 30th", and you say "he was
03   a self-employed independent contractor".
04   Is that what you're saying today, or are
05   you changing that?
06      A    Whatever the Alabama law says that
07   he is, because you know, I - - he was kind
08   of like self-employed, but we paid him to
09   do, you know, each job that we - - we
10   didn't - - he wasn't on an hourly basis, he
11   was just on a - - he was paid on the job
12   basis.  And yes and no.  Yes, he's a self-
13   employed independent contractor, but yes,
14   he was working for me during that time that
15   this job was - - had taken place.
16      Q    As I understand it, you had no
17   workmen's comp insurance that would have
18   covered him; is that right?
19      A    No, sir.
20      Q    Number 20, it says "as to the
21   plaintiff's earnings, please state how the
22   plaintiff was paid by you at the time of
23   the alleged injuries made the basis of the

Page 52

01  plaintiff's complaint." Is this true that
02  you paid him a hundred dollars a day when
03  he worked, or did you pay him by
04  installation?
05      A   Was it a hundred dollars a day, or a
06  hundred dollars - -
07          MRS. McGRIFF: At that time we was
08  paying him by the day.
09      A   At that time it was by the day.
10      Q   (BY MR. HOLLIS) Okay.  So, if he
11  worked a day you paid him a hundred
12  dollars?
13      A   Yes, sir.
14      Q   You didn't take out any taxes?
15      A   No, sir.
16      Q   No benefits, no nothing - -
17      A   No, sir.
18      Q   - - you just - - did you pay him in
19  cash or by check?
20          MRS. McGRIFF: Both.
21      A   Both.
22      Q   (BY MR. HOLLIS) Both.
23      A   Ladon surely didn't want taxes taken

Page 53

01  out.
02     Q   Okay.  Number 20, "please state in
03  detail exactly how plaintiff's alleged
04  injuries occurred, according to the best of
05  your information, knowledge and belief".
06        MR. ADAMS:  Number 20?
07     Q   (BY MR. HOLLIS) I'm sorry, 23.  As I
08  understand it, the answer to this is based
09  on hearsay, you didn't personally observe,
10  see, or know what happened out there that
11  day leading up to, or the event that caused
12  Ladon's injuries?
13     A   Yes, sir.
14     Q   This is basically from information
15  you obtained from David Brasher, and is it
16  Sedro Mancil?
17     A   Yes, Sedro.
18     Q   Sedro Mancil.  Okay.  This says,
19  "when I arrived on the scene", that's you;
20  is that correct?
21     A   Yes.
22     Q   "David Brasher and Mr. Mancil were
23  there.  David showed me the scene and

Page 54

```
01   explained what happened.  He said they were
02   setting up piers under the house.  All
03   piers were set, except the one under the
04   axle.  Ladon instructed David to jack up
05   his side while Ladon was jacking the other
06   side at the same point.  They pulled the
07   wheels and axles out from under the house.
08   Ladon instructed David to jack up house.
09   It got to the point David and Mr. Mancil
10   told Ladon they were not setting up this
11   house the way it should be done.  Ladon
12   told them to keep working that they would
13   be finished with the job in twenty minutes.
14   Mancil refused to back under the house.
15   Told him house was going to fall.  David
16   continued to work and did what Ladon asked,
17   then finally David told Ladon 'something is
18   wrong, the house is - - something is making
19   a noise'.  David was getting out from under
20   the house and was telling Ladon he needed
21   to get out also.  David said when he was
22   backing out from under the house the house
23   was moving toward Ladon's side and fell.
```

Page 55

01    Both David and Mr. Mancil said the house
02    was jacked up too high and Ladon was
03    jacking up both sides of the house at the
04    same time when he should have been jacking
05    one side at a time to set the piers.  Both
06    said Ladon was in a big - - in too big of a
07    hurry and not setting the house up the way
08    Lee Cook had shown them on other jobs.
09    Mancil also said Ladon was not using proper
10    foundation to set jack on, not using jack
11    plates between the house and jack.  The
12    house should have been sitting on piers
13    before tires and axles were removed.  David
14    said and got the logger to get the house
15    off of Ladon.  Both witnesses said the
16    logging crew picked the house up XXX first
17    and dropped home on Ladon."
18        A    Now, that's what was told to me, Mr.
19    Hollis.
20        Q    And it looks like Ladon had been
21    working for you since October the 20th of
22    2005?
23        A    Yes, sir.

Page 56

```
01    Q   So, he'd been working for you about
02  five months?
03    A   Yes, sir.
04    Q   Had you given him any special
05  training, in terms of installations of
06  mobile homes?
07    A   Lee was the trainer.
08    Q   Lee was the trainer?
09    A   Yeah, Lee.
10    Q   You didn't give any instructions?
11    A   If it was left up to me to train
12  them, Mr. Hollis, they'd still be learning.
13    Q   You didn't think you were a good
14  enough installer?
15    A   Well, I know, I've never installed a
16  house.
17    Q   You've never - -
18    A   I've just seen it done.
19    Q   You were a certified installer, and
20  you've never installed one?
21    A   Yes, sir.
22    Q   You've never installed a house?
23    A   I've never installed a house.
```

Page 57

01     Q     Okay.  Well, what procedures did
02   these people use that you sent out there to
03   install these trailer, do you even know?
04     A     You know, just - - the times that I
05   watched them, they'd always, you know, put
06   the house up on the pad - -
07     Q     Well, how to you get to - -
08     A     - - and then build the piers.
09     Q     - - be a certified installer?
10     A     Well, if you want to - - to be a
11   certified installer, go to the state of
12   Alabama, watch their film, listen to them a
13   little while, take a test, and pay your
14   monies, and you become a certified
15   installer.
16     Q     Okay.  What do you learn at that
17   installer school?  Not much?
18     A     Not much.  Not much.
19     Q     Well, do they - - you know, in here
20   they say they've got good practices that
21   are outlined in here if you don't have the
22   manufacturer's recommendations, did you
23   ever study these to find out what these

Page 58

01   good practices were?
02      A    The only thing that I've ever looked
03   at was just, you know, the compliance on
04   setting up the homes, you know, six foot
05   centers, you know, and how the anchors, and
06   what have you, are mounted to, you know,
07   screwed into the ground, and how it's
08   attached to the house.
09      Q    So, you would not have, at any time
10   during the five months that Ladon was
11   working for you, have instructed him on how
12   to install a mobile home, because you
13   wouldn't know?
14      A    I would not have instructed Lee or
15   Ladon.
16      Q    Because you didn't know how to
17   install one?
18      A    There you go.
19      Q    Now, on Page - - beginning on Page
20   10, these are photographs.  Were these
21   photographs - - who were these photographs
22   made by and when?
23      A    Them come from the - - these

Page 59

01  photographs here, if I'm not badly
02  mistaken, Mr. Hollis, are the photographs
03  that the Abbeville Police Department had
04  made.
05      Q    Okay.  And they were made actually
06  on the very day this thing occurred,
07  correct?
08      A    Yes, sir.
09      Q    Okay.  And then, on Page 12, what is
10  that?
11      A    That's the bill where we bought the
12  Cobalt jacks.
13      Q    And let's see, we'll start at the
14  top.  It says - - what is "SP Black Shield
15  D"?
16      A    That's something else we bought at
17  Lowe's that day, probably didn't even
18  pertain to these jacks or what have you,
19  but you know, the twelve - - the two
20  twelve-ton jacks at twenty-six-ninety-seven
21  each.
22      Q    A piece.
23      A    And then, the two Cobalt twenty-ton

Page 60

01  jacks at forty-nine dollars each.
02      Q    Okay.  And that was the day before
03  this accident happened?
04      A    Yes, sir.
05      Q    Okay.
06      A    Mr. Hollis, to my knowledge, that's
07  all the Cobalt jacks that I know that we
08  ever had purchased too.
09      Q    Four of them?
10      A    Four of them.
11      Q    And to this day you only have three?
12      A    Yes, sir.
13      Q    And the one missing is the twenty
14  ton or the twelve ton?
15      A    I couldn't tell you.  All I know is
16  the one missing is what they say is the red
17  jack.
18      Q    Now, Page 13, is this the bill of
19  sale for the home to Ms. Paramore?
20      A    This looks like it.
21      Q    It's Palmore, I guess.
22      A    Palmore.
23      Q    Yeah.  This was dated on the 21st

Page 61

```
01   day of February.  And she bought it for
02   fourteen-thousand-four-hundred-and-eighty-
03   five dollars; is that right?
04      A   Yes, sir.
05      Q   And then, what is Page 14?
06      A   Page 14 is the title application for
07   the house.
08      Q   Okay.  And what is 15?
09      A   A certificate of title for - - looks
10   like the title that - - where the house was
11   bought, you know, from Conseco Finance.
12   You know, from repossession of the house.
13      Q   Okay.  So, was this - - did y'all
14   buy this thing from Aycock, did you buy it
15   from - -
16      A   No, sir.  Conseco Finance was the
17   company that - - actually had the house
18   repoed.
19      Q   Okay.  And that's who y'all bought
20   it from?
21      A   Yes, sir.
22      Q   And then, you sold it to Ms.
23   Palmore?
```

Page 62

01   A   Yes, sir.
02   Q   Now, what is 16?
03   A   Buyer's Guide Disclosure.  This
04 looks like paperwork where my wife had
05 filled out that - - Honey, you're going to
06 have to answer this one.
07         MRS. McGRIFF: As is, no warranty.
08         MR. ADAMS:  That's not it.
09         MRS. McGRIFF: That's an as-is paper
10 with no warranty.
11         THE WITNESS: Yeah, but it don't say
12 that.
13         MRS. McGRIFF: Yes, it does.  Right
14 here.  When you bought this, signed, retail
15 dealer, used home, and furthermore they
16 know it is bought as is with no warranty.
17         THE WITNESS: Okay.
18   A   This is the disclosure form.
19   Q   (BY MR. HOLLIS) Okay.  I think we
20 are through with your - - with basically
21 the documents and your Answers to
22 Interrogatories.
23 (Plaintiff's Exhibit 15 was marked for

Page 63

01    identification and a copy of the same
02    is attached hereto as evidence)
03        Q    (BY MR. HOLLIS) I'd like for you to
04    look at Plaintiff's Exhibit Number 15 and
05    see if you have seen that before today?
06        A    Okay.  Bear Creek - - have I seen
07    this, I don't know.  I'm going to say that
08    I have, but - -
09        Q    All right.  Well, what I'm going to
10    do is go down each item and see if you've
11    produced anything, or have anything to
12    produce, other than what you did in answers
13    to your Interrogatories and Request for
14    Production.  First, this is one of the
15    things that brought us here, and it's a
16    30(b)(5)&(6) Notice that was not objected
17    to.  So, I'm basically trying to find out
18    if you have these documents, and if you do,
19    where are they, okay?
20        A    Okay.
21        Q    The first one is "testimony and
22    documents regarding the personnel file and
23    employment of Frank Ladon Cook which should

Page 64

01  include but not be limited to employment
02  application, withholding tax information,
03  references, correspondence, notes, memos,
04  e-mails, training materials or reprimands."
05      A   I would say we don't have any of
06  that stuff, with the exception of what you
07  got for his pay.
08  (Off the record)
09      Q   (BY MR. HOLLIS) Okay.  So, he had no
10  personnel file?
11      A   No, sir.
12      Q   Okay.  "Testimony and documents
13  regarding this defendant's qualifications
14  for its employees."  Did you have any
15  standards that you used for employing
16  people to install the trailers that you had
17  sold to various people?
18      A   Just other than the observation that
19  I have made of Lee Cook and how he, you
20  know, sets up mobile homes.  No, sir, no
21  documentation, just self, you know,
22  observations.
23      Q   Do you have any testimony or

Page 65

```
01   documents regarding the training and
02   testing of the employees by this defendant,
03   such as Lee Cook, Ladon Cook, Sedro or
04   David?
05     A   No, sir.
06     Q   You have nothing?
07     A   I have nothing.
08     Q   Okay.  "Testimony and documents
09   evidencing or relating to the purchase of
10   the jacks made the basis of this matter."
11   You have produced that receipt from Lowe's,
12   is that all you've got?
13     A   That's all we have.
14     Q   Okay.  Now, here is my problem, and
15   what I'm trying to find out.  Y'all bought
16   four jacks, okay, you bought two twenties,
17   you bought two twelves, okay.  One of the
18   twenties and one of the twelves remained in
19   your van.  The other twenty and the other
20   twelve was put in the service truck, okay.
21   We know that two jacks were being used
22   during the process they were using when
23   Ladon was injured.  As you know, we went
```

Page 66

01   out to the site, we found one of the jacks,
02   we did not find the other jack.  And I
03   can't remember if it was a twelve or
04   twenty, does anyone - -
05        MRS. McGRIFF: I think it was the
06   twenty.
07      Q   (BY MR. HOLLIS) Twenty.  Okay.  And
08   as I understand your testimony, there are
09   only three Cobalt - - you never bought but
10   four Cobalt jacks, and you only have three
11   left.  I need to know if the twenty is - -
12   whether it's the twelve or the twenty that
13   is missing, okay?
14        MR. ADAMS:  Well, if he's got three
15   left, and you've got one, I mean, that's
16   all of them.
17      Q   (BY MR. HOLLIS) Okay.  Well, which
18   one of those four - - which one of the
19   four, if it was one of those four that was
20   under the trailer, do you know that?
21      A   I'm not - -
22      Q   What I'm trying - - all I'm
23   specifically trying to do is to find that

Page 67

01   second jack that they were using out there
02   that day, that's what I'm trying to find.
03      A   Mr. Hollis, you got the Cobalt jack
04   that was under the house.  Now, as far as
05   where the other jack got off to, I don't
06   have - - I don't have any idea.
07      Q   Okay.  Tell me this: What is - - and
08   I know you've been over this, but I still
09   haven't gotten - - you said there was a red
10   jack and a black jack, the black jack - -
11      A   David Brasher had - -
12      Q   - - black jack - -
13         MR. STEWART:  It's a twenty that we
14   found under the house.
15      Q   (BY MR. HOLLIS) Okay.  It was a
16   twenty we found under the house.
17      A   Cobalt.
18      Q   Cobalt.  So, if they were using the
19   two Cobalts, the other one would have to
20   have been the twelve?
21      A   Right.
22      Q   Okay.  But you said that David told
23   you one of the jacks was black, that was

Page 68

01  the Cobalt jack, and one of them was red.
02  Now, if it was red and that's the one we
03  don't have, who would have made that one?
04     A   I don't know where the other jack
05  is.
06     Q   Do you have a black jack in your
07  inventory now?
08     A   We should have the three Cobalt
09  jacks.
10     Q   No, I'm sorry, red.  I'm sorry, I
11  phrased that wrong.
12     A   Yeah, there's - - we've got tons of
13  red jacks.  On both trucks.
14     Q   Okay.  And what kind are those?  Are
15  those the Huskys?
16     A   I'm assuming, Mr. Hollis, that some
17  of them are the Huskys, and whatever Lee
18  had just told you earlier.
19     Q   Okay.
20     A   I don't know the name of the other
21  jacks.
22     Q   Okay.  Other than David, did you
23  send Sedro, or anyone else, back out to

Page 69

01  that site?
02    A   No, sir.
03    Q   To your knowledge, did any employee
04  of yours, is there any possibility the
05  adjuster got the other jack, or do you
06  know?
07    A   I don't know.  I know none of our
08  employees has been out to the site, that I
09  know of.
10      MR. ADAMS:  Until the day you and I
11  went out there when you were there.
12    A   I never even went back to the site
13  until the day that I met - -
14    Q   (BY MR. HOLLIS) We went out there
15  and lifted it up?
16    A   Yes.
17    Q   Okay.
18      MR. ADAMS:  Andy, we'll let you look
19  at the - - you know, we'll take you down
20  and let you, your folks look at the service
21  trucks to see what kind of jacks are on
22  there.  We don't have any problem with
23  that.

Page 70

```
01        MR. HOLLIS: Well, I would also like
02   to - - we may need to take David's
03   deposition before we do that, and just see
04   exactly what he's going to say about this
05   black and red.  Because if it was the red
06   one, and we're dealing with a Husky, then
07   we know what we're looking for.  If it's
08   not, then you know, if you've got two
09   twenties left and one twelve, then that
10   other Cobalt is somewhere.
11      Q   Is there any chance that adjuster
12   might have - -
13      A   You've got the fourth one now.
14      Q   That's right.  So, we've got - -
15        MR. ADAMS:  We got four jacks.
16        MR. HOLLIS: We've got four Cobalt
17   jacks.  So, it wasn't a Cobalt.  It
18   couldn't have been a Cobalt if that - -
19        THE WITNESS: There you go.
20        MR. ADAMS:  Because you've got one,
21   and we've got three; is that correct?
22        THE WITNESS: That's correct.
23        MR. ADAMS:  You had two on your van,
```

Page 71

```
01   and you had one that was on the service
02   truck.
03      Q   (BY MR. HOLLIS) Okay.  You heard Lee
04   testify earlier today that he had had some
05   of these Cobalts fail on him.  Have you had
06   the same experience?
07         MR. STEWART: Object to the form.
08      A   No, sir.
09      Q   (BY MR. HOLLIS) You do not know what
10   he's talking about?
11      A   I don't know what he's talking about
12   with these Cobalts.  This is the first time
13   that we'd bought any Cobalt jacks.  And it
14   goes back again, now, I'm a tool fanatic,
15   you know, and I understood that Snap-On
16   builds these Cobalts for Lowe's.  Now, I
17   don't know if that's true or not, that's
18   just - -
19      Q   That's not true.  Not this one.
20      A   But I felt like, you know, it was a
21   good jack.  You know, I buy Cobalts - - Lee
22   is a big thing on Rigid stuff.
23      Q   Well, let me ask you this: Today
```

Page 72

01    when he testified about these Cobalts
02    leaking and draining down, is that the
03    first time you've ever heard that?
04        A    Yes, sir.  You know, there's - -
05    some of that doesn't line up either,
06    because we've never had a Cobalt jack in
07    our truck until we bought these four Cobalt
08    jacks from Lowe's.
09        Q    Well, as I understood him - -
10        A    Now, after the fact I have - - you
11    know, that's all I heard, "them Cobalt
12    jacks are no good, you know, they leak",
13    and what have you like that.  But Mr.
14    Hollis, every jack that I've seen, if you
15    use it enough, is going to start leaking.
16        Q    Well, do you still have those jacks
17    in service?
18        A    Well, I really don't know if they
19    use them or not, because we wound up buying
20    a translift, and - -
21        MRS. McGRIFF: No, they have, because
22    we had to go - - they had to buy some more
23    - - I gave him a check to go ahead and buy

Page 73

01  some more jacks.
02      A    Yeah.  So, from now on, to make Lee
03  happy, I give him a - - or she gives him a
04  check, "you go buy what you want, because
05  I'm not going to hear you no" - - they
06  don't like this.  You know, if somebody
07  doesn't get what they want, you won't never
08  satisfy them.  So, let them buy what they
09  want.
10  (Off the record)
11      Q    (BY MR. HOLLIS) I would like to
12  inspect the three Cobalts that you have and
13  the other ones, the red ones you've still
14  got.
15          MR. ADAMS:  Whatever we've got,
16  you're welcome to look.
17      A    You're welcome to all of them.
18          MR. STEWART:  Well, I'd just like to
19  have the same agreement with those jacks
20  that we've got with everything, which is
21  that nobody messes with them, touches them,
22  changes them, tests them, does any kind of
23  thing to them, that maybe they just go into

Page 74

01  Mr. Adams' possession and you just save
02  them during the course of this litigation.
03      MR. ADAMS: Now, I'm going to have a
04  - - I'm going to leave that back there with
05  the water level, and I'm going to have a
06  bunch of jacks now.
07    Q   (BY MR. HOLLIS) Okay.  Number 5,
08  "testimony and documents evidencing or
09  relating to any and all accident
10  investigation reports, memorandum,
11  correspondence, videos, evidence or
12  photographs regarding the incident made the
13  basis of this matter."  As I understand it,
14  the Abbeville Police Report, photographs
15  you've produced, is all there would be in
16  response to Number 5; is that right?
17      MR. ADAMS:  Except for what I've got
18  from Linda Wooten, from the videos when you
19  were up there and the photographs they
20  took.
21      MR. HOLLIS: Okay.
22    Q   Okay.  Number 6, "testimony and
23  documents evidencing or relating to any and

Page 75

01   all reports filed or sent to other entities
02   in connection with the occurrence made the
03   basis of this suit, including but not
04   limited to any Employer's First Report of
05   Injury and/or any other documents or
06   reports submitted to any government agency
07   or regulatory authority, whether local,
08   state or federal regarding the accident
09   made the basis of this matter."  Nothing?
10      A    Nothing.
11      Q    Okay.  "Testimony and documents
12   evidencing or relating to any and all
13   reports of police investigations arising
14   from the accident made the basis of this
15   suit."  The Abbeville Police Department is
16   the only one you've got; is that right?
17      A    Yes, sir, correct.
18      Q    Number 8, "testimony and documents
19   evidencing or relating to any and all
20   safety rules and regulations regarding the
21   work being performed by Frank Ladon Cook
22   and your employees at the time of the
23   incident made the basis of this matter."

Page 76

01   A   We don't have any kind of rules that
02 they sign.
03   Q   Okay.  Number 9, "testimony and
04 documents evidencing or relating to any
05 alcohol or drug tests regarding Ladon
06 Cook."  Do you have anything - -
07   A   Don't have anything.
08   Q   Do you have any evidence that you
09 know of, whether hearsay or otherwise, that
10 on the date of March the 30th, 2006 that
11 Ladon Cook, when this incident occurred,
12 was under the influence of alcohol, drugs,
13 either illegal or legal?
14   A   To my knowledge, I don't have any
15 evidence of that fact.  You know, some say
16 that he drinks, but I think we all take a
17 drink every now and then.
18   Q   Okay. "Testimony and documents
19 regarding any and all statements taken from
20 any witnesses to the accident made the
21 basis of this matter."
22   A   Which one is that again?
23   Q   That's Number 10.

Page 77

01    A    Number 10, testimony, no, sir.
02    Q    You haven't taken any written
03    statements or - -
04    A    No, sir.
05    Q    Eleven, "testimony and documents
06    regarding any and all lawsuits pending or
07    previously filed against this defendant,
08    for instance, similar to the incident made
09    the basis of this matter."
10    A    No, sir.
11    Q    You don't have any?
12    A    Don't have.
13    Q    There have been none?
14    A    There have been none.
15    Q    Okay.  "Testimony and documents as
16    to the plaintiff's earnings and/or average
17    weekly wage at the time of the incident
18    made the basis of this matter."  Other than
19    paying him a hundred dollars a day - -
20    A    That's all - - that's all we have.
21    Q    And we have already established that
22    I think he started to work for you in
23    October the 20th of '05, correct?

Page 78

01    A   Yes, sir.  It was before Christmas,
02  because they were without something to do
03  for awhile, and he was a big help at
04  helping us get some - - my son's chicken
05  houses up and running.
06    Q   Number 14, "testimony and documents
07  regarding who the plaintiff was employed by
08  at the time of the incident made the basis
09  of the matter."  We've been over that.
10  "Testimony and documents regarding
11  plaintiff's job duties at the time of the
12  incident made the basis of this matter."
13  Now, let's talk about that.  We know that
14  one of the jobs that Ladon had done for
15  you, since y'all had this association, was
16  to install trailers.  And then, you
17  mentioned a minute ago that he might have
18  helped you with one of your son's or son-
19  in-law's chicken houses; is that right?
20    A   That is - - he built some stuff,
21  because he was a fabricator with metal.  He
22  built some little angle pieces to go in the
23  houses there.

Page 79

```
01    Q    And how did y'all pay him for that?
02    A    Just cash.
03    Q    Okay.  Any other things that he did
04  for you between October the 20th and March
05  30th, other than those two things?
06    A    Just mobile homes.
07    Q    Just mobile homes.  Did he ever - -
08  did he ever pick up and actually deliver a
09  mobile home, like Lee did on this
10  particular one, or was he just - -
11    A    No, sir.
12    Q    - - strictly an installer?
13    A    He was strictly - - installed.  He
14  doesn't - - he's not - - he doesn't have a
15  CDL license.
16    Q    Okay.  18, "testimony and documents
17  regarding this defendant's licenses or
18  qualifications to install mobile homes."
19  We've been through that; is that right?
20    A    Yes.
21    Q    You basically don't know how to do
22  it, is that it?
23    A    That's right.
```

Page 80

01    Q    Okay.  19, "testimony - -
02    A    And I don't want to know how.
03        MR. ADAMS:  You shouldn't have said
04    that.
05    Q    (BY MR. HOLLIS)  - - and documents
06    regarding the procedure following to
07    install and/or set up a mobile home."
08    We've been through that.  Is there anyone
09    else that I hadn't asked you about that
10    you've talked to that either represented to
11    you they knew something about this
12    accident, was there, or anything of that
13    nature?
14    A    No, sir.
15    Q    Okay.  Have you had any contact with
16    the Alabama Manufacturing Housing
17    Commission regulatory authority in regard
18    to this accident at all?
19    A    No, sir, not that I know of.  Have
20    we?
21        MRS. McGRIFF: No.
22    Q    (BY MR. HOLLIS)  And there was never
23    any inspection done by the state of this

Page 81

01  trailer after Ladon's injury, correct?
02      A   That's correct.
03          MR. HOLLIS: That's all I have.
04  (Short break)
05  EXAMINATION BY MR. STEWART:
06      Q   We met before we got started.  I'm
07  Chuck Stewart, I represent Lowe's in the
08  case.  And I'm just going to ask you some
09  questions about your knowledge of this
10  incident.  You saw what I did last time,
11  just sort of clear up some things that Andy
12  asked that I didn't quite understand.  Have
13  you and I - - well, we met out there at the
14  site when the house was actually lifted up?
15      A   Yes.
16      Q   And before that time, had you and I
17  ever met each other?
18      A   No, sir.
19      Q   Had you and I ever spoken on the
20  telephone?
21      A   No, sir.
22      Q   And since that time, have we ever
23  talked?

Page 82

```
01    A    No, sir.
02    Q    Just to say "hi" this morning maybe,
03  but that's it?
04    A    Yes, sir.
05    Q    And have you talked with anybody at
06  Lowe's about this case?
07    A    No, sir.
08    Q    And do you have any friends that
09  work at Lowe's?
10    A    No, sir.
11    Q    And you heard this morning that Lee
12  said you like to shop at Lowe's?
13    A    Yeah.
14    Q    Do you still shop at Lowe's?
15    A    I sure do.
16    Q    Thank you.
17    A    I sure do.  When I retire, I'm going
18  to get me a job over there, get a discount
19  maybe.
20    Q    Well, when you bought the jacks on
21  the - - I guess the testimony has been that
22  it was the day before Ladon was injured; is
23  that right?
```

Page 83

01    A    Yes, sir.
02    Q    Had you talked with anybody about
03  the Cobalt jacks before you bought them?
04    A    No, sir.
05    Q    And so, you didn't talk to David or
06  Lee, or Ladon about Cobalt jacks; is that
07  right?
08    A    No, sir.
09    Q    And you didn't talk to anybody at
10  Lowe's about Cobalt jacks?
11    A    No, sir.
12    Q    Okay.  You just came into the
13  Lowe's, bought the jacks, paid for them and
14  left; is that right?
15    A    Yes, sir.
16    Q    You didn't seek any advice from any
17  of the people there at Lowe's about whether
18  to buy a Cobalt jack over some other type
19  of jack?
20    A    No, sir.
21    Q    And have you ever heard anything
22  negative about Cobalt jacks before this
23  case began?

Page 84

01    A    No, sir.
02    Q    And before today, had any of the
03    folks that help you install homes complain
04    to you about the Cobalt jacks?
05    A    Well, we never have used them prior
06    to this accident.
07    Q    Okay.  And then, after the accident,
08    did you ever use them?
09    A    Well, I'm assuming that they have
10    used - - I'm not for sure if they used
11    Cobalt jacks, or which jacks they used.
12    Q    Okay.  You heard Lee say that maybe
13    a couple of the jacks leaked at the seal
14    with the top of the base in the ram?
15    A    Yes, sir.
16    Q    And he testified to that this
17    morning?
18    A    Yes, sir.
19    Q    Before this morning had you ever
20    heard that?
21    A    Well, yes, but not just from a
22    Cobalt jack either.  You know, there's - -
23    all these jacks will start leaking over

Page 85

01  time.
02      Q    So, you've heard complaints from
03  your installers about leaking jacks, but no
04  one specifically said the Cobalt jacks are
05  the ones that leaked?
06      A    The only one that talked about
07  Cobalt jacks after this accident is Lee.
08      Q    Okay.  What did Lee tell you before
09  he testified today?
10      A    He didn't like the Cobalt jacks.
11      Q    And what did he tell you is the
12  reason he didn't like them?
13      A    Because they leak.
14      Q    Okay.
15      A    He doesn't like - - he does have a
16  Cobalt impact wrench on the truck too.  But
17  it's not no more.
18          MRS. McGRIFF: (Inaudible).
19          THE WITNESS: Well, okay.  Well, I
20  don't think it's the tool's fault, you
21  know, you're snatching cords out of them
22  and stuff like this.
23          MRS. McGRIFF: Throw them in the

Page 86

01  dirt.
02      THE WITNESS: Yeah.
03      MR. STEWART: I would agree with you.
04   Q   And what did you say when Lee told
05  you he didn't like the Cobalt jacks?  Did
06  you talk to him about it?
07   A   No, sir, I didn't - - I didn't talk
08  to him about it.  Just you know, let him
09  use his own jack, whatever jack he wants to
10  use.
11   Q   Okay.  But you did tell him when he
12  said he didn't like the Cobalt jacks that
13  any jack will leak?
14   A   Yes.  I mean, any jack's going to
15  leak.
16   Q   Okay.  Had you ever heard that a
17  leak in the Cobalt jack caused this house
18  to shift on the date of the accident?
19   A   No, sir, I've not referenced that
20  this - - anything about the jacks caused
21  the accident.
22   Q   At any time?
23   A   At any time.

Page 87

01    Q    And did you talk to David in an
02  effort to try to figure out why the house
03  shifted?
04    A    Yeah.  You know, I wanted to know
05  what happened.
06    Q    And did you talk to Sedro about why
07  the house shifted?
08    A    Yes, sir.
09    Q    Am I pronouncing his name right?
10    A    Sedro.
11    Q    Sedro.
12    A    I don't even know if I'm pronouncing
13  it right either, to be honest.  Mr. Mancil.
14    Q    Well, did you talk to Ladon about
15  why the house shifted?
16    A    No, sir.
17    Q    Okay.  So, setting aside Ladon for a
18  second.  Sedro and David never said
19  anything about the jacks causing the house
20  to shift?
21    A    No, sir.  It was - - just always the
22  jack - - the house was jacked up too high.
23    Q    Okay.  Did you ever read the owner's

Page 88

01    manual that came with the jacks, the Cobalt
02    jacks?
03       A No, sir.
04       Q    Did you ever open the box where the
05    Cobalt jacks were in?
06       A    Not the particular one that's
07    involved in this, no.
08       Q    Well, did you ever open any of the
09    other Cobalt jack boxes?
10       A    Yes.
11       Q    And what did you do with the manual
12    that was inside it?
13       A    Typically, filed it.
14       Q    Okay.  And do you know whether Lee
15    ever read the manual that was inside?
16       A    No, sir, I couldn't - - I don't know
17    if he's ever read the manual or not.
18       Q    Have you actually read the manual
19    since this lawsuit's been filed?
20       A    No, sir.
21       Q    Have you read any of the jack
22    manuals before?
23       A    I've done mechanic work all my life,

Page 89

```
01   I know there can be mechanical failure with
02   anything that's mechanical.  So, I always
03   take precaution.  Either if I'm jacking up
04   a car, I put something under it.  I never
05   take my lifeline out from under something
06   that I'm going to work on.  So, no, I'm not
07   going to say that I sit there and read the
08   manual, I don't even read how to put these
09   toys together.  It's just a puzzle, you put
10   it together.
11      Q    You said on the night that Ladon was
12   - - or the day - - excuse me, not night,
13   but the day that Ladon was injured, you
14   went to the hospital and his family was
15   there, and you said his step-father was
16   ranting and raving and you left because of
17   that because you weren't going to get in a
18   fist fight?
19      A    Well, I wasn't going to get in no
20   confrontations with him, you know.
21      Q    Was he blaming you, or others, for
22   this accident?
23      A    Well, I felt like that he was - - he
```

Page 90

01  was blaming us.
02      Q    What did he say?
03      A    Well, just he was cursing, you know,
04  talking about "these damn people", and you
05  know, talking about insurance mostly.  And
06  he - - actually he called Ann Barnham's ex-
07  husband, Sam, what's his name?
08          MR. ADAMS: Terry Bullard.
09      A    Terry Bullard.  He was talking to
10  Terry Bullard's son on the phone.  So, I
11  said "well, it's time for me to get on out
12  of here.  I need to go see my lawyer."
13          MR. STEWART:  Terry Bullard's son's
14  a lawyer?
15          MR. ADAMS: Yes.
16      Q    (BY MR. STEWART) And you said he was
17  talking about insurance, what was he saying
18  about insurance?
19      A    No, he was just ramping and raving
20  about, you know, "they probably don't have
21  insurance", and he just looked like a wild
22  kind of guy.
23      Q    And what's his name?

Page 91

01     A    I couldn't tell you.
02     Q    Okay.
03     A    I'd never even seen him before.
04     Q    Have you yourself ever seen one of
05   the Cobalt jacks leak?
06     A    No, sir.
07     Q    Did you ever consider taking the
08   Cobalt jacks back to Lowe's and get your
09   money back?
10     A    No, sir.
11     Q    Did you ever think about it?
12     A    No, sir.
13     Q    Are the jacks, these three that you
14   still have, are two in your van still?
15     A    No, they're probably on the service
16   truck.  Them boys will hit my van and get
17   stuff out of it to use if they're running
18   short on stuff.  So, I'm constantly having
19   to buy something.
20     Q    To the best of your recollection
21   then, or the best of your knowledge, the
22   three jacks that you still have in your
23   inventory are on the service truck?

Page 92

```
01      A   Yes, sir.
02   (Defendant's Exhibit 4 was marked for
03   identification and a copy of the same
04   is attached hereto as evidence)
05      Q   (BY MR. STEWART) I've sort of
06   compiled a bunch of things on this Cobalt
07   jack, if I can walk around.  This is like
08   the instruction manuals, and then I stuck
09   one of these jacks on a Xerox machine and
10   copied it.  But I just put it all together
11   in one thing.  I've got the box, and then
12   the manuals itself.  And when you get to
13   the manual itself, it starts over on Page
14   19.  That's the documents I've given y'all,
15   it's LHC0019, but I'll just refer to it as
16   like Page 19, if that's okay with you.  You
17   see that warning on the front page, it says
18   "to avoid crushing and related injuries
19   never work on, under or around a load
20   supported only by a jack.  Always use
21   adequately rated jack stands"?
22      A   Yes, sir.
23      Q   Based on your experience, and your
```

Page 93

```
01    mechanical background, is that a good
02    warning?
03       A   Yes, sir.
04       Q   Do you agree that you would never
05    get - - work on, under or around a load
06    that's only got a jack holding it up?
07       A   Yes, sir.
08       Q   You said that you would put some
09    kind of jack stand - -
10       A   Yes, sir.
11       Q   - - when you work on automobiles?
12       A   Yes, sir.
13       Q   Okay.  And in the manufactured home
14    business, what's the equivalent of a jack
15    stand?
16       A   Timbers, tires, axles, whatever you
17    can get to support the house.
18       Q   And is that what you heard Lee
19    talking about today?
20       A   Yes, sir.
21       Q   Okay.  If you'll look over on the
22    next page where it says "product
23    description", had you ever - - and that's
```

Page 94

```
01   Page LHC0020.  Had you ever read that
02   product description before?
03      A   No, sir.
04      Q   Okay.  If you'll read down about
05   three sentences you'll see, "after lifting,
06   loads must be immediately supported by
07   appropriate means"; is that what you're
08   talking about with the jack stands?
09      A   Yes, sir.
10      Q   And then, if you'll read down, the
11   last sentence there, "these jacks are not
12   recommended for use in lifting or
13   positioning construction trailers, houses
14   and/or other building structures."  Had you
15   ever read that before?
16      A   No, sir.
17      Q   Okay.  Did you ever talk with Lee
18   about whether he'd ever read that before?
19      A   No, sir.  Some things I don't
20   understand about some of these things.  You
21   rate a jack at twenty tons, and then you
22   say you can't - -
23        MR. ADAMS:  He didn't ask you that.
```

Page 95

01    What did I tell you this morning.
02        Q    (BY MR. STEWART) What do you do for
03    the County?  I'm sorry, I didn't know you
04    worked for the County.
05        A    Yes, sir, I'm - - well, I taught for
06    quite a while, taught automotive
07    technology.  And now, I'm over their
08    transportation and maintenance program for
09    the Houston County Board of Education.
10        Q    And what do you do, transportation
11    and what was that?
12        A    Maintenance.
13        Q    Are you over - -
14        A    Maintenance on schools.
15        Q    Okay.  And transportation, would
16    that be buses?
17        A    School buses.  Coordinate routes,
18    and whatever it takes to transport them,
19    get them back and forth to the school.
20        Q    Did you ever talk with Ladon about
21    the proper method for installing a home?
22        A    No, sir.
23        Q    Were you ever around when Lee was

Page 96

01  training him or talking to him about the
02  proper method?
03      A    Yes, sir.
04      Q    And do you recall anything that he
05  told him about properly installing a home?
06      A    Just basic stuff, you know, the do's
07  and the don'ts.  As far as specifically,
08  I've heard him tell everybody, you know,
09  about positioning the jacks and the jack
10  plates, and you know, where to put them on
11  the frames.  And never jack up both sides
12  of the house, you know, jack up one side at
13  a time.  You know, level your - - get all
14  your piers leveled before you can do that.
15  They build the piers, and get the water
16  level and level the piers under the
17  framework, like Lee was discussing this
18  morning.  And then, lift the - - you know,
19  get it on both sides, lift the house, take
20  the wheel out, lower it down, one side at a
21  time.
22      Q    So, you'd actually heard Lee tell
23  this to Ladon - -

Page 97

01    A    Yes, sir.
02    Q    - - before?
03    A    He's told everybody that.
04    Q    Do you yourself have any information
05    that something Lowe's did caused this house
06    to fall?
07    A    No, sir.
08    Q    Do you have any information that
09    something Lowe's, or LGC did to cause the
10    house to shift?
11    A    No, sir.
12    Q    Do you have any information that
13    there was some problem or defect in the
14    jacks that were being used out there that
15    day?
16    A    No, sir.
17        MR. STEWART: I don't have any other
18    questions.  Thank you.
19    EXAMINATION BY MR. RITCHEY:
20    Q    Mr. McGriff, I'm Greg Ritchey, I
21    represent Redman Homes.  Did you pick the
22    - - this particular home up from the
23    original installation site?

Page 98

01    A    Did I pick that up from the
02  original?
03    Q    Yes.  I understand - - was this home
04  originally repoed?
05    A    Yes.
06    Q    Okay.  Were you the company that
07  repoed the house?
08    A    Yes.
09    Q    Okay.  Were you there at the time it
10  was being picked up?
11    A    I wasn't there, no.
12    Q    Do you know who picked it up?
13    A    Lee.
14    Q    Lee did.  Okay.  Was it brought to
15  your lot?
16    A    Yes, sir.
17    Q    Did you buy it from Greentree, or
18  did you agree to - -
19    A    No, we purchased it.
20    Q    You purchased it from Greentree,
21  okay.  What kind of condition was the home
22  in when it was brought to your lot?
23    A    All I know, they'd done some

Page 99

01 remodeling to it.  You know, as far as
02 cosmetics, painting, carpet, vinyl
03 flooring, such things as this.
04     Q    Okay.  The previous owner did some
05 remodeling?
06     A    No, we done that before it was sold.
07     Q    Okay.  What kind of remodeling did
08 you do?
09     A    Just replace the floor, you know,
10 floor covering, paint cabinets, walls.  I
11 think we replaced a sink and a shower in
12 one of the bathrooms.  Just general
13 cosmetic stuff.
14     Q    Okay.  Did you inspect the entire
15 home when you got it?
16     A    Just as far as cosmetics.
17     Q    Did you do any other type of visual
18 inspection of - -
19     A    No, sir.
20     Q    Did it appear to have any type of
21 transportation damage?
22     A    It didn't appear to.
23     Q    Did you ever inspect the frame

Page 100

01 beforehand?
02    A    As far as looking for warpage under
03 the house and damage to the tongue, you
04 know, that's just kind of automatic, I
05 guess.  I didn't see no structural damage.
06    Q    Was this a bolt-on hitch?
07    A    I couldn't tell you.
08    Q    Do you have a check list that you go
09 through when you bring a house in?
10    A    No.
11    Q    And as far as the repairs, you did
12 those yourself and did not bill them back
13 to anybody?
14    A    No, we done the stuff ourselves.
15    Q    I believe the Alabama Manufactured
16 Housing Commission requires you to go
17 through certain steps before you re-sell a
18 house, did y'all do that?
19    A    You're talking to the wrong person.
20    Q    Save that one for your wife?
21    A    Yes.
22    Q    On the day of the incident you said
23 you were on your way to the installation

Page 101

01  site where Ladon was?
02      A   Yes, sir.
03      Q   Was this the first installation that
04  he had scheduled for that day, or the
05  second one?
06      A   I don't remember.  I really don't.
07      Q   Were you on the first - -
08      A   I thought - - I was thinking that it
09  was just the only one that he had to do
10  that day, but I'm not going to say that for
11  sure.
12      Q   Okay.  Is there any way that you can
13  go back and look to determine?
14      A   Well, ask her that.  Save that one
15  for her.
16      Q   All right.  And we've heard a little
17  bit about a red jack that was apparently
18  being used with the black jack.  The black
19  jack, I believe was the one - - is the
20  Cobalt one?
21      A   Yes, sir.
22      Q   Any of the other three Cobalt ones
23  that you have red?

Page 102

```
01    A    No, sir.
02    Q    They're all black?
03    A    Yes, sir.
04    Q    Okay.  And I think Ladon testified
05    that on his truck he believed he had five
06    jacks - - I'm sorry, Lee had five jacks?
07    A    Whatever they say that's on the
08    trucks.
09    Q    Okay.  And you had two of the newly
10    purchased Cobalt jacks in your van?
11    A    Yes, sir.
12    Q    So, if he had five jacks on that
13    truck, two would have been the new Cobalt
14    ones?
15    A    Yes, sir, on the service truck.
16    Q    And what size did you have in your
17    van, do you recall?
18    A    A twenty ton and a twelve ton.
19    Q    Okay.  So, the other twenty ton and
20    twelve ton would have been on the service
21    truck.  Then the other three jacks that
22    were there, were any of those red?
23    A    Yes, sir.  All the rest of them's
```

Page 103

01  red jacks.
02      Q    Okay.  Were they all operable?
03      A    I'm just assuming, I don't know.  I
04  couldn't answer that.
05      Q    Do you know what ton each of those
06  jacks were?
07      A    No, sir.
08      Q    Are those jacks still on the service
09  truck?
10      A    I just have to make that assumption.
11  That one you need to ask for Lee.
12      Q    Okay.  Does he have that truck now,
13  I guess?
14      A    Yes.
15      Q    So, if there is that other - - it's
16  possible that that other red jack may not
17  necessarily be missing, but may have just
18  been picked up at the site and just put
19  back on the truck?
20      A    That I couldn't tell you either.  I
21  mean, I was assuming myself that the jacks
22  were under the house.  I couldn't answer
23  that question.

Page 104

01    Q    Has anybody ever asked Sedro or
02  David what happened to the other jack?
03    A    You know, after I left the site, the
04  jacks never come back in my mind again
05  until Mr. Hollis had called me and wanted
06  to have them - - and wanted the jacks, and
07  I told him, "you're more than welcome to
08  them, but they're under that house."
09    Q    Okay.  When you got to the site, did
10  you walk around the site, or walk around
11  the house?
12    A    I just - - that front side of the
13  house, the rear of the house where the
14  machine had picked the house us, that's the
15  only place I walked to.
16    Q    Okay.  Did you see any jacks that
17  were just outside?
18    A    No, sir.
19      MR. RITCHEY: That's all I've got.
20  EXAMINATION BY MR. LEE:
21    Q    Mr. McGriff, as you know, I'm Will
22  Lee, and I represent Mills Timber.  Have
23  you ever had any conversations of any kind

Page 105

01  with any employees or agents of Mills
02  Timber about this accident?
03     A    No, sir.
04     Q    Do you contend or claim that Mills
05  Timber or its employees or agents did
06  anything wrong?
07     A    No, sir, not that I'm aware of.
08     Q    Do you believe that any act of Mills
09  Timbers or its agents or employees caused
10  or in any way contributed to Mr. Cook's
11  injuries that he's claiming in this
12  lawsuit?
13     A    Not that I'm aware of.
14        MR. LEE: That's all I have.  Thank
15  you.
16        MR. HOLLIS:  No further questions.
17  FURTHER DEPONENT SAITH NOT
18
19
20
21
22
23

Page 106

```
01   C E R T I F I C A T E
02
03   STATE OF ALABAMA
04   JEFFERSON COUNTY
05
06        I hereby certify that the above and
07   foregoing deposition was taken down by me
08   in stenotype, and the questions and answers
09   thereto were reduced to typewriting under
10   my supervision, and that the foregoing
11   represents a true and correct transcript of
12   the deposition given by said witness upon
13   said hearing.
14        I further certify that I am neither
15   of counsel nor of kin to the parties to the
16   action, nor am I in anywise interested in
17   the result of said cause.
18
19
20        _____
21        Joe Paul Moore,
22        Commissioner and Notary Public
23
```