**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CANAL INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV NO.: 1:07-cv-410-MHT** |
| | ) | |
| **FRANK LADON COOK; et al.,** | ) | **ORAL ARGUMENT STRONGLY** |
| | ) | **REQUESTED** |
| **Defendants.** | ) | |

<u>**DEFENDANT'S SECOND SUPPLEMENTAL BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**</u>

**COMES NOW** the Defendant Frank Cook, by and through his undersigned counsel, and files this Second Supplemental Brief in Opposition to Plaintiff Canal Insurance Company's ("Canal's") Motion for Summary Judgment. Defendant respectfully requests that this Court deny Plaintiff's Motion for Summary Judgment. Defendant Frank Cook ("Cook"), hereby submits his Second Supplemental Brief in response to the concerns expressed by this Court during the Pretrial hearing of January 28, 2008. In submitting this second supplemental brief, Defendant Cook readopts all arguments previously submitted to this Court in this action. Defendant Cook shows unto the Court the following:

<u>**INTRODUCTORY COMMENT**</u>

At the Pretrial Conference on January 28, 2008, this Honorable Court expressed concern regarding the arguments maintained by Defendants to this declaratory judgment action regarding the "loading and unloading" of the mobile home that fell upon Defendant Frank Cook causing his quadriplegia. Specifically, it is this counselor's understanding that this Court did not believe this particular argument would "carry the day". It is this counselor's further understanding that the Court did express concern that perhaps the

coverage question in this case may only be answered in knowing whether the subject mobile home was "designed for use with a four wheel private automobile" as defined in a paragraph contained in the subject policy of insurance. It is assumed by this counselor that by these statements, this Court is concerned that the mobile home that crushed Frank Cook may not have been a "covered automobile" at the time the mobile home collapsed. Cook submits that the subject accident and subsequent injuries suffered by Cook are a "covered" claim under the terms of the subject policy as these same terms have been historically defined, have been interpreted by the insurance industry and how these terms have been interpreted by other courts.

With great respect and deference to this Court, Defendant Cook would submit that defining the subject mobile home as one "designed for use with a private passenger automobile" is not the analysis to which this Court should focus its attention in this matter. Rather, as has been argued by Cook throughout this declaratory judgment action, this Court should instead look to (i) the language of the policy wherein coverage is provided for bodily injury (Section A); (ii) apply prior precedent, the facts as submitted in this case; (iii) and look to both the insurance industry interpretations and the common everyday use of the undefined terms in the Canal policy to determine whether coverage exists in this matter. By maintaining this position, the undersigned counselor certainly does not mean to convey any disrespect or insult upon this Court. Certainly, this counselor has been before Your Honor many times and has always held this Court in high regard.

Defendant Cook submits that if this Court looks within the above listed issue determining parameters, the Court will find that insurance coverage does exist for the actions and inactions of the insured (Bear Creek) in this case as it is undisputed in this matter that Bear Creek's errors and omissions in <u>unloading the subject mobile home from the 1988</u>

IH Tractor are what gave rise to or was the "efficient proximate cause" of the injuries suffered by Cook.

In the event that Defendant Cook failed to explain and/or argue this position clearly in his previously submitted memorandum briefs to this Court, Cook will attempt herein to show why the subject policy of insurance does provide coverage in this case and. in doing so, show that Plaintiff Canal Insurance Company's Motion for Summary Judgment should be denied.  As this Court is familiar with the facts of this case, Defendant Cook will only incorporate relevant facts into his argument as same become necessary.

**I.      THIS CASE REVOLVES ENTIRELY OUT OF A CAUSATION DISPUTE AND THE MEANING OF THE "ARISING OUT OF" CLAUSE**

This entire declaratory judgment action revolves around a request by Canal Insurance Company for this Court to declare that the accident and injuries suffered by Frank Cook and made the basis of the underlying case styled *Frank Ladon Cook v. Bear Creek Sales, L.L.C., a corporation, et al.*, CV-06-42, do not fall under the coverage provisions of the subject automobile insurance policy.

As this Court is aware, there is <u>no dispute</u> in this matter that Cook's paraplegia was caused by the collapse of a mobile home that was hauled, unloaded and left at the situs of Cook's accident by Bear Creek.  Likewise, there is <u>no dispute</u> that the injury causing mobile home was not unloaded properly, to wit; Bear Creek's owner admits to this failure.

Plaintiff Canal has argued that no coverage exists in this case because the mobile home that fell and caused Cook's quadriplegia was not attached to the 1988 IH tractor used to transport and unload the injuring mobile home at the time of its collapse.  In other words, Canal maintains that both the cause of this accident and Cook's injury do not fall within the

policy provisions because the mobile home was not a covered automobile as it was not "attached" as referred to in the Declarations Page.

Defendant Cook maintains that the facts in the underlying case invoke coverage as all acts of negligence that caused the subject mobile home to collapse and were thus the "efficient proximate cause" of Cook's subsequent injuries, arose out of the use (unloading) of the 1988 IH tractor. Stated differently, the unloading of "owned automobile" (the 1988 IH Tractor) in this case was the "use" that ultimately was the "efficient proximate cause" of the bodily injuries suffered by Cook and thus coverage is mandated under Alabama law (discussed infra.). To be sure, according to the undisputed testimony of Bear Creek's owner, Bryan McGriff, the unloading process includes a series of intricate steps before the unloading process is completed. Moreover, the failures and omissions of Bear Creek to ensure that the subject mobile home site was level, tied down and stable all occurred while the 1988 IH Tractor was being used to unload the mobile home and while the mobile home was attached to the tractor. No party or witness in this case can or does dispute that the unloading of the subject mobile home involves the "use" of the owned automobile (the 1988 IH Tractor).

With the above as the respective positions of the parties, Cook submits that the issue for determination in this case is: whether insurance coverage (both defense and indemnification) exists under the terms of the subject insurance policy provisions after a mobile home collapsed causing injury when the collapse of said home was caused by the failures to ensure safety and stability during the unloading of said home from an "owned automobile" (1988 IH Tractor) and after said owned automobile left the premises upon which the injuring mobile home was unloaded? Put another way, does the failure to ensure

that the unloading process is carried out properly and safely "arise out of the use" of an owned automobile under the terms of the subject policy of insurance.

Cook submits that the answer is unequivocally -- YES. In deciding the coverage question in the instant case, this Court should first look to the Insuring Agreement made between Canal and its insured Bear Creek.

## THE INSURING AGREEMENT

The specific insuring agreement and policy provision at issue in this case, Section A (I) states as follows:

> The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of
>
> ### bodily injury or property damage
>
> to which this insurance applies, caused by an **occurrence** and *arising out of the ownership, maintenance or use, including loading and unloading,* for the purposes stated as applicable thereto in the declarations, of an **owned automobile** or of a **temporary substitute automobile**, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suite are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
>
> (Basic Automobile Liability Policy No. 470433; Exhibit "A") (bold emphasis in original, italicized and underlined emphasis added).

Following this Insuring Agreement, Canal has set forth a number of Exclusions to which the subject insurance does not apply. None of the listed exclusions (Section A, Part I, Exclusions paragraphs (a)-(g)) apply to exclude coverage for the unloading of cargo (in this case the subject mobile home) from the 1988 IH tractor ("owned automobile") listed in the Declarations page when the owned automobile is used for a commercial purpose as it was in this case. In other words, this agreement provides insurance coverage for bodily injury and

property damage when caused by an occurrence that arises out of the use, maintenance or ownership, including loading and unloading, of an owned automobile while said automobile is used for a commercial purpose (as sated in the Declarations Page). Since it is undisputed that the 1988 IH Tractor is a "owned automobile"; since no party or witness has disputed that the 1988 IH Tractor was being used for a commercial purpose in towing and delivering the subject mobile home; and since no witness or party can or has disputed that both the accident at issue and the injuries suffered by Cook were caused by the acts and omissions of Bear Creek during the time that the subject mobile home was being unloaded from the 1988 IH Tractor, it is axiomatic that, given the language of this Insuring Agreement, this Court should need only look to the substantive law of Alabama on causation to decide whether the underlying accident and subsequent injuries "arose out of" the use or unloading of the subject mobile home from the 1988 IH Tractor, which is again, an undisputed "owned automobile" as defined by the policy at issue.

## II.  ALABAMA CAUSATION LAW IN INSURANCE CONTRACTS--THE RULE

Alabama follows the efficient proximate cause rule in making determinations of whether an event or accident is covered under any given policy of insurance. Indeed, the efficient proximate cause rule was adopted by the Supreme Court of Alabama in the case of *Western Assurance Co. v. Hann*, 78 So. 232 (1917). In adopting the efficient proximate cause rule, the Court held that "the word 'direct,' used in connection in such policies, means merely 'immediate' or 'proximate' as distinguished from 'remote'" and that issues of causation in insurance were not different from issues of causation in the law of negligence. *Id.* at 234 (quoting *Ermentrout v. Girard F. & M. Ins. Co.*, 65 N.W. 635 (Minn. 1895)). In *Hann*, a building neighboring the building of the insured caught fire and was severely

damaged.  <u>Several months later</u> one of the walls that was still standing from the burned building was blown over and damaged the building of the insured.  It was held that the fire was the efficient proximate cause of the loss to the insured's property.

Interestingly, the Court in *Hann* discussed the causational rule as follows:

> "On principle, and by the weight of authority in many well-considered cases we think it clear that,…, the question, What is a cause which creates a liability? is to be determined in the same way in actions on policies of fire insurance as in other actions…the direct and proximate cause does not mean that the cause or agency which is nearest in time or place to the result is necessarily to be chosen, concluding this thought in the following language:
> The active efficient cause that sets in motion a train of events which brings about a result without the intervention of any force started, and working actively from a new and independent source, is the direct and proximate cause referred to in the cases."

*Id.* at 235, quoting *Lyn Gas, etc., Co. v. Meriden F.I. Co.*, 158 Mass. 570, 33 N.E. 690.

The Court in *Hann* explained further that:

> "In considering these questions it must also be borne in mind that the proximate cause is not always nor generally the act or omission nearest in time or place to the effect it produces. In the sequence of events there are often many remote or incidental causes nearer in point of time and place to the effect than the moving cause, and yet subordinate to and often themselves influenced, if not produced, by it. Thus a defect in the construction of a boiler of an engine may long exist without harm, and yet finally be the proximate cause of an explosion, to which the negligence of an engineer, the climate, and many other incidental causes nearer by years to the effect may contribute.

quoting *Union Pac. Ry. Co. v. Callaghan*, 56 Fed. 988, 6 C.C.A. 205.

Ever Since the holding in *Hann*, it has ever since been the law in Alabama that the efficient proximate cause is that cause that sets in motion a chain of events which brings about a result.  This is the law that should be applied in this case.  While not applicable to

the case at bar, it should be noted that the efficient proximate cause rule can be limited via contract.

**1.     Parties to an Insuring Agreement can Contact around Alabama's Efficient Proximate Cause Rule as Long as the Agreement does not Violate a Rule of Law and Does not Offend Public Policy**

Defendant Cook feels compelled to remind this Court, as it is already aware, that Alabama law does allow parties to an insurance agreement to contract around this efficient proximate cause rule to further narrow coverage as long as the agreement does not violate the law or public policy.  While Plaintiff Canal has no such coverage limiting agreement clause in the instant policy, a discussion of this concept (as was done by the Alabama Supreme Court in *State Farm v. Slade*, infra.) is nevertheless appropriate to illustrate Canal's current inability to limit coverage in this case by referring to a non-applicable statement in the Declarations Page.

The issue of efficient proximate cause was revisited in the case of *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293 (Ala. 1999).  As before, unlike the case at bar in which no effort has been made by Canal to contract around the efficient proximate cause language in its own policy (i.e. Section A, Part I - "arising out of the ownership, maintenance or use, including loading and unloading"), the Court in *Slade* was confronted with an <u>exclusion within a policy</u> of insurance which <u>did</u> limit the extent of the efficient proximate cause rule. In *Slade*, the insured's home was damaged when a retaining wall fell and struck the home.  It was alleged that a lighting strike caused the earth movement, which in turn caused the wall to fall into the home.  Earth movement was specifically excluded by the insured's policy of insurance.

The Supreme Court of Alabama recognized that "[s]ome courts have chosen to invalidate policy language inconsistent with the rule of efficient proximate causation in

situations in which the policy clearly contradicts the rule." *Slade*, 747 So. 2d at 314. In considering the position of other courts, the Supreme Court of Alabama reasoned that Alabama has "a long-standing rule against rewriting unambiguous insurance policies 'so long as they do not offend some rule of law or contravene public policy.'" *Id.* (quoting *Northam v. Metropolitan Life Ins. Co.*, 163 So. 635, 636 (Ala. 1935)). Ultimately, the Court held that "the rule of efficient proximate causation adopted in *Hann*, supra., does not require us to invalidate the earth-movement exclusion, which indicates State Farm's efforts to contract for narrower coverage." *Id.* at 314-15.

The Supreme Court of Alabama in *Slade*, supra, does not eliminate the efficient proximate cause rule, but rather provides that private parties are free to contract around the rule. Moreover, the efficient proximate cause rule has long been and still is the substantive law on causation for purposes of interpreting insurance policies in Alabama. This is the rule Defendant Cook submits should be applied by this Court in the case at bar.

In doing so, this Court should not disregard the Insuring Agreement in this case and ignore, as Plaintiff Canal would have this Court do, the <u>listed exclusions</u> in its own policy. Nowhere in the "Exclusions" section from the subject policy does Canal even attempt to contract around the efficient proximate cause rule regarding the "arising out of the ownership, maintenance or use, including loading and unloading" of the 1988 IH Tractor. Certainly if Canal wished to exclude the "unloading" of the tractor from coverage on this policy, it was free to do so--it did not. After having <u>failed</u> to exclude "unloading" of an owned automobile (1988 IH Tractor) in the subject policy, Plaintiff Canal cannot now "run for cover" underneath an inapplicable "one-liner" contained in the Declarations Page. To allow Canal to do so would effectively rewrite this insurance contract and completely toss aside the self-limiting language of the Insuring Agreement as quoted above along with the

efficient proximate cause language contained in the insuring agreement portion of the policy as written <u>by Canal</u>. Canal accepted money in exchange for its promise to provide insurance coverage for "bodily injury arising out of the use" of the 1988 IH tractor, including the "unloading" of said tractor. Defendants in this case ask this Court to do nothing more than to apply Alabama's substantive efficient proximate cause rule and instruct Canal that it must honor its agreement for provide both a defense and indemnify its insured for any damages assessed against it as a result of bodily injury suffered by Frank Cook that was caused by the use and unloading of Bear Creek's 1988 IH Tractor.

2.  <u>Alabama's Efficient Proximate Cause Rule as Applied to "Arising Out Of" Clauses In Automobile Insurance Policies</u>

On several occasions the Alabama Supreme Court has applied the efficient proximate cause rule to "arising out of" clauses identical to the one found in the policy involved in the instant case. In doing so, the Supreme Court has stated that the "term 'arising out of the use' in liability policies has generally been held to be a broad, comprehensive term meaning 'origination from,' 'having its origin in,' 'growing out,' or 'flowing from.'" *Taliaferro v Progressive Spec. Ins. Co.*, 821 So.2d at 980 (quoting *Travelers Ins. Co. v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 365 (Tenn. 1973)). The Court in *Travelers* has stated that "[t]he term 'use'…has been a general catch-all term construed by the courts to include **all proper uses of a vehicle**. *Id.* (emphasis added). Finally, the Alabama Supreme Court has also held that "[c]overage exists where the minimal causal connection between the use of the vehicle and the injury is provided by the foreseeable and reasonable use of the vehicle…" *Taliaferro* at 980 quoting *Garrison v. State Farm Mut. Auto. Ins. Co.*, 258 Kan. 547, 558-52; 907 P.2d 891, 895 (1995).

By Bear Creek's own admission, the subject mobile home was unloaded from the undisputed "owned automobile" (1988 IH Tractor) and left at the situs of Mr. Cook's

accident. Certainly the unloading of a mobile home from the tractor Bear Creek used to pull its mobile homes is and was within the "foreseeable use" of both Bear Creek and Canal. This point is undeniable especially since Canal saw fit to include in the Declarations Page that Bear Creek was in the business of "Mobile Home Pullers – Mobile Homes". (See Declarations Page previously submitted). Clearly, the unloading of a mobile home from the 1988 IH tractor that pulled Bear Creek's mobile homes was one of the proper, foreseeable and contemplated uses of the tractor. Moreover, Bear Creek's owner testified that the unloading process included an inspection of the delivery site for stability, the backing in of the mobile home, the setting of piers to hold the weight of the home, leveling of unloading site, the tying down of the home and the unhooking of the 1988 IH Tractor. (See previously submitted deposition of Colbert Bryan McGriff of September 14, 2007 at p. 20-23). Bear Creek's owner testified that is was only after all of these intricate and ostensibly important steps are completed that the unloading process is properly and safely completed. Clearly, the unloading of a mobile home from Bear Creek's "toter-truck" was one of the proper uses of the 1988 IH Tractor. Moreover, Defendant Cook has proffered the undisputed affidavit of Ray Helmer, who confirms that in his expert opinion, it was the multiple failures and omissions during the unloading of the mobile home from the 1988 IH Tractor, which "led to the collapse of the mobile home onto Cook." See (Affidavit of Ray Helmer previously submitted with Def. Opp'n to Pl's Mot. for Summ. J. of October 23, 2007). In other words, Cook's injuries "arose out of" the use of the "owned automobile" because, as the evidence in this case suggests, the cause of Cook's injuries 'originated from,' 'had their origin in,' 'grew out of,' and/or 'flowed from the many failures of Bear Creek that were carried out while the subject mobile home was attached to the 1988 IH Tractor and while the mobile home was being unloaded from said "owned automobile". Throughout this case Plaintiff Canal dose

not and cannot dispute that the mobile home collapse upon Defendant Cook was caused by the improper unloading of said home from the 1988 IH Tractor that is undeniably covered under the policy of insurance made the basis of this case. Plaintiff's Motion for Summary Judgment is due to be denied.

**3.      Alabama's Efficient Proximate Cause Rule as Applied to "Arising Out Of" Clauses In Loading and Unloading Cases**

To be sure, in applying the causational rules to interpret insuring agreements such as the one in the instant case, Alabama courts have noted that the terms loading and unloading are "used to **extend and expand the** ordinary **meaning of the word 'use."** *Sentry Ins. Co. v. Pac. Indem.*, 345 So.2d 283, 285 (Ala. 1977) (emphasis added) (citing *Fireman's Fund Ins. v. Canal Ins. Co.*, 411 F.2d 265, 268 (5th Cir. 1969)). "It is sufficient if there is an immediate causal connection between the loading [or unloading] operation or the way it is carried out and the accident." *Fireman's Fund*, 411 F.2d at 269.

Since Plaintiff's Canal concentrates its efforts on the non-coverage argument because of "no attachment", Defendant Cook will submit first that Canal's argument is of no consequence to the determination of the issue in this case since the cause of the mobile home's collapse arose out of the use of the 1988 IH Tractor to unload the subject mobile home. Indeed the Alabama Supreme Court has previously held a trailer is still covered even after becoming detached from an insured automobile. *See Amerisure Ins. Co. v. Allstate Ins. Co.*, 582 So.2d 1100 (Ala. 1991). In *Amerisure*, the policy described coverage as extending to a "trailer, *while attached* to an insured auto." *Id.* (emphasis added). The Court found there was coverage even though the trailer became disconnected from the automobile before the trailer struck another vehicle. *Id.* This reasoning used by the Alabama Supreme Court in *Amerisure* is the exact reasoning this Court should use in making its determination as to

12

coverage. In the instant case, the negligent "occurrence…arising out of the…use, including loading and unloading" of the mobile home began long before the mobile home was disconnected from the covered tractor.[1]  Similarly, in the case at bar, the acts of negligence that lead to the collapse of the subject mobile home upon Mr. Cook occurred during the unloading process while the mobile home was still attached to the undisputed "owned automobile"-- to wit; one 1988 IH Tractor listed in the Declarations Page.

In another case wherein the "use" of a covered vehicle included unloading, the Alabama Supreme Court in *Pac. Indem. Co. v. Run-a-Ford Co.*, found coverage where a company had negligently unloaded a package. *See Pac. Indem. Co. v. Run-a-Ford Co.*, 161 So.2d 789 (Ala. 1964) dist'g on other grounds by *Paulin v. Fireman's Fund Ins. Co.*, 403 P.2d 555 (Ariz. App. 1965). In *Run-a-Ford*, the employee laid a package against the front door of the customer's home. *Id.* at 790. Some thirty minutes after the package was delivered, the customer returned home through the back door. *Id.* At some later point, they started out their front door attempting to reach their front porch when they tripped and fell over the package. *Id.* The customer, who was the eventual plaintiff in the *Run-a-Ford* action, was injured in the fall. *Id.* In their complaint, the plaintiff alleged that the package was negligently unloaded. *See Id.* at 790-791 (where "the injury was allegedly caused by the negligent placing of the parcel."). The Alabama Supreme Court said: "[i]n the case at bar, we think unloading began, when the insured lifted the parcel from the truck, and ended when insured placed the parcel in front of plaintiff's door. <u>The causative negligence charged is negligence which occurred during the unloading of the truck.</u>" *Id.* at 791 (emphasis

---

[1] Defendant would also point out that Canal is attempting to have this Court make a determination regarding coverage based on one, isolated phrase in the policy, rather than based upon the policy as a whole. Alabama case law is well settled on this point: "[A] court cannot consider the language in the policy in isolation, but must consider the policy as a whole." *Am. Resources Ins. Co. v. H & H Stephens Const. Co., Inc.*, 939 So. 2d 868, 873 (Ala. 2006) (citing *Turner v. United States Fidelity & Guar. Co.*, 440 So. 2d 1026 (Ala. 1983)).

added.)  The Court found that "because the policy covered injuries ***arising out of the***

***unloading***, the policy covered insured's liability to pay for the injury here."  *Id.* at 792

(emphasis added).

In *Run-a-Ford*, the Court examined two cases outside Alabama.  It first looked at

*Raffel v. Travelers Indem. Co.*, 141 Conn. 389 (Conn. 1954).  In *Raffel*, the insured delivered "a

roll of linoleum and left it standing upright at the door" of plaintiff's home.  *Run-a-Ford*, 161

So.2d at 792.  The linoleum later "fell on and injured plaintiff."  *Id.*  The Supreme Court of

Errors of Connecticut said:

> It is reasonable to assume that the operation of **unloading did not end until**
> the linoleum **was placed where it could be used by its purchaser**.  If the
> driver, in carrying forward this mission, was negligent in leaving it where it
> could, and did, cause injury, that negligent act was a part of the operation of
> unloading the truck and had a direct causal relation with the truck and the
> unloading operation.  Such an interpretation of the contract requires no strained
> construction and does no violence to the fair meaning of the terms used.

> *Id.*

In the other case examined by the Alabama Supreme Court, *Am. Auto. Ins. Co. v.*

*Master Bldg. Supply & Lbr. Co.*, the insured "delivered nine pieces of sheetrock and placed it

on edge in the basement of plaintiff's home."  *Am. Auto. Ins. Co. v. Master Bldg. Supply & Lbr.*

*Co.*, 179 F.Supp. 699 (D.C. Md. 1959).  "About four hours later, while plaintiff was standing

near the sheetrock, it fell on her and injured her leg."  *Id.*  The plaintiff alleged in her

complaint that the sheetrock was negligently unloaded.  *See Run-a-Ford*, 161 So.2d at 792.  In

*Am. Auto*, the "insurer contended that the automobile policy would afford no coverage

because the accident did not occur during the unloading operation, but occurred several

hours after the truck had left the scene."  *Id.*  The court, however, found that the policy

covered the sheetrock and the injured plaintiff.  *Run-a-Ford*, 161 So.2d at 792.  The Maryland

District Court stated:

[A] number of courts have noted that the words 'arising out of' are broad, general and comprehensive, effecting broad coverage. (Citations Omitted). 'Workmen's compensation cases have taught us that the words 'arising out of' have a very different meaning from the words 'in the course of' (Citations Omitted). If the draftsmen of the policy had intended to limit the coverage to accidents which occur in the course of the unloading, he could easily have done so.

*Id.*

Since the Supreme Court in *Run-a-Ford* saw fit to note the examination of a states worker's compensation law to define "arising out of", Defendant Cook submits that this Court can do the same. Should it choose to do so, the same general efficient proximate cause rule will be yielded.

Indeed, as this Court is aware, Alabama courts have long held that "arising out of" employment involves a causal relationship between the employment and the injury; that is, the job performance was the cause and source of the injury. See *Edwin Kewish v. Alabama Home Bldrs. Self Insurers Fund, supra.* at 922 (Ala. 1995). In order to satisfy the source and cause requirement, the Court of Civil Appeals in *Alabama Power Co. v. Mackey*, explained that:

> the rational mind must be able to trace the injury to a proximate cause **set in motion** by the employment and not otherwise. . . .

*Alabama Power Co. v. Mackey,* 594 So. 2d 1238, 1239 (Ala. Civ. App. 1991). (emphasis added).

Clearly, Alabama courts have long interpreted only the finding that an injury be "set in motion" by employment in order that it be concluded that an on-the-job injury "arose out of" one's employment. It cannot be disputed that Cook's injury was "set in motion" by the omissions of Bear Creek during the unloading of the subject mobile home from the 1988 IH Tractor as, *inter alia*, Bear Creek failed to ensure that the ground was stable, failed to ensure that the ground was level, failed to ensure that the subject mobile home was tied down, and failed to ensure that all piers were set in place. Bear Creek's owner and the insured in this

case testified that all these things are included in the unloading process, that the truck should not be disconnected until all these items have been accomplished, and that further, the unloading process in not complete unless these items have been completed. In other words, Cook's injuries were "set in motion" by the many failures of Bear Creek that were carried out <u>while the subject mobile home was attached</u> to and being unloaded from the 1988 IH Tractor. Throughout this case Plaintiff Canal has not even attempted, nor can it, to dispute these facts.

## III.    STANDARD INDUSTRY PRACTICES AND STANDARDS FOR POLICY INTERPRETATION LEAD TO A CONCLUSION OF COVERAGE

Since the terms "arising out of the use…including loading and unloading" are not defined in the policy itself, this Court may also look to both insurance industry practices and standards for policy interpretation and also the "ordinary meaning attributed…in everyday parlance." (Bibb Allen, Alabama Liability Handbook, Section 19-6 p422, Michie Law Publishers 1996).

To this end, Defendant Cook proffers the affidavit of Everette Lee Herndon, Jr. (attached hereto as Exhibit "A") who has worked for 25 years and an insurance claims adjuster and another 10 years as a Claims Consultant and expert witness. Mr Herndon is of the opinion that based upon his experience, training and education along with his knowledge of standards used in the insurance industry, that the facts in the underlying case are covered losses under the provisions of the subject policy of insurance. Mr. Herndon sets forth his opinions and rational in his affidavit and attachments thereto. Plaintiff Canal has not ever argued that insurance industry standards regarding the manner in which the policy is defined fails to provide coverage in this case. In fact, as this Court is already aware, Canal has refused to proffer its claims manual that governs the subject policy. In this counselor's

experience, this manual will disclose numerous factual scenarios illustrating the coverage provisions of the subject policy. (See Defendant Request to Issue Subpoena-submitted on January 28, 2008) Certainly if the annual were "helpful" to Canal in denying this claim, this manual would have already been produced.

### CONCLUSION

The issue in this declaratory judgment action involves a determination of whether the accident made the basis of the underlying action "arose out of" the "use" of an "owned automobile" when, while the insured was unloaded a mobile home from a 1988 IH Tractor, the insured failed to unload said trailer in a manner that would have prevented the mobile home from later collapsing onto Defendant Frank Cook and causing injury.

It has long been the law in Alabama that the efficient proximate cause rule is to be used in making determinations of whether an accident or injury arose out of the use and/or unloading of a covered automobile. This rule merely requires that the injury be set in motion by any proper and foreseeable use of the automobile. Moreover, insurance industry standards provide that the unloading of a covered automobile is certainly within the contemplation of "use" of an automobile as that term is used in the industry.

In the case at bar, there is no dispute by any party or witness that the 1988 IH Tractor is a covered automobile under the subject policy of insurance. Likewise there is no dispute in this case that it was the failure to unload the subject mobile home in the proper manner from the Tractor that caused the mobile home to collapse upon Mr. Cook. The unloading of both the subject mobile home and any other mobile home from Bear Creek's 1988 IH Tractor was certainly a proper, contemplated and foreseeable "use" of the Tractor. Since the underlying accident and injury was set in motion and otherwise caused by the acts and omissions of Bear Creek during the unloading of the subject mobile home from an

"owned automobile", the policy made the basis of this case does provide insurance coverage for both defense and indemnification of its insured.  Canal Insurance Company's Motion for Summary Judgment is due to be and should be denied.

**WHEREFORE, PREMISES CONSIDERED**, Defendant Frank Cook respectfully requests this Honorable Court to deny Plaintiff Canal Insurance Company's Motion for Summary Judgment.  Defendant Cook would also ask that this Court grant oral argument before its determination of the issue in this case.

<u>**ORAL ARGUMENT REQUESTED**</u>

Respectfully submitted,

/s/ Steve Couch
STEVEN WILLIAM COUCH

**<u>OF COUNSEL</u>:**
**HOLLIS & WRIGHT, P.C.**
1500 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 324-3600
(205) 324-3636 Facsimile

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have served a true and correct copy of the above and foregoing via the CM/ECF system, this the 8th day of February, 2008, which will provide notice to the following:

K. Donald Simms
David R. Wells
Miller, Hamilton, Snider & Odom, L.L.C.
500 Financial Center
505 20th Street North
Birmingham, Alabama 35203

Samuel L. Adams, Esq.
Merrill, Harrison & Adams, LLC
Post Office Box 1690
Dothan, Alabama 36302

Rufus R. Smith, Esq.
Post Office Drawer 6629
Dothan, Alabama 36302-0000

/s/ Steve W. Couch
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CANAL INSURANCE COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 1:07-CV-410-MHT |
| FRANK LADON COOK; | ) | |
| COLBERT BRIAN MCGRIFF; | ) | |
| LOWE'S HOME CENTERS, INC. | ) | |
| L.G. SOURCING, INC; | ) | |
| REDMOND HOMES, INC.; and | ) | |
| BEAR CREEK SALES, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF EVERETTE LEE HERNDON, JR.

1.    My name is Everette Lee Herndon, Jr. I am over 19 years of age and have qualifications as outlined in my CV attached hereto. (Exhibit A)

2.    My experience in the insurance industry includes 25 years as an claims adjuster and claims supervisor plus 10 years as a Claims Consultant and Expert Witness. I am licensed as an Adjuster in California and as an Attorney (Inactive) in California. I have testified in deposition over 80 times and in trial 13 times, including both state and Federal courts.

3.    I have reviewed the documents provided to me concerning the facts of the case, the Basic Automobile Liability Policy issued by Canal Insurance Company to Colbert Bryan McGriff dba Bear Creek Movers and various pleadings in the various Motions for Summary Judgment and those in Opposition to the various Motions for Summary Judgment . I am qualified by education, training, experience, and personal knowledge to attest to the opinions and facts contained in this Affidavit.

4.    It is my professional opinion that in accord with the standards of the insurance industry and the terms of the policy the accident in question in this lawsuit is covered under the Basic Automobile Liability Policy issued by Canal Insurance Company to Colbert Bryan McGriff

1

dba Bear Creek Movers.

5. Canal Insurance Company issued a Basic Automobile Liability Policy to Colbert Bryan McGriff dba Bear Creek Movers for the business of MOBILE HOME PULLERS - MOBILE HOMES. This policy provided coverage for a 1998 IH TRACTOR and ANY MOBILE HOME WHILE SINGULARLY ATTACHED TO A SCHEDULED TRACTOR. The policy provided a Combined Single Limit of $1,000,00.00 for Coverage A - Bodily Injury. The policy stated:

> "The company will pay . . .*bodily injury* . . . to which this insurance applies, caused by an *occurrence* and arising out of the ownership, maintenance or use, including loading and unloading . . .and the company shall have the right and duty to defend any suit against the *insured* . . . "

6. All parties concur that the scheduled vehicle, a 1998 IH Tractor, hauled the mobile home in question to the site in question, disconnected the mobile home from the tractor and that the tractor left the area before the mobile home was properly and completely set-up for occupancy. Frank Ladon Cook was injured before completion of the *"unloading"* process of the mobile home, a day or two after the tractor left the area.

7. Colbert Bryan McGriff, the owner and operator of Bear Creek Movers, testified in deposition that he was in the business of transporting mobile homes to the site selected by the purchaser of the mobile home. Mr. McGriff also testified that delivery duties included inspecting the site, making sure water would not run under the mobile home, and that the ground was hard enough to back up on. Delivery responsibilities included set up of the piers to support the mobile home and tie down of the mobile home to those piers as all being part of the unloading process. Unloading was not finished until the mobile home had the piers set up with the tie downs completed and holding the mobile home stable. According to Mr. McGriff it was only at that point one would disconnect the tractor from the mobile home. Then the unloading process would be complete.

8. Ray G. Helmer provided an Affidavit as an expert in the delivery, set-up and unloading of mobile homes. Mr. Helmer attested to various actions or failures by Bear Creek Sales (Movers) that resulted in the accident. These included:

     A.    Unloading unit at site not inspected prior to unloading  
     B.    Failure to ensure unloading site was stable prior to unloading  
     C.    Failure to ensure employee/agent certified in mobile home set-up was present to oversee delivery, unloading, and set-up process  
     D.    Failure to ensure the unloading site was properly compacted prior to unloading  
     E.    Failure to ensure site was level prior to unloading unit  
     F.    Failure to ensure that the tractor used to deliver the unit stayed connected to the unit during unloading and set-up to provide adequate stability

2

Mr. Helmer attested that the accident resulted from (i.e. arose out of) the various actions or failures of Bear Creek during the unloading process associated with this the mobile home.

9.    According to the testimony of Mr. McGriff and Mr. Helmer, the two individuals most knowledgeable about the process, a mobile home is not considered unloaded until the mobile home is properly situated on an acceptable site, with piers set up and the unit is properly tied down to the piers and stable and ready for occupancy. Both Mr. McGriff and Mr. Helmer testified to the effect that the unloading process was not complete until the mobile home was properly secured to piers and stable, which should be done prior to unhooking the unit from the tractor. According to insurance industry claims handling and coverage standards, the accident is considered to have arisen from the act or process of "*unloading*" the mobile home, or in this case the negligent and incomplete act or process of "*unloading*" the mobile home. The accident is considered to be "*arising out of*" the "*unloading*" in that there is a causal relationship between the negligent act of "*unloading*" and the accident itself.

10.    The Basic Automobile Liability Policy issued by Canal Insurance Company states that "*The company will pay . . .bodily injury . . . arising out of the ownership, maintenance or use, including loading and unloading . . .*" The Canal Insurance Company policy does not define the terms "*arising out of*" or "*unloading.*"

11.    Webster's New Collegiate Dictionary, 1977 edition, defines "*unload*" as *to take off, deliver, to perform the act of unloading.*

12.    I researched The Fire, Casualty & Surety (FC&S) Bulletins, which are widely accepted in the insurance industry as a basic reference source for the interpretation of insurance policies in claims handling situations. In an article entitled "***Loading and Unloading an Insured Vehicle***" the FC&S states:

> "*As for when the unloading stops, that has to be a matter of judgment. There is no definition in the auto policy to help, so a common sense, rational approach has to be taken.*" (Exhibit B)

13.    Another FC&S article discusses delivery of a couch where the employees placed the couch on the floor to reposition it for carrying it to a final resting place and caused damage to the floor.

> "***Loading or Unloading Coverage Dispute:*** . . . *Since the couch was not at the place where it was to be finally delivered, the property damage claim should be handled by the auto policy.*" (Exhibit C)

14.    Another FC&S article discusses delivery of an item at the final destination.

> "***Business Auto or CGL for Loading and Unloading:*** *In general, the business auto policy covers "loading and unloading" from the time the article being transported is accepted until it is delivered to its final destination. . . . .However, if the men still were in the act of delivering it, the business auto policy should*

3

*apply.*"  (Exhibit D)

15.  The insurance industry standard is to interpret coverage liberally in favor of the insured and to interpret exclusions narrowly.  If the terminology in a policy is undefined it is to be given a common sense and rational interpretation.  If the language of a policy is ambiguous it is to be interpreted in favor of the insured.

16.  The 1998 IH Tractor was an insured vehicle.  The tractor hauled the unit to the site. Unloading of the unit was not completed until the unit was set up and stabilized and finally delivered as being ready for occupancy.  Unloading of the unit from the tractor was not completed at the time of the accident.  The accident is considered to be *"arising out of"* the *"unloading"* of the unit in that the unit was improperly and negligently in the process of being unloaded and *"unloading"* was not complete in accord with the testimony of Mr. Helmer, an expert in these matters.  The insured, thru his agents, was still in the act of delivering the mobile home when the accident occurred.  The accident arose out of the *"unloading"* of the unit.

17.  In accord with standard English usage of the word *"unloading"* and the insurance industry interpretation of *"unloading"* as discussed in the FC&S Bulletins, coverage exists under the Business Auto policy for the injuries suffered by Mr. Cook.

18.  My opinion is not offered as a legal opinion but as the opinion of an insurance industry expert familiar with insurance industry standards in claims handling and policy interpretations concerning claims handling.

19.  Defendant's Supplemental Brief in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment cites a number of legal cases that are consistent with and support the insurance industry claims handling procedures and policy interpretation standards listed above.  The Pac. Indem. Co v Run-a-Ford Co case involved a package negligently laid against a front door with an individual tripping over the package some 30 minutes later.  In the case of Raffel v Travelers Indem. Co, a role of linoleum was left standing upright at a door and later fell on and injured a plaintiff.  In the case of Am. Auto. Ins. Co. v Master Bldg. Supply & Lbr. Co., some sheetrock was delivered and placed on edge and four hours later fell and injured a plaintiff.  In these cases coverage was found to exist under the business automobile policy.

20.  These three cases are consistent with the insurance industry interpretation that this accident arose out of and during the process of *"unloading."*  The term *"unloading"* is to be considered and defined broadly and liberally to find coverage for the insured and protection for the insured against claims arising out of the *"unloading"* process.  It is not necessary that the scheduled and insured vehicle (the 1998 IH Tractor in this case) be physically connected to the mobile home during the entire *"unloading"* process or even that the insured vehicle be present at the time of the accident.

4

21.    It is my professional opinion that in accord with the standards of the insurance industry the accident in question in this lawsuit is covered under the Basic Automobile Liability Policy issued by Canal Insurance Company to Colbert Bryan McGriff dba Bear Creek Movers.

22.    This opinion is based on the information provided and reviewed and is limited to the question of policy coverage concerning the accident.  Should there be additional discovery or new information provided which would bring new or additional information to my attention, I reserve the right to revise my opinion.

23.    I have personal knowledge of the facts to which I attest.  My opinions set forth in this Affidavit are based upon my professional education, training, experience, review of provided relevant discovery undertaken tin this case, and my review of relevant and widely accepted insurance industry literature.  I prepared this Affidavit in its entirety and further attest that it is true and correct.


_____
Everette Lee Herndon, Jr.

SWORN TO AND SUBSCRIBED before me this 5th day of February 2008.


_____
Notary Public


Commission expires  12/1/11



5

# EXHIBIT A

# EVERETTE LEE HERNDON, JR.
## Claims Consultant & Expert Witness

7147 Murieta Parkway
Rancho Murieta, CA 95683-9543
Http://www.leeherndon.com

Phone:  916-354-8521
Fax:      916-354-2564
E-mail:  herndon@ranchomurieta.org

**January 1998 to date  -  Everette Lee Herndon, Jr.**
### Claims Consultant & Expert Witness

Claims Consultant & Expert Witness. Insurance Bad Faith. Insurance claims handling, custom and practice. Claims handler E&O.  Claims handler malpractice.  Insurance industry standards. State and Federal Court. Property, Liability, Automobile and Workers Compensation. Over 37 years experience in claims handling issues, coverage issues, claims management and litigation management. Trained and supervised adjusters. High standards of integrity and professionalism.

**June 1996 to July 1997             Contra Costa County Grand Jury**
### Grand Juror

Responsible for investigation of reports of malfeasance and misfeasance of governmental entities within the county.  Conducted investigations and wrote reports.

**April 1970 to September 1995       GAB Robins North America, Inc.**
### Regional Supervisor

Responsible for the supervision, coordination and review of adjusters, claims, claims files and claims programs for numerous insurance companies, corporate and public entity accounts - liability, property, automobile and workers compensation.  Trained adjusters in claims handling and industry standards.  Directed defense counsel.  Handled high exposure claims:  e.g. complex litigation, coverage issues, E&O, construction defect, products liability, employment and environmental pollution.  Reported directly to Regional Vice President.

**June 1966 to June 1994             United States Air Force, Reserves**
### Intelligence Officer

Retired - Lieutenant Colonel, Air Intelligence Agency, Reserves.  Intelligence analyst. Briefed command staff.  Briefed and debriefed combat crews.  Imagery interpretation officer.  Executive Officer,  Director of Operations and Training, IRD-20.

**Everette Lee Herndon, Jr.**

Positions with GAB (partial list): Qualified Manager, Regional Supervisor, Regional Casualty Supervisor, Regional Casualty General Adjuster, Manager of Contract Administration Center, and multi-line adjuster.

Activities while with GAB:

- In 25 years with GAB Robins North America, Inc., I adjusted or personally supervised over 30,000 files: property, liability, automobile and worker's compensation.

- Held GAB's California Independent Adjuster License and served as GAB's Qualified Manager for four years.

- Worked on or supervised claims for over 100 different insurance companies.

- Dealt with claims and litigation in all 50 states.

- Organized, trained and supervised GAB's first Worker's Compensation unit in California.  Self-insured Worker's Compensation Administrator.

- Developed and wrote GAB's  "A Guide to California Claims Handling Under Title 10" - California's Fair Claims Settlement Practices regulations.

- Conducted training seminars for adjusters to insure compliance with state regulations, good claims handling practices, good faith and avoidance of bad faith.

- Performed branch inspections and file audits.

- Devised, initiated and recommended  standards and procedures to adjusters and branch managers for improving the quality and accuracy of their investigations and reporting procedures.

- Resolved many delicate and complicated coverage interpretation issues between insureds, insurance companies and brokers over the interpretations of both standard and manuscript policies.

- Founding member of Integrated Quality Team for Pacific Region.  Trained adjusters on Total Quality Management methods.

- Set up and supervised new liability unit and obtained assignment from insurance company of over 1700 litigated cases from another third party administrator. Trained examiners and supervisors.

### Everette Lee Herndon, Jr.

**CREDENTIALS:**
- Attorney - Member of State Bar of California - # 96464  (1980) (Inactive)
- Insurance Adjuster License - # 2C02651
- Certified Forensic Consultant
- Senior Claim Law Associate
- Property Claim Law Associate
- Automobile Claim Law Associate
- Fraud Claim Law Associate
- Worker's Compensation Claim Law Associate
- Legal Principles Claim Specialist
- Associate in Claims
- Certificate to teach Law at Community College level in California
- Graduate Certificate in Teaching Critical Thinking


**PUBLICATIONS:**
- "*The Mold Exclusion,*" *Claims*, September 2007
- "*After The Mold Exclusion.*" *Mealey's Litigation Report* - Mold, July 2007
- "*Bad Faith in First Party Property Claims,*" *The Advocate*, September 2004
- "*Do Adjusters Have a Duty to Warn of the Risks of Mold Contamination?*" *Mealey's Litigation Report: Mold*, October 2001
- "*Are Mold Claims Covered Under a Homeowner's Policy?*" Mealey's Mold Conference, June 26, 2001
- "*Mold & Mildew: A Creeping Catastrophe,*" *Claims*, August 2000
- "*Water Damage Claims and Mold,*" *IAQ COUNCIL*, July/August 2000
- "*Protect Yourself From Mold Liability,*" *Cleaning & Restoration*, Nov. 2000
- "*Asbestos Awareness Training: Protecting Both Adjusters and Insureds,*" *Claims*, December 1998
- "*A Guide to California Claims Handling Under Title 10,*" GAB, January 1994


**SPEAKER:**
- Mealey's Mold Conference, June 2001, Marina del Rey, CA - "*In-Depth Analysis of the Insurance Coverage Issues In Mold Litigation*"
- Mealey's Mold Conference, October 2001, Pasadena, CA - "*Insurance Coverage and Bad Faith*"
- Mealey's Mold Conference, February 2002, Phoenix, AZ - "*Insurance Coverage Issues Part I: First Party Claims*"
- Policyholders of America, March 2002, Austin, TX - Insurance, Mold and Bad Faith
- Harris-Martin Mold Conference, October 2002, San Antonio, TX - "*Analysis of a Mold Case: Interactive Panel Discussion*"
- American College of Toxicology, November 2004, Palm Springs, CA - "*The Great Debate: Indoor Mold - Plague or Nuisance?*"

**Everette Lee Herndon, Jr.**

## PROFESSIONAL ASSOCIATIONS:

- State Bar of California - # 96464  (1980) (Inactive)
- Forensic Expert Witness Association
- American College of Forensic Examiners Institute
- Society of Claim Law Associates

## EDUCATION:

**GAB Robins North America, Inc:**
- Damages School
- Remedies School
- Advanced Casualty School
- Vale Tech, Automobile School
- Intermediate Casualty School
- Basic Property and Casualty School
- Casualty Correspondence Course
- Property Correspondence Course

**San Francisco State University:**
- Master of Arts - Philosophy.  1997
- Graduate Certificate in Teaching Critical Thinking

**John F. Kennedy University - School of Law:**
- Juris Doctor.  1980.

**University of Georgia:**
- Bachelor of Arts - Philosophy.  1966.

December 1, 2007                        4

Everette Lee Herndon, Jr.


**Conferences and Seminars (partial listing - 1999 thru 2007):**
- Low, Ball & Lynch - CA Fair Claims Settlement Practices - November 2007
- Claims Conference of Northern California, September 2007
- Ropers, Majeski, Kahn & Bentley - Year in Review - May 2007
- ACFEI Regional Conference - July 18/19, 2006
- FEWA Expert Witness Summit - March 31/April 1, 2006
- Low, Ball & Lynch - CA Fair Claims Settlement Practices - November 2005
- Sacramento Claims Association - Update on California Law, November 2005
- Ropers, Majeski, Kahn & Bentley - Year in Review - May 2005
- Low, Ball & Lynch - CA Fair Claims Settlement Practices - November 2004
- American College of Toxicology Conference - November 2004
- Claims Conference of Northern California, September 2004
- Ropers, Majeski, Kahn & Bentley - Year in Review - May 2004
- Low, Ball & Lynch - California Law Update - November 2003
- ACE-SCLA Conference - Seattle, WA, October 2003
- Claims Conference of Northern California, September 2003
- Ropers, Majeski, Kahn & Bentley - Year in Review - May 2003
- Harris-Martin's Mold Litigation Conference, San Antonio, TX, October 2002
- Claims Conference of Northern California, September, 2002
- Ropers, Majeski, Kahn & Bentley - Year in Review - May 2002
- Property Loss Research Bureau Claims Conference - Anaheim, CA, April 2002
- Policyholders of America - Attorney Workshop, Austin, TX - March 2003
- Mealey's National Mold Litigation Conference, Phoenix, AZ, February 2002
- Property Claims Forum - Summer Mold Seminar - June 2001
- Low, Ball & Lynch - California Law Update - November 2001
- Mealey's National Mold Litigation Conference, Pasadena, CA, October 2001
- Mealey's National Mold Conference, Marina del Rey, CA, June 2001
- Ropers, Majeski, Kahn & Bentley - Year in Review - May 2001
- Claims Conference of Northern California, September 2000
- Ropers, Majeski Kahn & Bentley - Year in Review - May 2000
- Low, Ball & Lynch - California Law Update - April 2000
- Ropers, Majeski, Kahn & Bentley - Third Party Bad Faith - October 1999
- Ropers, Majeski, Kahn & Bentley - Year in Review - April 1999
- PLRB/LIRB Claims Conference - New Orleans, LA, March 1999

# EXHIBIT B



**Current document:**
The FC&S Bulletins/Q&A VOLUME/Business Auto/Loading and
Unloading an Insured Vehicle

# Loading and Unloading
# an Insured Vehicle

**Q**

I have a question regarding the loading and unloading of an insured vehicle under the business auto policy. If our insured is at a job site and is unloading a ladder from his truck and the ladder falls, damaging an object, does the BAP apply to the damage?

Also, at what point would the ladder be considered to be not in the act of unloading? I considered the analogy of delivering an item to its final destination, but this is not an item being delivered. If the ladder was placed on the ground after unloading, and then picked up again to move to the worksite, has the act of placing the ladder on the ground ended the unloading?

**New Jersey Subscriber**



**A**

The business auto policy does not actually discuss loading and unloading like the CGL form. But, there is an exclusion on the BAP pertaining to bodily injury or property damage resulting from the movement of property. Of course, this exclusion applies only when the injury or damage results from the movement of property by a mechanical device, unless the device is attached to the covered auto. Since in this case, the damage resulted from the moving of property by hand, this exclusion does not apply and the damage is covered by the auto policy.

As for when the unloading stops, that has to be a matter of judgment. There is no definition in the auto policy to help, so a common sense, rational approach has to be taken. In this instance, since there is no intention of delivering the ladder anywhere and it is just being taken off the truck for work purposes, we are of the opinion that once the ladder leaves the truck, that is when the unloading stops. After the insured has placed the ladder on the ground with the intention of picking it up again to use in his work, the act of unloading has already ended.

# EXHIBIT C



**Current document:**
The FC&S Bulletins/Q&A VOLUME/Commercial Property/Loading
or Unloading Coverage Dispute

# Loading or Unloading Coverage Dispute



The question we have is in regard to which policy covers the following loss. The insured is a furniture delivery company. While delivering a couch, the employees placed the couch on the floor to reposition it for carrying it to the final resting spot. The couch leg snagged the carpet and damaged it. Is this damage covered under the commercial auto policy or the general liability policy?

**Kentucky Subscriber**

**A**

Since the couch was not at the place where it was to be finally delivered, the property damage claim should be handled by the auto policy. The loading or unloading exclusion on the general liability form applies to property damage due to the handling of property while the property is being moved from an auto to the place where it is finally delivered. The handling of property exclusion on the auto policy applies to property damage resulting from the handling of property after the property is moved from the covered auto to the place where it is finally delivered by the insured. The two exclusions on the two policies complement each other in this way so as to give the insured liability coverage for property damage he causes while delivering or moving or handling property, both while the property is in the loading or unloading phase and while it is in the auto itself.

# EXHIBIT D



**Current document:**
The FC&S Bulletins/Q&A VOLUME/Business Auto/Business Auto
or CGL Coverage for Loading and Unloading?

# Business Auto or CGL Coverage for Loading and Unloading?

**Q**

Should the business auto or the CGL policy respond to a situation in which a fireplace, being delivered to the buyer's home scratches a floor? One of our clients sells fireplaces, and a floor was scratched during delivery of a fireplace unit. We turned the claim in to the auto carrier, but the adjuster denied it and said the CGL insurer should handle it. The men who delivered the fireplace also installed it. Which coverage should apply?

**Ohio Subscriber**



**A**

In general, the business auto policy covers "loading and unloading" from the time the article being transported is accepted until it is delivered to its final destination. The commercial general liability policy generally handles third party damages caused prior to acceptance and after delivery.

Therefore, you should determine the point at which the floor was scratched. The fact that the same individuals who delivered the fireplace installed it may make it more difficult to determine whether the delivery had been completed or not when the damage occurred. If the fireplace was in place in the home and installation had been started, the CGL should respond. However, if the men still were in the act of delivering it, the business auto policy should apply.